UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE FERNANDO L. AENLLE-ROCHA, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,           )
                                    )
                  Plaintiff,        )
                                    )
     v.                             )   Case No. CR 23-149 FLA
                                    )
DAEKUN CHO,                         )
                                    )
                  Defendant.        )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
MOTIONS HEARING
FRIDAY, MARCH 1, 2024
10:37 A.M.
LOS ANGELES, CALIFORNIA

_____

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    E. MARTIN ESTRADA
    United States Attorney
    BY:  JENA A. MACCABE
    BY:  KEVIN J. BUTLER
         Assistant United States Attorneys
    312 North Spring Street
    Los Angeles, California  90012

**FOR THE DEFENDANT:**

    WERKSMAN, JACKSON & QUINN, LLP
    BY:  MARK WERKSMAN
    BY:  KAREN M. SOSA
         Attorneys at Law
    888 West Sixth Street, Fourth Floor
    Los Angeles, California  90017

UNITED STATES DISTRICT COURT

FRIDAY, MARCH 1, 2024; 10:37 A.M.

LOS ANGELES, CALIFORNIA

-oOo-

THE COURTROOM DEPUTY:  Calling LA CR 23-00149, United States of America versus Daekun Cho.

Counsel, please make your appearances, beginning with the Government.

MS. MACCABE:  Good morning, Your Honor. Jena MacCabe on behalf of the United States.

MR. WERKSMAN:  Good morning, Your Honor. Mark Werksman and Karen Sosa on behalf of Mr. Cho who is present in custody.

THE COURT:  All right.  Good morning to everyone.

We are here today for the final pretrial conference on this case, which is set to begin jury trial on March the 19th.  I'm going to assume that the lawyers will let me know if I'm wrong, that the parties have exhausted all efforts to settle, and that this is definitely going to trial on the 19th of March.  Is that true?

Yes, Your Honor.

MR. WERKSMAN:  Yes, Your Honor.  We expect that to be the case.

THE COURT:  All right.  Very well.

My trials -- if you haven't tried a case here, my trials typically will start on Tuesday and run through Thursday

the first week.  I have calendar, as you know, today, on Friday.  So if the trial hasn't ended by Thursday, then we'll continue on Monday.

My typical trial hours are 8:15 in the morning to 2:30 in the afternoon with a couple of brief breaks in between.

And I try to make sure that we have a jury selected on the first day.  So if that requires us to stay past 2:30, then I will.  And we typically can't start by 8:15 in the morning because we have to wait for the panel to be assembled downstairs and brought up to this courtroom.

So parties -- obviously, it's difficult to know in advance how long it will take to have a jury selected.  If it goes faster than expected, then, of course, I would want to -- the trial to commence.  So the parties should be prepared to present opening statements and the Government to proceed with witnesses.

On the other hand, if jury selection is going into the afternoon, it's not uncommon for me to recess for the day and I will start with the presentation of evidence and opening statements, of course, the following morning.

All right.  So those are my typical -- typical hours, absent something unusual happening on a particular day.

There are a number of motions in limine that have been filed in this case.  So I think we should turn to those so that I can give the parties' rulings so you can prepare

accordingly in advance of trial.

So why don't we start with the defendant's -- we'll call it MIL Number 1, which is to exclude -- I'll call it gang-related evidence.  So defense's motion, I'm happy to take argument.

MS. MACCABE:  Your Honor, may I bring up one housekeeping matter before we start?

THE COURT:  Sure.

MS. MACCABE:  Well, this might be it.

The Government just received a Superseding Indictment in this case.  We made defense counsel aware of that.  It's with respect to the victims with the initials K.Y.J. and Y.K.  That is why my trial partner, Kevin Butler, is not here yet.

We've spoken about it.  I'm happy to address this further with the Court once we get to that point, but I wanted to just make the Court aware of that now.

THE COURT:  All right.  So that will -- I presume that that would affect at least one motion in limine; right?

MS. MACCABE:  That's correct, Your Honor, at least a portion of that motion.

The other acts that we've discussed related to the beating and the shooting and other things that I'll address with the Court later are not affected by the Superseding Indictment.  It's just with respect to extortion of those two

named victims in the Government's briefing.

THE COURT:  Has the defense been provided with a copy of the First Superseding Indictment?

MR. WERKSMAN:  No, Your Honor.  I was informed yesterday that the Government would obtain the Superseding Indictment.  I'm told that if the text that the prosecutor just got is the one she was waiting for, she would now be able to give us a copy.

I will inform Your Honor, she -- Ms. MacCabe did represent to me that the charges would involve these two new additional alleged victims, K.Y.J. and Y.K., about whom we've received discovery.  We're aware of the basic elements of the accusations involving those two victims.  And we're awaiting the actual Indictment itself.

Is it -- you can give it to us now?

MS. MACCABE:  Yes.  If the Court would allow me to approach defense counsel, hand it over.

THE COURT:  Yes, you may.

Has the Indictment been returned before a magistrate judge or not yet?

MS. MACCABE:  Not yet, Your Honor.  I just got the notification that there was a true bill.

THE COURT:  Okay.

MS. MACCABE:  I also have a copy for the Court, if the Court would like one.

THE COURT:  Sure.

MS. MACCABE:  May I approach?

THE COURT:  Yes.

MS. MACCABE:  Thank you.

And those new charges would be on pages 6 and 7 of the Superseding Indictment.  All the other charges remain the same.

THE COURT:  So Counts 1 through 34 are unaltered?

MS. MACCABE:  Counts 1 through 30 -- oh.  I understand the Court's question.

They're unaltered.  However, Counts 33 and 34 are renumbered such that they appear now as Counts 56 and 57.  The new extortion counts precede those now in numbering only.

THE COURT:  Okay.  So it used to be a 34-count Indictment.  Yes?

MS. MACCABE:  Yes.

THE COURT:  It is now a 57-count Indictment.

MS. MACCABE:  Yes.

THE COURT:  Okay.  Well, where does this leave us?

MS. MACCABE:  My conversations with defense counsel is that this does not change the trajectory of the trial date.  However, it will change argument with respect to the Government's motions to admit uncharged acts for inextricably intertwined and for 404(b) because those portions that address these two victims are not charged acts.

**UNITED STATES DISTRICT COURT**

THE COURT:  Is there any remaining uncharged conduct that the Government seeks to use?

MS. MACCABE:  Yes, Your Honor.  That would be the beating of D.E. and the karaoke bar worker in September of 2022 and then also the shooting at the car with one of the karaoke drivers in July of 2022 as well as defendant's arrest and the surrounding circumstances of what was found at his home.  Otherwise -- otherwise, this is now all charged conduct.

Oh, and the -- I apologize, Your Honor.  Also the text messages that the defendant sent to other unnamed victims who -- the text messages of which were found on his Motorola.

THE COURT:  Mr. Werksman.

MR. WERKSMAN:  Your Honor, as I mentioned, we learned yesterday from Ms. MacCabe that the Government would seek the Superseding Indictment.  We take seriously our obligation to be effective counsel, to be prepared for trial, and to do what's in our client's best interest.

We discussed the matter with Mr. Cho.  And at this point, we do feel prepared to go forward with trial, notwithstanding the existence of the new pleading, because the allegations are about conduct we've already been made aware of and we've already received the discovery on.

The fact that these two new victims are now named victims as opposed to possible 404(b) or inextricably intertwined witnesses does slightly change the character, I

mean, dramatically increases our client's liability for charged acts. But at the same time, we do feel that we are prepared to go forward with trial on the March 19th date, and our client does not want us to seek a continuance.

Unless the Court feels for whatever reason that this matter ought to be continued or delayed so that either the Court or for whatever reason the Court believes that this case should not proceed in two weeks with the existence of a Superseding Indictment, we will defer to Your Honor.

However, our position right now is that, we will argue in a moment if we proceed with this hearing, that there's absolutely no need for uncharged acts at this point. We now have gone from three charged victims to five charged victims. And instead of having four uncharged victims, we now only have two that are now completely irrelevant, cumulative, and unduly prejudicial. We'll argue that.

But assuming that the character of the case hasn't changed because we already got the discovery relating to the allegations against these two new victims and the essential allegations -- we knew that there was -- it was possible that the Court would allow these witnesses to testify as uncharged acts. We do feel that we can capably and effectively proceed with trial on March 19th.

THE COURT: All right. I'm prepared to try the case. I have a heavy month, just so you know. But I'm

scheduled to begin a criminal trial next week and then I have a civil trial the following week.  But they're all expected to be about one-week trials so, you know, we should be able to get to your case on or near the 19th as scheduled.

So it sounds as if the evidence, number of witnesses and whatnot is probably not affected by the Superseding Indictment.

