UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE FERNANDO L. ANELLE-ROCHA, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,        )
                                 )
          PLAINTIFF,             )     CASE NO.
                                 )
          vs.                    )     CR 23-149-FLA
                                 )
DAEKUN CHO,                      )
                                 )     PAGES 1 TO 88
          DEFENDANT.             )
_____)

REPORTER'S TRANSCRIPT OF
SENTENCING
FRIDAY, AUGUST 16, 2024
1:23 P.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

MARTIN ESTRADA
UNITED STATES ATTORNEY
BY:   JENNA MACCABE
Assistant United States Attorney
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT:**

WERKSMAN JACKSON & QUINN, LLP
BY:   MARK WERKSMAN
888 West Sixth Street
Suite 400
Los Angeles, California 90017

Also Present:

Jennifer Stanley, Probation Officer
Michael Choi, HSI Special Agent

**LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 16, 2024**

**1:23 P.M.**

---

THE CLERK:  Calling LACR 23-00149, United States of America versus Daekun Cho.

Counsel, please make your appearances beginning with the Government.

MS. MACCABE:  Good afternoon, Your Honor. Jenna MacCabe on behalf of the United States, and with me at counsel table is HSI Special Agent Michael Choi.

MR. WERKSMAN:  Good afternoon, Your Honor. Mark Werksman appearing on behalf of Mr. Cho who is present in custody.

PRETRIAL SERVICES OFFICER:  Jennifer Stanley appearing on behalf of Officer Maytee Zendejas on behalf of United States Probation and Pretrial Services Office.

THE COURT:  All right.  Good afternoon to everyone.

Mr. Cho, I'm Judge Aenlle-Rocha.  I'm sure you recall that I presided over your trial in March of this year. On March 26, 2024, a jury found you guilty of all 57 counts in the First Superseding Indictment.  The jury also found that you inflicted serious bodily injury in connection with Count 57 which charged you with aiding and abetting carjacking in

violation of 18 U.S. Code Sections 2119(2) and section 2. Counts 1 through 55 charged you with extortion, and Count 56 charged you with attempted extortion in violation of 18 U.S. Code Section 1951(a) which is commonly referred to as the Hobbs Act.

We're here today for your sentencing. So I'd like to just describe to you how the hearing will go forward. Under the Sentencing Reform Act of 1984, the United States Sentencing Commission issued guidelines for judges to consider when sentencing individuals in criminal cases. The sentencing guidelines today are advisory which means that they are no longer binding on judges. Even though they are not binding or mandatory, however, I am still required to arrive at a correct sentencing guideline range. I'm required to consider that range along with a number of other factors before imposing a final sentence.

As a result, during the hearing this afternoon, I will be making calculations under the sentencing guidelines, and I will be arriving at a final sentencing guideline range. Before imposing sentence, I will consider that range.

I will hear the parties' objections to the presentence report, and I will rule on those objections. I will consider the statements of the prosecutor and your attorney. And if you would like to make a statement, I will be happy to hear from you. You are not obligated to make any

statement whatsoever.

I will consider the recommendation of the probation officer.  I will consider whether a sentencing guideline sentence is appropriate after determining whether I should depart upward or downward from that range in your case. I will also consider a number of factors set out at Title 18 United States Code Section 3553(a) -- we typically call them the 3553(a) factors -- to determine whether I should vary from the sentencing guideline range.

The 3553(a) factors, which I'm sure Mr. Werksman has covered with you but I want to go over them here during the hearing, consist of all of the following: The nature and circumstances of the offense and your personal history and characteristics, the need for the sentence that I impose to reflect the seriousness of the offense, to promote respect for the law and to provide a fair and just punishment for the offense, the need for the sentence to afford adequate deterrence to criminal conduct, to protect the public from future crimes by you, and to provide you with any needed educational or vocational training, medical care or other correctional treatment in the most effective manner available to us.

I'm also to consider the types of sentences available and the need to avoid an unwarranted sentencing disparity among defendants who have similar records to you and

who engage in similar criminal conduct.  And, lastly, the need to provide restitution to the victims of the offense.

Not all of the factors, as I mentioned, may apply, but those are all of the 3553(a) factors.

In preparing for the hearing today, I have read and considered the report and recommendation of the U.S. Probation Office including the revised report and the addendum to that report and the sentencing memoranda that were prepared and filed by the prosecutor, by your attorney including the letters that were submitted by your parents, your sister, your aunt and uncle and friends.

Have both parties received and reviewed the final presentence report?

MS. MACCABE:  Yes, Your Honor.  Thank you.

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  Mr. Werksman, have you read and discussed with your client the final presentence report, the addendum to it, and the recommendations in that report?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  Have you explained to your client the standard conditions of probation and supervised release in this Court's second amended General Order 20-04 which is attached to the presentence report?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Cho, have you read and

discussed with your attorney the final presentence report, the addendum to it, the recommendations in the report, and the standard conditions of probation and supervised release contained in this Court's second amended General Order 20-04 which is attached to the presentence report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Cho, do you waive reading of the standard conditions of probation and supervised release contained in this Court's second amended General Order 20-04?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Counsel, do you join and concur in that waiver?

MR. WERKSMAN:  I do.

THE COURT:  All right.  I'm going to attempt -- I know it's a tall task, but I am going to attempt to summarize the probation officer's guideline recommendations as set forth in the presentence report.

As counsel are aware, there are 57 counts of conviction.  None of the counts group because they do not substantially involve the same harm under Guideline Section 3D1.2 and because the offenses covered by Guideline Sections 2B3.1 and 2B3.2 are excluded from grouping under that subsection.  As a result, each count must be calculated separately under the guidelines.

To the extent that there are similarities,

extortion Counts 1 through 30, 32 through 48, and 50 to 55 have the same guideline calculation.  So the guideline calculation for each of those counts is as follows:

The probation officer has recommended a base offense level of 18.  This is pursuant to Guideline Section 2B3.2(a).  Probation officer recommends or has applied a two-level increase under Guideline Section 3A1.1(b)(1) because Mr. Cho knew or should have known that the victim of each of those offenses was vulnerable.  Application Note 2 of Guideline Section 3A1.1 defines a vulnerable victim as a person, quote, "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," end quote.  The probation officer considered each of the victims associated with Counts 1 through -- the counts that I mentioned, 1 through 30, 32 to 48, and 50 to 55 and concluded they were vulnerable and that Mr. Cho knew or should have known that they were vulnerable. So this results in an adjusted offense level of 20, again, based on the probation officer's calculation as to those counts.

Turning to Count 31, also an extortion count involving victim S.S. which occurred on January 25 of 2023, the probation officer has applied a base offense level of 18, again, pursuant to Guideline Section 2B3.2(a).  The probation officer has applied a two-level increase under Guideline

Section 2B3.2(b)(1) because the offense involved an express or implied threat of death, bodily injury, or kidnapping.

On January 24, 2023, when the defendant found and punched S.S., the defendant stated to the victim, quote, "If you ignore more text messages, next time I'm going to kill you," end quote.

The probation officer also has applied a three-level increase under Guideline Section 2B3.2(b)(3)(B) because the offense involved preparation to carry out a threat of death or serious bodily injury or because the defendant otherwise demonstrated the ability to carry out a threat of death or serious bodily injury.

At the time of this offense, the defendant had been texting others asking where Victim S.S. lived and what car or type of car he drove.  At the time Mr. Cho was arrested, which was less than two months after this offense, Mr. Cho had a metal baseball bat in his trunk, had been in possession of multiple firearms, and a wide assortment of ammunition inside his home.  The metal baseball bat was in a children's size and hot pink in color, and no children resided with the defendant. The probation officer concluded that the bat was intended to be used as a weapon as opposed to for recreational purposes.

The presentence report also concluded that the defendant was prepared to carry out a threat of death or serious bodily injury if the victim did not comply with his

demands as the defendant had attacked other victims, thus demonstrating his ability to carry out threats of death or serious bodily injury.

The probation officer also applied a two-level increase under Guideline Section 2B3.2(b)(4)(A) because the victim in this count actually sustained bodily injury. On the date of the offense, Mr. Cho approached the victim S.S. who was sitting in his car and punched the victim in his face. The presentence report concludes that the victim sustained bodily injury as a result of the blow to the face.

In addition, the probation officer has applied a two-level increase under Section 3A1.1(b)(1) because the defendant knew or should have known the victim of the offense S.S. was vulnerable.

And when combined, this results in an adjusted offense level of 27, again, based on the probation officer's calculation as to Count 31.

Turning to Count 49, another extortion count, the victim of that count is Y.K., and the offense occurred on October 19 of 2022. Probation officer recommends a base offense level pursuant to Guideline Section 2B3.2(a), has applied a two-level increase under Section 2B3.2(b)(1) because the offense involved an express or implied threat of death, bodily injury, or kidnapping.

On October 18 of 2022, the defendant texted the

victim Y.K. to demand a $200 penalty and stated that if the victim violated their rule one more time, that the victim was going to see the real demon.  The victim told police and testified at trial that he understood this to mean that the defendant would beat the victim like a demon if the victim did not pay the defendant.  The next day, October 19, 2022, the victim paid the defendant $200 via Venmo.

The probation officer also has applied a two-level increase for vulnerable victim under Guideline Section 3A1.1(b)(1) because the defendant knew or should have known the victim of that offense was vulnerable.  This results in an adjusted offense level of 22 as to this count.

With respect to Count 56, attempted extortion, the victim is S.S., and that crime occurred on February 16 of 2023.  Guideline Section 2X1.1(a) states that the base offense level for an attempt should be taken from the guideline for the substance of offense plus any adjustments from that guideline for any intended offense conduct that can be established with reasonable certainty.

As stated, the substantive offense of extortion requires application of Guideline Section 2B3.2 which dictates a base offense level of 18 pursuant to Guideline Section 2B3.2(a).  Probation officer applied a two-level increase under Section 3A1.1(b)(1) because the defendant knew or should have known the victim of that offense S.S. was

vulnerable.  So this results in an adjusted offense level of 20 as to Count 56.

Lastly, as to Count 57 -- this is the carjacking count -- the victim is Y.S., and the crime occurred on May 8 of 2021.  The probation officer has assigned a base offense level of 20.  Under Guideline Section 2B3.1(a), a four-level increase has been applied under Guideline Section 2B3.1(b)(2)(D) because a dangerous weapon was used.  The defendant and his accomplice beat victim Y.S. with metal baseball bats and then took the victim's car.

A four-level increase has been applied under Section 3B3.1(b)(3)(B) because the victim sustained serious bodily injury.  The defendant and his accomplice broke the victim's left arm, caused injuries to his lower left leg requiring stitches, and caused multiple lacerations, abrasions, and bruises to the victim's legs and hips, all of which resulted in the victim's hospitalization.