MS. MACCABE:  That's correct, Your Honor.  The Government's estimates remain the same.

THE COURT:  Okay.

MR. WERKSMAN:  In a funny way, Your Honor, if I may -- and I don't want to anticipate the argument.  We've been saying to the Government all along, if you really think he did these things, charge him.  Don't just try to bring in witnesses of uncharged acts to try to bloody up the defendant in front of a jury and prejudice him.  And they took us up on it.

THE COURT:  In part.

MR. WERKSMAN:  In part.

So, you know, now we -- you know, we can see the whites of their eyes.

Having said that, Your Honor, I do believe -- again, maybe this is -- I'm getting ahead of myself, but this really ought to be it.  And, you know, we're ready for trial, assuming we've just had to deal with these five.  And I'll submit to Your Honor on whatever else needs to be determined here today.

THE COURT: All right. Would you like to proceed with arraignment?

MR. WERKSMAN: Yes, if the Court's willing to and avoid the inconvenience of having another appearance, absolutely.

MS. MACCABE: The Government would really appreciate that, Your Honor.

THE COURT: Sure.

All right. Do you need a few minutes with your client to show him the First Superseding Indictment and --

MR. WERKSMAN: Well, I'd like --

THE COURT: -- and have him enter a plea?

MR. WERKSMAN: I'd like to be able to have him at least read these pages, Your Honor. Can we have about --

THE COURT: Absolutely.

MR. WERKSMAN: Just a moment.

THE COURT: I'll give you whatever time you need.

MR. WERKSMAN: Five minutes?

THE COURT: Whatever you need. You just let my courtroom deputy know when you're ready, then we'll come out and take care of the --

MR. WERKSMAN: Thank you, Your Honor.

THE COURT: You're welcome.

THE COURTROOM DEPUTY: All rise. We're in recess. You may be seated.

(Break taken.)

THE COURT:  All right.  We're back on the record.

I believe we have additional Government counsel.  If you wouldn't mind making your appearance.

MR. BUTLER:  Correct, Your Honor.  Kevin Butler also on behalf of the United States.  Apologies for the delay.  I think the Court knows where I was.

THE COURT:  All right.  Defendant and counsel ready to proceed with the arraignment?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  If I could have Mr. Cho and counsel at the lectern, please.

All right.  Mr. Cho, the grand jury has returned a First Superseding Indictment consisting of 57 counts and two forfeiture allegations.  Have you had an opportunity to review it?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And do you waive reading of the First Superseding Indictment and your Statement of Rights?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  How do you plead, sir, then, to Counts 1 through 57 in the First Superseding Indictment?  Guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE COURT:  And do you admit or deny the two

forfeiture allegations in the First Superseding Indictment?

THE DEFENDANT:  Deny it.

THE COURT:  All right.  The defendant's plea and denial of all counts is ordered entered into the record.

MR. WERKSMAN:  Thank you, Your Honor.

THE COURT:  You're welcome.

And, Mr. Cho, since I just have you there, you heard your attorney earlier announce to the Court that he and co-counsel are ready to proceed with your trial on the First Superseding Indictment.  As you -- as we all heard this morning, this Indictment has just been returned by the grand jury this morning.

So is it, in fact, your desire to move forward with your trial as currently scheduled on the 19th of March?  Do you wish to go to trial on the 19th of March?

THE DEFENDANT:  I wish to go to trial.

THE COURT:  You do.

THE DEFENDANT:  Yes.

THE COURT:  All right.  Very well.

All right.  Thank you.  You may have a seat.

All right.  Well, let's proceed, then, with what remains of the motions in limine.  And then we'll turn to the other components of trial for purposes of today's hearing.  I imagine the Government still seeks to introduce evidence concerning Mr. Cho's alleged affiliation with the Grape Street

Crips.  Is that right?

MS. MACCABE:  Yes, we do, Your Honor.

THE COURT:  All right.  Well, the defense has moved to exclude it.  So let me give counsel an opportunity to be heard on the defendant's motion.

MS. SOSA:  Thank you, Your Honor.

I won't repeat everything that's already been said in the motion, but I think the filings since defendant's motion to exclude the Grape Street Crips evidence just further proves our point.  They now have 57 counts and five victims.  They have years' worth of financial statements, text messages, testimony from people who have known Mr. Cho for years.

The only connection that possibly makes Grape Street Crips relevant in this case is that one person, Y.S., says Mr. Cho claimed affiliation with Grape Street Crips.  And the -- and Y.S. also says "and I saw him hanging out with black guys."

And when the Government writes that Y.S. -- according to Y.S., defendant appeared to be using Grape Street Crip members as his muscle to help him collect extortion payments, that's what that actually boils down to, is that I saw Mr. Cho hanging out with black guys.

That -- to go from that to bringing in not only evidence essentially trying to prove the truth of whether or not Mr. Cho was in Grape Street Crips but also to bring in an

expert to testify not about Mr. Cho's involvement with Grape Street Crips but what about Grape Street Crips does. They conduct the, uh, protection fees, they wear purple, they show these gang hand signs, they commit all kinds of violent offenses.

That is such a reach from the actual tenuous connection to this case that the Court should reject the Government's request to introduce this evidence.  It is extremely prejudicial, of course, as the Court knows and as the Government knows.  And given the limited probative value to what's actually charged in this case, it cannot -- the prejudice is absolutely undue.  It's overwhelming compared to the limited relevance or probative value to the charged acts in this case.

If the Court has any questions beyond what I've already articulated in the motion, I'd be happy to respond to them.  But as I said, I just think that we're even -- we're even -- we have even more evidence coming in before the jury, none of it to do with Grape Street Crips.  The 404(b) motion had all kinds of additional acts, none of it to do with Grape Street Crips.  They even said in their motion that he was acting as a -- I can't remember whose motion said it first but that they in their 404(b) motion essentially said the same thing, that he was doing this on his own.

There's just -- to bring in evidence of -- of a

Crips criminal street gang is not supported by the evidence that's going to be relevant before the jury.

THE COURT:  All right.  Thank you, Ms. Sosa.

All right.  Let me hear from the Government.

MS. MACCABE:  Thank you, Your Honor.

With respect to this evidence, the cases that the Government cited throughout its opposition are numerous, that reputation of being involved with organized crime, even if it doesn't turn out to be true but that the defendant doesn't dispute that, is relevant to the victims' fear in paying the defendant.  And the Government has the obligation to prove that the defendant used actual or threatened force, violence, or fear in all of these extortion counts.

And adding additional victims with additional extortion counts does nothing to limit the probative value of this evidence or any of the other evidence we're going to be discussing today because, again, the Government has to prove those elements for each and every single one of those extortion counts.

So given the number of cases that the defendant has not distinguished, let alone addressed today or in their motion, this evidence should come in.

It's also relevant under 404(b) for all the reasons that the Government discussed in its opposition.  And, here, the defendant was intimidating all of these victims for

numerous reasons, as we'll get into.

But with respect to Grape Street Crips specifically, as you can see from his social media post that we included in our opposition, as well as from the statements that will come from Y.S. and possibly from other victims once the Government has asked them about this specifically, the defendant was intimidating them by claiming to be affiliated with Grape Street Crips.

And to the extent that he did not do so with the other victims directly, still that reputation should come in.

And with respect to the expert, the expert can explain what these social media posts were indicating and how the defendant was portraying himself.

Also, as the Ninth Circuit has held, experts are able to testify about seemingly innocuous behavior that's actually criminal. And to the extent that the defense at trial is going to be he was just being paid to protect these victims, the expert should be able to explain what protection fee rackets are and how they're used to get victims to comply and pay.

With respect to 403, the prejudice has to be unfair, which it's not in this case given that the defendant is representing himself to be so affiliated with Grape Street Crips. And in addition, it has to substantially outweigh the probative value.

And as the cases explain in the Government's opposition, the probative value is incredibly high in extortion cases specifically because the victims are paying out of fear.

And to the extent that the Court is concerned about unfair prejudice, a limiting instruction would be sufficient in this case to explain to the jury that they are only to determine -- only to consider that evidence for the limited purpose.

And for all of those reasons, the Government would ask that the Court allow the victims to testify about their understanding as to his reputation.

THE COURT:  And remind me, as of now, have you submitted a proposed limiting instruction as to this area or not yet?

MS. MACCABE:  Your Honor, may I check the jury instructions?

THE COURT:  Yes.

MS. MACCABE:  Thank you.

(Pause in the proceedings.)

MS. MACCABE:  Yes, Your Honor.  We have proposed it. We have not specifically identified Grape Street Crips in the instruction, but we are happy to do so.  But we have proposed to the Court along with defense counsel's buy-in that other crimes, wrongs, or acts of the defendant are not -- are only to be considered for a limited purpose.