A two-level increase has been applied by the probation officer under Guideline Section 2B3.1(b)(5) because the offense involved carjacking.  Application Note 2 to Guideline Section 2B3.1 defines the offense of carjacking in part as the taking of a motor vehicle from the person or presence of another by force and violence or by intimidation. So the crime that occurred in this case fits within that definition.

A two-level increase has been applied by the probation officer under Guideline Section 3A1.1(b)(1) because the defendant knew or should have known the victim of the offense Y.S. was vulnerable.

A two-level increase has been applied under Guideline Section 3B1.1 for an aggravating role in the offense because the victim was a manager or supervisor of one or more other criminally responsible participants in the commission of this crime.  The defendant had previously ordered the victim Y.S. to pay him extortion fees for protection from himself, and the victim paid these fees for years.  In 2021 the defendant told the victim that he was raising his prices, and the victim refused to pay the price increase.

On April 21, 2021, as captured on the victim's car and dash camera, the defendant told the victim that he needed his money and asked whether the victim had called the police.  On May 8 of 2021, the defendant and his accomplice pulled the victim out of the victim's car and beat him with baseball bats.  During the attack, the defendant gave orders repeatedly to his accomplice using profanity to injure the victim. So this results in a total adjusted offense level of 34.

Under the guidelines in the case of multiple counts that do not group, units are assigned to each count group depending on the seriousness of the various adjusted

offense levels pursuant to Guideline Section 3D1.4(a) through (c).  The highest adjustment offense level, as I stated, was 34, and one unit was assigned to that offense.  The second highest adjusted offense level was 27 which is seven levels less serious than the highest offense level, and that is assigned a half a unit.  The remaining adjusted offense levels were 20 and 22 which are more than nine levels less serious than the highest offense level of 34, and those are disregarded and assigned no units.  So this results in a total of one and a half units.  One and a half units requires adding one level to the offense level applicable to the count with the highest offense level under the table at Guideline Section 3D1.4.

So this results in a combined adjusted offense level of 35.  The probation officer made no further adjustments.  So that means that leaves us with a total offense level of 35.

Mr. Cho was assigned one criminal history point which places him in criminal history category I.  The sentencing guideline range as a result is 168 to 210 months.

As to statutory penalties, Counts 1 through 56 each carry a 20-year maximum term of imprisonment or a total of 1,120 years.  Count 57 carries a 25-year maximum term of imprisonment.  So the maximum statutory term for all counts, if imposed consecutively, would be 1,145 years.

With respect to supervised release, as to Counts

1 to 56, the maximum statutory term is three years per count. As to Count 57, the maximum term is five years.

Under the sentencing guidelines, as to Counts 1 to 56 the guideline range for supervised release is between one and three years per count.  As to Count 57, it's between two and five years.  Multiple terms of supervised release must run concurrently.

With respect to probation, Mr. Cho is eligible for between one and five years' probation per count on Counts 1 through 56.  He is ineligible for probation with respect to 57 because it is a class B felony.  Under the guidelines, he is ineligible for probation because the guideline range falls within zone D on the sentencing table and because of the conviction for Count 57 which is a class B felony.

The maximum possible fine by statute is $250,000 per count.  The fine range is between $40,000 and $14,250,000. There's also a mandatory $100 special assessment per count.  So that leads to a total of $5,700.  That summarizes the sentencing guidelines.

I'm going to first take argument and objections to the final presentence report, the findings in that report, its calculations and recommendations.  I will rule on those objections.  And after I have done that, I will then take argument from the parties and Mr. Cho if he wishes to speak as to the 3553(a) factors.

So let me first start with objections to the presentence report.  And I recognize there are objections by both parties, so let me start with the Government.

MS. MACCABE:  The Government maintains its objections in its previously filed papers.

With respect to obstruction specifically, part of probation's reasoning for not applying that enhancement was that some of the threats that the defendant made to the victims with respect to going to law enforcement to report him happened before the investigation started.  But as the Court is aware and as actually detailed in the presentence report, many of his threats were after the investigation had already begun.  At a minimum, the investigation started with the carjacking that happened in May of 2021.

But even talking about when federal authorities became involved in the investigation, the threats to S.S. and asking S.S. if he had called police while the undercover surveillance operation was happening in February of 2023 was certainly well within the investigation and is a part of this.

But that doesn't include all of the other obstructionist facts, which I'm happy to get into for the Court but I think we have laid out quite detailed in our papers, that taking all of those factors together shows that he was trying to obstruct justice.  Whether or not his attempts were successful, as we laid out, is not conclusive under the law.

It is that he was trying to do so with respect to threatening the victims, telling them not to go to police, hiding his phone, trying to use other methods to prevent law enforcement from detecting him.  He was very, very careful, and he tried very hard not to be caught, and his obstruction didn't work in the end.  He certainly tried.  And the two-level enhancement should apply for that.

THE COURT:  When did the federal investigation begin?

MS. MACCABE:  May I ask my case agent specifically?

Approximately April of 2022.  So about a little less than a year after the carjacking happened.

THE COURT:  Is it your position that it had come to light or that Mr. Cho figures out that he's under investigation at some point and then tries to discourage witnesses from coming forward?

MS. MACCABE:  Yes, Your Honor.  As some of the evidence that was laid out at trial and also in the presentence report show, the defendant was constantly concerned about undercovers.  And so there are text messages going back and forth about seeing undercovers.  Law enforcement observed him doing counter-surveillance.  He certainly was concerned they were investigating him personally for the exact crimes that he was committing, and that's why he took these steps.  And the

phone that he hid is the phone that had the extortionate text messages, not the iPhone that law enforcement also found at his house.  And so he was clearly concerned about this particular investigation with respect to the crimes that he's now been convicted of.

THE COURT:  As you know, the obstruction enhancement is separate -- it's more than just threats; right?  It's very specific.

MS. MACCABE:  Yes.

THE COURT:  It really speaks to the administration of justice; right?

MS. MACCABE:  Yes.

THE COURT:  And specifically as to the investigation, the prosecution, or the sentencing; right?  So we're really talking about the investigation in this case.  And because the counts don't group, you can't simply say, well, he obstructed generally; right?  Or he tried to discourage witnesses from contacting the police and apply that adjustment to 57 counts.  You have to conduct a count-by-count analysis as to whether this adjustment applies as to each of those 57 counts or, you know, some subset.

So I don't think this was clearly addressed in the Government's position paper on this issue.  And so I'm trying to get a sense.  We're talking about five years' worth of conduct in this case.  There are many, many acts which, of

course, I heard at trial.  But in order for me to try to make an informed and ideally a correct decision as to the application of the guidelines, I would need to know what your theory is as to which specific counts this adjustment would potentially -- could potentially apply to.

MS. MACCABE:  Understood, Your Honor.  And I think I can start with the carjacking count specifically given that that is what's also driving the guidelines here.  I think it certainly applies to that count.

As the victims said and as the presentence report includes, they received threatening messages, and that's continuing their fear after they were carjacked.  We know where you live and all this information about their families, personal information, and trying to dissuade them from going to the police.  And so with respect to the carjacking of Y.S. alone, we think the Court should apply the -- and we think the Court should apply the two-level enhancement for obstruction.

We also think the two-level enhancement should apply to the attempted extortion of S.S.  We think it should apply to -- if I can just quickly pull up the --

THE COURT:  The attempted extortion, so that's Count 56?

MS. MACCABE:  Yes, Your Honor.  And then --

THE COURT:  Let's take them one at a time.  We don't need to rush.

So with respect to the carjacking count which happens in May of 2021 --

MS. MACCABE:  Yes.

THE COURT:  Before or after the federal investigation has begun?

MS. MACCABE:  It is before the federal investigation has begun, but it is still with the investigation of the carjacking.  So it's the same facts that they are investigating.  It just happens to be in LAPD's jurisdiction instead of having yet been brought to HSI.  But it was the exact same crime that HSI ended up investigating.  And so it is still part of the investigation, and I think it should still apply.

THE COURT:  So your position is that as of May 8 of '21 after that crime is completed, that the LAPD is investigating?

MS. MACCABE:  Yes, Your Honor.

THE COURT:  All right.  And at some point the federal agency becomes involved.

MS. MACCABE:  Yes.

THE COURT:  Okay.  Remind me specifically what -- just so we're clear here, Application Note 4 of Guideline Section 3C1.1 lists a -- what it states is a non-exhaustive list of examples of the types of conduct to which this type applies.

You have asserted a variety of conduct to which you contend this adjustment should apply.  But right now we're talking about threats to victims.  At 4K of that application note, as an example of the type of conduct to which the adjustment applies is, quote, "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction."

So tell me explicitly what evidence is set out in the presentence report or came out at trial that demonstrates that Mr. Cho threatened -- this would be Y.S. following the carjacking count and the commencement of a criminal investigation by law enforcement in an attempt to prevent him from reporting it.

MS. MACCABE:  The text messages that Y.S. received saying that I know where you live and information about his family, when read into context of this defendant asking Y.S. if he had called the cops in their last interaction right before the carjacking had happened.  Y.S. certainly took those as threatening and took those as trying to dissuade him from reporting this to law enforcement.  And certainly from all of defendant's conduct that the Court has seen throughout trial and in the presentence report, that was the defendant's intent.

THE COURT:  Remind me.  Obviously he goes to the hospital that night is my recollection.

MS. MACCABE:  Yes.

THE COURT:  When does he -- does he call the police at some point?

MS. MACCABE:  The next day he meets with police. He interviews with them and tells them about what had happened and about the extortion that him and his business partner had been suffering from the defendant.

THE COURT:  Okay.  And the messages from Mr. Cho threatening him in an effort to prevent him from contacting law enforcement, when did those come in?

MS. MACCABE:  Those came in after the carjacking happened.

THE COURT:  How long after?

PROBATION OFFICER:  To answer that question, Your Honor, it happened in July 2021, and the carjacking occurred on May 8, 2021.  So approximately two months.

THE COURT:  Thank you, Ms. Stanley.

MS. MACCABE:  Thank you.

THE COURT:  All right.  I think that addresses Count 57.  And I think you wanted to speak to Count 56, the attempted extortion of S.S.

MS. MACCABE:  Yes.  I want to speak about Count 56 in conjunction with also Count 32.  So the way the Indictment was structured numbers-wise, S.S. is completed extortions and at Count 32.  So that would be March 16, 2023, which was the last of the extortion payments.  But Count 56,

which is the attempted extortion, was also of S.S., and it was the month prior.  So that month prior, the defendant was asking the victim if he called the cops, doing counter-surveillance methods, is very concerned about S.S. reporting him.  And S.S. was afraid, understandably so.  And when he goes to pay the defendant the following month, it is still under that same fear of the defendant not trying to get him to report him to the authorities.