THE COURT:  Obviously this would be expert testimony.  Right?  So it would be in the context of an expert witness testifying.

MS. MACCABE:  We also submitted the expert witness jury instruction for the Court as well.

THE COURT:  All right.  But -- so when you say a limiting instruction, what do you have in mind?  What would -- what would I be telling the jury with respect to its consideration of this evidence?

MS. MACCABE:  The Government would propose the traditional limiting instruction under 404(b).  I know that the Ninth Circuit offers some alternatives where you can specifically lay out the other acts.  And so the Government would be happy to specifically identify it as well.  But so far, the parties have agreed and proposed to the Court to the general limiting instruction, in the Model Jury Instructions.

THE COURT:  How long do you think -- obviously this is a fairly narrow area of testimony and evidence.  As defense counsel stated, it relates to a single -- I guess to the expected, the proffered testimony of a single witness concerning representations made by the defendant.

The expert, a police officer, who has, you know, training, experience, whatnot, with respect to this particular gang, how long do you expect he would be testifying to, given sort of the fairly limited scope of the evidence?

MS. MACCABE:  The Government conservatively estimated 45 minutes, but we have not yet run through his witness prep and I imagine it could be much shorter.  The defense informed us that the cross-examination would be about 30 minutes.

THE COURT:  Okay.  Well, just as I think this through, right, the case isn't about the Grape Street Crips gang, right, and its conduct in the community?

MS. MACCABE:  Correct, Your Honor.

THE COURT:  So you're offering it to provide context, right, to explain the importance of the statement and the impact of the statement by the defendant on the victim, right, and why it matters, why it's not a meaningless statement.  Right?

MS. MACCABE:  Yes, Your Honor.

THE COURT:  So if I were to allow it, I think some careful thought should be given to how to tailor the testimony so as to not turn this into a trial about the Crips street -- Grape Street Crips; right?

MS. MACCABE:  Absolutely, Your Honor.

THE COURT:  Okay.  All right.  Anything else from the defense?

MS. SOSA:  Your Honor, just to that -- just to that point, if the Court were to allow this evidence for the effect on Y.S., then what's relevant is what -- what that means to

Y.S.  When he says I'm in the Grape Street Crips, what does that mean to you, Y.S.?  Why did that scare you, if it scared you?  Officer Rice's testimony about what Grape Street Crips does and Jordan Downs and they do this, that --

THE REPORTER:  Counsel, can you please slow down.

MS. SOSA:  I'm sorry.

They're in Jordan Downs and they do this, that, and the other really isn't relevant to what the Court was just talking about, letting it in for the effect on Y.S.

So I would still argue that Officer Rice should not be permitted, period, and that it would only be for Y.S. to say what that meant to him.

THE COURT:  I will rule in a moment.  But I -- it seems to me that -- I presume Y.S. will be testifying before any expert testimony.  So it would be helpful to me to hear Y.S.'s testimony and what he has to say about the statements that the defendant made to him and their impact on him.

So I will conditionally admit this testimony, but I want to hear the victim's testimony so that I can then make a final decision as to sort of the ultimate utility and value of the -- of the testimony.

As I -- I know the parties are fluent with respect to the facts.  But for purposes of the record -- I mean, the Government is telling me that a witness is going to testify that the defendant essentially held himself out as having ties

to a criminal street gang.  And the Government also is telling me in its motion or in its opposition to the motion that it will be seeking to move into evidence social media posts depicting the defendant while he's in the act of, I guess, engaging in or making references to signs and colors that are affiliated with this gang in particular.

So assuming that the evidence at trial is consistent with the proffer, I do believe that there is a sufficient showing that's being -- that has been made concerning the defendant's claimed involvement with this particular gang and the value of some expert testimony as to this -- this topic.

I think the evidence is relevant under 402 because it does tend to prove a material element of the extortion charges, you know, namely, as the prosecutor stated, that the defendant allegedly obtained property from victims through the use of actual or threatened force and violence and fear and the testimony would give a jury context to help it understand the meaning and effect of the statement or statements on at least one victim.

It appears as if the witness will be qualified under Rule 702 to speak to this topic because of his specialized knowledge, training, experience concerning this particular criminal street gang.

But as I said, I don't want this turning into a trial about the criminal street gang because it's -- it is

relevant, clearly, but that's not what this trial is about. But I do think that, as I -- in my gatekeeping role with respect to 702 evidence, that there is sufficient relevance and value and assistance that the testimony will give to a jury to help it both interpret and assess the meaning and the impact of the defendant's social media posts and his professed ties to the -- to the gang.

With respect to 403, it does turn -- the key language as quoted by the prosecutor is correct. I don't believe the probative value is substantially outweighed by the prejudicial effect. And it has to be outweighed by the danger of unfair prejudice along with the other factors that are set out in Rule 403, including confusion, misleading the jury, unnecessary delay, waste of time, or the needless presentation of cumulative evidence.

So, again, I think the evidence is probative. And it will be presented through a single law enforcement witness. It will be limited to a single street gang. It will be limited to the claims the defendant is making with respect to the gang and, you know, any social media posts and the relevance of those social media posts and the content of the social media posts, right, to the extent that they purport to affiliate him with a gang, again, through his own words.

So with that said, I will allow it. I'll deny the motion, and I will also wait to hear the evidence.

So let's turn to the Government's motions, which have been impacted by the return of the First Superseding Indictment.  And these are two motions that are -- that are related.  They relate to the same evidence.  The Government is just advancing two different theories as to the admissibility of the evidence as both inextricably intertwined with the charged conduct and as other crimes, wrongs and acts, under 404(b).

So let me turn to the Government.

MR. BUTLER:  Thank you, Your Honor.  As the Court just noted -- I'll just briefly apologize to the Court and defense counsel to the degree any of this -- these motions are mooted by the First Superseding Indictment.

As the Court can imagine, willingness to testify in an extortion case is always at issue.  And we did not present to the grand jury until we had such assurances, which can only be obtained post detention and that original Indictment.

I think what remains in both of these motions are the alleged shooting, the assault of Victim D.E., which is on camera, the defendant's corroborative texts which sometimes are extorting other drivers or other victims but also include bragging about assaulting D.E., which is the -- the other act I just talked about.  And the defendant's possession of weapons, ammunition, and attempted flight during the arrest.

I don't want to repeat everything that's in both of

these motions.  But in terms of inextricably intertwined, there is ample case law that goes to the same elements that we were talking about on the Grape Street Crips motion, which is that the defendant's reputation here is extremely important and that is extremely relevant and probative, as the Government has to prove why the charged victims continued to pay the defendant.

I don't think that there will be any real dispute that Venmo payments and cash payments were given to the victims who are going to testify.  We have the records.  And I don't think there will be dispute over that.  So the real question is as to why.

And although the victims will be testifying about their fear, not all of them were physically assaulted, not all of them have a text that is corroborative of a threat and, instead, are doing so based on the reputation that the defendant purposely cultivated within this community, which included a shooting, which included an assault of D.E. that, again, is on camera.  He then goes on to assault a worker at that karaoke bar in the same instance.

One of the new victims in the First Superseding Indictment, Y.K., was there, saw the assault of the worker that is on camera, and then continued to pay the Venmo extortionate fees post assault.

As we put in our inextricably intertwined motion, none of these payments are occurring in a vacuum.  They all are

based on a fear that is based on a reputation that is based on assaults, shootings, threats, and bragging about all of those same things.

Since we have to prove an element, there's also a need to provide a coherent story as to why these victims are paying and we have corroborative texts that not only show the assault but really the elements we have to prove.

As we put in our motion, there are texts to nonvictims that -- noncharged victims in this case that really set forth the real elements that will be at issue at this trial, which is the defendant telling someone do you want to pay or get beat up?  Those are your options.  Or another series of texts, either pay a penalty, get banned, or I come see you.

These are directly what is going to be at issue at trial, which is why these payments were made.  And the defendant's texts and his acts that he talks about in those texts, the shooting, the assault, the other extortions, go directly to those elements.

I can move on to 404(b), which we think is also an equal alternative for admissibility.

THE COURT:  Go ahead.

MR. BUTLER:  All those same acts, the shooting, the assault of D.E., the corroborative texts, the flight, and the evidence found at defendant's house all go to all of the elements that are necessary -- or requirements under 404(b).

They go to a material point which is planning, preparation, intent, identity.

Just to point out one thing, the assault of D.E. and the assault of the karaoke worker is a much clearer video of the defendant. And I think we're going to have someone testify, Y.S. testify that the defendant beat him with a baseball bat and took his car.

That is on video, but it's a much more obscured video. And it will go -- it will be based solely on Y.S.'s identification of the defendant in that.