THE COURT:  As a result of what happened that night, right -- this was essentially a controlled payment; right?

MS. MACCABE:  Correct.  Yes.

THE COURT:  But your theory is that the defendant got wind of it, noticed the involvement of law enforcement, engaged in counter-surveillance activities, and ultimately didn't follow through on receiving payment from the victim that evening; correct?

MS. MACCABE:  Almost all of that except he did receive payment from the victim.  It just happened to be money that belonged to HSI.  So we charged it as an attempt because it wasn't the victim's own property.  It was HSI's property that was paid.

THE COURT:  Understood.  But that payment was ultimately orchestrated through a third party; right?  Because wasn't it the defendant's instructions to the victim that he

not pay him directly but that he get payment through someone else?

MS. MACCABE:  Yes.  Who happened to be Y.K. who is another victim listed in the Indictment.

THE COURT:  So Y.K. used his funds to make that payment on behalf of S.S.

MS. MACCABE:  Yes.

THE COURT:  And how long after the evening of the counter-surveillance did that payment happen?

MS. MACCABE:  That payment happened that night.  So that's Count 56.

THE COURT:  Electronically.

MS. MACCABE:  Electronically.  Count 32 is about a month later on March 16.

THE COURT:  Okay.  And that's a separate financial transaction?

MS. MACCABE:  Correct.

THE COURT:  A separate extortion payment that S.S. made directly to Mr. Cho?

MS. MACCABE:  Yes.  Through Venmo.

THE COURT:  Obviously we know what happened in connection with Count 56.  With respect to the other count, I think, 32, what sort of threats does he make to the victim S.S. as part of an attempt to prevent him from reporting the conduct to law enforcement?

MS. MACCABE:  It would just be the continued threat that he was under from the month prior.  So the fact that S.S. even paid him a month later is just a part of this and why each extortion keeps happening as the defendant builds on this fear.

THE COURT:  All right.  We're talking about the payment of the extortion.  The adjustment goes to threats to not contact police; right?

MS. MACCABE:  Yes.

THE COURT:  Again, it's count-by-count.

MS. MACCABE:  Yes.

THE COURT:  Is there some explicit communication between Mr. Cho and Victim S.S. a month later that results in Count 32 where he is threatening him for the purpose of attempting to prevent him from contacting the police?

MS. MACCABE:  There is not, Your Honor.

THE COURT:  All right.  What else on this point?

MS. MACCABE:  On the obstruction point?

THE COURT:  Yes.

MS. MACCABE:  Yes.  So I recognize it is count-by-count.  The tricky thing about this case is the obstructionist conduct that was going on at his house when he was arrested spreads backwards because it involves him trying to hide evidence of his extortion through hiding his phone. It's not the only thing.  It's just a part of this.

So on his phone, law enforcement found numerous text messages including the ones we presented at trial with respect to the victim's extortion.  It would be very difficult for me to go through all of them right now on the fly.  But the reason why we didn't go count-by-count in our papers is because his conduct on the day of his arrest is to hide his conduct that had been going on throughout this case.  And it was directly tied to the extortion he had committing to these victims because the text messages on his phone were to S.S. and Y.K. and also to I.D.K. although he's not one of the victims listed in the count.  But his phone being hidden is a part of his obstruction of all of this.

And that's why we had proposed whether the Court wanted to just apply a two-level enhancement to the victims generally in their count.  But understanding the Court's point, I would certainly be advocating strongly for obstruction to apply to both the carjacking as well as to at a minimum the attempted extortion count.

THE COURT:  56 and 57?

MS. MACCABE:  Yes.

Does the Court have more questions on obstruction?

THE COURT:  Anything else you want me to consider on obstruction?

MS. MACCABE:  Nothing specifically other than I

would just note the first addendum to the presentence report doesn't really address all of the other Government's points on this.  I'm not going to belabor them, but I just don't think they have been refuted on the non-dissuading witnesses factors that go toward the obstruction conduct.  But that would be all I would say on obstruction.

THE COURT:  Before I turn to the defense on this point, does the probation office have anything to add in addition to what's in its addendum to the obstruction -- possible application of an obstruction of justice enhancement?

PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  Feel free to adjust the microphone so you can be heard.

PROBATION OFFICER:  So with regards to the carjacking count, the probation office is of the standpoint that the "where you live" text messages and text messages regarding knowing information about the victim's family does not have that threat of, if you call the police, I'm going to do something to you as it goes to the application note that the Court cited to.

So the probation office does not believe that those facts really indicate that that would apply for that enhancement.

Additionally, as it goes to the attempted extortion count, in terms of the counter-surveillance that was

done at that time, that could potentially be considered obstruction of justice.  However, the probation office has identified that should obstruction of justice apply to this count, it would have no impact on the guidelines applications.

Additionally, in regards to the facts that the Government is citing to with the attempting to flee at the time of arrest and the hiding of the cell phones, as highlighted in the Application Note 2, obstruction of justice, so guideline 3C1.1, that's actually more so conduct that's not covered by the guideline because that's more like attempting or fleeing escape of arrest.  So obstruction of justice would not apply to those.

I hope that resolves that, Your Honor.

THE COURT:  Okay.  Thank you.  Mr. Werksman, would you like to be heard on -- let me give --

Government, do you want to respond to the probation officer's statement?

MS. MACCABE:  Just very briefly, I think what distinguishes it from a typical arrest or flight from arrest, is that law enforcement was also there to execute search warrants on the defendant and on his residence and on his vehicles.  And so him trying to hide evidence and to remove himself from the residence where he would be searched is problematic, and I see that as slightly different from a normal flight from arrest, but I understand probation's point.

THE COURT:  There was limited testimony on this at trial.  It's fairly narrow.  Can you sort of help fill gaps in terms of what happened at the time of the execution or the attempted execution of warrants.  These are warrants to search and to arrest?

MS. MACCABE:  Yes, Your Honor.  There was a complaint on file as well as a search warrant for defendant's person, residence and Mercedes and motorcycle.  So law enforcement set up an operation to do this at around 4:00 a.m., and they arrived.  They did multiple callouts.  I believe there was a drone.  I believe it was both in Korean and in English, and they were trying to get the defendant out of his house.

THE COURT:  Starting at 4:00 in the morning?

MS. MACCABE:  Approximately 4:00 a.m.  Certainly it was night service of these warrants.

THE COURT:  All right.

MS. MACCABE:  Law enforcement had set up around the residence.  First, it was SRT, which is similar to swat, that was supposed to come in and clear the residence before the searchers came in.  So those SRT members are the one who saw the defendant poke his head out of the bathroom and see them and retreat back into the residence, but he still wouldn't come out.  That bathroom under the sink is where the searchers later found the Motorola phone that contained the extortionate text messages of concern.

Of concern also to law enforcement was that one of the firearms had the safety disengaged.  We're not saying the defendant necessarily did that that morning, but it was concerning to law enforcement that he stayed inside the residence for so long, wouldn't come out even after he saw them, and then also had a gun that had the safety disengaged.

So that in context with everything else, especially given that law enforcement saw him doing counter-surveillance tactics only a month prior is why we think this was obstructionist conduct and not just someone waking up in the middle of the night and being out of it or something along those lines.

THE COURT:  It's been described as a standoff in your papers.  How much time lapsed from the time -- there's an announcement that there are police there to execute warrants to the time when Mr. Cho, I presume, peaceably came out.

MS. MACCABE:  Approximately seven minutes.

THE COURT:  Seven minutes.

PROBATION OFFICER:  Your Honor, if I may.

THE COURT:  Do you wish to be heard?

PROBATION OFFICER:  Yes.  Correct.  Thank you, Your Honor.

In regards to those facts, however, the probation office still maintains the same position the obstruction of justice would not apply.  Given the amount of cases that we

see -- and we do have a lot of defendants that attempt to flee, that attempt to hide evidence at the time, that would in turn result in the enhancement applying to nearly all cases that we see.  So I don't believe that really differentiates really between the defendant taking a further step to obstruct justice at that point if that makes sense.

Thank you, Your Honor.

THE COURT:  All right.  Anything else, Ms. MacCabe, on this point --

MS. MACCABE:  On this --

THE COURT:  This objection.

MS. MACCABE:  On this point, no, Your Honor, unless the Court has more questions for me or unless I can have a brief response depending on what opposing counsel says.

THE COURT:  I would like to invite Mr. Werksman to respond with respect to this objection by the Government.

MR. WERKSMAN:  Thank you, Your Honor.

We agree with probation on the issue of obstruction.  This is an example of how the Government's maximus approach to the guidelines trips over itself.  The Government creates the seeds of chaos and mayhem when they send a SEAL Team Six type raid at 4:00 in the morning and a defendant inside an apartment is confused, befuddled, takes him a minute or two to figure out whether he's being -- about to have a home invasion robbery or whatever.  The behavior here is

fairly typical of people who are raided at 4:00 in the morning. For a few minutes, he doesn't come to the door.  And then when they do come in, they find some evidence easily obtainable. Other evidence may have already been hidden weeks before.

But to suggest there was something unusual about the raid that raises the level of Mr. Cho's behavior to obstruction of justice, it's self-created, and it's actually a little bit preposterous.

In addition, Your Honor, the allegation that he committed obstruction in the other counts is equally inflated. I wanted to ask the Court just to step back for a second here and recognize that the whole point of these enhancements -- and I want to also mention the other enhancements -- is that they take the behavior that the guidelines consider in the base offense, and they go beyond it, like really beyond it.  They're special.  It's behavior that is above and beyond the normal criminal behavior that the guidelines for 40 years now have basically recognized in their broad application.

So to call this extra behavior obstruction takes it far beyond what's contemplated by the base offense levels that apply to the crimes alleged hereto.

With regard to the vulnerable victims, same thing, Your Honor.  Extortion by its very nature -- I'm turning to the --

THE COURT:  I noticed.  So are you done with your

response to the Government's objection on obstruction of justice?

MR. WERKSMAN:  Yes.  But, also, to add --

THE COURT:  Okay.

MR. WERKSMAN:  -- that the example they gave us of the communications that are allegedly transmitted to the victim of the carjacking constitutes some additional obstruction.  They don't.  As the Court may recall, as I recall the evidence from the trial, after this alleged carjacking -- and I want to address whether it's really a carjacking or not for purposes of these proceedings -- after this, the extortion scheme that is alleged continues.  He's continuing to bug and pester these people for money.

It's not obstruction of justice.  It's just an ongoing continuation of the illegal conduct that is already alleged for which he's already convicted and for which he's already facing astronomical base offense levels.  So there is no practical or realistic or reasonable application of an enhancement of obstruction in this case.

I will submit on that.

THE COURT:  All right.  Thank you.  I will give you plenty of time to be heard on all objections.