So I think one of the main issues at trial will be whether or not Y.S. is mistaken in his identification, seeing a very similar act which is the accosting, assaulting, battery of not only a karaoke worker but another karaoke driver, D.E., on camera at a similar karaoke location goes to that very identity, that identification, and also goes to the general points of planning, preparation, intent, which is the defendant cultivating this reputation which allows him to extort his victims and allows to show that it was not by some accident or mistake that he wasn't offering legitimate protection fees and being paid because the -- the victims were scared of the defendant by some sort of mistaken reputation but that it's a deliberate, intentional, purposeful, and accurate represent- -- or reputation, for assault, for retribution.

The acts are similar across the board. They all go

to the same modus operandi.  The texts are corroborative of the same exact scheme -- again, pay or get beat up.  The assault of D.E. is exactly the same as the assault -- assault of Y.S.  And the shooting is just further evidence of the violent lengths that the defendant is willing to go to to control which drivers are allowed to go to which karaoke bars.

All of these acts are contemporaneous.  There are some instances in which a witness could testify about earlier conduct.  But almost all of the acts that we put forth here, whether that's text or video or testimony, are from the exact same time period as the scheme that's charged in the original Indictment, in the First Superseding Indictment.

As to proof, the shooting is on camera.  You can't see the actual shooting take place, but a witness will say that the defendant was the person in the video who you can see accosting a driver who then drives away and there is a shot that's fired directly after that.  And the weight of that will be for the jury to determine.  But the actual evidence that he was present at the shooting and that similar ammunition was found at his house without a corresponding firearm is sufficient proof to that shooting.

As to the D.E. assault, the proof, again, is clear on camera with multiple witnesses being able to identify the defendant in the video.

And the texts and the ammo and everything found at

his house, as well as the flight from the house, that's the defendant's conduct, witnessed by law enforcement.  And the texts themselves are from the defendant's phone.  I don't think there's really any dispute over that.

What only is left, then, is a 403 balancing.  And as the Court just went through, these are all prejudicial, to be sure, but there is no unfair prejudice that would follow from these -- the admission of these other acts.  They are no more inflammatory than the furtherance of the scheme that we will present as part of proving the First Superseding Indictment.  And because the conduct is both similar and contemporaneous, there is no unfair prejudice, only prejudice that goes from the defendant's actions.

THE COURT:  All right.  Thank you, Mr. Butler.

For the defense.

MR. WERKSMAN:  Thank you, Your Honor.

Your Honor, as the Court knows -- by the way, this is my first appearance in front of Your Honor in the United States District Court.  I'd be remiss if I didn't say it's nice to see Your Honor.

THE COURT:  It is noted.  Thank you.

MR. WERKSMAN:  We used to sit over there.  Now we sit here.

Your Honor, the problem, as the Court knows, with introducing uncharged conduct is that, when the jury reaches a

guilty verdict, if they do, we're not going to be able to know whether they reached a guilty verdict because they were persuaded by evidence about the charged conduct or if they were persuaded by the evidence about the uncharged conduct.

And, here, the Government is shedding crocodile tears when they say that, you know, we can't advance our narrative, we can't tell our story if we don't have every single piece of evidence we've derived from this case introduced as evidence one way or another.

They have five charged victims. And the timeline is instructive here because it puts -- it puts to -- to allay the allegation that they need the uncharged conduct to prove their case. The timeline. I'm going to list the five charged victims and when the alleged extortion occurred with those five victims. And this is important.

J.S. allegedly was extorted starting around November of the year 2020. J.L. allegedly extorted beginning around January 2021. S.S. allegedly extorted starting in December of 2020. K.Y.J., who's now charged, used to be a 404(b) until this morning, allegedly extorted in December of 2020. And Y.K., until an hour ago uncharged, now charged, allegedly extorted in March of 2022.

So the charged conduct in this case in the new Superseding Indictment runs from around late 2020 to early 2022. But that's not enough for the prosecutors. They want to

mess up their record, overreach, and add two now uncharged victims, J.K. and D.E.

J.K. was allegedly shot at in July of 2022, four months after the last alleged extortion in the Indictment.  And by the way, J.K. allegedly shot at, a victim, isn't going to even be testifying, according to what we've been told by the Government.  They're going to try to prove up the shooting with a guy named R.  We're going to be crazy with -- with initials in this case, and it's going to be very hard to keep track.

But R. is going to testify that he's a manager of a karaoke club and he saw cars coming and going, heard shots fired.  Nobody actually saw Mr. Cho shoot at Y.K. but -- I'm sorry, at J.K., but the Government's going to try to prove that a shot was fired that caused an injury to a passenger in a vehicle being driven by J.K. in July of 2022, four months after the last alleged extortion scheme against a charged victim began in the Indictment.

Then there's D.E. who allegedly was punched in the face at the Soop Sok Karaoke club.  And that allegedly occurred in September of '22.  So that's six months after the last extortion against a charged victim began, and that would be Y.K.

So what the jury's going to be told is there are five alleged victims in the Indictment who were all extorted during this time frame.  But then in order to make sure you

jurors understand that these victims who were charged victims were really afraid, were subject to the elements of the offense, and that they were victimized by that man, they're going to add two subsequent extortions that occurred after time in which the charged victims were extorted.

It's unnecessary.  It's -- it's extraneous, it's cumulative, it's unduly prejudicial, and it's irrelevant.

Now, I know, Your Honor, on the fringes the Government can point to a fact here or a fact there that might underscore or buttress some allegation or some piece of evidence in the charged conduct in the Indictment.  But that little hook shouldn't be enough to bring in a whole new body of alleged crimes that will absolutely unduly prejudice this jury.

It's always a problem when you bring in uncharged acts, that the jury -- we don't know what's going to cause the jurors to go over the top if they reach a conclusion that proof has been given beyond a reasonable doubt, which is why uncharged acts should be used sparingly and they should be used only when necessary.

If they only had one or two charged acts of extortion, I can understand why they could sincerely tell the Court, hey, we need all this other stuff so that the jury can get the picture.  But here, Your Honor, this is -- this is the picture of -- including the five charged victims is so vivid, it's so rich in detail, it's such an intricate tapestry as it

is that, for them to stand there with a straight face and say we need two more uncharged victims or the jury won't understand what extortion is, is pure folly.  And I will submit on that, Your Honor.

With regard to -- we can address separately the other stuff, guns in the house, talk about it now or later.

THE COURT:  No.  Now is fine.  I think it's all part of the -- it's wrapped into these two motions.

MR. WERKSMAN:  Okay.  There are a couple of really scurrilous allegations that the Government wants to get in.  And I say "scurrilous," not to be pejorative, maybe that's not the right word, but inflammatory.  The first is that he tried to jump out the window when the police came and had a, quote/unquote, "standoff" with the police.  That's in the pleadings, Your Honor.

We would ask the Court to exclude evidence that the defendant tried to flee through a window or that there was a standoff.  According to the police reports and my reading of them, it took exactly eight minutes for the police to enter the house when they banged on his -- Mr. Cho's door at 4:00 in the morning.

The guy's asleep.  He's awakened from a slumber at 4:00 in the morning with police banging on the door.  We live in a dangerous and chaotic world.  He's stunned.  There was some delay.  But an eight-minute delay -- to allow the

jurors *[sic]* to argue to the jury and to present evidence that there was a standoff and that he showed consciousness of guilt by trying to flee through the bathroom window, I think, is a -- is a bridge too far to allow the prosecutors to travel in trying to prejudice this defendant.

I don't know that there's really evidence that he tried to get out the window, but they're going to claim that. And I think that kind of evidence, Your Honor, is way too prejudicial because it does go to consciousness of guilt. And given the amount of provable evidence that go to the elements of the offense, again, I think it's insincere for the Government to say they need to show there was an 8-minute standoff to convince the jury that he knew that he was guilty of the myriad of other things that are alleged in the case and that they will attempt to prove.

Then there's the introduction of evidence that the Government seeks of this arsenal that Mr. Cho had. And I call it an arsenal because it is an arsenal. He had a bunch of weapons in his home. And this is the kind of stuff, Your Honor, that is absolutely unduly prejudicial of a defendant.

There's no evidence that any firearm that was recovered from his apartment was used in any of these offenses. They -- there's no forensic evidence that any of these evidence -- weapons were used. And to allow the jury to hear

evidence of his possession of firearms would be irrelevant and it would be unduly prejudicial.  On that basis, I would ask the Court to exclude it.

I think I've covered everything.  Is there anything else, Your Honor, that you'd like the defense to address that the Court's considering?

THE COURT:  I don't think so.  If you want to distinguish between 404(b) and this theory of inextricable intertwinement, you're welcome to.  Obviously I've read the papers.  But I raise that only in the event that you would like to address it.  Otherwise, I don't think -- I don't think there are any other facts that you haven't addressed.