Does the Government wish to respond in any way?

MS. MACCABE:  So briefly, I just want to first mention, for SRT specifically, this wasn't something the

Government was trying to manufacture as defense counsel can see in the warrant itself.  Night service was requested because of the danger of the defendant.  So we were not trying to create some scary situation.  We were trying to protect the safety of the law enforcement officers.

Second of all, this is not extra behavior worthy of the enhancement.  As the Court is aware and as we tried to lay out clearly in our papers, the enhancements are applying for behavior that isn't already covered by the offense conduct and because the offense conduct within the 2B3.2 does not involve this type of conduct, that is why we are treating this as obstruction separately.

THE COURT:  Anything else from probation?

PROBATION OFFICER:  Yes, Your Honor.  The guidelines that do apply in this case actually do go to the point of -- it is called extortion; right?  And with extortion, there is always that threat.  If you don't do X, I will do Y; right?  In this case, if you do not pay me money, I will, you know, create violence as the defendant has already been convicted of in this case.

And so the probation office is of the belief that there are really no extra steps and that actually that's already included within the offense conduct itself and captured by the total offense level -- or, rather, the base offense level that applies in this case.  However, it's within this

Court's broad discretion to make such a decision.

THE COURT:  Anything else, Mr. Werksman, on this point?

MR. WERKSMAN:  Yes.  The only thing dangerous was raiding a man's home with drones, personnel carriers, black clad operatives at 4:00 in the morning.  They created their own danger.

THE COURT:  All right.  Does the Government have any further objections to the presentence report?

MS. MACCABE:  Yes, Your Honor.

Our only other objection would be about whether the departures apply.  Given they are listed in the first addendum, I thought now might be the time to talk about it, but I'm happy to wait and reserve.  Would the Court like to --

THE COURT:  Are they objections or requests that the Court depart?  And then there's obviously a response from the probation office.  I mean, the probation office did not recommend that I depart, but I don't think I have seen a presentence report yet that does.  So it's --

MS. MACCABE:  Understood, Your Honor.  I will just ask the Court right now if --

THE COURT:  I'm really focused on objections to the presentence report at this stage.  But I will hear you out on your request for an upward adjustment on various grounds.

MS. MACCABE:  If I may keep --

THE COURT:  Go ahead.  Why don't you just go ahead and address it.

MS. MACCABE:  Okay.  The only thing I wanted to talk about is just about the first addendum.  It says that the upward departures wouldn't apply because the circumstances listed do not appear to be to an unusual degree as envisioned by the narrowly tailored guideline provisions.  From my reading of the guidelines, the unusual degree standard really only comes into play for Chapter 5, part H, which are the upward departures that are discouraged but may be relevant for the Court's consideration, and that is when the Court is to look at something as having an unusual degree.

So for that part, it would be for our recommended departures on criminal history grounds and dependence on criminal livelihood.  But for the part K grounds, which is all of our other grounds, a different standard applies, and that standard has to do with whether the applicable offense guideline already takes the ground into account or if the ground is present to an exceptional degree.

That was my only sort of objection.  Otherwise, I will reserve my argument about the applicability of the departures for later in this hearing.

THE COURT:  Let me go ahead -- let's go ahead and take argument from you on your request for upward departures on a number of 5K2 grounds and the 15H ground.

MS. MACCABE:  In addition to everything that's been laid out in our papers, an upward departure is warranted on each of these because either the unusual degree standard applies because of the part H discourage grounds for criminal history grounds and dependence on criminal livelihood.

This is an unusual situation where the defendant was on a diversion track with state court while he was committing the crimes at issue in this case and then, while in federal custody, had that case dismissed.  The Government is not aware of how that case was dismissed or diversion successfully completed given he was charged with a number of federal felonies including a violent carjacking.

But I think the criminal history is certainly understated in this case to an unusual degree, and the crimes that he had been committing and receiving those diversion-type sentences in state court were so recent in time to what we are dealing with here.  It's not like we're talking about some outdated conduct.  We're talking about within the years leading up and even during the extortion that he's charged with here and then the carjacking.  So we think that does rise to the level of an unusual degree such that the Court would depart upwards.

The dependence on criminal livelihood, I think it's to certainly an unusual degree here where there is not a single verified employment that resulted in any income to the

defendant.  The sole verified employment was an unpaid internship, and yet, when law enforcement goes to his house, they find over $20,000 in cash.  He has a Mercedes-Benz.  He has a Harley-Davidson motorcycle.  He's living in a home, not an apartment.  It's a home in Woodland Hills.  This defendant was living a very, very nice, very comfortable lifestyle, but there is nothing in the presentence report that shows any verified income.  And that's just the factors that we know about.

Probation talks in here about cryptocurrency, and us not knowing how much the defendant has, but he certainly was living the lifestyle of someone who is bringing in money, and it was clearly dependent on his criminal livelihood.  So we think that also is present to an unusual degree.

As to the part K departures we are asking for, those are all encouraged grounds for the Court to consider.  And given that none of those are already taken into account by the guidelines and even the first addendum to the presentence report mentions that the Court can consider these foreign upward variance --

THE COURT:  Departure.

MS. MACCABE:  I believe the first addendum said the Court may consider it for a variance but not a departure.  The Government isn't as concerned with which route the Court takes, but just from a legal standpoint, the part K departures

are certainly warranted here as the applicable offense guidelines don't already account for them.

And so the case law that we cite throughout our original sentencing memorandum goes through when extreme psychological injury applies or things of that sort. And here, just sticking on extreme psychological injury, as the Court saw in all the victim impact statements, this has caused serious issues for all of them. They have been long lasting for many years and have continued despite him being in custody. We think we have shown why each of these are certainly applicable.

Another one I just want to touch on is the gratuitous infliction of additional harm, the extreme conduct departure that we asked for where he's continuing to beat the victim despite the victim saying he would pay, despite him being just completely down on the ground, the accomplice leaves, the defendant just continues to hit him with a metal baseball bat is absolutely gratuitous and was not necessary.

So that type of conduct is just one example of the defendant's conduct throughout this case. The Court heard about him carrying an assault rifle at a karaoke bar and all of these things. We think this is extreme conduct. To not belabor any of the points in my sentencing memorandum, I would just ask if the Court has any questions specifically about any of those.

THE COURT: No. I don't believe I do.

MS. MACCABE: Thank you, Your Honor.

THE COURT: Thank you.

Before Mr. Werksman goes, Ms. Stanley, do you wish to be heard on any of these?

PROBATION OFFICER: No, Your Honor.

THE COURT: All right. Thank you.

Mr. Werksman, would you like to be heard on the Government's request for -- I believe the Government is asking for a two-level upward departure altogether; right?

MS. MACCABE: It would be two levels if the Court was not to apply the obstruction of justice enhancement. If the Court was, we think the appropriate guidelines range starts with offense level of 39. So whether the Court reaches that by an upward variance or an upward departure, we believe that is the range the Court should be looking at.

THE COURT: Thank you.

MR. WERKSMAN: I believe by virtue of this request, that's how the Government is getting to a recommended sentence of 25 years on a case where the base offense level for the extortion is one-fifth that, approximately four-and-a-half to five years.

Your Honor, just in general, I want to make a record that we do ask the Court to accept our sentencing memorandum and its objections to the presentence report. We restate them. In particular, I want to object to the

Government's request for additional time on the factors that the prosecutor just annunciated.  These are part and parcel of an extortion scheme.  The idea that the beating of the victim of the carjacking was somehow gratuitous, he's already subject to an enormous enhancement for inflicting serious bodily injury for that.

The Government is double and triple dipping with these demands for upward adjustments and enhancements and whatever you call them.  The core conduct, as the probation officer correctly noted, I believe, with regard to obstruction, the core conduct here is already contemplated by the guidelines.

Then, if I may, the whole vulnerable victim stuff is already contemplated in the sense that an extortion crime inherently involves a stronger, bigger person taking money that doesn't belong to them from a smaller, weaker person.  Every victim of extortion is vulnerable or they wouldn't be extorted.

The whole point of extortion is you find someone vulnerable to your threats, to your menace, and take money from them.  That's what the guidelines contemplates with the base offense level of 18.  I understand why the guidelines then may add a couple points or four points or six depending on whether you beat somebody and inflict some injury or serious injury or life-threatening injury.  Okay.  But that's where the guidelines then and this discussion in this courtroom departs

from reality.

Up to now we have a guideline level of 18, which is about four-and-a-half years, for the basic crime of extortion which inherently involves bigger, stronger, menacing people, the law of the jungle, praying on weaker, smaller, vulnerable people.  They are already vulnerable or they wouldn't be victims in the first place.

Then, Your Honor, we get to this preposterous point where the Government asks to quintuple that sentence to 25 years by double, triple and quadruple dipping with a bunch of miscellaneous guideline provisions which pile on and unnecessarily and unreasonably inflate the base conduct which is already contemplated by the guidelines.

In this case, Your Honor, Mr. Cho is extorting money according to the jury.  He has his reasons, and I will argue those when we get to the final point of this sentencing hearing when we talk about what the ultimate sentence ought to be.  But the jury convicted him of extortion.  He's collecting 100, $200 a week, relatively modest payments from a bunch of doumi drivers.  Every now and then, there is either a beating, in one case there is a shooting.  Nobody gets seriously injured except a broken bone or two, a hospitalization of one guy who is released the next day.

But it's all, if I may, Your Honor -- and I'm not trying to belittle or be dismissive of the crime.  It's an ugly

crime.  It deserves of a punishment of a guideline level of 18 plus a couple points here or there for the injuries.  That's already five, six years in federal prison for these crimes.  But that's the crime.  The crime is preying on people, using menace, and then enforcing the threat by occasionally inflicting violence.  That is what extortionists do.  Every now and then there's violence.  That's contemplated by the base offense level.

So in this case, Your Honor, we reject and ask the Court to reject an application of the vulnerable victim enhancement.  These victims are no different than any other person who falls prey to an extortionist.  They're little guys running around, in this particular case, they're in a gray market economy.  The reason they don't want to go to the police is not because of their immigration status.  It is because they are making untaxed income in cash, moving girls around who are involved in prostitution, drug dealing and other sundry crimes that occur in these after-hour clubs where drunken businessmen party until 2:00 in the morning with the flesh that is delivered to them by these duomi drivers who came to court shedding crocodile tears that they paid 100 or $200 a week to Mr. Cho.

So this is an extortionate scheme for which he's been convicted where the victims are no more vulnerable than anyone else who gets extorted by some thug who tries to

basically take a piece of their action.  These people are not vulnerable.  They choose not to go to the police for the most part because they've got a good thing going and they don't want it to end.