MR. WERKSMAN:  No, I think I've addressed it.  The most important really -- with regard to the inextricability is the fact that, because these instances occurred afterwards in time of the charged conduct, there's no way that they're inextricably bound with the charged conduct.  They happened subsequent in time to what he's accused of doing.  How could something that someone does eight, ten months later be inextricably intertwined with the conduct that he's alleged to have committed previously?

And then the 404(b) context, of course, goes to a common plan or scheme.  You can't have a common plan or scheme that is different in time from what's alleged in the Indictment.

UNITED STATES DISTRICT COURT

And the uncharged conduct -- I'll leave it at that, Your Honor, I think I made my argument.  I won't repeat myself.

Thank you.

THE COURT:  All right.  Thank you.

Mr. Butler.

MR. BUTLER:  Just a few points, Your Honor.  I don't think the Government has any --

THE COURT:  Can you address the timing issue?

MR. BUTLER:  Yes.  That would -- I agree with most of what defense counsel said on the timing and the dates that those extortions began.  However, Y.K. and S.S. both paid through March of 2023.  And although this is a continuing scheme, the Government -- each count is an extortion count and the Government is tasked with charging and proving each count by itself.

There are people, victims who certainly stopped paying the defendant.  The jury may ask why didn't the others stop paying him.

Now, we will hear evidence that some of the victims either left the business and/or the state to flee from the defendant's conduct.  But they are going to be questioned, was this a legitimate fear?  Why was there continued payment, particularly if there wasn't some sort of violent assault that was enacted against them.  And these acts that are in July 2022 and March 2022 are going to be long before the -- the alleged

payments from Y.K. and S.S. stopped.

Again, these are long after the shooting and the assault that are both inextricably intertwined and relevant as 404(b).  We've got to show the fear through that date in March of 2023.

As to the number of counts, again, each one must be proved by itself.  And Rule 404(b), as the Court is well aware, is one of inclusion.

As to the flight evidence, I think that's always -- almost always a -- admissible as consciousness of guilt.  The testimony will be that he appeared to leave the window, there will be a witness who will testify to that.  And the jury can weigh that as they want.

But there was also a loaded firearm found in that same place.  But more importantly, the cell phone that had almost all of the inculpatory text messages, extortions, the ones I went through when I was first at the lectern were found in that same room underneath a bathroom sink behind many different items.  All of this is part of that same consciousness of guilt and flight evidence that will be presented to the jury intertwined with each other.

The arsenal that defense counsel just mentioned goes not only to a reputation for violence but also a willingness to act on it.  I think the *Gilley* case is a Ninth Circuit case that we cited in our brief that shows a willingness to act on

it.

Also, to the degree the Court is going to allow the shooting, evidence of the shooting to come in, the ammunition found there that did not correspond with any of the firearms found at the location was the same caliber and type that would have been used for that shooting.

THE COURT:  Meaning ammunition that fit a revolver.

MR. BUTLER:  Correct, Your Honor.  And as we put in our papers, there was no shell casing found at the scene.  And all the other types of ammunition found at the defendant's house corresponded at least in some way to the firearms found there.

All of this is also referenced in his text in one way or another, some more explicitly.  The assault of D.E. is referenced very explicitly in the text that he was at Forest or Soop Sok in that he assaulted someone at the location, which, again, is on video.  This all goes from the same phone which was found in the same location that he tried to flee from.

And then there are other corroborative texts of the shooting as well as the texts talk about damaging someone's car with you in it, which is exactly what happened with the shooting.

And I think that all of the victims are going to testify as to the fact that they knew about these incidents and that they were part of the reason why they continued to pay

long after those incidents occurred and through March of 2023.

THE COURT:  All right.  Thank you.

As I stated, these are two different motions in limine that the Government has brought involving the same evidence.  With respect to the first motion in limine, the Government seeks to admit the evidence on the theory that the evidence of other crimes, wrongs, or acts, that that evidence is part of the same transactions that are charged in the -- now in the First Superseding Indictment or that they're necessary for the Government to offer a coherent and comprehensible story regarding the charged offenses.

I agree with the defense with respect to this theory.  I think these acts are distinct from the acts in the charged counts and that I don't think they really expound on the charged counts.  So I don't -- I will not be admitting them under the theory of inextricable intertwinement.  However, they are quintessential evidence of other crimes, wrongs, or acts that are admissible under Rule 404(b).  As counsel said, 404(b) is a rule of inclusion.

The Ninth Circuit has been quite explicit in adopting a four-part test that District Courts are to consider and apply when evaluating the admissibility of evidence under Rule 404(b).  That's in the *Iverson* decision from 1998.

So let me address each of those factors with respect to this additional evidence.  So in my view, this -- the

evidence of other acts, crimes, and wrongs, the evidence does prove material issues in the case.  The alleged shooting, assault, and the possession of firearms by the defendant, all that evidence is probative of the defendant's -- not just modus operandi but motive, opportunity, intent, knowledge, plan, identity, and lack of accident and mistake with respect to the charged offenses.

The fact that the defendant is alleged to have bragged about his other acts of violence to others does tend to prove that the charged offenses were not the product of mistake or accident and helps disprove a claim that the defendant was collecting payments for some other reason, a lawful reason.

Evidence of the shooting, assault, and possession of firearms also helps prove the defendant had the intent and the opportunity to follow through on the violent threats as well as his knowledge that he was not charging, quote, "protection fees" to protect the victims from others but was, instead, demanding payment and compliance with his orders based on fear of retribution by the defendant himself.

As to the second prong, the -- the other crimes, wrongs, or acts are similar to the charged offenses.  The assault of a karaoke driver and the shooting at a car occupied by another karaoke driver is sufficiently similar to the carjacking that's charged in the Indictment, which alleges that the defendant took a victim's car by means of force and

violence and caused serious bodily injury.

With respect to the third factor, the other crimes, wrongs, and acts are not remote in time.  Nearly all of these acts occurred contemporaneously with the charged offenses, and they helped advance the charged acts of extortion.  The uncharged shooting and assault happened in July and September of 2022.  And as the prosecutor just stated, the acts that are covered by the Indictment cover a period of at least 2020 through 2023.

With respect to the fourth prong, I believe there is sufficient evidence from what has been proffered to me in the motions.

As to the other crimes, wrongs, or acts, the Government has proffered that it intends to introduce witness testimony as to each act, that many of the acts were captured on closed-circuit TV and that the defendant's text messages corroborate commission of these acts along with witness testimony.

With respect to the shooting, I believe there's sufficient both direct and circumstantial evidence tying the defendant to the act.  The defendant, of course, will be free to challenge the sufficiency of that evidence and cast doubt on the Government's claim that the defendant was the shooter.

With respect to the 403 balancing, the probative value of the evidence, in my view, is significant.  It's

substantial. It's not substantially outweighed by the danger, again, of unfair prejudice and the other factors set out in 403, including confusion, misleading the jury, undue delay, waste of time, or the needless presentation of cumulative evidence.

The evidence is not more inflammatory than the evidence of the charged offenses. The shooting and the assault are in proportion with the offense of carjacking that's charged in the Indictment. And I will give the jury a limiting instruction as to how the evidence is to be used to eliminate the risk of any of the dangers that are set forth in Rule 403.

There's a third motion in limine that the Government has filed to exclude evidence, argument, examination of witnesses about human trafficking. I've not seen an opposition. I hope I didn't miss it, but I didn't see an opposition.

MR. WERKSMAN: May I address that, Your Honor?

THE COURT: Yes.

MR. WERKSMAN: Okay. Your Honor, I didn't file an opposition because I think it's premature.

Let me state this. The prosecution, I think, in their papers they acknowledge that they did the motion prophylactically because of something I said on the phone to them when I chided them for being concerned about victims who are -- might be trafficking young women.

And I just want to give this context and ask the Court to keep an open mind.  And, of course, I'm not going to expect to turn this case into a case about human trafficking or prostitution.  But we have to be realistic about what the evidence is in this case.

This is a case about drivers who put ads in Craigslist to get young women to agree to wear scantily clothes -- scantily clad outfits and go to nightclubs between 10:00 p.m. and 3:00 a.m. to drink heavily with middle-aged businessmen in these karaoke clubs.

There's vice.  And there's drugs, alcohol, and sex goes on in these arrangements.  And, again, this case is not about pimping and prostitution.  I don't intend to make it that.  I know the Court wouldn't want me to.  And I told the prosecutors that I wouldn't.