Finally, Your Honor, there is no obstruction of justice as for the reason we discussed.  I would ask the Court on this -- I know this part of the discussion is about the enhancements and the revised probation report.  I think I have covered it.  Unless the Court has specific inquiry or wants me to address any particular areas, I would ask the Court to strip away these enhancements, the adjustments, everything but the injury enhancements from the base offense level.

And, then, if I may just -- I will only argue this once.  I won't repeat this.  But I have to say this, Your Honor.  And the prosecutor alluded to this that the extortion count, 57, is driving the sentencing.  No pun intended.  It shouldn't.  This was not a core carjacking.  Now, I understand he's been convicted of it.  But the whole reason that we have the Court to arbitrate these disputes over sentencing and to make a final decision based upon the Court's experience, the Court's wisdom, the Court's compassion, is for the Court to see through the actual conduct that happened.

This wasn't a carjacking where a man went to a guy and took his car.  That's carjacking.  Put a gun to some driver's head, scared the bejesus out of them, get them to get

out of their car, and you drive away in it.  That's what the guidelines contemplate.  That's what people think of when they talk about carjacking.

In this case, Your Honor, he was convicted of carjacking kind of by accident because of the way the case was pled by the Government.  In this case, there was an extortion scheme.  The alleged victim of the carjacking who is -- is that Y.K.?

THE COURT:  Y.S.

MR. WERKSMAN:  Yes.  Y.S. wasn't paying.  So allegedly so Mr. Cho and an unknown colleague drag him out of his vehicle, and they beat him, and they continue to beat him.  As the prosecutor alleged, when she's demanding additional sentencing for the beating, he goes on and on and on beating him.  That was the crime.  That was the objective of the crime was to beat Y.S. for not making his payments.

As an afterthought, after the admittedly prolonged, gratuitous beating, then and only then -- we have seen the video like nine times, Your Honor.  We have all seen it, maybe 19 times during the trial.  Then as an afterthought, some other dude, who has never been identified in the courtroom but who was clearly not the defendant, gets in Y.S.'s van and drives it away.

That's not a carjacking.  He may have been convicted of carjacking, but I would ask this Court in the

sentencing phase not to make that conviction the engine of the sentencing because it's the exorbitant, extraordinary guideline levels that apply to a carjacking that turn this from a five- or six-year case of extortion to a 14-year case under the probation analysis and a 25-year case under the Government's analysis.

This is my argument with regard to the application of the guidelines.  I would ask this Court to reject applying the guidelines of carjacking to what is at heart and what is factually an extortion case.  This is not a carjacking case, and it shouldn't be sentenced like a carjacking case.

I will submit on that.

THE COURT:  All right.  So just to be clear, Mr. Werksman, when you say you submit it, is that the sum and substance of all your objections to the presentence report?

MR. WERKSMAN:  That and anything I have already put in my sentencing memorandum.  We covered a lot of ground. I don't want to waive anything by not mentioning it in oral argument.  It's all in our sentencing memorandum.

THE COURT:  Understood.  So just, again -- you don't have to argue it.  You can submit it on your papers.

I believe there was an objection by the defense to a two-level enhancement for threat of death or serious bodily injury being applied to Count 31.

MR. WERKSMAN:  Yes.

THE COURT:  You're not withdrawing it.

MR. WERKSMAN:  I'm not withdrawing it, Your Honor.

THE COURT:  Okay.  But you wish to be heard on it or not?

THE WITNESS:  No.  It was just more Daekun demanding money from duomi drivers.  It was more part and parcel of the underlying extortion scheme.  It wasn't anything special.  It wasn't a death threat.  He never threatened death. If he used apocalyptic terms like, you will see the demon in me, it is, again, part of the darwinian nature of extortion. Big guy says to little guy, do what I ask or I'm going to whop you.  The actual language used doesn't rise to the level of a death threat.  It is extortion.  Give me what I want or you're going to get beaten.  That is extortion.  It's covered by the guidelines.

THE COURT:  All right.  Thank you.

PROBATION OFFICER:  Your Honor, if probation may be heard.

THE COURT:  Yes.  You may be heard.

PROBATION OFFICER:  Thank you.

First off, regarding the victim-related adjustment, so that being the vulnerable victim, the probation office is of the standpoint --

MR. WERKSMAN:  Your Honor, I apologize for interrupting.  My client is having some distress.  He's sweating profusely, and asked if he can be taken to the restroom.  He may be dehydrated.  Can the Court give us --

THE COURT:  Why don't we go ahead and take a --

MR. WERKSMAN:  Can the marshals take him back and just get him some water and let him use the restroom?  He's not well.

THE COURT:  We can take a recess.  We will take a recess.  We will resume in a few minutes.

THE CLERK:  All rise.

(A recess was taken at 2:31 p.m.)

THE COURT:  All right.  Mr. Werksman, we left things where Mr. Cho wasn't feeling too well.  What's the status?

MR. WERKSMAN:  He's better.

THE COURT:  All right.  He looks better.

Would you like to continue with the hearing?

MR. WERKSMAN:  I think we should.

THE COURT:  All right.  If at any point in time he starts feeling unwell again, please let me know.

MR. WERKSMAN:  I explained that to him, Your Honor.  He did tell me he feels like he can go forward.  He had some water, some rest, and I think he's going to be fine.  Thank you.

THE COURT:  Thank you.

I believe, as we left things, Ms. Stanley was about to respond to some points that had just been made.

PROBATION OFFICER:  Correct, Your Honor.  Thank you.

So to start off with the vulnerable enhancement that was applied, the probation office maintains that stance. As articulated in the PSR, multiple victims did not speak English fluently, were undocumented.  They were working in an industry where alcohol served at late hours was creating more danger.  Although counsel believes that by way through all people are vulnerable; right?  That is just part of extortion itself.  That is not the case.

When we look at the application notes to guideline 3A1.1, it actually articulates different factors that are considered at play including even the nationality and immigration status of a person and also if they speak English fluently.  So the probation office maintains that this vulnerable victim enhancement applies.

As it pertains to the upward departures that both parties have been discussing, the probation office has pinpointed a few that may apply although it's upon the discretion of the Court to apply them, the first being 5K2.8 for extreme conduct, the second being 5K2.18 for violent street gangs, and the last one being 5H1.9, dependence upon criminal

activity for livelihood.

The probation office believes the other upward departures identified do not apply in this case because they are already captured by the guidelines themselves such as extreme physical injury and extreme -- extreme psychological injury.  Now, extreme physical injury is already captured with the special offense characteristics, particularly the carjacking one at play that defense counsel has cited to and mentioned multiple times.

In regards to extreme psychological injury, the probation office did not receive information pinpointing that any of the victims suffered psychological injury requiring treatment.  However, it's important to highlight that the 5K2.8 for extreme conduct may apply due to the fact that multiple victims stated that they were unable to work whether because of their injuries or because of danger or fear for their safety when going back to their employment because of the defendant.

And that will be all from the probation office at this time.  Thank you.

THE COURT:  Would anyone else like to be heard on objections to the presentence report?  Anything else?

MS. MACCABE:  Just very briefly.

THE COURT:  Go ahead.

MS. MACCABE:  To start with where defense counsel left off about the carjacking, as the Court is aware, it would

be clear error to controvert the jury's verdict by imposing a lower sentence because defense counsel disagrees with whether or not this constituted carjacking.

However, we do agree that this is not a typical carjacking. In the Government's view, it is so much worse. And in the *Clark* case that we cite in our original sentencing memorandum, that judge said that if you stick a gun in somebody's face and you say, get out of the car, I'm stealing it, that's a terrible thing to do. But then to take a private citizen who is doing nothing more than driving down the road and stick a gun to their head, travel around, rob the person, terrorize the person, et cetera, took it out of the heartland for the Court with respect to that being a much more serious carjacking than normal carjacking.

Here the Government's point is that the defendant was clearly trying to take the victim's car and leave the victim lying in the parking lot without help and completely alone. His car had his phone in it. He was just left there barefoot on the ground as the Court saw in the video, and yet the defendant continued to beat him with a metal baseball bat. And that's the point the Government was trying to make with respect to this being more serious than normal carjacking.

For the vulnerable victims, we agree with the probation office with respect to that applying. But I also just wanted to point out that the Government also stated cases

in its brief, the *Bengali* case and *Shyllon* case, both talk about how there is a vulnerable victim enhancement that can apply for extortion cases.  It's not prohibited.  I think those cases are analogous here.

Finally, to respond to defense counsel's point that the victims had a reason for not wanting to go to the police, the defendant had a reason to make them not go to the police which was he did not want his crimes to be found out and he did not want to get caught.

Again, the Government has explained this many, many, many times, but the defense has zero evidence whatsoever that the victims were involved in human trafficking.  I will not belabor it because it very strenuously did so in our position paper.  It's just not true, and I want to correct the record again on that point.

THE COURT:  All right.  Anything more on objections to the presentence report?

MR. WERKSMAN:  Submitted, Your Honor.

THE COURT:  All right.  I am consulting and taking into account the 2023 edition of the sentencing guidelines.  As to those portions of the final presentence report, to which the parties do not object, I adopt the final presentence report as my findings of fact and conclusions of law regarding the advisory sentencing guidelines.

With respect to the parties' objections, I adopt

the following sentencing guidelines, factors and calculations starting with the Government's objection to the presentence report's failure to add a two-level enhancement for obstruction of justice under Guideline Section 3C1.1.  Application Note 1 to Guideline Section 3C1.1 states in part that, quote, "This adjustment applies if the defendant's obstructive conduct, A, occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction. Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated and likely to thwart the investigation or prosecution of the offense of conviction."

Much of the conduct that's subject to the indicted counts and the counts of conviction occurred before the start of the investigation in this matter.  There are some exceptions which the Government has pointed out such as the undercover operation in February of 2023 when the victim S.S., who was assisting law enforcement at that moment in time, he attempted to make an extortion payment directly to Mr. Cho. Mr. Cho became suspicious ultimately, changed the meeting location multiple times, and eventually directed S.S. to make the payment to an intermediary.  This is what resulted in Count 56, the attempted extortion count.

But for that one event, the bulk of the evidence

concerns conduct that was initiated and continuing from a time before the investigation was underway and Mr. Cho became its target. I certainly understand that there was local police involvement at certain points in time, at least initially. And there's no doubt that Mr. Cho was wary of the police. But, again, I don't believe there is sufficient evidence to satisfy the burden of proof in connection with this adjustment where he clearly knew of the investigation and made efforts to impede or obstruct it again. As the -- as the application note states, the conduct has to be purposefully calculated and likely to thwart the investigation.

The evidence relates to the contrary. The investigation was not thwarted. It continued and ultimately was successful.