The motion, though, I think seeks to put a straightjacket on any discussion about the vice that goes on.  And, in short, the defense is that these drivers are in a gray area involving vice.  They know that these women that they bring to the clubs sometimes bring drugs, they're sex workers, and there's, of course, alcohol consumption, which is how these clubs make their money, they do bottle service.  They have liquor licenses that are very valuable.

And so there's an extreme sensitivity by the clubs and the drivers about illegal activity going on with the doumi,

d-u-o-m-i *[sic]*, the escorts, the hostesses that are brought to these clubs.

So the drivers, they don't fear Mr. Cho.  They fear each other.  There's intense competition to provide hostesses to the different clubs.  And they fear the police because the drivers themselves are, in this many cases, illegally in this country.  They shouldn't be working.  They're working for cash.  And they are trafficking in a gray area where there is a lot of vice.  And the clubs have the same fear.

So in short, Your Honor, the defense is basically that Mr. Cho had a voluntary association of drivers who paid him to oversee the regular order of this business, dispatch drivers to different clubs with different girls at different times and avoid infighting and to prevent outside street gangs and criminal elements from infecting this industry, which is reliant on keeping liquor licenses and keeping their patrons safe.

So in the course of the presentation of evidence by both sides and in cross-examining witnesses, I think inevitably there will be some discussion about the fear of allowing vice to occur -- vice of any kind -- drugs, sex, violating liquor law license -- liquor law license regulations.  And I want to be free to explore that, Your Honor.

And I would not want the Court to reach any conclusions based upon the Government's motion that would cause

**UNITED STATES DISTRICT COURT**

the Court to prophylactically order the defense not to mention any of the vices that go on in the course of the conduct that we're going to hear about during the trial.

In short and in conclusion, I'm telling the Court I know what this case is about.  It's not about sex trafficking or prostitution or pimping.  But I think it's heavy-handed of the Government to try to seek an advance to foreclose any cross-examination or discussion of the fact that these drivers are in a gray area.

These scantily clad women who are servicing businessmen until 3:00 in the morning are -- create risks with law enforcement.  And I think we need to be able to go into that without fear that in advance I'm violating some Court order by merely suggesting that there's something untoward about the business activities that are going on in the backdrop of this alleged extortion scheme.

That's what I have to say about it, Your Honor.

THE COURT:  I imagine that the Government's concern, of course, is, you know, how far it's going to go.  Right?  So I understand how there's a need to give the jury context as to some kind of explanation as to the nature of this business, how it operates, the individual roles played by different people.

But on the other hand -- and to the Government's point -- you know, relevance may be stretched a bit thin when you're -- if you're essentially trying to tarnish -- right?  At

the end of the day, you know, evidence is admissible -- this is essentially character evidence.  Right?  So what makes it admissible?  Well, you've got 404, 608, 609.

So how does this -- if it doesn't squarely fit within those rules, then how do you get it in and how much are you going to get in because there seems to be -- if it's not a straightjacket, it seems like there should be at least some limits on where this is going to go in the examination of these victims, which I presume is where it would come out.

MR. WERKSMAN:  Your Honor, this is the problem with prophylactic motions.  And I occasionally encounter this with prosecutors who want to micromanage in advance what the defense can say and do.

Your Honor, I have no evidence and I don't seek to proffer that there's prostitution of any particular kind or with any particular driver in any particular instance.  May I suggest, Your Honor -- we're all aware of the issue.  I will proceed with extreme caution.  And I will seek either a sidebar if I think I'm going to go into an area that I know the Court or the prosecution would object to.  But, of course, if a cross-examination strays into an area where either side thinks it's irrelevant, we can raise an objection.

But I'm telling Your Honor right now -- and I told the prosecutors this -- I'm not going to talk about prostitutes and trafficking.  But we don't know what these drivers are

going to say.  And in the cross-examination, what they may reveal about their fears and concerns on the street, which is why they engaged with Mr. Cho in the first place -- so I'm just asking the Court to keep an open mind.  I have no intention of going into an area the Government is prophylactically seeking to prevent me from going into.

But I have to say, though, that we need some flexibility in cross-examination with regard to this -- the gray area conduct because the very reason why these drivers would pay Mr. Cho and not go to the police is because they understand that they're in a gray area.

And ironically, Your Honor, while the prosecutors want to sanitize the role of these drivers and foreclose any suggestion that they're doing anything untoward, we know that if my client's convicted at sentencing, they're going to ask for a vulnerable victim enhancement because these poor drivers were pimps and they were afraid to go to the police because they'd be getting into trouble.

So in short, Your Honor, I'm not going there in the -- in the trial with regard to human trafficking or prostitution.  But I think we need to see where the evidence goes and allow some latitude of cross-examination with regard to the vices and the gray area that these drivers find themselves in.

THE COURT:  All right.  Thank you.

Let me give the Government an opportunity to be heard.

MS. MACCABE:  Your Honor, as we noted in our motion, we're happy to wait to see how the evidence comes in for the Court to more carefully consider this issue.  But just note that this -- once this door has been opened, it cannot be closed.

I will represent to the Court that we don't have any intention of discussing these doumis through the victim testimony.  Frankly, whether they were driving typical customers of these karaoke bars or doumis to and from these karaoke bars doesn't matter.  The defendant was still extorting them.

And to just counter what defense counsel said, the defendant was being paid because the victims were afraid of him beating them up, as we've discussed at length in all of our briefing.  It was not that they were paying him because they were transporting these doumis.

And I think that's very clear through what the evidence that the Government has.  And, frankly, if we're not getting into the issue of doumis, I don't understand how this would be coming up at all.  But I just want the Court to be fully aware and briefed, as the Court mentioned.  Those are the rules that apply, and this information really should not be introduced.

THE COURT:  And would you mind, for those of us who perhaps are less informed, the term doumi, what -- who exactly falls under the scope of that term?

MS. MACCABE:  Yes, Your Honor.  My understanding through this investigation and through the affidavits that were submitted with the Complaint and search warrant, these doumis are women who -- customers at the karaoke bars pay to party with them, to drink with them, or to sing along with them.

They're, essentially, entertainers.  And so these drivers are taking them to karaoke bars where customers will presumably pay them, and the drivers are making a fraction of that money for being their transportation.

This is all happening after hours.  And I think that there is much that the defense can get into about after hours operations generally and serving alcohol after hours and how a typical citizen might not know to go to these karaoke bars after hours.

But the issue of what these women were doing is completely irrelevant.  We have not alleged that the defendant was extorting these doumis, we're not alleging that he is doing anything with respect to them.  Even with the shooting, he shot at the doumi driver's car, happened to shoot a doumi, but we weren't planning on bringing her in or getting into any of this.  It's just with respect to these drivers who are just driving to and from karaoke bars after hours.

And so with that, it's completely irrelevant to get into whether or not there was prostitution going on, highly prejudicial.  And I won't belabor the point that we made in our motion, but it really should not come up without the Court weighing in on it first.

THE COURT:  The drivers, do they exclusively transport doumis or do they also drive others?

MS. MACCABE:  My understanding is that they drive doumis.  However, in some of the defendant's text messages, he's asking some of these victims who he's extorting to drive him.

So I don't know -- again, we're not planning on asking our victims, Who were you driving?  We're just planning on having them explain that they're driving people to and from karaoke bars and that's where they encountered the defendant.

THE COURT:  All right.  Okay.  I am -- what I'm going to do is I am -- I am going to order that there be no reference made to -- to this topic without Court authorization.  All right?  So you're not to just mention it in opening statement, in argument, in examination of witnesses without a sidebar and a ruling by the -- by the Court.

As I -- as I mentioned earlier, this is a form of character evidence.  And you're essentially potentially trying to just tarnish the character of a witness.  Well, there are certain ways to do that under the Federal Rules of Evidence.

You're all highly experienced lawyers, you know what those rules are, but among them are 404, 608 and 609.

There may be other reasons why evidence like this could be admissible.  But I don't have context right now.  We're not in the middle of trial.  I'm not hearing testimony just yet.  So I could see a situation in which Mr. Werksman or his co-counsel may have a question that touches in this area that may be relevant where the door could have been opened or otherwise fits into the examination.

But, otherwise, if it doesn't, I will be excluding it because, again, its -- its probative value is -- it doesn't sound as if it's particularly strong or compelling, but that will be driven by other evidence in the context of other evidence.

So I will do as you've asked, Mr. Werksman, I will keep an open mind.  And I will also take you up on your offer to have a sidebar or a conference outside the jury's presence to rule on any examination before the topic comes up.

MR. WERKSMAN:  Can I seek some clarification, Your Honor?  Because the Court -- the Court has said that it won't allow discussion of this topic, the topic broadly expanded during Ms. MacCabe's argument.  Because I did not know until I heard her argument that she is not even going to let the jury know who the passengers are of these drivers.