Now, it is a bit of a closer call with respect to Mr. Cho's threats to victims. As I stated, Application Note 4 to Section 3C1.1 lists examples of conduct to which the adjustment applies. Mr. Cho often pointedly asked victims whether they had called the police. Again, I believe these threats largely occurred during the commission of the offenses of conviction and not necessarily in response to the investigation or the prosecution of Mr. Cho.

With respect to his efforts to flee or avoid arrest, I don't think there's sufficient evidence that rises to the level to satisfy the burden of proof with respect to this

adjustment again.  Mr. Cho did not crawl out the window.  He did not actually run away.  He stuck his head out.  He looked. It was early in the morning as has been stated here, and then he went back inside.

Application Note 5 of that guideline section makes clear that avoiding or fleeing from arrest, that that is an example of the type of conduct that ordinarily does not warrant application of this adjustment.  However, it may warrant a greater sentence within the otherwise applicable guideline range.

So I am finding with respect to this adjustment that the Government has not met its burden of proof, and I am declining to impose a two-level increase for obstruction of justice.

The aggravating facts, however, of course, they are relevant.  They're highly relevant under Section 3553(a) including the nature and the circumstances of the crimes and the other factors that fall within the scope of 3553(a).

Turning to the Government's request for, I guess, either a two- or what would now be a four-level upward departure with respect to the various grounds under 5K2 and 5H1, you know, I really do agree with probation.  I believe these guideline sections generally require truly aggravated extreme facts, for example, the guideline section that addresses extreme physical injury, speaks of an injury that may

prove to be permanent, or where the victim suffers a major permanent disability.

The guideline section that suffers psychological injury requires that it be much more serious than normal resulting from the commission of the crime requiring, quote, "substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim of an extended or continuous duration."

The guideline section addressing extreme conduct includes things like torture, gratuitous infliction of injury, or prolongation of pain or humiliation.

So I am agreeing with the reasons set forth in the probation officer's addendum and as stated today here during the hearing by the probation officer, and I am declining to grant an upward departure on any of these grounds.  I do not believe the circumstances surrounding each of these bases are of such an unusual degree to merit granting an upward departure.

I will take argument as to all aggravating facts when it comes to weighing the 3553 factors.

So let me turn now to the defendant's objections. First, as to the objection to the two-level increase for vulnerable victim, Application Note 2 of Section 3A1.1 defines a vulnerable victim as a person who is unusually vulnerable due to age, physical, or mental condition or who is otherwise

particularly susceptible to the criminal conduct, and I believe it is the last phrase that is particularly applicable in this case.

The crimes in this case took place over an approximately five-year period between 2018 and March 16 of 2023.  Mr. Cho extorted individuals that he curated, anywhere from 20 to 30 according to his Venmo records and the victims' statements.  They were largely sole proprietors of businesses in Koreatown, part of a small, insular world of Korean karaoke bars, drivers, and hostesses.  And all of the victims were either managers and drivers of hostesses catering to karaoke bars or managers of karaoke bars.

All of the victims were Korean immigrants.  Their command of English was weak.  They lacked legal status in the United States, and they were unschooled in the American legal system.  They were not the sorts of people in our country who would avail themselves of the protections that the law affords them.  Go to court, secure protective orders, or call the police and demand protection and prosecution.

Like so many first-generation immigrants, their primary focus was survival in a new land which in part required not drawing attention to themselves.  Mr. Cho knew exactly who his victims were, their vulnerabilities, and that their condition made them particularly susceptible to extortion.

The defendant shared a common culture and

language with them.  The victims were entirely dependent on their small businesses, their automobiles, their hostesses, and their bar patrons to survive.  The defendant knew this, and he knew that they would pay to keep working and keep their businesses alive so long as he inflicted just enough fear and intimidation and showed that he was capable of committing acts of violence.

So as set forth in the presentence report, I find that each of the victims of the defendant's 57 counts of conviction were otherwise particularly susceptible to the defendant's acts of extortion and violence and that the defendant clearly knew or should have known of their vulnerability.  So this objection of the enhancement is overruled.

With respect to the defendant's objection to the two-level enhancement for threat of death or serious bodily injury that was applied to Count 31, Mr. Cho asserts that this threat is not contained in the defendant's phone and that the source of the information is unreliable because it originates from an interview by police of Victim S.S. which was not under oath or otherwise constitutes competent evidence.

The presentence report states that on the night of January 24, 2023, the defendant approached S.S. who was sitting in his car and punched him in the face.  Before and during the assault, the defendant asked S.S. if he wanted to

die and threatened him, "If you ignore more text messages, next time I'm going to kill you."  The defendant texted someone bragging that night that he got S.S. and that the next day he socked him.  He texted another person that, quote, "I found him and socked him."

At trial S.S. testified credibly that the defendant threatened to kill him.  This testimony and the subsequent statement to police are more than enough to justify imposition of this two-level enhancement.

As counsel know, the burden of proof at sentencing is preponderance of the evidence, and Federal Rule of Evidence 1101(d) makes clear that the Rules of Evidence do not apply at sentencing.  So the burden of proof has been met in this case.  The jury heard the testimony at trial as did I, and the evidence presented in this regard is credible and has ample indicia of reliability.  So the objection to this adjustment is also overruled.

I find that the total offense level remains 35. As I said earlier, 18 U.S. Code Section 3553(a) lists factors that I am required to consider before I can impose an appropriate sentence.  Mr. Cho and the Government have each filed sentencing memorandums which I have reviewed including the supporting documents.

Government, have the victims been notified of this proceeding?

MS. MACCABE:  Yes, they have, Your Honor.

THE COURT:  Do any of them wish to be heard?

MS. MACCABE:  May I have one moment, Your Honor?

THE COURT:  Yes.

VICTIM SHIN:  Hello.

THE COURT:  Good afternoon.  If you can just identify yourself for the record, please.

VICTIM SHIN:  My name is Yun Shin, and I was the victim of a carjacking and assault.

To be honest, it's kind of hard for me to park my car at, like, an open parking lot thinking that, you know, someone might be next to the car.  And it's really -- I'm having a hard time of, like, going around to places.  At the time it sounded like it was only extortion and beating, but if I didn't block the bat with my left arm, I might have died at the moment because he was aiming for my head.  And the reason why I broke my arm was because I was protecting my head from the baseball bat.  And it's -- I don't know why it sounded like it was nothing when the -- when Mr. -- I don't know his name, but when he was saying that it was only a part of extortion. It's not only the part of extortion to me because I almost died from that accident -- not accident but from carjacking and assault.

After the incident, I had a hard time, like, working outside because I tried doing Uber, but it was hard for

me to drive around since -- after the carjacking.  So to me it's -- yeah.  I don't know what to say.  But I hope that you can sentence him like a reasonable time for me.

That's it.  Thank you.

THE COURT:  Thank you.

Ms. MacCabe, any other victims who would like to be heard?

MS. MACCABE:  Your Honor, unfortunately the other victims could not make this afternoon's hearing.  However, as the Court reviewed, victims have provided written impact statements for the Court.

THE COURT:  Which I have reviewed.

MS. MACCABE:  Thank you.

THE COURT:  Would you like to be heard before I impose sentence?

MS. MACCABE:  On argument?

THE COURT:  Yes.

MS. MACCABE:  Yes.  Thank you, Your Honor.

The Government would incorporate all of its arguments for an upward departure -- for an upward variance in this case.  This conduct by the defendant was very serious.  This is not a typical extortion case.  This is not something dealing with a single carjacking.  This, as the Court is well aware, happened for years and years and years.  This defendant did not stop victimizing and dehumanizing so many vulnerable

victims in the Koreatown area.

And while brave victims like Y.S. were able to come forward and report his crimes to law enforcement, there were so many others who were too afraid or too afraid until after he was already in custody.  This has had a serious impact on all of them.

One of the victims who only recently wasn't able to make this afternoon's hearing, I would just like to read one small excerpt from his victim impact statement.  K.Y.J. said that "I strongly believe that Mr. Cho should be held accountable for his actions.  I know that the anxiety, fear, depression, helpless mind that he put inside me will never go away easily.  I hope there will be no victims like me.  My life and my family's life will never be the same again."

And I think that's just a sample of what the few victims that the Court got to hear from at trial and then also through the impact statements experienced at the hands of the defendant.  And the defendant's danger to the community is real, and his danger that he's still exhibiting on jail calls and other inmates shows that he's still a danger to the community and with serious concerns.

With respect to the defendant's own conduct, even setting aside this impact that it's had on all the vulnerable victims in this case, this defendant was controlling numerous victims for many, many years.  This was all with force and fear

and violence over and over and over.  And he took what he wanted from them.  And defense counsel may have characterized it as small dollar amounts.  It was a lot of people that he was extorting.

And, frankly, the impact that it had on them emotionally and psychologically is much more significant than the dollar amounts that he had actually taken from them.  For the victims, that's what they're most concerned about.  That's what they express in their victim impact statements.  That's what they testified to the Court about.

The fact that he took it a step further beyond just taking their money and temporarily taking one of their cars, to dehumanized them the way that he did is just unacceptable and inexcusable and makes this case really serious and warranting such a high sentence that the Government is asking for.  That's what's necessary here.  And it's no more than necessary.

The Government cited numerous cases in its brief about other high sentences in this case.  What defense counsel is asking for is completely unwarranted, and it doesn't account for everything that's involved here.  This isn't a single extortion.  We're dealing with 56 extortion counts.  One of them may be attempted, but he did get money out of it.  That is just the Venmo payments that were made.  That doesn't include all the cash payments that these victims made to him over the

years.  It doesn't include all the vulnerable victims who wouldn't come forward or I.D.K. who testified but didn't feel comfortable coming forward until closer to trial, so he wasn't included in this.  All of those outside factors the Court needs to consider under the 3553(a) factors.

I just want to end on the shooting that happened. The Court saw the video of that and heard from I.D.K. about that, and S.S. also reported hearing about it.  The fact that the defendant would shoot at a car that was occupied and then include those photos of one of his shooting victims in his sentencing memorandum as not being vulnerable victims and clearly not being there to show off their conversation skills or their singing skills is completely inappropriate, and it minimizes what all of these victims were going through at the hands of this defendant.

I think the shooting is certainly something that this Court needs to consider in fashioning the sentence in addition to how strongly the Government agrees with Y.S. that he could have died by the defendant trying repeatedly to hit him in the head with a metal baseball bat.  And it's a miracle that he didn't, and it's a miracle that the woman he shot didn't.

But the defendant was not being stopped by any court intervention up to this point.  And despite putting all these victims in absolute fear and terror, it didn't make him

change his ways.  He didn't write a letter to the Court apologizing.  He's not been remorseful on any of the countless jail calls that I listened to.  He's still mocking the victims and saying that they're lying and they're trying to controvert the jury's verdict.