Your Honor, this is all about drivers taking doumi,

hostesses, to the bars.  They're not Uber Eats drivers who are bringing food, passengers.  This is all about bringing hostesses.  You will see videos, you, Your Honor, will see videos, as will the jury, of what these girls are like when they're going in the club.  This is all about female hostesses for male patrons.  People can draw their own conclusions and they'll -- it's inescapable that this is an industry devoted to driving hostesses, female hostesses for the benefit of male patrons at after-hour nightclubs.

Now, the reason -- so what I'd like to clarify with the Court is, when the Court says we can't discuss the topic, I think it's only fair that we be able to explore the topic of the very nature of the business that these drivers are in.

And here's just one example of relevance.  There will be text messages -- I know the Court will see in the course of the trial, they'll be introduced by the prosecution -- in which Mr. Cho is allegedly telling drivers there are three clubs you can't go to.  There's three clubs that are now off limits.

And I think the witnesses will acknowledge that one of the reasons that these clubs are off limits was because there was a concern that some of the doumi were bringing drugs to those clubs or were involved in prostitution at these clubs. And nobody wants the heat of law enforcement in this little industry, the karaoke business, when the doumi are bringing

illegal vices into the clubs.

So, Your Honor, I -- I will absolutely not go into any area that's incendiary with regard to sex trafficking, prostitution without seeking the Court's order.  Of course, I'll observe any Court order the Court gives.

But I think to say that it's off limits to even query as to a driver -- so who are your clients?  Who are these people you're transporting to the clubs?  Why -- what is your function?  What business are you in?  And why would you not go to certain clubs?  Why would there be an agreement among certain drivers not to patronize certain clubs?  That's all fair game, Your Honor, without necessarily going into sex trafficking.

But I think the Court's tentative is overbroad in a way that I didn't anticipate, that the prosecution was going to sort of pretend that these are just like Uber drivers, they're just out there taking things to the clubs and ignore the whole nature of the industry that they're in.  That's just putting on blinders.  It's -- it defies reality.

THE COURT:  All right.  Would you like to be heard, Ms. MacCabe?

MS. MACCABE:  Yes.

My question for defense counsel would be how those questions about them driving doumis would be relevant except for laying the groundwork for him to then insinuate that these

UNITED STATES DISTRICT COURT

drivers were supporting prostitution or trafficking these women.

Again, as extensively briefed here, there's just no evidence of that.  And so insinuation of it through asking these types of questions feels rather inappropriate.  It's not relevant to the charges in this case.  And my brain cannot find a reason for why we would even be going into these questions except for laying the groundwork to open the door for them to then ask about human trafficking in the industry.

Again, the fact that they are driving people to and from karaoke bars after hours, I think, is sufficient enough for defense counsel to establish the context that this defendant encountered these victims in this after-hours situation.  But who was in the car has no relevance to the charges in this case.

And the fact that certain karaoke bars were banned or drivers were banned has to do with their nonpayment to the defendant.  That's very clear throughout his text messages.  I think we've made that point in all of our briefing for today.

If a karaoke bar didn't pay him -- I mean, K.Y.J. is one of the extorted victims who managed a karaoke bar.  If karaoke bars don't pay him, he doesn't want drivers bringing people there.  If a driver didn't pay him, he doesn't want them being able to drive people to karaoke bars.

It has to do with victims not complying with his

extortion demands rather than this sideshow of what I expect will happen in this trial, which is laying the groundwork for human trafficking argument.

THE COURT:  There will be videos that show some of these young ladies getting out of cars, around cars that are being driven by victims?

MS. MACCABE:  We have produced such videos. However, the carjacking actually happens after all of the women are inside of the karaoke bar.  So it's not -- it's not a piece of the actual carjacking, what happens.  The defendant and his accomplice come through afterwards.

I'm happy -- I have videos that we're planning to introduce at trial.  I'm happy to provide the Court with a copy after this or I'm happy to play them in court now.

But clipping the videos so that we can keep this trial short for the jury and move through everything quickly, there's no women in those shots that would relate directly to the defendant's conduct other than what we've all discussed today, which is the drivers happen to be there because they were driving doumis.

THE COURT:  So is the scope -- so as I -- as I read your motion, it seemed to me that you were claiming that, I guess there had been an insinuation by defense counsel that the victims in this case, you were concerned of bringing -- attempt to introduce evidence that the victims in the case were somehow

facilitating or benefiting from illicit sexual conduct at these karaoke bars because your victims drove them there.  Right?  They drove these doumis.  And obviously, it's a -- it's a term of art; right?

So are you asking me to exclude any and all relevance to even the term "doumi," to the nature of the clientele that your victims service?  Like, how sanitized -- essentially what defense's counsel's getting at.  And I was really responding to your motion.  So what is the breadth of it?

MS. MACCABE:  Yes, Your Honor.

The motion was directed specifically at human trafficking because that had been our conversations with defense counsel.

What I will say is the Government separately is not intending to elicit the doumi testimony or anything to that nature on its own.  The Government would request that the defense make an offer of proof for that why that would be relevant, should they seek to elicit such information.

I -- I don't know how it would come up after we have completed our direct examination of the victims who didn't discuss it, but I am happy to hear the defense position and then respond to that specifically.

THE COURT:  All right.  Go ahead, Mr. Werksman.

MR. WERKSMAN:  May I, Your Honor?

THE COURT:  Yes.  You may respond.

MR. WERKSMAN:  There's intense competition among the drivers to be able to provide doumi to these clubs because the drivers get a cash kickback from the doumi who are paid cash for providing whatever services they provide to the patrons of the karaoke bars.

THE COURT:  The doumis are paying a kickback?  That's for the transportation fee or just a bonus?

MR. WERKSMAN:  A bonus.  Let me explain.  And I think the Government will confirm the facts.  And I'm not going to editorialize or advocate.  I'm going to state some facts as to what's going on, and the Government knows this.  And I think they are trying to overly sanitize this in such a way.  I don't understand why they want to present such a skewered, blindered perspective on this that's just going to mystify the jurors as to what these drivers are doing in the middle of the night with scantily clad women.  But anyway, here are the facts.

The karaoke bars have liquor licenses.  There are about nine or ten of them.  They are the mainstream karaoke bars in Koreatown.  And they -- they have male patrons who want to be entertained.  There's a tradition of the doumi.  They're hostesses.  The term "doumi" literally means hostess.  It doesn't mean prostitute.  I can see that.  And there's no expectation necessarily that a hostess or doumi will provide sexual services.

But in reality, these are after-hour clubs where, in order to induce male clients not only to come in the first place and patronize the establishments but to stay until 3:00 in the morning and order overpriced bottles of watered-down liquor, is they get these girls to come in called doumi who sing with them, party with them, offer sex occasionally and drugs.  That's what goes on.  To pretend it doesn't is inane, but that's what goes on.

So there are certain men with cars who have figured out how to profit from this little arrangement.  They call themselves drivers.  They put ads in Craigslist for hot young women who want to be hostesses at karaoke clubs.  These women come from all over the world.  They're not necessarily Korean.  Some of them are eastern European.  They're just young women who answer ads on Craigslist to be hostesses at after-hour bars where they are going to lubricate male clientele with drinks and have a good time and earn cash.

The fee that the patrons pay the doumi is anywhere from $150 to whatever else they negotiate as consenting adults in these little rooms within the karaoke bars where -- I should add that you go to the karaoke bar and you get a room, a private party room with a bunch of patrons.  And they can stay there until 2:00, 3:00, 4:00 in the morning or sometimes they'll go to a different club at 2:00 when the liquor license requires them to close, they'll move somewhere else, this is

59

all part of the business.

And the drivers get anywhere from 60 to $80 in cash per doumi for bringing the doumi to the clubs.  The drivers have relationships with the clubs and the managers of the clubs and Mr. Cho, who had an association with these drivers and kind of regulate where they went.  That's our defense.  That's kind of a side point here.

But, nevertheless -- so these drivers are competing with each other to be able to bring as many girls as they can per night to these clubs because each time they bring a girl to a club and the girl gets selected by the club to come in and entertain the -- the patrons, the -- the doumi get paid, then the drivers get paid.

So because of this intense competition, there's --

THE COURT:  They don't get paid for driving, otherwise?

MR. WERKSMAN:  No.  They're paid a kickback based upon the cash income the doumi earned from entertaining the male clientele as hostesses.

Now, tawdry?  Yes.  Illegal?  Probably not.  Prostitution?  Definitely, but it's kind of don't ask, don't tell.  Not something I have evidence of that I'm going to present in court.