Frankly, the Court should be sentencing the defendant within the range that the Government has recommended, upward variance for sure, and also the defense has not shown mitigation worthy of a downward variance or even a low end sentence in that range.  The Court should sentence the defendant to 300 months' imprisonment, and that is no greater than necessary but it is necessary for the public and for the defendant.  The Government strongly recommends that sentence as well as the restitution and the five years of supervised release that the Government asks for.

THE COURT:  All right.  Thank you, counsel.

Mr. Werksmen.

MR. WERKSMAN:  Thank you, Your Honor.

Your Honor, before you today is a 39-year-old man who, as you know, denies the allegations against him although he's been convicted by the jury, so here he is now, and he must face the sentencing for these crimes.  In his own ham-handed way, he thought he was acting as air traffic control and bringing some order to a chaotic gray market economy where the drivers were going around bringing these young ladies to the

clubs at all hours and he, in his own mind, thought that he was protecting them in a way by organizing them.

His methods, Your Honor, the Court has heard, were heavy-handed, and they have been found to be illegal, and he's been convicted of extortion for the acts that he committed.

But, nevertheless, Your Honor, he's a young man who is likely to be deported once he completes whatever sentence this Court imposes because he no longer has legal status in this country.  So he is not going to walk free in this community probably ever again.

He's described in the seven letters Your Honor has by people who know and love him, and two of them are here today, his girlfriend and his aunt.  Then there is also a friend of his came to watch this proceeding, somebody he's known from the community.  They describe him as being kind, generous, polite.  They describe him as a man who loves his family.  He has a strong desire to succeed.  They call him a man with a big heart.  They say that he's regretful for what he's done.  They say that he exhibits unwavering loyalty and that he is resilient and has a sense of responsibility.  He's a human being, Your Honor.

The guidelines contemplate for your run-of-the-mill extortion a sentence of between four and six years.  The prosecution has described a grotesque caricature of

Mr. Cho as if he was some kind of one-man crime wave who brutally oppressed an entire ethnic community for half a decade. That's not the case. This was a small-time penny-ante operation amongst a dozen or so drivers over a couple-year period involving a hundred, $200 at a time. And the Government is now asking for him a sentence equivalent to what the Government requested for John Gotti for being the chief of the Gambino crime family in his extortion and racketeering trial.

25 years is an eon. The guidelines ought to be interpreted more reasonably, and the request that we make is for a five-year federal prison sentence. I think one of the problems that we have in these courts, Your Honor -- and the Court knows this well -- is that the guidelines become an abstraction. There are dozens of different provisions that fly fast and furious across our desks to be considered whether they're to be added or subtracted, and we lose sight of the humanity of this.

I understand there is a humanity on the side of the Government with the victims. It's compelling that these people have come to court. I saw them. I cross-examined them. Some of them really felt they were hurt, they were threatened, they were scared. The jury has found him guilty. We're not denying that. I'm not saying he should get probation and he should walk out of here so he can go and do it again.

But I'm saying that a 39-year-old man who has

already been in jail now for a year and a half, to give him five years in federal prison is a lot of time.  And the Government has taken a maximus approach, almost like a law school exam where they go issue spotting and try every single guideline provision that can remotely apply and then stretch it like Gumby to see if they can make it fit.

I understand Your Honor has now made rulings on the applicability of certain guidelines, but I will for the last time urge the Court not to let the draconian guidelines that apply to carjacking quintuple the value of the sentencing in this case because they quintuple.  It's five times.  It goes from a five-year case -- well, three times.  It goes from a five-year to a 15-year case under the probation analysis, and the Government has added another ten years because they can.

So I would ask Your Honor to look at the humanity of the case understanding that some crimes have been committed. They're ugly.  They are real victims.  I get it.  But a five-year federal prison sentence is still in this world a lot of time for a man at this age to spend in a cage away from his family only at the end of which to be disgorged to Homeland Security for deportation to a country he hasn't lived in most of his life which is Korea.

And on that, Your Honor, I will submit that he deserves this Court's compassion, and I would ask the Court to bring down the sentence to a more deserving sentence rather

than the artificially inflated guideline sentence that's driven by the carjacking count which is not a carjacking.

Thank you, Your Honor.

THE COURT:  All right.  Thank you, counsel.  I'm going to take a few minutes to speak with the probation officer.  So we're going to take a recess until I'm done, and then I will return for purposes of imposition of sentence.  Thank you.

THE CLERK:  All rise.

(A recess was taken at 3:28 p.m.)

THE COURT:  All right.  Mr. Cho, before I impose sentence, would you like to make a statement for me to consider?  As I stated, please understand that you are not obligated or required in any way to say anything.  Your attorney has spoken on your behalf eloquently, and I have reviewed the sentencing memoranda that was filed and the letters of support that were filed as well.  But on the other hand, you have a right to speak before I impose sentence, and I am happy to hear from you.

THE DEFENDANT:  I'm okay.

THE COURT:  All right.  Thank you, counsel, and, Mr. Cho.

I am now prepared to impose sentence.  Does either counsel know of any reason why sentence should not now be imposed?

MS. MACCABE:  No, Your Honor.

THE COURT:  I'm sorry, Mr. Werksman.  I didn't hear you.

MR. WERKSMAN:  I'm sorry.  No, Your Honor.  Thank you.

THE COURT:  Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant Daekun Cho is hereby committed on Counts 1 through 57 of the First Superseding Indictment to the custody of the Bureau of Prisons for a term of 270 months.

This term consists of 270 months on each of Counts 1 through 57 of the First Superseding Indictment, all to be served concurrently.

It is ordered that Mr. Cho shall pay to the United States a special assessment of $5,700 which is due immediately.  Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter.

PROBATION OFFICER:  Your Honor, may we sidebar, please?

THE COURT:  All right.  Excuse me, counsel.

(Discussion off the record.)

THE COURT:  All right.  I am correcting the sentence as follows:

The term consists of 240 months on each of Counts 1 through 56 of the First Superseding Indictment and 270

months on Count 57 of the First Superseding Indictment, all to be served concurrently.

All right.  It is ordered that Mr. Cho shall pay to the United States a special assessment of $5,700 which is due immediately.  Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.

It is ordered that the defendant shall pay restitution in the total amount of $248,167.89 pursuant to 18 United States Code Section 3663(a).  The amount of restitution ordered shall be paid as follows:

To Victim Y.S., the amount of $74,247.89;

To Victim J.L., the amount of $147,200;

To Victim S.S., the amount of $11,520;

To Victim K.Y.J., the amount of $4,000;

To Victim Y.K., the amount of $11,400.

Restitution shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.  If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least 10 percent of the defendant's gross monthly income but not less than $300, whichever is greater, shall be made during the period of supervised release and shall

begin 90 days after the commencement of supervision.

Nominal restitution payments are ordered as the Court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

If the defendant makes a partial payment, each payee shall receive approximately proportional payment unless another priority order or percentage payment is specified in the judgment.

Pursuant to 18 United States Code Section 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest.  Payments may be subject to penalties for default and delinquency pursuant to 18 United States Code Section 3612(g).

Pursuant to Guideline Section 5E1.2(a), all fines are waived as I find that Mr. Cho has established that he is unable to pay and is not likely to become able to pay any fine.

Upon release from imprisonment, Mr. Cho shall be placed on supervised release for a term of five years.  This term consists of three years on Counts 1 through 56 and five years on Count 57 of the First Superseding Indictment, all such terms to run concurrently under the following terms and conditions:

One, the defendant shall comply with the rules and regulations of the United States Probation and Pretrial

Services Office and second amended General Order 20-04 including the conditions of probation and supervised release set forth in Section 3 of second amended General Order 20-04;

Two, the defendant shall not commit any violation of local, state or federal law or ordinance;

Three, the defendant shall cooperate in the collection of a DNA sample from the defendant;

Four, the defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter not to exceed eight tests per month as directed by the probation officer;

Five, the defendant shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath or sweat patch testing as directed by the probation officer.  The defendant shall abstain from using alcohol and illicit drugs and from abusing prescription medications during the period of supervision;

Six, during the course of supervision, the probation officer with the agreement of the defendant and defense counsel may place the defendant in a residential drug treatment program approved by the U.S. Probation and Pretrial Services office for treatment of narcotic addiction or drug dependency which may include counseling and testing to determine if the defendant has reverted to the use of drugs.

The defendant shall reside in the treatment program until discharged by the program director and probation officer;

Seven, as directed by the probation officer, the defendant shall pay all or part of the costs of the court-ordered treatment to the aftercare contractors during the period of community supervision.  The defendant shall provide payment and proof of payment as directed by the probation officer.  If the defendant has no ability to pay, no payment shall be required;

Eight, during the period of community supervision, the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

Nine, the defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgment, and other financial gains to the court-ordered financial obligation;

Ten, the defendant shall not contact the victims or the victims' families by any means including in person, by mail or electronic means or via third parties.  Further, the defendant shall remain at least 100 yards from the victims at all times.  If any contact occurs, the defendant shall immediately leave the area of contact and report the contact to the probation officer;

Eleven, the defendant shall comply with the

immigration rules and regulations of the United States and, if deported from this country either voluntarily or involuntarily, not re-enter the United States illegally.  The defendant is not required to report to the Probation and Pretrial Services Office while residing outside of the United States.  However, within 72 hours of release from any custody or any re-entry to the United States during the period of court-ordered supervision, the defendant shall report for instructions to the United States Probation Office located at 300 North Los Angeles Street, Suite 1300, Los Angeles, California 90012-3323;

Twelve, the defendant shall not engage as whole or partial owner, employee, or otherwise in any business involving karaoke bars without the express approval of the probation officer prior to engaging in such employment. Further, the defendant shall provide the probation officer with access to any and all business records, client lists, and other records pertaining to the operation of any business owned in whole or in part by the defendant as directed by the probation officer;

Thirteen, the defendant shall cooperate with the U.S. Probation Office in the investigation and approval of any position of self-employment including any independent, entrepreneurial, or freelance employment or business activity. If approved for self-employment, the defendant shall provide the U.S. Probation Office with full disclosure of

self-employment and other business records including but not limited to all of the records identified in probation form 48F, request for self-employment records or as otherwise requested by the U.S. Probation Office;

Fourteen, the defendant shall submit the defendant's person, property, house, residence, vehicle, papers, computers, cell phones, or other electronic communications or data storage devices or media, e-mail accounts, social media accounts, cloud storage accounts, or other areas under the defendant's control to a search conducted by a United States probation officer or law enforcement officer.  Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation;

Fifteen, the defendant shall possess and use only those digital devices, screen user names, e-mail accounts, social media accounts, messaging applications, and cloud storage accounts as well as any passwords or passcodes for all such digital devices and accounts that have been disclosed to the probation officer upon commencement of supervision.  Any

new devices, accounts, applications, passwords, or passcodes are to be disclosed to the probation officer prior to the first use.  A digital device is any electronic system or device that can access, view, obtain, store, or transmit digital data;