This isn't going to be a trial about the drivers being pimps.  What it is, though, is about drivers involved in

this tawdry, sordid business where, because there's money involved and girls after hours, possibly involved doing drugs and sex behind closed doors in these clubs, endangering the liquor licenses and they're bringing the vice squad in, because there's competition and these drivers are worried about law enforcement, they're worried about each other stealing competition, stealing business from each other, and they worry about street gangs outside Koreatown moving in on their business.

And so in the course of the trial, Your Honor, the jury is going to hear about this.  But to pretend that there's no female patrons -- or no female --

THE COURT:  And they're going to hear -- they're going to hear about this because your defense goes to --

MR. WERKSMAN:  Goes to why, sir, were you concerned about the competition?  Why were you concerned about certain clubs banning the girls that you would bring?  Why are you concerned about not taking certain girls who you are told are involved in drug trafficking or prostitution?

THE COURT:  Right.  But how does that tie into the charged counts?

MR. WERKSMAN:  It ties into the charged counts, Your Honor, because these drivers voluntarily joined an association headed by Mr. Cho.  And they paid him a weekly fee to regulate their business and assign them to different clubs

and -- and mediate with the different clubs the arrangement so that they wouldn't all be bringing doumi to the same place at the same time and that they would all have an opportunity spread out across the industry to bring their doumi to different places.  That's the business model.

And to pretend it doesn't exist by sanitizing it and excluding any mention of the fact that it's all about bringing young women who are scantily clad -- exclusively scantily clad to patronize these bars after hours, to pretend that's not going on is to give the jury an incomplete picture and would handcuff and disable the defense from presenting its defense.

THE COURT:  All right.  We do have to bring this to an end.  You really want to say something.

MS. MACCABE:  Yes.

THE COURT:  All right.  Keep it brief.

MS. MACCABE:  I will make it very, very brief.

That is exactly what we are trying to avoid and why we filed the motion.

THE COURT:  Look, so I understand that -- I guess you'd like to sanitize all this and just -- I guess just to have the -- the jury hear about men driving cars and dropping off people at these clubs and the defendant is extorting them, but it seems that this is what it is.  So -- right?  Like, the jury needs to have some kind of context as to what's going on here.

And on the one hand, I'm not going to let this turn into a sideshow about, you know, prostitution inside these clubs.  But I think the defense has to be given some leeway to present its defense and to be able to explain, I guess, this theory concerning Mr. Cho's role vis-à-vis the drivers and why it matters; right?  Because this isn't like an Uber situation; right?  It's something a little bit different.  Right?

MS. MACCABE:  I understand --

THE COURT:  I mean, you're in this world; right?  So there is some baggage that comes with that world; right?  So I -- I don't think it would be fair to completely sanitize it so that the jury can't really hear hardly anything and they're sort of left scratching their heads about what -- I understand that these aren't affirmative defenses, okay -- right? -- if these young ladies are doing whatever they're doing.  I understand none of that is an affirmative defense to acts of violence and threats and injury and so on.  But they need to have some kind of context.

MS. MACCABE:  I completely understand, Your Honor. I just will put defense counsel on notice that we may object if things move too far into victim blaming, given that the Ninth Circuit has specifically held that that's not permissible.  And to the extent this starts veering into jury nullification as well, we will be taking things up with the Court.

THE COURT:  Well -- and just to preview that, that's not where this is going to go.  And I -- I understand obviously the defense is going to zealously represent its client, but we're not going to engage in victim blaming or try to get a nullified verdict that's illegal to begin with by trying to get the jury to think that the victims are somehow, you know, to be blamed because they're participating in this world.

But I will allow some examination into, essentially, the context of this business, how it operates, how it works, but it will be one question at a time and I may have to hear objections at sidebar.

So not sure if that helps, but hopefully that provides everybody with a little bit more clarity.

MR. WERKSMAN:  It does.  And that's all I sought, Your Honor.  Thank you.

THE COURT:  All right.  Jury instructions are going to have to be reworked as a result of a First Superseding Indictment.  So I'm going to ask the parties to get together and submit a new set of joint proposed jury instructions.

If you could do that by a week from today, I'd appreciate it.  So I'm going to order that you do that by a week from today.

Obviously, your verdict forms are going to be impacted.  The verdict form will need to be amended.  Please submit that a week from today.

64

And, obviously, look through the rest of your trial documents.  And if any of them need to be amended, please just file everything by no later than a week from today.

One minor point with respect to what is a traditional sort of longstanding jury instruction that the Circuit has, it's joint proposed -- in the current set, it's joint proposed Instruction Number 8 at line 19.  It speaks to the thing -- sorts of things jurors aren't supposed to do, which is to go out and -- and to -- onto the Internet or social media to look for information and so on.

Anyhow, Twitter has ceased to be Twitter.  So I have been calling it X, formerly known as Twitter, in this instruction.  If there's any objection to that, you may make it now.

MS. MACCABE:  No objection, Your Honor.

MR. WERKSMAN:  No objection, Your Honor.

THE COURT:  All right.  Okay.  Anything else that you'd like to address before I just kind of give you a few pointers?

MR. WERKSMAN:  Literally a housekeeping matter, Your Honor.  The Court mentioned the Court has a busy trial calendar between now and March 19.  If the Court is still in trial, would we move day by day or would the Court just kick us week by week?  If the Court could give us some insight.

THE COURT:  You know, that's a good question.  I

guess it kind of turns on our jury room and what we can do with the jurors, if we can trail them day to day.

(Pause in the proceedings.)

THE COURT:  All right.  I am told that we can do this day by day with the -- our jury room downstairs, so that will be it.  We'll let you know.  Obviously, there's actually two trials set to go before this one in March.  So we'll see how they go.

MR. WERKSMAN:  Thank you, Your Honor.

THE COURT:  All right.  Make sure you are familiar with my trial order, which is lodged in every criminal case. Please read that thoroughly.  It should answer hopefully all of your questions concerning trial procedures here in this courtroom.  So make sure you've read it and that you comply with it.

Exhibits are not to be shown to the jury until they're in evidence.  Okay?  So no publishing to the jury unless something has been successfully moved into evidence.

The trial estimate is still about the same, I take it?  The evidence is the same?

MS. MACCABE:  It is, Your Honor.  But given that we'll be filing amended documents by next Friday, I think we may be able to pare some of this down.

THE COURT:  Okay.  All right.  Well, we'll see, I guess, where that comes in.  But I was assuming four to five

trial days.  Is that about right?  For all of it.

MS. MACCABE:  I think it will be three to four.  And I should also mention now that we've spoken with defense counsel about some of the 902(11) issues, and I think a couple of witnesses might be able to be completely cut by that.  So when we file our amended list next week, I think that will give more clarity.  But probably three to four would be our estimate.

THE COURT:  Okay.  Defense agrees?

MR. WERKSMAN:  Yes, Your Honor.  Except most of the victims will be testifying through interpreters; correct?

MS. MACCABE:  That is correct.  But we don't anticipate very long direct examinations of the victims.

MR. WERKSMAN:  Four days, that sounds right, Your Honor.

THE COURT:  Okay.  Obviously have your witnesses ready.  It's never a good thing to make jurors wait when it's avoidable.

Please always use the lectern when examining witnesses, arguing to the Court.  Obviously sometimes you can just rise and address an objection from where you are.  But any sort of meaningful dialogue with the Court, with the jury, with witnesses should be done from the lectern.

Please refrain from making arguments during opening statements.  Do not make speaking objections, objections should

just consist of legal ground.  No speeches.  If something needs to be heard in greater detail, you can ask for a sidebar.  I don't always grant it, but I will make a decision at that moment.  And we can always take it up during a break as well.

Because of my compressed daily schedule, I try not to have too many breaks.  I typically will have about a 10-, 15-minute break in the morning and about a 40-minute break in the middle of the day to give everybody an opportunity to eat something to sustain themselves.  But the goal here is to end by midafternoon so that -- I think it's been a positive schedule for lawyers, witnesses, and especially jurors.

So when in session, of course, argue to me, not to each other.

Never speak to a juror under any circumstance.

And remain at counsel table unless you ask me otherwise.  So if you want to approach a witness, please ask to approach.  But otherwise, remain at counsel table through arguments, examinations, and -- and so on.

Anything else?

MR. WERKSMAN:  No.  Thank you, Your Honor.

MS. MACCABE:  Not from the Government.  Thank you.

THE COURT:  All right.  Thank you, everyone.  I guess we'll see you back here on or around the 19th.  If you need us to address anything, just bring it to our attention.

Thank you.

THE COURTROOM DEPUTY:  All rise.  This court is adjourned.

                    (Proceedings concluded at 12:38 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


             I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


                         DATED THIS 6TH DAY OF NOVEMBER, 2024.



                         /S/ MYRA L. PONCE
          _____
            MYRA L. PONCE, CSR NO. 11544, CRR, RDR
               FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**