Sixteen, all computers, computer-related devices, and their peripheral equipment used by the defendant shall be subject to search, seizure, and monitoring.  This shall not apply to items used at the employment site that are maintained and monitored by the employer;

Seventeen, the defendant shall comply with the rules and regulations of the computer monitoring program.  The defendant shall pay the cost of the computer monitoring program;

Eighteen, the defendant shall disclose to the probation officer all digital assets owned or controlled by the defendant.  Digital assets are defined as any type of value storage represented in digital form.  Digital assets include but are not limited to all forms of virtual currencies, Bitcoin BTC; Ethereum, ETH; digital tokens of any kind including non-fungible tokens, et cetera.  Defendant shall report all digital assets, whether such assets are stored through an account, with a third-party custodian such as Coinbase, or in a self-hosted wallet such as paper wallets, telephone applications, decentralized applications, hardware devices. The defendant shall not obtain, open, or maintain any wallets

or accounts without prior approval of the probation officer. All digital asset transactions shall be disclosed to the probation officer upon request.  The defendant is prohibited from using privacy-based block chain protocols or techniques including but not limited to Zcash, Monero, Mixing Services, Tornado Cash, and Wasabi Wallets unless prior approval is obtained from the probation officer;

Nineteen, in addition to the aforementioned disclosure requirements, the defendant shall comply with the Internal Revenue Service's reporting requirements as they pertain to digital assets and shall provide proof of having done so to the probation officer;

Twenty, the defendant shall not associate with anyone known to the defendant to be a member of the Grape Street Crips gang and others known to the defendant to be participants in the Grape Street Crips gang's criminal activities with the exception of the defendant's family members.  The defendant may not wear, display, use, or possess any gang insignias, emblems, badges, buttons, caps, hats, jackets, shoes, or any other clothing that the defendant knows evidence affiliation with the Grape Street Crips gang and may not display any signs or gestures the defendant knows evidence affiliation with the Grape Street Crips gang.

Twenty-one, as directed by the probation officer, the defendant shall not be present in any area known to the

defendant to be a location where the Grape Street Crips gang meet or assemble.

I authorize the Probation and Pretrial Services Office to disclose the presentence report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency.  Further re-disclosure by the treatment provider is prohibited without the consent of this Court.

I find this sentence to be appropriate for the following reasons:

I have considered all of the aggravating and mitigating circumstances in your case, Mr. Cho.  Despite characterizations by the defense today to the contrary, this is among the most serious of cases that I have seen on the district court.  Mr. Cho stands convicted of 57 serious offenses, all involving acts of violence.  They are described in detail in the presentence report, and they were proven at trial.

I have granted an upward variance because the sentencing guidelines do not capture the full extent of the crimes, their continuing impact on the victims, and the danger that Mr. Cho poses to the victims, the Koreatown community, and the public at large.

Other aggravating factors were also present and were not part of the guidelines calculations.  There were

additional victims who also were extorted by Mr. Cho.  However, those victims were too afraid to cooperate and to testify.  As a result, those crimes went uncharged and were not taken into consideration by the sentencing guidelines.

Mr. Cho engaged in, certainly from the perspective of the victims, in a five-year reign of terror over vulnerable victims through acts of force, fear, intimidation, and violence.  Mr. Cho spoke with and sent threatening messages to dozens of vulnerable victims for the purpose of extorting monthly payments.  There is no evidence he engaged in any lawful activity during this time.

His livelihood turned on extorting money from people within his community who, as I said earlier, were vulnerable and highly susceptible to his crimes.  His acts instilled dread and uncertainty and created a sense that he could strike at any moment, at any place within the Koreatown karaoke community.  Pay him or see the real demon.  Face the consequences and get beat up, all his words.

He threatened to injure and to kill.  He pointed a gun at a victim's head.  He punched one victim and beat another with a bat.  He was seen carrying an assault rifle, and he fired a gun at a car that led to one young woman being shot in the neck.  Yes, no one died, but serious injury and death were risks those who stood up to him faced.  Had that bullet landed a few inches higher, that young woman may have died.

Had the one victim who spoke today not raised his hands to protect his head from Mr. Cho and his accomplice's blows with bats, he could have died.

Mr. Cho also used his ties to a criminal street gang to enhance his image as an enforcer and to remind those who considered resisting that he could draw upon the support of the gang to help him when needed.  He bragged about his crimes to others, and he put his victims on notice that resistance or cooperation with law enforcement would be punished.

The victim impact statements speak to the anxiety, fear, anger, sleep deprivation, nightmares, feelings of insecurity, fatigue, and depression Mr. Cho caused his victims.  Some chose to close their businesses and leave the state rather than continue to live in fear of him.

At the time of his arrest, Mr. Cho was found in possession of multiple firearms, a partially built ghost gun, multiple loaded high capacity magazines including one capable of holding 50 rounds, and ammunition for a revolver.  The revolver was never recovered, and it was suspected as having been used to shoot the woman in the car as no rounds were found on the street.  Also found were metal bats, skull masks, the cell phone found under the sink that contained extortionate messages to his victims and over $20,000 in cash.

Recorded jail calls after the bail hearing in this case also capture Mr. Cho laughing at and mocking his

victims.  Other calls reveal an ongoing propensity for violence with statements that he assaulted a cellmate and weighed the possibility of attacking rivals in the dayroom at the jail.

In another call, he and the other participants laughed about the prospect of sexually assaulting the prosecutor in this case.  After one victim testified at trial, the victim received a threatening message from an unknown number stating the sender was Mr. Cho's friend, that Mr. Cho was a Crips member, and that the victim needed to be careful.

Now, in addition to the very serious nature of the offenses in this case, I also considered Mr. Cho's personal history and background in determining the appropriate sentence. Mr. Cho is currently 39 years old.  He will soon be 40.  When he committed the crimes in this case, he was on state court diversion for two counts of carrying a loaded firearm, selling a firearm without a dealer license, and attempting to destroy or conceal evidence.  The fact that he committed the crimes in this case while on state court diversion demonstrates a lack of respect for the laws of our country.

I did consider his personal circumstances growing up in South Korea and in the United States and the circumstances he faced without his parents in a new country. However, the aggravating circumstances in this case far outweigh the mitigating ones.

So I decline today to impose a lower sentence

because it would put the victims and the public at risk and would result in an unwarranted sentencing disparity with other defendants with similar records who have been convicted of equally similar egregious conduct.

So for all of these reasons, I find that the sentence I have imposed today is sufficient but not greater than necessary to comply with the purposes of 3553(a).

The sentence imposed reflects the seriousness of the offenses.  It promotes respect for the law.  It provides just punishment for the crimes.  It will protect the public from further crimes by Mr. Cho.  It affords adequate deterrence of criminal conduct in the future, and it will provide Mr. Cho with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

My statement of reasons will be included in the commitment order and judgment and shall be provided to the United States Probation Office, the United States Sentencing Commission, and the Bureau of Prisons.

Mr. Cho, you have the right to appeal your conviction and your sentence.  With few exceptions, a Notice of Appeal must be filed within 14 days of the judgment being entered in this case.

Do you understand this?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  If you're unable to afford a

transcript of the record in this case, one will be provided at Government expense.  If you're unable to pay the cost of an appeal or the filing fee, you may apply for leave to appeal in forma pauperis.  If you do not have counsel to act on your behalf and if you request it, the clerk of the Court will prepare and file a Notice of Appeal on your behalf.  Again, you must make that request within 14 days of the judgment being entered.

The Notice of Appeal must designate the judgment or order appealed from and the fact you are appealing to the United States Court of Appeal.  It should designate the portion of the proceedings that are not already on file in the docket that you deem necessary for the court reporter to include as part of the record on appeal.

Do the parties have any further objections you would like me to consider?

MR. WERKSMAN:  Your Honor, may I address some housekeeping matters?

THE COURT:  Yes.

MR. WERKSMAN:  Number one, Your Honor, would the Court please order that he be evaluated for the so-called RDAT program when he is designated to federal custody?

THE COURT:  As a result of prior drug use?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  I will.

MR. WERKSMAN:  Will the Court address that with a number of conditions as well so I know the Court has already determined that to be an influence in his life?

THE COURT:  That is correct.  I will recommend as part of the sentence that the Bureau of Prisons evaluate Mr. Cho's eligibility for the 500-hour Residential Drug Abuse Program known as RDAT.

Anything else?

MR. WERKSMAN:  Yes, Your Honor.  He would like to request that he be designated to the Terminal Island facility if the Court can make that recommendation.  I know the Court has no control over that, but a request for a Terminal Island designation would be helpful to him.  Puts him as close as possible to his family.

THE COURT:  I hereby recommend that Mr. Cho be assigned to the U.S. prison facility at Terminal Island to facilitate contact by family and friends.

As your lawyer just stated, Mr. Cho, please understand that it is the Bureau of Prisons that determines where individuals serve their sentences, not judges.  So all I can do is recommend.  But I have done so now, and it will be included in the judgment and commitment order.

MR. WERKSMAN:  Finally, Your Honor, so there is no confusion, on the record, my office has prepared a Notice of Appeal to be filed in pro per.  It is signed.  I can give it to

the clerk today or file it electronically.  It was important to Mr. Cho that I mention this on the record that there will be an appeal and that my firm makes sure the proper paperwork gets filed electronically unless the Court --

THE COURT:  I think you should file it electronically via CM/ECF.  That would be best.

MR. WERKSMAN:  Thank you.

THE COURT:  All right.  Do the parties have any further objections you would like me to consider?

MS. MACCABE:  No, Your Honor.  Thank you.

THE COURT:  Anything else from the defense?

MR. WERKSMAN:  No.  Thank you, Your Honor.

THE COURT:  Good luck to you, Mr. Cho.

Hold on, everybody.

I need to dismiss the underlying Indictment. There is a First Superseding Indictment in this case; correct?

MS. MACCABE:  Yes.  That is right.  Thank you, Your Honor, for bringing that up.  Thank you.

THE COURT:  You can thank Ms. Freeman.

MS. MACCABE:  I will do that after court.

THE COURT:  So I take it the Government is moving me to dismiss the underlying Indictment, is that correct, as to Mr. Cho?

MS. MACCABE:  Yes, Your Honor.

THE COURT:  All right.  That motion is granted.

Anything more?

MR. WERKSMAN:  No, thank you, Your Honor.  Have a nice weekend.

THE COURT:  Thank you.  You too.  Thank you very much, everyone.

THE CLERK:  All rise.

(Proceedings concluded at 4:22 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  11TH  DAY OF NOVEMBER, 2024.


/S/ MIRANDA ALGORRI
_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER