UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. FERNANDO L. AENLLE-ROCHA, JUDGE PRESIDING

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 23-00149-FLA |
| | ) | |
| Daekun Cho, | ) | |
| aka "DK," | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial Day 1

Tuesday, March 19, 2024

9:34 A.M.

Los Angeles, California

Wil Wilcox, CSR 9178
Official U.S. District Court Reporter
Los Angeles, CA  90012

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:

        UNITED STATES ATTORNEY'S OFFICE
        BY:   JENA A. MACCABE
        BY:   KEVIN J. BUTLER
        Assistant United States Attorneys
        Violent and Organized Crime Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012

FOR THE DEFENDANT:

        WERKSMAN JACKSON & QUINN LLP
        BY: MARK J. WERKSMAN
        BY: KAREN M. SOSA
        888 West Sixth Street, Fourth Floor
        Los Angeles, California 90017

3

# I N D E X

TUESDAY, MARCH 19, 2024; VOLUME 1

## CHRONOLOGICAL INDEX OF WITNESSES

| Party WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Joo Hun Lee | 156 | 180 | 217 | | | 1 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| Lee, Joo Hun | 156 | 180 | 217 | | | 1 |

## EXHIBITS

| EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 28 | Document | | 161 | 1 |
| 45 | Photograph | | 177 | 1 |
| 46 | Photograph | | 177 | 1 |
| 47 | Photograph | | 177 | 1 |
| 48 | Photograph | | 177 | 1 |
| 49 | Photograph | | 177 | 1 |
| 50 | Photograph | | 177 | 1 |
| 51 | Photograph | | 177 | 1 |
| 60 | Document | | 173 | 1 |
| 86 | Document | | 162 | 1 |
| 203 | Document | | 202 | 1 |

4

OPENING STATEMENTS

                                                        PAGE     LINE

Opening Statement Ms. MacCabe ...................144       1

Opening Statement Ms. Sosa .....................149       1

5

LOS ANGELES, CA.; TUESDAY, MARCH 19, 2024

9:34 A.M.

- - - - -

*(The jurors entered the courtroom.)*

THE CLERK:  Calling CR 23-00149-FLA, United States of America v. Daekun Cho.  Counsel, please make your patients beginning with the Government.

MS. MacCABE:  Good morning, Your Honor.  Assistant United States Attorney Jena MacCabe and Kevin Butler on behalf of the United States, and with us at counsel table is Special Agent Michael Choi.

MR. WERKSMAN:  Good morning, Your Honor.  Mark Werksman and Karen Sosa appearing on behalf of defendant Daekun Cho who is present here to our left.

THE COURT:  All right.  Good morning, everyone.

All right.  To all of the prospective jurors, welcome.  Good morning to each of you.  This is courtroom 6B of the United States District Court for the Central District of California, and we're here to select the jury in a criminal case.

As you just heard, the case is captioned or styled United States versus Daekun Cho.  Before we get going, I'm sure my courtroom deputy has already asked everyone to make sure all electronic devices are turned off and in silent mode or turned off all together.  If phones go off in the

6

courtroom, they will be seized.  I'm sure you don't want that to happen, so please keep your devices turned off.

Before we get going, all prospective jurors have to be sworn in for purposes of today's jury selection.  So I'm going to ask my courtroom deputy, Ms. Freeman, to swear in all prospective jurors in the courtroom.

So, ladies and gentlemen, I'm going to ask all of you to please rise to be sworn in.

THE CLERK:  Ladies and gentlemen, please raise your right hand.

Do you solemnly swear that you will make true answers to such questions as may be put to you touching upon your qualifications to serve as a juror upon the trial of the cause now before this court so help you God?

THE PROSPECTIVE JURORS:  I do.

THE CLERK:  Thank you.  You may be seated.

THE COURT:  All right.  We're now going to begin the jury selection process, and I'm going to ask Ms. Freeman to call the numbers of 12 jurors who will sit in the jury box for examination.

I do not use jurors' names when we are conducting trials, so please be mindful of the number that is on your jury badge because that's what's going to be used to call up jurors to be seated in seats one through twelve in the jury box.  All right.  So make sure you have that number in front

of you where you can read it.

THE CLERK:  And I will start, Your Honor.

Calling Juror ID Badge No. 205854137.  Please be seated in Seat No. 1.

The next number is 205823099.  Please take Seat No. 2.

205831175, Seat No. 3, please.

205964196, Seat No. 4, please.

205874252, and you will take Seat No. 5.

205994297.  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.  I called the name outside and someone answered.  So let's try this again. 205994297, you will take Seat No. 6.

205870308, Seat No. 7, please.

206307629, Seat No. 8, please.

205924426, Seat No. 9.

I'm going to have you come all the way down, sir.

205830019, Seat No. 10, please.

Sir, if you would go through the -- there's an entrance.  Perfect.  Come all of the way down in the next available seat.

205951704, seat No. 11, please.

And 205802750, Seat No. 12, please.

THE COURT:  All right.  We're now going to begin the process of speaking with the jurors that are seated in the jury box.  But before I do that, I'm just going to make

some preliminary comments for everyone.

I'm going to be addressing, during this examination process, the 12 jurors that are seated in the jury box, but my comments and questions are really directed to everyone seated in the courtroom today who's a prospective juror.

It's not uncommon for the jury selection process to take a while and for jurors that are initially seated to be excused for one reason or another.  So those of you who are sitting in the gallery right now could very easily find yourself sitting in the jury box.

This process will go a lot more smoothly if everyone pays attention throughout this process, listens carefully, and is prepared when you take a seat in the jury box to answer the questions that I will be putting to you, which will become obvious as we move forward.

It's a large courtroom.  It's important that everyone is able to see and hear what's happening.  So if anyone in the courtroom is struggling to see or hear, please raise your hand and let me know, and we'll try to accommodate you to facilitate your ability to see and hear what's happening.

I'm not seeing any hands.  So I'm assuming the answer to my question is no.

I am Judge Fernando Aenlle-Rocha.  I will be

presiding over this trial, and throughout the case, I will be making rulings on things like the admissibility of evidence.  However, it's the jury's role to determine what the facts are in the case.  So what facts are proved or not proved will be up to the 12 individuals who are seated in the jury box and selected to serve as jurors in the case.

After the jury's been selected and then, again, before -- after all evidence has been presented and before closing arguments, I will instruct you on the law that you're to apply in the case.

So I will be doing that in two installments, an initial installment after all jurors have been selected and sworn in and seated and before the trial essentially begins the presentation of evidence and statements by the lawyers, and then, again, at the end, after you've heard all of the evidence in the case.

You've already met Ms. Freeman.  She's my courtroom deputy.  She handles all of the administrative tasks while we're in trial including keeping track of all exhibits that are admitted into evidence and creating a daily record of what's occurring in the courtroom.  She also is your principal liaison with me.  So if, at any point in time, you need to speak with me or pose a question, you should communicate it to her, and she will pass it along to me, and I will do my best to respond to you as promptly as

possible.

I'm sure you've seen and, for those of you who've been on jury service before, you know that we also have a court reporter in the courtroom.  The court reporter's job is to create an accurate and complete record of what happens during the trial, and that requires writing down what everyone says.

So there's a few rules to keep in mind to help the court reporter create as accurate of a record as possible:

One is, when it's time for you to answer the questions that I will be putting to you, to answer those questions verbally with words.  Okay.

It's not uncommon for us humans to communicate in nonverbal manners, such as shaking of the head or nodding. that cannot be transcribed; right?  So you must answer questions verbally.  I will prompt you, but please keep that in mind.

And, secondly, it's really important that we not interrupt each other because the court reporter can only transcribe one speaker at a time.  So if two people are speaking over each other, it creates an unclear written record.  So please be patient as I am posing questions to you even if you have a pretty good sense of what the question will be because you've heard me put it to other prospective jurors, but please wait and then answer the

11

question, and I will do my very best to also allow you to answer the questions without interruption.

With respect to scheduling, my intention is to have a jury selected today.  I'm not perfectly sure how long that will take.  It is not uncommon to take the better part of a day or consume a good amount of it.

Ordinarily, my hours in trial are 8:15 in the morning, and that means 8:15 in your seats and we're ready to begin the trial, and we typically recess at about 2:30 in the afternoon with a couple of breaks.  So there's not a long lunch break.  There's just a couple of shorter breaks.  All right.  So just keep that in mind as the schedule.

Could I go past 2:30?  Well, possibly, if there's a witness whose testimony is going to wrap up, if we just stay an extra ten or fifteen minutes, then that person doesn't have to come back the next day and we don't interrupt the flow of that person's testimony, then, yes, I may stay past 2:30.  It's possible we could break a little before 2:30.  Again, it just depends on the dynamic of what's happening at that moment in trial.

I am typically not in session on Fridays with trial because I hear other matters on Fridays, and that, certainly, will be the case this week.

This particular Thursday, I have court obligations starting in the afternoon.  So I'm not going to make it all

the way until 2:30.  All right.  So Thursday, we will probably recess somewhere between noon and 1:00, and then we will resume on Monday with the trial.  Once the trial is done and the jury is deliberating, then I do expect you to come for a full day including on a Friday.  All right.

So if you're still deliberating, you know, I guess it would be a week from this Friday, and any day before that, you're going to come -- I expect you to be here, basically, 8:30 to 5:00 o'clock on non-trial days when the jury is deliberating.  And, obviously, you can take breaks as needed.  You'll be provided lunch.  We won't be inhumane but expect a full -- not an abbreviated day, but a full day.

It's really important to be on time.  We cannot get started unless everyone is here.  So if a single person is running late, it affects everyone else in this courtroom.

And today, of course, we have a larger group because we have a panel of about 40 prospective jurors.  So when we take a break, if someone is slow getting back, we literally or the others, however many of us are left here are waiting for that person to get here.

If, for any reason, you are running late, I recognize that it can happen.  My courtroom deputy will provide you with court contact information for the courtroom as to how to get in touch with us to let us know when we can

expect you.  Obviously, emergencies can happen, but you know where we live and you know this is a large district and a large county that the courthouse is situated in.  You know how long it takes to get around this place.  Okay.  So please factor that all in for purposes of ensuring that you're sitting in those seats at 8:15 in the morning.  So better to be early than late.

At times, I will need to address and resolve questions of law with the attorneys, and that can happen in a couple of different ways.  I can have it either here at what we call the sidebar, which is to my right, outside of your hearing, and I will be speaking with them quietly to resolve whatever issue it is that needs to be addressed at that moment in time, or I may excuse you from the courtroom, and we'll attend to it during a break that I'm giving you or I have to excuse you from the courtroom for whatever reason.

I will be repeatedly admonishing you throughout the trial not to communicate with anyone whatsoever about the case itself.  All right.  You're, certainly, welcome to tell people that you're serving on a jury -- including employers, family members -- but not to talk to them about the case itself or what you're hearing and experiencing in the courtroom.

The attorneys and their witnesses and the parties

all know that they cannot speak to jurors.  All right.  And that includes cordial greetings.  All right.  So they're not even to say good morning to you or hello.  All right.  So please understand that.  Do not communicate with them.

This is a public building.  It's not quite as busy as our county courthouses in terms of the volume of people using the building; but, nevertheless, it is a public building.  People can come into it.  It's important that you wear your juror badge because that makes it clear to everyone that you are a juror and at least those familiar with our justice system know that jurors are not to be addressed or spoken to.

If anyone does attempt to speak with you or says something to you at any point in time, please bring it my attention.  You could do that through my Courtroom Deputy, Ms. Freeman, so that I can attend to it.

You should all have been handed a questionnaire. That's everyone in this courtroom that's a prospective juror.  If anyone is missing the questionnaire, please raise your hand right now so that we can get you a copy.

Okay.  Juror No. 1 does not have her questionnaire.

THE PROSPECTIVE JUROR:  I left it on my chair.

THE COURT:  She absentmindedly left it in the gallery.  So we will have to correct that.

Well, I will be the spoiler.  Question No. 6 asks you whether you know any of the witnesses in the case or recognize any of their names.

I will be providing you with the names of all potential witnesses soon in a few minutes.  If you do recognize the names of any of those individuals, please let me know when I get to you when I will be speaking with each of you in order one through twelve.  So please do let me know.

Also, if, for any reason, you don't recognize the name but you are selected as one of the 12 -- plus, I will be seating two alternates -- and a witness walks into the courtroom during trial and maybe you didn't know that person by name but you recognize the person all of a sudden, you're going to need to let me know.  So it's really important that you let me know whether you know any witness in the case.

I'm going to ask counsel for the Government to read you the Indictment, but before counsel does that, I'm just going to tell you something about the Indictment.

The Indictment is just a charging document, all right?  It's returned by a grand jury.  It's not evidence in and of itself.  It doesn't prove anything, all right, but it just sets out the charges.  There's quite a few in this case.  So I've asked counsel for the Government to read it to you so you know what the charges are.

16

Okay.  So, counsel, if you could please do that.

MR. BUTLER:  Thank you, Your Honor, and apologies for the length to the panel.

Counts 1 and 2, on or about the following dates in Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., knowingly and with intent to obtain property, obstructed, delayed, and affected interstate commerce by committing extortion in that Defendant Cho obtained property consisting of money from victim Y.S., a manager of hostess -- hostesses catering to karaoke bars by means of threatened force, violence, and fear of injury, immediate and future, to Victim Y.S. and Victim Y.S.'s business:  Count 1, November 16th, 2020, in the amount of $100, and Count 2, December 19th, 2020, in the amount of $100.

Counts 3 and 4:  On or about the following dates in Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., knowingly and with intent to obtain property, obstructed, delayed, and affected interstate commerce by committing extortion in that Defendant Cho obtained property consisting of money from Victim J.L., a manager of hostesses catering to karaoke bars, by means of threatened force, violence, and fear of injury, immediate and future, to Victim J.L. and Victim J.L.'s business:  Count 3 on January 12th, 2021, in

the amount of $100, and Count 4 on February 15th, 2021, in the amount of $100.

Counts 5 through 32:  On or about the following dates in Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., knowingly and with intent to obtain property, obstructed, delayed, and affected interstate commerce by committing extortion in that Defendant Cho obtained property consisting of money from Victim S.S., a manager of hostesses catering to karaoke bars, by means of threatened force, violence, and fear of injury, immediate and future, to Victim S.S. and Victim S.S.'s business:  Count 5 on December 20th -- 17th, 2020, in the amount of $100; Count 6 on January 17th, 2021, in the amount of 100 dollars; Count 7 on February 15th, 2021, in the amount of $100; Count 8 on March 16th, 2021, in the amount of $100; Count 9, April 15th, 2021 in the amount of $200; Count 10, May 14th, 2021, $200; Count 11, June 15th, 2021; $300, count 12, July 16th, 2021, $300; Count 13, August 15th, 2021, $300; Count 14, September 16th, 2021, $300; Count 15, October 16th, 2021, $400; Count 16, November 18th, 2021, $400; Count 17, December 18th, 2021, $500; Count 18, January 15th, 2022, $520; Count 19, February 15th, 2022, $500; Count 20, March 17th, 2022, $500;  Count 21, April 16th, 2022, $500; Count 22, May 15th, 2022, $400; Count 23, June 20th, 2022,

$400; Count 24, July 14th, 2022, $400; Count 25, August 16th, 2022, $400; Count 26, September 16th, 2022, $500; count 27, October 19th, 2022, $700; Count 28, November 15th, 2022, $500; Count 29, December 16th, 2022, $500; Count 30, January 15th, 2023, $500; Count 31, January 25th, 2023 $400; Count 32, March 16th, 2023, $500.

Counts 33 through 39:  On or about the following dates in Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., knowingly and with intent to obtain property, obstructed, delayed, and affected interstate commerce by committing extortion in that Defendant Cho obtained property consisting of money from K.Y.J., a manager of a karaoke bar, by means of threatened force, violence, and fear of injury, immediate and future, to Victim K.Y.J. and Victim K.Y.J.'s business: Count 33, December 7th, 2020, $600;  Count 34, January 7th, 2021, $600; Count 35, February 1st, 2021, $600; Count 36, March 6th, 2021, $600; Count 37, April 10, 2021, $600; Count 38, April 23rd, 2021, $400; Count 39, May 5th 2021, $600.

Counts 40 through 55:  On or about the following dates in Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., knowingly and with intent to obtain property, obstructed, delayed, and affected interstate commerce by committing

extortion in that Defendant Cho obtained property consisting of money from Victim Y.K., a manager of hostesses catering to karaoke bars, by means of threatened force, violence, fear of injury, immediate and future, to Victim Y.K. and to Victim Y.K.'s business:  Count 40, March 1st, 2022, $1,000; Count 41, April 15th, 2022, $200; Count 42, June 5th, 2022, $200; Count 44, July 14th, 2022, $200; Count 45, July 25th, 2022, $500; Count 46, August 15th, 2022, $200; Count 47, September 15th, 2022, $200; Count 48, October 15th, 2022, $200; Count 49, October 19th, 2022, $200: Count 50, November 15th, 2022, $200; Count 51, December 15th, 2022, $200; Count 52, January 14th, 2023, $200; Count 53, January 16th, 2023, $200; Count 54, February 16th, 2023, $400; Count 55, March 15th, 2023, $400.

Count 56:  On or about February 16th, 2023, in Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., knowingly and with intent to obtain property, attempted to obstruct, delay, and affect interstate commerce by committing extortion in that Defendant Cho attempted to obtain property consisting of $500 from Victim S.S., a manager of hostesses catering to karaoke bars, by means of threatened force, violence, and fear of injury, immediate and future, to Victim S.S. and Victim S.S.'s business.

Count 57:  On or about May 8th, 2021, in

Los Angeles County, within the Central District of California, Defendant Daekun Cho, also known as D.K., and others, known and unknown to the grand jury, each aiding and abetting the others with the intent to cause death and serious bodily harm, knowingly and intentionally took a motor vehicle, namely, a Honda Odyssey minivan that had been transported, shipped, and received in interstate and foreign commerce, from the person and presence of another, namely, Victim Y.S., by force and violence and by intimidation resulting in serious bodily injury.

THE COURT:  Thank you, Counsel.  Thank you.

All right.  In addition to the Indictment, ladies and gentlemen, the following witnesses may testify in this case.  It doesn't mean that all of them will be called, but these are all potential witnesses:

Felipe Pardo with the Los Angeles Police Department; Dr. Craig Torres-Ness; Jeffrey Bennett with the FBI; Jacob Rice with the Los Angeles Police Department; Steven Cavazos with the Los Angeles Police Department; Jason L. Collins with Homeland Security Investigations; Karen Gaspar, also with Homeland Security Investigations; John Armstrong with Homeland Security Investigations; Frank R. Cannata -- that's C-A-N-N-A-T-A -- Keanu L. Beltran with the FBI.

Yun Soo Shin; Joo Hun Lee; Sang Heun Shin;

21

Ki Young Jung; Young Nae Kang; Ivan Day Kwag.

As you've heard, this is a criminal case.  The Defendant has pleaded not guilty to all of the charges.  The Defendant is presumed innocent unless and until the Government proves his guilt beyond a reasonable doubt.

The burden of proof remains with the Government at all times throughout the case.  The Defendant has a right to remain silent and never has to prove his innocence or present any evidence whatsoever.  If he exercises that right, you cannot hold it against him in any way.

Trial is expected to last, approximately, three to four days.  This is an estimate.  The lawyers are pretty good about estimating the length of their trials; but, again, it's an estimate.  It does not take into account the amount of time that the jury will need to deliberate.  All right.  So that's only for the trial itself.

So I, very much, hope that the presentation of the case, including the evidence and the arguments and instructions to you, will take three to four days, but I will not guarantee it to you, okay, because jury trials, like every day of life, are unpredictable and sometimes things happen that no one can control that cause unexpected delays, for example.  All right.

So, in any event, I understand the jurors in our case have been cleared for up to two weeks in terms of

availability, generally.  So this should not take two weeks; hopefully, three to four days.  You must be available to serve during this time period, which would include the trial and any time it takes for the jury to deliberate.

So if you are selected and if you rise from one of those 12 seats or all 12 of those seats to be sworn in, once that happens and you've been sworn in, I will be expecting you to serve for the duration of the trial.  So once that happens, once you are sworn in as a jury, I will not be excusing you, all right, for appointments to go see the doctor, to go pick up a child, for work, or for anything else once you're sworn in.

So jury selection time, what we're about to engage in right now, what we call voir dire or jury selection, is the time for you to disclose to me any and all issues that could affect your ability to serve as a fair and impartial juror in this case, all right, not later.

So I, certainly, recognize that jury duty, when that notice arrives in the mail, that it's not always a welcome sight and that, at times, it imposes a burden -- if, not at all times, it imposes a burden on us.  I, too, am called for jury service.  It impacts all of us, but I want to just briefly address with you, in the hopes of winning you over, that this is extremely important.  We have very few obligations as citizens of this amazing country, and

this is one of them.  All right.  And, again, it's one of the very few that we actually have.  All right.

We don't even have a compulsory, you know, military conscription.  This is one of our very few duties.  It is critical to our democracy and to our justice system.  Our Constitution guarantees individuals the right to a jury trial in criminal cases, in civil cases, and we cannot fulfill the promise of our Constitution without willing and able jurors to step forward to take a time out from life and the demands of day-to-day living and serve in this extremely important role.

So I hope that, for those of you who are selected, that you will look upon it as an opportunity to continue to protect and preserve our democracy, which should never be taken for granted.

Also, please keep in mind that a lot of current and past generations of Americans have made significant sacrifices to preserve the rights and the privileges that are contained in our Constitution.  Those sacrifices have been made for well over 200 years now.  Sometimes, these individuals have made the ultimate sacrifice to preserve rights for everyone else in our country and for future generations of Americans.

So in this small but critically important way, you, too, can help to preserve this important right that is

24

set forth in our Constitution.  It would not be possible, again, without your service.

So thank you to all of you in the gallery and in the jury box for being here today for willingly coming forward to serve in this way.  I appreciate it, and I know the lawyers and the parties appreciate it, as do all of the judges who are -- who have the privilege of serving in this district in these courts.

As I said, once the jury has been selected and again at the conclusion of the case and before the presentation of closing arguments by the lawyers, I will be giving you detailed instructions on the law that will apply. It is those instructions that will govern your deliberations.  Okay.  But for now, let me just give you some basic legal principles that apply in all criminal cases which, hopefully, will help -- will serve to orient you as we go forward with this process today.

First, jurors are what we call triers of fact. That goes back to what I said earlier.  That means that, if you are selected, you, the jury, will decide the facts in the case.  You will decide what actually happened in the case.  In doing this, in making those decisions, all right, and coming to those conclusions, you must only consider evidence that is admitted and presented here at trial.

What is evidence?  Evidence consists of -- there's

25

only three categories.  All right.  Evidence consists of testimony, all right, the testimony of witnesses who take an oath to tell the truth, take the witness stand, and tell you what they saw, heard, did, experienced.  Okay.  That's one form of evidence.

Another type of evidence is what we call exhibits, tangible things, objects.  They can be documents or photographs or video, for example, or sound recordings that are admitted into evidence and accepted.

And, third, the third category, is anything that the parties agree to as being proven.  All right.  So if the two sides get together and decide if something's proven, then evidence doesn't have to be taken on that, on that fact.  Okay?  So you are to accept it as true and proven, and I will be telling you to accept it as true and proven.  Please -- that's it.  Those are the only three categories that constitute evidence.  You must make your decision based on evidence, and it is only those three things.

Among the things that are not evidence are what the lawyers say, all right?  So when the lawyers argue to you, they make statements to you, they examine witnesses, none of that is evidence, okay?  And I will be instructing you as to that.

The lawyers are not witnesses.  They're not taking the witness stand and taking an oath to tell the truth.

They're not serving in that role, okay?  So that is not evidence.

So you can only consider evidence that's presented here in the courtroom.  So what does that mean?  That means that you too, you cannot consider evidence that is acquired from any other place, from any other source, okay?  So nowadays what does that include?  The Internet, your mobile device, conversations with family and friends, research that you may want to do about this case, and it's so tempting, isn't it, with all of the information that's out there?  But you can't do that, all right?

It's extremely important that you do any outside research.  All of the information you will be getting about this case can only come from inside this courtroom when we are all gathered together.  You're in your seats, I'm in mine, they're in theirs, and we are in session and on the record.  That's the only evidence that you can consider.

If you do investigate on your own or do your own research or gain information from another source, that could be extremely harmful, all right?  It could lead to what's called a mistrial, which means that you'd all get dismissed, and we'd have to start this trial all over again with a whole new batch of new jurors and do it again.

And it also runs the risk that whatever it is that you learn or acquire on your own is inaccurate, it's

incomplete, and it's misleading.  And none of it has been tested here in the courtroom, all right?

So it's not fair to the parties to consider anything else because no one else has gotten to experience it or to test it or to challenge it in any way here in the courtroom.

When witnesses take the witness stand, they get examined by both sides.  They get -- their memory gets tested.  Their credibility gets tested, and it is ultimately up to you to decide what to believe or not to believe with respect to evidence that's submitted in the case, okay?

Third, you sit in my shoes during the trial.  You are to serve as an unbiased decider of those facts, okay?

You are not to take sides.  You are not to favor or disfavor the attorneys, their clients, their witnesses. You are to serve as a neutral arbiter of the facts in the case.

And lastly, you -- or near last, I will be instructing you on the factors that you are to use in assessing the credibility of witnesses.

What's important is that you apply those factors even handedly, fairly, as to all witnesses, okay?  So you will apply those factors in evaluating credibility.

What do you not do?  Well, you don't automatically believe or disbelieve a witness because of the witnesses'

28

occupation or job, the witnesses' personal characteristics, for example, the witnesses gender, race, ethnicity, immigration status.  Some witnesses may require the use of an interpreter, okay?

So you don't assess -- you don't believe or disbelieve a witness because of those factors, all right?  You set all of that aside, and I will be providing you with the factors in the form of an instruction as to what you are to consider when evaluating the credibility of witnesses and apply it evenhandedly.

And lastly, you must follow the instructions on the law that I will be giving to you regardless of how you feel about those instructions, whether you like them or not, whether you agree with them or not, all right?

I will be giving you the law.  I am the source of the law for you.  There is no other source.  If you don't like the law, there's a few things you can do, all right?

You can write your congressman to get them to change the laws.  You can go out and run for office yourself to go change those laws, but what you do not do is to attempt to change the laws from where you sit as a juror.  You must accept the law as I give it to you and apply it to the facts that you will be deciding have been proven or not proven.

Okay.  We're going to start the process of

29

selecting a jury now, and this process will allow the parties to consider and evaluate each of you.  And the objective at the end of the day is select a panel of 12 jurors plus two alternates who will be fair, who will be impartial to both sides, who will decide the case based on nothing but the evidence presented here in the courtroom when we're in trial, and the law that I will be giving to you.

The questions I will be putting to you are not meant to embarrass you or make you uncomfortable.  If there is a question that does make you feel that way and you'd rather not answer it in front of everyone else here in the courtroom, then you are welcome to ask for that same sidebar that I referred to earlier, and we will bring you around over here.  And the lawyers will stand around so they can hear, and you and I will speak, all right?  So that you can answer the question privately, if you will.  All right?

So the questions that I will be putting to you are contained on this two-page questionnaire that everyone now has, and I'm going to be asking you to answer one through five.  So everyone will be answering one through five.

And then, for six through 17, all I want to know is if you have any yeses to any of those questions, okay?  So we're not going to go one by one.  You're just going to tell me, okay, I have a yes to whatever, eight, ten, 12,

and then we're going to walk through your answers to those questions, all right?  Trust me, that's the most efficient way to do this.

Okay.  With respect to one through five, the very first question asks you what your general area of residence is, okay?  Emphasis on the word general.  So all I want is the city that you live in, all right?  Don't give me your street address.  Don't give me the street that you live on; just a city, right?  So Santa Monica is an example, right?  Santa Barbara's another, right?  So just the city that you live in, how long you've lived there, how many years it's been.

Marital status is very broad, of course.  That includes your status today.  If you are widowed, what your former spouse -- well, we're going to get to occupation, but all of these questions are captured.  Basically we just want to know what your marital status is -- are you married, not married, divorced?  Are you in a relationship with someone who you, you know, you consider that to be a serious substantial relationship.

Your occupation, what you do.  If you are retired, what you did in the past, all right?  And then the same for any adults in your household, okay?  Just the adults in your household.  So that's 18 and up.

So if you have people in your household below 18,

I'm delighted for you, but you don't need to tell us, you know, what they're up to, all right?  Only 18 and up, occupation, all right?  And that includes a spouse or a former spouse, and of course, adult, other adult relatives as an example.  You could have roommates.

With respect to number five, if you've ever served on a jury, I think most of the questions are self-explanatory.

With respect to verdict, please note in underline and in bold.  Do not tell us the verdict, okay?  So if you served on a criminal case, for example, just tell me what the charge was, about how long ago you served, and whether or not the jury reached a verdict, all right?  So if the jury did or did not reach a verdict, all right?

And if it was a civil case, what the nature of the civil case was about, right?  And whether the jury reached a verdict or not, okay?  And then we get to six through 17.

**VOIR DIRE EXAMINATION**

THE COURT:  All right.  So I think we are ready to start.  We're going to be handing out a microphone that is cordless so you can hand it over to the next person after you are done, and we're going to start with juror in seat number one.  If you could please answer questions one through five to get started.

THE PROSPECTIVE JUROR:  I live in Santa Clarita,

32

and I've lived there for 20 years.  I'm married, and I'm a stay-at-home mom.  My husband is a lineman, and I've never served on a jury.

THE COURT:  And would you mind helping me out? What does that mean, a lineman?

THE PROSPECTIVE JUROR:  For the power company, like Edison.

THE COURT:  So he works for the utility on the lines?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Great.  Thank you.  All right. Terrific.

And no other adults in your household, I presume?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Very good.  And before you became a stay-at-home mom, did you ever work outside the home?  Did you have any kind of a profession, anything?

THE PROSPECTIVE JUROR:  I worked at a cookie shop. That's it.

THE COURT:  Okay.  Good enough.  How about six through 17?  Do you have any yeses to any of those questions?

THE PROSPECTIVE JUROR:  Yes.  I have a yes to number ten.

THE COURT:  All right.  You may answer.

33

THE PROSPECTIVE JUROR:  I have several family members in law enforcement, family members and friends.  You would like me to list them and their agencies?

THE COURT:  Maybe.

THE PROSPECTIVE JUROR:  I mean, mostly like local law enforcement, sheriffs, LAPD.

THE COURT:  All right, and this includes --

THE PROSPECTIVE JUROR:  One ATF agent.

THE COURT:  Okay.  Let's start with family first. What degree of family and what --

THE PROSPECTIVE JUROR:  Not immediate, just close family members.

THE COURT:  Okay.  So we are talking about what, cousins, uncles?

THE PROSPECTIVE JUROR:  Yeah, cousins, uncles, second cousins, married two cousins, okay.  So nothing immediate.

THE COURT:  Sounds like a few.  We're talking about more than a handful, half a dozen, a dozen?

THE PROSPECTIVE JUROR:  Probably five, I would say.

THE COURT:  All right.  And they're all with either L.A. County Sheriff or LAPD?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And then you have friends

34

that fall into this category?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Ballpark, how many?

THE PROSPECTIVE JUROR:  It's a larger number.

THE COURT:  Okay.  A dozen?

THE PROSPECTIVE JUROR:  Yeah.  Twelve to 20, I would say.

THE COURT:  All right.  The same agencies?  You mentioned ATF, but other than that?

THE PROSPECTIVE JUROR:  Yeah.  LAPD, sheriff, and then one ATF agent.

THE COURT:  All right.  And that's a friend, the ATF agent?

THE PROSPECTIVE JUROR:  Yes, uh-huh.

THE COURT:  Now, we're probably talking -- I don't know, about 20 people here altogether, ballpark?

THE PROSPECTIVE JUROR:  Yeah, roughly.

THE COURT:  All right.  Do you ever talk to them much about their day-to-day jobs, you know, what they do, cases they've worked on?

THE PROSPECTIVE JUROR:  No, no.  Not really.

THE COURT:  You just generally know what they do?

THE PROSPECTIVE JUROR:  Yes, yeah.

THE COURT:  All right.  Anything else?

THE PROSPECTIVE JUROR:  I don't think so.

35

THE COURT:  No other yeses?  Okay.

Well, you heard what I've said.  So in the case of your many friends and family members who are in law enforcement, especially if you are selected to serve as a juror, you can't talk to them about the case.  You can't go to them for any advice.  You will have to decide the case based on nothing but the evidence that is presented here when we're in session in trial.  Can you do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes.  Will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you so much.

If you could hand that over to juror number two. All right.  We're going to go through the same exercise. One through five, please.

THE PROSPECTIVE JUROR:  Great.  I live in Los Angeles.  I've lived here for about three years now.  I am not married.  I'm single, but I do live with my significant other.

THE COURT:  Uh-huh.

THE PROSPECTIVE JUROR:  I am a sales account executive for a tech company.  My person that I live with works for the city.  He works for LAHSA, the L.A. Homeless Services Authority.

THE COURT:  And what does he do for that agency?

THE PROSPECTIVE JUROR:  He does outreach coordination and helps organize kind of logistics for helping people get into housing, and I have never served on a jury before.

THE COURT:  All right.  And no other adults in your household?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  I think a maybe for 17 just because I accepted a new position on April 1st, and I'm just a little concerned about the timeline of the case.  It seems like it should be fine, but downstairs they told me I should mention it.

THE COURT:  Okay.  Well, it's good to mention it. Let's see.  Well, I'm optimistic.

THE PROSPECTIVE JUROR:  Right.

THE COURT:  Okay.  And obviously you should let your new employer know if you are selected.  We do not know right now if you will be selected, right?  But if you were

to be selected, you know, let your new employer know as soon as possible. But I'm optimistic that you'll be okay.

THE PROSPECTIVE JUROR: Okay. Great.

THE COURT: All right. Other than that, anything else that's responsive to any of these questions?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. If you are selected, will you decide the case based on nothing but the evidence as presented here at trial?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Will you follow the law that I give to you?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Can you be fair to both sides?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you. If you can hand that over to number three.

Good morning.

THE PROSPECTIVE JUROR: Good morning. I live in Baldwin Park, and I've lived their 27 years. I am currently married. I am a diagnostic imaging veterinary technologist.

My spouse, my husband works for the city of Carson, and he is in purchasing. My mother in law also lives with us. She works at Jack in the Box, and then her boyfriend also lives with us. And he works for the Snyder's

Auto Company where he does repairs with painting.

I have served on a jury duty once before.  I'm not sure if it was a criminal or civil case.  We were determining how much a family would receive as a payout after a family member was -- died by -- they were hit by a car.  And they were a pedestrian, and the right of way.  Apart from that, we did determine a verdict.

THE COURT:  Okay.  Very good.  All right.  That sounds like a civil case.  All right.  Thank you.

How about six through 17?  Do you have any yeses to any of those questions?

THE PROSPECTIVE JUROR:  I do have quite a few yeses.

For number eight, one of my close friends that I grew up with has had legal training.  She is studying to be a lawyer.  So I've known her my whole life, and she is very close to me.  So I've known kind of through the process of what she's gone through for that.  Apart from that --

THE COURT:  So she's in law school right now?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Apart from that, number nine, my parents have been involved in two civil cases.  One was an identity theft case.  They were the -- they were the plaintiff.  They were also involved in another civil case

where they had to remove someone from a home that they were renting out.  They were also the plaintiff for that, and then I was involved in the one where we had to remove someone from the home.

For number ten, I do have family in law enforcement, LAPD.  I also do have one friend.  The family member is a close relative, but we never talk about it.  I just know he's in LAPD.  The other one is the spouse of a friend.

THE COURT:  So with respect to the family member, what's that person's relation -- you know, how would you describe that family relation?

THE PROSPECTIVE JUROR:  They are a cousin.

THE COURT:  Cousin.  Okay.

THE PROSPECTIVE JUROR:  Uh-huh.

For number 12, I have had a family member arrested for a crime.  One was my father-in-law, another one was a sibling, one of my brothers.

THE COURT:  Okay.  Let's take them one a time. Let's start with your father-in-law.  What was he arrested for?

THE PROSPECTIVE JUROR:  Driving under the influence and hitting a pedestrian.

THE COURT:  How long ago did that happen?

THE PROSPECTIVE JUROR:  I would say maybe two

40

years ago.

THE COURT: And were you involved in the case in any way?

THE PROSPECTIVE JUROR: I was not.

THE COURT: All right. Do you have any feelings about how, you know, the case turned out for him? I'm not interested in what, you know, the result was of the case. But just whether the process was fair or unfair to him, what your perceptions were?

THE PROSPECTIVE JUROR: I think it was a fair trial.

THE COURT: All right. And then, I'm sorry. You mentioned a second person, your brother?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Okay?

THE PROSPECTIVE JUROR: My brother, when he was younger, was playing with a BB gun, and he broke a couple car windows.

THE COURT: How young was he?

THE PROSPECTIVE JUROR: Seventeen, almost 18.

THE COURT: And so he was actually charged with that, some kind of property crime?

THE PROSPECTIVE JUROR: I believe so, yes.

THE COURT: And again, were you involved in any way in the case? Were you a witness, anything?

41

THE PROSPECTIVE JUROR:  I was not.

THE COURT:  And how do you feel that your brother was treated by our justice system?

THE PROSPECTIVE JUROR:  I believe it was fair, and I believe that is -- or I guess 12 is I have known someone who was also the victim of a crime.

THE COURT:  All right.  And that someone, is that someone close to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Friend?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  What was the crime?

THE PROSPECTIVE JUROR:  Sexual abuse and child abuse.

THE COURT:  And were you involved in, is that -- I don't know if that was one case or multiple cases?  Were you involved in any way?

THE PROSPECTIVE JUROR:  It was a single case, and I was not involved.

THE COURT:  And do you feel that your friend -- your friend was a victim you said; correct?

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  All right.  Did you feel that your friend, as a victim, was treated fairly or unfairly by the justice system?

42

THE PROSPECTIVE JUROR:  I do.

THE COURT:  Which one, fair or unfair?

THE PROSPECTIVE JUROR:  Fair.

THE COURT:  All right.  Anything else?

THE PROSPECTIVE JUROR:  No.  That is it.

THE COURT:  So you've heard what I've said.  If you are selected, and you've served on a jury before, so I'm sure you have some recollection of the process and the experience.

You'll need to decide the case based on just the evidence that's presented here in the courtroom.  That means you can't talk to any of your family members or friends that are in law enforcement or otherwise.  Can't go to them for advice, and can't talk to your friend that's in law school about the case or ask that person for advice.  Can you do that?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  Can you decide the case just on the evidence that's presented here in the courtroom?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

43

THE COURT:  All right.  Thank you.

Hi.  Good morning.

THE PROSPECTIVE JUROR:  Good morning.  Let's see. I've lived in Los Angeles my entire life except for the ages of two to 13 when I lived in Pico Rivera.  Sorry.  I'm a widower.  I'm still an attorney.  I'm licensed with the state of California, but I've effectively stopped practicing as of about 2015 when I retired from state service where I was at that time --

THE COURT:  I'm sorry.  I can't --

THE PROSPECTIVE JUROR:  Maybe it's directional -- where at that time I was an administrative law judge.  Prior to that I was a deputy commissioner with the California State Board of Parole Hearings, which was previous to that, the Board of Prison Terms.  Prior to that I was in private practice for, since about 1982.

THE COURT:  How long were you in private practice for?

THE PROSPECTIVE JUROR:  About 20 years give or take, yeah.  About 20 years before I entered state service.

THE COURT:  And what was the nature of your practice when you --

THE PROSPECTIVE JUROR:  It was criminal but mainly appellate and parole revocation matters, some trial court matters, some juvenile delinquency proceedings.

44

THE COURT:  Okay.  All right.  Then after you ceased being in private practice, about how many years would you say you were in state service?

THE PROSPECTIVE JUROR:  Twelve.

THE COURT:  Twelve.  And that included --

THE PROSPECTIVE JUROR:  It was about -- it was mostly with a Board of Parole Hearings and Board of Prison Terms, and then --

THE COURT:  And what do you do as an attorney for them?

THE PROSPECTIVE JUROR:  No.  I was effectively an administrative law judge, but we didn't have the title.  We had a title of deputy commissioner, and we decided parole revocation matters, life parole hearing matters, things like that.

THE COURT:  I see.  So you were actually making the decisions as to whether or not someone had violated his or her parole?

THE PROSPECTIVE JUROR:  Yes, among other types of decisions, but yes.

THE COURT:  All right.  So when you said you served as an administrative law judge, it was in that capacity?

THE PROSPECTIVE JUROR:  At the tail end of my career they decimated our operation, realignment, if you

recall.  So they shuffled some of us into other departments where I remained for a short period of time and then just decided to retire.

THE COURT:  Understood.  All right.  Thank you.

THE PROSPECTIVE JUROR:  Thank you.  And then, let's see.  I've never served on a jury -- oh, I'm sorry.

THE COURT:  All right.  You've never served on a jury?

You said you were a widower.  What did your spouse do?

THE PROSPECTIVE JUROR:  Yeah.  I'm sorry, I didn't mean to skip that.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Yeah, she was an attorney, criminal lawyer.  Actually, prior to that she was a clinical social worker.  She had an MSW, and then she went to law school.  That's where I met her, and she was a terrific criminal lawyer.  And then she -- then she entered the county counsel's office because she had this terrific background, a social worker.  And she did terrific there. She moved up quickly and retired as a senior county counsel.

THE COURT:  Okay.  Great.  What kind of cases did she handle at the county counsel's office?

THE PROSPECTIVE JUROR:  Child dependency, not delinquency.  She handled --

THE COURT:  The dependency cases?

THE PROSPECTIVE JUROR:  Yes.  Let's see.  Then in terms of yeses, I do -- I mean, I don't keep in close contact with these -- well, I don't know what close means.  I don't know what you mean by close, but they are friends.  They are more than acquaintances, and they are people I met through work.  And let's see, one of them -- one of them had a background like me, but plus before that he was also a probation officer.

I also -- wait, I have got to back up.  I'm sorry.  Yeah.  I kind of want a bench on nine, if I could approach.

THE COURT:  Sure.  Before we do that, just if you don't mind if you could just answer anything that you are comfortable answering.

THE PROSPECTIVE JUROR:  Oh, sure.

THE COURT:  And then we'll take up whatever you'd like a bench conference on.

THE PROSPECTIVE JUROR:  Okay.  That's fine.  Let's see.

Oh, okay.  I mean, I was a plaintiff once in an automobile accident.  That's not what I want the bench conference for.  Let's see -- or defendant, I'm sorry.  I was a defendant.  I was a defendant, not the plaintiff.  I apologize.

THE COURT:  How long ago was that?

47

THE PROSPECTIVE JUROR:  It was a long time ago. This is, I think, in the '80s.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  Yeah, it's in the '80s, I think.  I'm pretty sure.

THE COURT:  Did you feel that you were treated fairly or unfairly?

THE PROSPECTIVE JUROR:  Oh, I'm sorry.  It didn't go to court.  You know, it settled out of court, but there was a pleading.  It went, you know, it didn't settle before a pleading.  That's all.

THE COURT:  Understood, but your carrier presumably --

THE PROSPECTIVE JUROR:  Right.

THE COURT:  -- defended you?

THE PROSPECTIVE JUROR:  Right, and it wasn't a real major accident.  It was a relatively medium accident. I don't think there were any major personal injuries.  It was mainly property.  Let's see.

I have a lawyer friend.  I don't keep in real close contact with him, but I know in the past he had a -- he was a defendant in an assault case, felonious assault, and the kind of thing where they don't take your license necessarily.  Let's see.

THE COURT:  Your friend was a defendant?  Your

48

attorney friend was a defendant --

THE PROSPECTIVE JUROR:  Yes, he was.

THE COURT:  -- in a criminal assault case?

THE PROSPECTIVE JUROR:  Yes, yes, yeah.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Let's see.  I think that's it.  I think it's just sidebar on this one, unless you want me to proceed with the rest of them first.

THE COURT:  Well, that's what I was trying to get you to do.

THE PROSPECTIVE JUROR:  Gotcha.  I do have a nephew who is a probation officer, and he's a high ranking Los Angeles County probation officer.

And I have another friend who is a deputy -- retired deputy sheriff.  And actually, he became -- he joined our ranks as a deputy commissioner as well.

Let's see.  My wife, when she was young, she was a victim of a serious assault, a sexual assault.  She was able to fend the assailant off.  It didn't result in a, in a case.

THE COURT:  Before you knew her, I take it.  You said she was young?

THE PROSPECTIVE JUROR:  Yes.  Before I knew her.  She was in her, maybe her 20s, I think, her mid-20s, something like that.  She experienced a, a residential

burglary before we met, and while we were together, we suffered two residential burglaries.

See.  I don't have frequent contact with my nephew, but I do talk to him from time to time, and he is, as I indicated, he has that role with the probation department.  I guess it's just the sidebar.

THE COURT:  All right.  Let's go do that.  Let's have you come on over to the sidebar.

(*The following was held at the bench:*)

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Come on up.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Just speak into that, all right?

THE PROSPECTIVE JUROR:  Okay.  I will.

THE COURT:  The court reporter is going to write down what you're saying.

THE PROSPECTIVE JUROR:  Very good.  I have a stepbrother from my mother's third marriage who -- as I vaguely recall, somewhere around the 2000s, maybe early 2000s, he was tried and convicted for some very awful crimes:  Home invasions, rapes, murders.  And he ended up being sentenced to life without parole.

He's somebody I had a little contact with when I was very young, but by the time he committed these crimes, I had -- I wasn't having any contact with him.  I mean, it was

really -- the only relationship is really the technical familial relationship.

THE COURT:  It sounds like he's significantly older than you?

THE PROSPECTIVE JUROR:  No, no, no.  He was younger.  He was a very troubled kid because of my mother's third husband.  In fact, it was, it was an awful day.  When we were young the -- I'm sorry.

Let me back up.  Our age differences are probably, I would say it could be a ten-year age difference.  He could be ten years younger than me.  I forget, but it was one of those awkward things where my mother and her new husband basically essentially kind of kidnapped this kid from his mother.

And the kid was a very troubled kid anyway.  In fact, they kidnapped him because they felt he, you know, she wasn't raising them well.  Anyway, the kid was a mess.  He had a horrible juvenile record, and then led to a horrible life of adult crime.

THE COURT:  Well, all right.  Well, thank you for your answers to all of the questions, and since I have you here.  You heard what I told the other jurors, and obviously you're intimately familiar with the practice of law and serving in the role as a judicial officer.

If you were to serve as a juror, you have to

51

decide the case based on just the evidence as presented here in the courtroom.  Can you do that?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  And would you follow the law that I provide to you?

THE PROSPECTIVE JUROR:  Absolutely.

THE COURT:  And of course, you won't have contact with anybody else whatsoever or conduct any research, anything like that?

THE PROSPECTIVE JUROR:  I won't.  And I do live alone.  I don't think I mentioned that.  There's no one else in my household.

THE COURT:  Okay.  And can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you so much.  Thank you.  Appreciate it.

THE PROSPECTIVE JUROR:  Thank you.

*(End of conference held at the bench.)*

THE COURT:  All right.  Thank you very much.  If there's nothing else, if you don't mind passing the microphone on over to juror number five.  Thank you.  All right.

All right.  Good morning, ma'am.  If you could please answer one through five.

52

THE PROSPECTIVE JUROR:  Thank you.  I live in Calabasas.  I have lived there for about three years.  I am married.  My occupation is a program manager for a nonprofit.  For my spouse's occupation, he is an accountant.  I also live with my sister.  She is a writer and a researcher for unscripted development, and I have never served on a jury.

THE COURT:  And can you just tell me a little bit about your nonprofit.  You don't have to identify it, but just tell me what the nature of the nonprofit is; what its mission is, for example.

THE PROSPECTIVE JUROR:  Definitely.  It is a social services nonprofit.  So we have six different program areas, including domestic violence, human trafficking, mental health and trauma treatment, justice services, and our 211 information and referral hotline.

THE COURT:  All right.  Thank you for that.  Do you have any yeses to six through 17?

THE PROSPECTIVE JUROR:  I do not.

THE COURT:  All right.  You've heard what I've said to the others if you were to be selected as a juror.  Will you decide the case based on nothing but the evidence that's presented here in the courtroom when we're in trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the law that I provide

53

to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you so much.

THE PROSPECTIVE JUROR:  Good morning.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  I live in Temple City. I've lived there for 43 years.  I'm married.  I'm a retired schoolteacher.  My husband's also retired from Metrolink. He was a train driver.  I have never served on the jury.

THE COURT:  All right.  Thank you.  What level or grade school did you teach?

THE PROSPECTIVE JUROR:  I was working for a residential treatment center as a birth instructor.

THE COURT:  All right.  So when you say you're a teacher, was in that role?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Thank you.  Would you mind answering six through 17?  Any yesses?

THE PROSPECTIVE JUROR:  Yes, on number ten.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  I also have family members with LAPD.

54

THE COURT:  All right.  Degree of family.  Are we talking about brothers?  Sisters?  What --

THE PROSPECTIVE JUROR:  I'm talking about three nephews and a niece.

THE COURT:  And are they, you know, like patrol officers?  Do they do other things?

THE PROSPECTIVE JUROR:  They're stationed -- they're assigned at the Metropolitan Detention Center.

THE COURT:  Okay.  Anything else that's responsive to any of my questions?

THE PROSPECTIVE JUROR:  Number 12.  My daughter was a victim of a crime.  They did a drive-by at her home, and they shot into her home several times.

THE COURT:  Oh, dear.  Was she or anyone else hurt?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Thankfully.  Was she home when this happened?

THE PROSPECTIVE JUROR:  Yes.  They were all home.

THE COURT:  Oh, boy.  All right.  Was that crime reported to the police?

THE PROSPECTIVE JUROR:  Absolutely, to the sheriffs.

THE COURT:  All right.  Do you know if anybody was ever caught for that?  Yes?

55

THE PROSPECTIVE JUROR:  Yes.  It went to court.

THE COURT:  Were you involved in the case in any way?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Do you feel -- I mean, I hope it's over by now.

THE PROSPECTIVE JUROR:  Absolutely, yes.

THE COURT:  I mean, was she and her family, were they treated well, fairly by law enforcement and the justice system or not?

THE PROSPECTIVE JUROR:  They were.  Yes, they were.

THE COURT:  Okay.  Anything else that's responsive to any of these questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you're selected as a juror you'll have to decide the case based on just the evidence that is presented.  You won't be able to have contact with any of your family members that are in law enforcement.  So will you do that?  Decide the case just on the evidence that's presented here in court?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  All right.  Anything else.

THE PROSPECTIVE JUROR:  (Shakes head).

THE COURT:  All right.  Thank you so much.

So let's turn a juror number seven now.

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Hello.  Good morning.

THE PROSPECTIVE JUROR:  I live in Los Angeles --

THE COURT:  Could you hold that microphone a bit closer?  There you go.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes.  We want to make sure we can hear you.  It's a big courtroom.

THE PROSPECTIVE JUROR:  It is.  I've lived in Los Angeles for 30 years.  I'm married.  I'm retired.  I formerly worked as a public affairs office for the Department of Foreign Trade for the Australian government.

My husband works at American Motion Picture Arts and Sciences Society.  He works on scientific and technical area, film, lenses, light, research, archiving.

I've never served on a jury.

Number --

THE COURT:  Yes, six through 17, any yeses?

THE PROSPECTIVE JUROR:  Number eight.

57

THE COURT:  Go ahead.

THE PROSPECTIVE JUROR:  My brother-in-law is ADA for the Chief Appeals Bureau in Brooklyn.

THE COURT:  When you say ADA?

THE PROSPECTIVE JUROR:  Assistant district attorney.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  Number ten, my sister is a former policewoman in Australia, and her ex-husband is -- was a former policeman also.  He's now in Vietnam.  That's it.

THE COURT:  All right.  That's it.

All right.  Well, you've heard what I've had to say.  You won't be able to chat with any of these family members, right, at least about the case while you're sitting here as a juror, you understand?

THE PROSPECTIVE JUROR:  Yes.  I do.

THE COURT:  All right.  If you're selected, will you decide the case based on just the evidence that's presented here in the courtroom?

THE PROSPECTIVE JUROR:  Certainly.

THE COURT:  Will you apply the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides?

58

THE PROSPECTIVE JUROR:  Hopefully, yes.

THE COURT:  Yes is ideal.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Any doubt?

THE PROSPECTIVE JUROR:  None at all.

THE COURT:  All right.  Thank you so much.  Anything else?

THE PROSPECTIVE JUROR:  No.  That's it.

THE COURT:  Okay.  Thank you.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  All right.  Juror number eight, sir.

THE PROSPECTIVE JUROR:  So I live in Cerritos, have been there for about ten years.  Before that I was in Pasadena for another ten, and then I was in India before that.

I'm married.  My occupation, I am responsible for product development for a tech company, and then also have a consulting firm which does more IT audit related services.

As far as my spouse, my wife, she's a pharmacist, and she's the only other adult in the family or in the household.

I have never served a jury, on a jury.  Yep.

THE COURT:  How about six through 17?  Do you have any yeses to any of those questions?

THE PROSPECTIVE JUROR:  Probably only 12, number

12. That one I was subjected to a burglary, part of a hotel manager, when I was a hotel manager there. And then a couple of my family members have also gone through that, like my uncles and aunts. But nothing, no one was seriously hurt or anything like that.

THE COURT: All right. Let me try to get a little bit more information.

With respect to your personal experience, can you just tell me a little bit about that? You said when you were a hotel manager?

THE PROSPECTIVE JUROR: Yeah.

THE COURT: When you said you were a victim of a burglary while you were a hotel manager?

THE PROSPECTIVE JUROR: Correct.

THE COURT: So what does that mean, precisely? Somebody broke into someone's room?

THE PROSPECTIVE JUROR: No. Someone came in to the front desk and pointed a gun and was like, hey, I want money.

THE COURT: Oh, I see. Okay. I would actually call that a robbery.

THE PROSPECTIVE JUROR: Oh, sorry.

THE COURT: Okay. So somebody actually came up to you armed and demanded money when you were working at the front desk of a hotel?

60

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And what happened?

THE PROSPECTIVE JUROR:  I gave them the money.

THE COURT:  All right.  And no one was hurt?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Thankfully.  All right.  Did you contact the police?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was that here in LA or in California?

THE PROSPECTIVE JUROR:  Yes.  It was in Inglewood.

THE COURT:  Okay.  All right.  Was anyone ever caught?  Prosecuted?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Inglewood Police?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  Okay.  And then you mentioned uncles and aunts, right, that had similar experiences?

THE PROSPECTIVE JUROR:  Yes, similar experiences, yes.

THE COURT:  Wow, okay.  At hotels or in other contexts?

THE PROSPECTIVE JUROR:  Hotels.

THE COURT:  So while manning the front desk at a hotel.

THE PROSPECTIVE JUROR:  That's correct.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  One of them was actually beaten a little bit.  So they got hurt too.  So there was assault.

THE COURT:  All right.  Here?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Police called?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  For all of these?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  You where not involved in the others I presume, right?  You weren't there?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  With respect to all of these, any feelings good or bad as to your experience vis-a-vis the police department, your family members' experiences?

THE PROSPECTIVE JUROR:  I'd say probably indifferent.

THE COURT:  Okay.  All right.  Anything else that's responsive to these questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you serve as a juror in the case, you will need to set aside your personal -- the

experience you just described to me at the hotel.  It's got nothing to do with this case, right?  Whoever did that is not charged in this case, and it has nothing to do with case so you got to set that aside.  Can you do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Can you decide the case, this case if you were selected to serve as a juror based on nothing but the evidence as presented in the case during the trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Let's pass the mic on over to juror number nine.

THE CLERK:  You can hand it to me, sir.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  All right.  Good morning, sir.

THE PROSPECTIVE JUROR:  Good morning.  I live in Santa Clarita Valley.  I've lived there for more than 30 years.  I am currently married to my beautiful wife Maureen.

My occupation is a high school teacher at the greatest high school ever, St. Genevieve High School.

My wife is currently the best oma to our five grandchildren, and I've never served on a jury.

THE COURT:  All right.  It sounds like things are going well.  All right.  Let's turn to six through 17.  Any yeses?

THE PROSPECTIVE JUROR:  Being a teacher for over 44 years, I have a lot of former students that are in the legal profession, and not that we talk that much.  But about every year there, we get together, well, anyway, alumni.

My brother-in-law, unfortunately ran into some difficulties and was incarcerated.  So that's number nine.

THE COURT:  Can we just dig into that a little bit?  What sort of difficulties did he run into?

THE PROSPECTIVE JUROR:  I don't know exactly.  I know that he served time, and it was -- it had something to do with theft involving Home Depot and some type of activities there.

And he came out of it -- this was a number of years ago and was doing better with his probation officer, and so things were working out for him.

THE COURT:  Okay.  You weren't involved in the case in any way?

THE PROSPECTIVE JUROR:  No.  No, no.  I wasn't

64

involved in the case.

THE COURT:  Okay.  And just going back to your former students and alums, you said they're in the legal profession.  Are they police officers, are they lawyers?

THE PROSPECTIVE JUROR:  Lawyers, in that regard.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  But I do have a number of also students that have been FBI and also in law enforcement.

THE COURT:  Yeah.  I imagine in 44 years you have quite a few.

THE PROSPECTIVE JUROR:  Yeah, yeah.  It's a pretty close school, so we stay in contact, and that's what helps the school.

THE COURT:  All right.  Other than seeing them it sounds like at annual functions, right, like a reunion or something?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  You're not really in regular contact?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  So you hear about what they're doing and their --

THE PROSPECTIVE JUROR:  Yeah, and we, we touch bases and, you know.

THE COURT:  Got it.  All right.  Anything else?

65

THE PROSPECTIVE JUROR:  A brother-in-law currently FBI.

THE COURT:  An FBI agent?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you know where?

THE PROSPECTIVE JUROR:  There's an FBI office down --

THE COURT:  In L.A.?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  As opposed to some other part of the country or world?

THE PROSPECTIVE JUROR:  Right, L.A.

THE COURT:  Do you know what kind of work he does?  A particular section?

THE PROSPECTIVE JUROR:  No, I don't.  I don't.  He doesn't talk too much about it.  That, I think, is the yeses that I see.

THE COURT:  All right.  If you were to be selected, will you decide the case based on nothing but the evidence that I've provided to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And obviously it's not a good time to reach out to your brother-in-law or any of your former students or anyone else for advice or to chat with him about the case.  You won't do that, right?

66

THE PROSPECTIVE JUROR:  No.  I will not.

THE COURT:  All right.  Will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes, I will.

THE COURT:  And can you be fair to both sides in this case?

THE PROSPECTIVE JUROR:  I can.

THE COURT:  All right.  Thank you very much.

Let's turn to juror number ten.

THE PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  Good morning, sir.

THE PROSPECTIVE JUROR:  I live in Manhattan Beach.  I've lived there for 12 years.  I'm currently single.  I'm an attorney, and I've never served on a jury.

THE COURT:  Okay.  Tell me a little bit about your practice.

THE PROSPECTIVE JUROR:  I've been practicing for 19 years, civil defense.  I used to clerk for a retired Judge Otero, and then went into big law, and now I do labor and employment defense.

THE COURT:  On the defense side.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Very good.  Great.

And you said no jury service, right?

THE PROSPECTIVE JUROR:  No jury service.

THE COURT:  All right.  How about -- obviously, one of these will be a yes just based on your legal training, but how about six through 17?  Any other yeses?

THE PROSPECTIVE JUROR:  Seven -- I don't know you personally, but I do have a case on your docket.

THE COURT:  All right.  I make no promises about that case.

THE PROSPECTIVE JUROR:  That's all.

THE COURT:  I appreciate the disclosure.

THE PROSPECTIVE JUROR:  Number ten, I do have a cousin that's, that works as a police officer in Maui. That's it.

THE COURT:  Okay.  All right.  And do you know anything at all about what your cousin does, what kind of work?  Street?  Police patrol?  Anything else?

THE PROSPECTIVE JUROR:  Not sure.

THE COURT:  Okay.  Great.  All right.  Well, obviously, as a lawyer and a former law clerk, you have a great deal of experience, foundation in the law.  You have to set all of that aside, okay?  So you'd have to follow the instructions and the law that I give to you, not bring in, into deliberations any other knowledge that you have of the law, or obviously there is no room for you to disagree with the instructions I give to you.  Can you do that?

THE PROSPECTIVE JUROR:  Yes, I can.

THE COURT:  All right.  Would you decide the case based on nothing but the evidence as presented here in the courtroom at trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And can you be fair to both sides in the case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  Nothing.

THE COURT:  All right.  Thank you so much.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Let's turn to juror number 11.

THE PROSPECTIVE JUROR:  I live in the city of Los Angeles, and I've lived here for five years now.  I am single.  I am an influencer, a director for a beauty and hair company.  I do not live with anyone else, and I have never served on a jury.

THE COURT:  All right.  How about six through 17?

THE PROSPECTIVE JUROR:  Number eight, one of my best friends is a criminal defense lawyer, as well as I have another close friend that is in law school currently.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Number nine, no.  Number ten, I have a very close friend who's spouse is a state police officer as well as another close friend who is a

state police officer.

THE COURT:  Okay.  Are you in touch with any of these people on any kind of regular basis and talk about their work or not?

THE PROSPECTIVE JUROR:  Regularly, but not -- the civil -- the criminal defense lawyer, I speak to her a lot about her court cases after the fact, of course.  Outside of that, not with any of the law enforcement officers.

Number 11, I had two close friends that were charged with DUIs in previous years.

THE COURT:  You weren't involved in those cases in any way, I take it?

THE PROSPECTIVE JUROR:  I was in the car for one of them.

THE COURT:  Oh, you were.  Okay.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  And when that happened, what police department, if you know, caused your friend to be stopped?

THE PROSPECTIVE JUROR:  Yeah.  It was on the Foxborough Police Department in the state of Massachusetts.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  All right.  Number 13, I also have two close friends that our -- that our officers of the court and a family friend who is a correctional officer.

THE COURT:  When you say two friends that are -- two close friends that are officers of the court, do you mean they're attorneys or something else?

THE PROSPECTIVE JUROR:  They are cops in the courtroom.  I don't know what you call that.

THE COURT:  Oh, I see.  Okay.  So they -- yes, they're like court security officers or bailiffs or something like that inside the courtroom?

THE PROSPECTIVE JUROR:  Yes, yes.

THE COURT:  All right.  And they work for a local police department, I presume?

THE PROSPECTIVE JUROR:  The city of Cambridge in Massachusetts.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Beyond that, that's it.

THE COURT:  All right.  Anything about any, any of these relationships or the experiences you mentioned, like being an occupant, right, a passenger in a car that got pulled over, any of that?

THE PROSPECTIVE JUROR:  I can't say I don't have a bias against racist cops, but that's about it.

THE COURT:  Okay.  Well, the question for you is whether you would do as I said and apply the standards, right, the factors that I will be giving you in assessing the credibility of witnesses to all witnesses even handedly

fairly, regardless of their occupation, for example, all right?  So can you do that?

THE PROSPECTIVE JUROR:  Yes, I believe I can.

THE COURT:  All right.  So if a law enforcement officer takes the stand, are you going to automatically disbelieve that person or assume that person is a racist?

THE PROSPECTIVE JUROR:  Not unless they showed me otherwise.

THE COURT:  All right.  So you, in other words, you would wait to hear the evidence and hear it all --

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  -- before making any decision, right?

THE PROSPECTIVE JUROR:  Absolutely.

THE COURT:  All right.  And that's actually something else that I will be instructing the jury on is that they're not to make any decision, right, until the end of the case.

And so keep an open mind during the trial.  Trials are presented in stages and pieces, and you are not to form or express an opinion during the trial until it's over and it's given to you.  So can you do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the instructions on the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.

Number 12 -- good morning.  I think good afternoon -- good morning still.

THE PROSPECTIVE JUROR:  I live in Ventura for about a year.  Previous to that it was in Santa Clarita for about 20 years.  I am married.  I work as a sales support in a beauty company.  My husband works for U.P.S.

I have never served on a jury.  Number ten, we have a friend who is a retired sheriff.  And number 11, my son had a DUI.

THE COURT:  Okay.  How long ago did that happen?

THE PROSPECTIVE JUROR:  About three years ago.

THE COURT:  And was that here or somewhere else?

THE PROSPECTIVE JUROR:  Santa Clarita.

THE COURT:  Santa Clarita.  All right.  And were you involved in the case in any way?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  How do you feel your son was treated, fairly, unfairly by the justice system?

THE PROSPECTIVE JUROR:  Treated fairly.

73

THE COURT:  Okay.  Anything else that's responsive to any of these questions?  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you were to be selected, will you decide the case based on nothing but the evidence that's presented here in the courtroom in trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you very much.

All right.  Let me -- I need to see the attorneys for a couple of minutes.  So just give me a moment.

(*The following was held at the bench:*)

THE COURT:  All right.  Good morning, everybody.

MS. MacCABE:  Good morning.

THE COURT:  So it's time for challenges for cause. I don't know if you have any other questions you'd like me to consider asking the panel.  If you do, let me know, and I will consider that.

MR. BUTLER:  No.

THE COURT:  Nothing from the government.

74

MR. WERKSMAN:  Number ten --

THE COURT REPORTER:  I'm sorry, I cant hear.

MR. WERKSMAN:  Sorry.  Number ten is the lawyer?

THE COURT:  Yes.  He is an attorney who has -- yeah, right.  He's a labor employment lawyer.

MR. WERKSMAN:  I'm going to make a cause challenge, but if the court is not going to grant it, the cause challenge --

THE COURT REPORTER:  I'm sorry, I can't hear you.

MR. WERKSMAN:  I'm sorry.  I was going to make a cause challenge, Your Honor.

THE COURT REPORTER:  I cannot hear counsel, Your Honor.

MR. WERKSMAN:  Is this better?  Can you hear me now?

THE COURT REPORTER:  Yes.

MR. WERKSMAN:  I was going to make a cause challenge because he has got a case in front of Your Honor, but if the court isn't going to grant it, I want to know a little more about his law practice.  Has he done any criminal work?  Has he been involved in any bar associations or any pro bono activities that might reflect on his attitudes about the criminal justice system?  I just want to inquire a little more about that if the court isn't inclined to let him go just because the fact that he's a litigant in

front of Your Honor.

THE COURT:  Okay.  Well, let me -- let me hear you out on the challenge for cause as to his saying that he had a case pending before me.

MR. WERKSMAN:  Well, Your Honor, naturally he's going to be inclined to be concerned during this trial about how you're going to rule on various things and how his behavior in this trial, maybe the verdict he reaches, maybe a question you might ask or anything that might happen here would reflect on his ability to represent his own client in another matter before Your Honor.

I think there's an inherent conflict, if not actual; and certainly, a perceived conflict where he's actually got a case right now in front of Your Honor and has to basically curry favor with this court in order to zealously represent his client in some other unrelated matter.

THE COURT:  Okay.  Does the government wish to weigh in on that or not?

MR. BUTLER:  I don't think so, Your Honor.

MR. WERKSMAN:  Your Honor, it's a horrible conflict for him.  He's the one with the conflict as well as this court.

THE COURT:  Are there any other challenges by either side?

76

MR. WERKSMAN:  Can you imagine a scenario, Your Honor, where the court has to give a so called Allen charge or there's one hung jury or some issue arises and he's asked to answer to this court for something that happens, and he's going to be thinking oh, darn, this might affect the way the judge thinks of me because I've got this big case.  And maybe it's a plaintiff's case, and he's got a contingent fee riding on it and he needs you.

THE COURT:  All right.  Mr. Werksman, you've carried the day.  I'll let them go.  All right.  Any other challenges for cause?

MR. BUTLER:  None for the government.

MR. WERKSMAN:  No.  Thank you.

THE COURT:  All right.  Very well.  Given that I'm going to excuse him, I not going to ask him any follow-up questions, okay?  All right.  So we'll refill that seat, go through the same exercise.  Then I'm just going to ask you if you have any challenges for cause as to that one juror, and then we'll go into peremptories, okay?

And I can't recall, did I cover that with you during the pretrial conference, the order in which we will go with peremptories?

MR. WERKSMAN:  May I make a request, Your Honor?

THE COURT:  Yes.

MR. WERKSMAN:  Just because our client is in

77

custody and we haven't had a chance to have any real discussions about this.

THE COURT REPORTER:  I'm sorry, I can't hear you.

MR. WERKSMAN:  I'm sorry.  I apologize.  I'll speak up.  Would Your Honor be willing to take the morning recess before we do the peremptories so we can have a moment to consult with our client?  You know, under these circumstance with him in custody, we don't have an opportunity really to meaningfully talk inside or outside the courtroom.  And it is -- I'm only asking so I can have a chance to talk to my client about the peremptories.

THE COURT:  Okay.  That's fine.

MR. WERKSMAN:  Thank you.

THE COURT:  Okay.  Thank you.

*(End of conference held at the bench.)*

THE COURT:  All right.  So juror number ten, I'm going to excuse you.  Thank you for being here today.  Please return to the jury assembly room downstairs for instructions, okay?

THE PROSPECTIVE JUROR:  Okay.  Thank you, Your Honor.

THE COURT:  And thank you for your service.

*(The prospective juror exited the courtroom.)*

THE CLERK:  The next JID number I will call is 205992899.

78

THE COURT:  All right.  Welcome.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  All right.  Can we get you that microphone?

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

THE COURT:  All right.  Yes, you are welcome. Thank you.

Ma'am, if you could please answer one through five.

THE PROSPECTIVE JUROR:  I live in the Santa Clarita area for about 23 years.  I am married.  I am a nursing assistant, and my husband was a former United States Marines.  And he's also volunteered in the sheriff's department for more than 20 years.

We have three adult children.  They are all full-time students, and my oldest one works as a TA, teacher's assistant.  The other one works as a phlebotomist and a nursing -- in a hospital.  And my last one is a esthetician, full-time student.

THE COURT:  So all three of them are students as well as working?

THE PROSPECTIVE JUROR:  Yes.  Uh-huh.

THE COURT:  And just tell me a little bit about what your husband has done in a volunteer capacity for the L.A. County sheriffs.

THE PROSPECTIVE JUROR:  He worked -- I mean, he volunteered as a Vital -- the VIDA program as the Vital Intervention program for juvenile kids.  So that's what he did, and he's also a superintendent for apartments.

THE COURT:  All right.  And the volunteer work for the -- just intervention with young people?

THE PROSPECTIVE JUROR:  Young juvenile children that get in trouble with the law, and so he does, like, a boot camp.

THE COURT:  Understood.  Great.

How about six through 17, do you have any yeses to any of those questions?

THE PROSPECTIVE JUROR:  I have a yes on number ten.  I do have family members who are L.A., Los Angeles police officers and also sheriff's department.

THE COURT:  All right.  And what kind of family member?  What relationship?

THE PROSPECTIVE JUROR:  Oh, cousins, uncles.

THE COURT:  All right.  How many would you say there are?

THE PROSPECTIVE JUROR:  I have seven LAPD and eight sheriffs.

THE COURT:  Quite a few.  When you get together, do you talk about their work?

THE PROSPECTIVE JUROR:  No, no, I don't.  I don't

80

ask them.  No.

THE COURT:  Understood.

THE PROSPECTIVE JUROR:  I also have a yes on number 13, probation officer.  My sister is a probation officer here at L.A. County.

THE COURT:  L.A. County probation officer?

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  Very well.  Anything else that's responsive?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Well, you've heard what I've told the others.  If you're selected, you're not going to be able to speak to your many relatives that are in law enforcement or anyone else about the case while you are sitting as a juror.  Will you follow that instruction?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you set -- can you decide the case based on nothing but the facts that are presented here in the courtroom and that are evidence?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

THE PROSPECTIVE JUROR:  You're welcome.

THE COURT:  Do the parties pass for cause as to juror number 10?

MR. BUTLER:  The government does, Your Honor.

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  All right. We're going to go ahead and take a ten-minute recess, ladies and gentlemen.  Please be mindful of my admonition that you're not to discuss the case with anyone whatsoever.  That includes all of the many people who are here gathered here -- hold on.  Don't go anywhere.  All right.  And please be timely.  Get back here in time so we can continue with the process and get a jury selected and seated.  All right. Thank you very much.  Be back in ten minutes.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

*(Recess.)*

*(The jurors entered the courtroom.)*

THE COURT:  All right.  Welcome back, ladies and gentlemen.  It is now time for what are called peremptory challenges.  Each side gets a certain number of peremptory challenges that they can exercise.

82

So don't be too terribly upset or offended if one is exercised against you.  So the first peremptory is with the government.

MR. BUTLER:  The government would ask that the court thank and excuse prospective juror number four.

THE COURT:  All right.  Number four, sir, that's you.  Thank you for being here today.  You are excused. Please return to the jury room downstairs for instructions.

*(The prospective juror exited the courtroom.)*

THE CLERK:  And the next JID I will call is 206259472.

Hold on.  I have two people standing up.  So let me try that again.  206259472.  Okay.  Please take seat, number four, and can we hand juror number four the microphone, please.  Thank you.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Good morning.

THE COURT:  All right.  If you could please answer one through five.

THE PROSPECTIVE JUROR:  I have lived in Lancaster, California for over 30 years.  I am divorced.  I am an accountant.  My former spouse was a telephone man.  I have one adult child in the house.  He is unemployed.

I have served on a jury once.  It was criminal, and we did reach a verdict.

THE COURT:  And what was the charge in that case?

THE PROSPECTIVE JUROR:  Murder.

THE COURT:  All right.  And when you say your former spouse was a telephone man.

THE PROSPECTIVE JUROR:  He climbed up telephone poles and did telephone stuff.

THE COURT:  Perfect.  That's all I needed.

Your son, I think you said, had an occupation outside the home or not yet?

THE PROSPECTIVE JUROR:  Unemployed.

THE COURT:  Not yet?

THE PROSPECTIVE JUROR:  Not yet.

THE COURT:  Very good.  All right.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  I don't have any yeses on six through 17.

THE COURT:  All right.  Very good.  If you are selected to serve as a juror in the case, will you decide the case based on nothing but the evidence that's presented here in the courtroom when we're in session?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And will you follow the instructions on the law that I will be giving to you?

THE PROSPECTIVE JUROR:  I will.

THE COURT:  Can you be fair to both sides?

84

THE PROSPECTIVE JUROR:  I can.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you so much.  Pass for cause as to juror number four, government?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Defense?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  The next peremptory is with the defense.

MR. WERKSMAN:  Hour Honor, the defense asks the court to thank and excuse juror number one.

All right.  Juror number one, ma'am, thank you for being here today.  You're excused.  Please return to the jury room for instructions.  Thank you.

THE CLERK:  The next JID I will call is 206350452.  Please take seat number one, ma'am.

THE PROSPECTIVE JUROR:  Okay.

THE COURT:  Good morning.

THE PROSPECTIVE JUROR:  Good morning.  I have lived in Los Angeles most of my life.  I'm now in Studio City.  I am married.  I am a real estate agent.  My husband owns his own company.  He manufactures martial arts gear, and that is the only adult aside from myself in the household, and I have never served on a jury.

THE COURT: All right. How about six through 17?

THE PROSPECTIVE JUROR: Number eight, I have lots of clients and neighbors and people I know that are attorneys mostly in the entertainment field, and I was a witness in a civil case. Do you want to know about that?

THE COURT: Sure.

THE PROSPECTIVE JUROR: Okay. A real estate agent that I worked with closely, he fell off a building, a couple of stories, and had traumatic brain injury. So I was asked to testify on that.

Number 12, many, many, many years ago when I was like 20, I worked at a bank as a teller, and we were robbed. And that was so long ago I don't remember a lot of the details, if they got caught or anything like that.

THE COURT: Okay.

THE PROSPECTIVE JUROR: I think that's it.

THE COURT: All right. Do you recall whether that person was armed or unarmed, whether --

THE PROSPECTIVE JUROR: There were several, and they were all armed.

THE COURT: I see, okay. And obviously some law enforcement came out. Somebody responded?

THE PROSPECTIVE JUROR: I believe it was -- I mean, this was over 30 years ago. I believe it was, like, the FBI or something like that, yeah.

86

THE COURT:  You never went to court for this?

THE PROSPECTIVE JUROR:  Never.

THE COURT:  All right.  Getting back to the other case, the one involving your friend who was a realtor --

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  -- who was severely injured.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  You said you testified?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was that in a deposition or at a trial?

THE PROSPECTIVE JUROR:  It was in court as a witness.  They wanted to know my thoughts on his, I guess, mental state capacity to continue his work.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  Oh, one more thing.  I do know a judge.  I sold her a house.

THE COURT:  Okay.  Don't tell me where it is.  Which judge, what court, if you know?

THE PROSPECTIVE JUROR:  Do you want to know?

THE COURT:  Well --

THE PROSPECTIVE JUROR:  I don't know -- I remember her name, but I don't know exactly where.  She's in Manhattan Beach.  I don't know where the court is.

THE COURT:  Probably state court?  State court

judge, maybe?

THE PROSPECTIVE JUROR:  I don't know.  I could text her if you like.

THE COURT:  No.  No, no, no, we're not going to do that.  No, no, no.  Okay.  All right.  Anything else that you want me to know?

THE PROSPECTIVE JUROR:  That's it.

THE COURT:  Okay.  You've heard what I've been saying.  If you are selected, will you decide the case based on nothing but the evidence that's been presented in the trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And will you follow the instructions on the law that I will be giving to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.

Any parties pass for cause as to juror number one?

MR. BUTLER:  The government does, Your Honor.

THE COURT:  Defense?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  The next peremptory is with the government.

MR. BUTLER:  Your Honor, the government would ask

the court to thank and excuse prospective juror number 11, please.

THE COURT:  All right.  Juror number 11, thank you for being here today.  You are excused.  Please return to the jury room for instructions.

THE CLERK:  The next JID number I will call is 206319786.

Please take seat number 11.

THE COURT:  All right.  Good morning.

THE PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  All right.  Sir, if you could please answer one through five.

THE PROSPECTIVE JUROR:  Yes.  I'm a lifelong Los Angeles resident.  I'm married.  I'm a retired mechanic of 46 years, and I have served on a jury.  And it was for a criminal case, and it started out as disorderly conduct, disorderly conduct, and then turned into resisting arrest. And a verdict was reached.

THE COURT:  All right.  Very good.  What does your spouse do?

THE PROSPECTIVE JUROR:  So my spouse was retired elementary schoolteacher.

THE COURT:  All right.  Very good.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  So I guess eight, I have a

brother-in-law who's a retired trial attorney.

THE COURT:  Do you know what kind of trials your brother-in-law?

THE PROSPECTIVE JUROR:  Criminal.

THE COURT:  All criminal?

THE PROSPECTIVE JUROR:  Criminal and civil.

THE COURT:  Both?

THE PROSPECTIVE JUROR:  (Nods head).

THE COURT:  Okay.  And did he practice here in this part of the world or somewhere else?

THE PROSPECTIVE JUROR:  No.  He did.  He practiced here and then move down south and then practiced down there before he retired.

THE COURT:  Okay.  All right.  Very good.  Anything else?

THE PROSPECTIVE JUROR:  Number 12, I had a car stolen from me when I was twenty-one.

THE COURT:  Did you call?  Did you let the police know about that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Was it ever recovered?

THE PROSPECTIVE JUROR:  About 800 pounds left of it when it was found.

THE COURT:  All right.  Anybody ever caught for doing that?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you were to serve as a juror in the case, you obviously won't be able to speak to anyone in law enforcement, anyone who's an attorney, retired attorney, family member about the case.  Will you follow that instruction?

THE PROSPECTIVE JUROR:  I will.

THE COURT:  All right.  Will you decide the case based on just the evidence admitted here in the courtroom at trial?

THE PROSPECTIVE JUROR:  I will.

THE COURT:  Will you follow the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides in this case?

THE PROSPECTIVE JUROR:  I can.

THE COURT:  All right.  Thank you.  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.  Pass for cause?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Defense?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  The next peremptory is with the defense.

MS. SOSA:  Your Honor, the defense asks the court to think and excuse juror number six.

THE COURT:  All right.  Juror number six, ma'am, thank you very much for being here.  You are excused. Please return to the jury room downstairs.

THE PROSPECTIVE JUROR:  Yes, sir.

THE CLERK:  The next JID I will call is 205813301. Please take seat number six.

THE COURT:  All right.  Good morning, sir.

THE PROSPECTIVE JUROR:  Good morning.

THE COURT:  All right.  If you can please answer one through five.

THE PROSPECTIVE JUROR:  I live in Pasadena.  I've been there seven years.  I'm currently married.  I work as a data scientist in a financial company, and my wife works as an assistant controller at a financial company as well.

And I have served on the jury one time.  It's a civil case.  We did not reach a verdict.

THE COURT:  And is that -- just to clarify with you, is that because the jury was just unable to reach a verdict, or did the jury end up not deliberating?

THE PROSPECTIVE JUROR:  It ended up being a

mistrial.

THE COURT:  Okay.  As a result of the jury failing to reach a verdict?

THE PROSPECTIVE JUROR:  As a result, someone that should not have been in the room but was in the room.  Like, alternate jurors shouldn't be in a room, but that person was in the room while the deliberation.

THE COURT:  Okay.  I see.  Okay.  All right.

Can you just tell me a little bit about your job? I did not perfectly understand what you meant by a data scientist.

THE PROSPECTIVE JUROR:  Yeah, analyze data to -- our sales data to help our sales team.  It's kind of -- yeah, I don't know if you want me to go in more details.

THE COURT:  Okay.  That's fine.  That's fine. Thank you.  All right.

How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  I'd say I have been arrested for DUI, and that's probably 15 years ago.

THE COURT:  Which police agency was involved?

THE PROSPECTIVE JUROR:  I think it was the sheriff, L.A. Sheriff.

THE COURT:  Okay.  And how do you feel you were treated generally, fairly?  Unfairly?

THE PROSPECTIVE JUROR:  Fairly, generally.

THE COURT:  Anything you want me to know about that incident?

THE PROSPECTIVE JUROR:  No, nothing in particular. I probably feel like I got more ripped off by a lawyer than anything to do with that, but anyway.  That's kind of the side note.

THE COURT:  Okay.  Thanks for sharing that.

THE PROSPECTIVE JUROR:  I do have a close friend who is a lawyer.  He does most corporate laws.

THE COURT:  All right.  Anything else?

THE PROSPECTIVE JUROR:  That's it.

THE COURT:  Okay.  So obviously you won't be able to chat with your friend during trial that is a lawyer, ask for advice.  You can chat with him but not about the case. Understood?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  If you're selected, will you decide the case based on nothing but the evidence that's admitted here in the courtroom?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the instructions on the law that I will be giving to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides in this case?

94

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you so much.  Pass for cause as to juror number six, government?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Defense?

MS. SOSA:  Yes, Your Honor.

THE COURT:  All right.  The next peremptory is with the defense.

MS. SOSA:  Your Honor, the defense asks the court to thank and excuse juror number eight.

THE COURT:  All right.  Juror number eight, sir. Thank you so much for being here.  You are excused.  Please return to the jury room downstairs.

*(The prospective juror exited the courtroom.)*

THE CLERK:  The next JID I will call is 205806118. Please take seat number eight.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Yeah, I think we're a minute away from that.  Hello.

THE PROSPECTIVE JUROR:  Hello.  I am from Long Beach.  I've been living there for 23 years.  I am single. I am unemployed.  My mother works for a medical office, OB-GYN.  My older brother is a music producer, and my other

95

older brother is a bartender.

I've never served on the jury.

THE COURT:  All right, and have you ever had any employment?

THE PROSPECTIVE JUROR:  Yeah.  I was a paralegal at a habib- -- habitability -- I always -- I can't pronounce it.  In Long Beach.

THE COURT:  Okay.  Did that law firm -- what did it do, represent tenants?

THE PROSPECTIVE JUROR:  We sued slum lords, landlords.

THE COURT:  Understood.  How long did you work there?

THE PROSPECTIVE JUROR:  A year and a half.

THE COURT:  All right.  Are you still in touch with anybody from there?

THE PROSPECTIVE JUROR:  Not really.  No.

THE COURT:  All right.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  Legal training, yes, my old job as a paralegal.  Thirteen, I am currently in law school.  So all my professors are lawyers.  My dad's been arrested for two DUIs, and that's about it.

THE COURT:  All right.  How far along are you in law school?

THE PROSPECTIVE JUROR:  I'm about to finish my first year.

THE COURT:  You're in your second semester of first year?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  How did the first semester go?

THE PROSPECTIVE JUROR:  Good.

THE COURT:  All right.  Good.

Let's see, with respect to your dad, were you involved in either of his cases?

THE PROSPECTIVE JUROR:  No, I was not.

THE COURT:  Okay.  How did you feel he was treated in both of those cases?

THE PROSPECTIVE JUROR:  Fairly.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.  That's it.

THE COURT:  All right.  If you are selected, you'll need to decide the case based on just the evidence in the case.  Can you do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Now, with respect to the law, you need to follow the instructions on the law that I give you.  Will you do that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  So obviously, I'm sure you've learned a great deal in a semester and some weeks, but you can't use any of that or apply any of that if you're selected as juror in this case; do you understand?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And you won't do that?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Of course.

THE COURT:  All right.  Thank you.  Pass for cause?

MR. BUTLER:  Yes, Your Honor.

MR. WERKSMAN:  Your Honor, may we approach?  May I request one follow-up question?

THE COURT:  Yes.  Come on up to the sidebar.  One moment.

(*The following was held at the bench:*)

THE COURT:  Go ahead.

MR. WERKSMAN:  Your Honor, my middle child is a second year law student at Pepperdine.  She could be a classmate.  I just wanted to ask, where did she go to law school?  That's the only thing.  She could know my son and in the course of this trial discover that she's a classmate and friend of my son's.

98

THE COURT:  Got it.  Okay.

MR. WERKSMAN:  That's it.

THE COURT:  I'll find out.  How about if I just ask whether she's at Pepperdine or not?  We don't have to get into wherever else she might be.

MR. WERKSMAN:  That's fine, Your Honor.

THE COURT:  Okay.  Thank you.

*(End of conference held at the bench.)*

THE COURT:  All right.  So juror number eight, are you at Pepperdine law?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you.  Any challenge for cause?

MR. WERKSMAN:  No, Your Honor.  Thank you.

MR. BUTLER:  No, Your Honor.

THE COURT:  Next peremptory is with the government.

MR. BUTLER:  The government would ask the court to thank and excuse juror number eight and wish her the best of luck in law school.

THE COURT:  That was a short visit.  Thank you for being here.  You are excused.  Please go downstairs.

*(The prospective juror exited the courtroom.)*

THE CLERK:  The next JID I will call is 205885323.  Please take seat number eight.

THE PROSPECTIVE JUROR:  Hello, Your Honor.

THE COURT:  Hello.  Welcome.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  And good afternoon.  Could you please answer one through five?

THE PROSPECTIVE JUROR:  I live in Newbury Park. I've lived there for 37 years.  I am married.  I am retired. My occupation was physical therapist.  My husband is a recording engineer, and I have never served on a jury.

THE COURT:  All right.  Thank you.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  Yes on number 12.  We were the victim of a home burglary about eight years ago.

THE COURT:  And did you notify the police after that happened?

THE PROSPECTIVE JUROR:  We did.

THE COURT:  And did anything come of it?

THE PROSPECTIVE JUROR:  The person was apprehended and arrested.

THE COURT:  All right.  And as a result of that, did you and/or your spouse participate in the criminal process in any way?

THE PROSPECTIVE JUROR:  We did not.

THE COURT:  You never went to court?

THE PROSPECTIVE JUROR:  We didn't.

THE COURT: All right. With respect to that experience and obviously the person who was arrested for it, do you have any positive or negative feelings about it, the way you were treated, the way that person was treated?

THE PROSPECTIVE JUROR: It was a positive experience as far as how it was -- how it came about.

THE COURT: And was that the LAPD that responded to your home?

THE PROSPECTIVE JUROR: No. It was Ventura County.

THE COURT: Ventura County Sheriff.

THE PROSPECTIVE JUROR: Yes.

THE COURT: Anything else that's responsive to these questions?

THE PROSPECTIVE JUROR: No.

THE COURT: All right. All right. If you're selected, will you decide the case based on nothing but the evidence that's presented here in the courtroom?

THE PROSPECTIVE JUROR: I will.

THE COURT: Will you follow the instructions and the law that I give to you?

THE PROSPECTIVE JUROR: I will.

THE COURT: Will you be fair to both sides?

THE PROSPECTIVE JUROR: I will.

THE COURT: Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Thank you.  The next peremptory is with the defense -- oh, excuse me.  Any pass for cause?

MR. BUTLER:  Pass for cause, Your Honor.

MS. SOSA:  Defense passes, yes.

THE COURT:  Thank you.  The next peremptory is with the defense.

MS. SOSA:  Your Honor, the defense asks that the court thank and excuse juror number nine.

THE COURT:  All right.  Juror number nine, sir. Thank you for being with us.  You are excused.  Please return to the jury room.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  You're welcome.  Thank you.

THE CLERK:  The next JID I will call is 206211197. Please take seat number nine.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Good afternoon.  Welcome.  Could you please answer one through five.

THE PROSPECTIVE JUROR:  I live in Southeast L.A. in the Downey area.  I've lived there for ten years.  Prior to that I lived in South Gate and in the Bell area just on the other side of the river.  I am married.  I am a teacher. My wife is a fraud investigation for a health insurance company, and I have served on a jury.  It was a criminal

case, and we did reach a verdict.

THE COURT:  What was the charge in that case?

THE PROSPECTIVE JUROR:  I don't know the actual charge.  It was a stepfather that was accused of putting in a video in his stepdaughter's bedroom and bathroom.

THE COURT:  Okay.  All right.  And you said your spouse is a fraud investigator for a health company?

THE PROSPECTIVE JUROR:  Health insurance company, yes.

THE COURT:  And what level do you teach?

THE PROSPECTIVE JUROR:  I teach high school English.

THE COURT:  All right.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  My parents had a small business, a restaurant for about 30 years.  So in the span of those 30 years there were break-ins, property damage, armed holdups a couple of times.

THE COURT:  Okay.  Were you ever involved in any of those events?

THE PROSPECTIVE JUROR:  I personally was not while I helped them, but my father and my brother were.

THE COURT:  Okay.  Did you participate in any kind of legal process with respect to any of those events?

THE PROSPECTIVE JUROR:  No.  Just to remind them

to call the police and file a report.

THE COURT:  All right.  And do you know whether they did that?

THE PROSPECTIVE JUROR:  They did.

THE COURT:  All right.  And were the individuals that committed these acts ever caught?

THE PROSPECTIVE JUROR:  That I know of, no.

THE COURT:  How do you feel that your family was -- I assume -- I don't know which police agency.

THE PROSPECTIVE JUROR:  It was the local city police.

THE COURT:  Okay.  Do you feel that the family was treated well, not well by local police in connection with these events?

THE PROSPECTIVE JUROR:  They were treated well.

THE COURT:  All right.  Anything else?

THE PROSPECTIVE JUROR:  No.  That's it.

THE COURT:  Nothing else?  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  If you are selected, will you decide the case based on nothing but the evidence that is presented here in court?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Will you follow the instructions on

the law that I give to you?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.  Thank you.  Pass for cause?

MR. BUTLER:  Yes, Your Honor.

MS. SOSA:  Yes, Your Honor.

THE COURT:  The next peremptory is with the defense.

MS. SOSA:  Your Honor, the defense asks the court to thank and excuse juror number ten.

THE COURT:  All right.  Juror number ten.  Ma'am, thank you for being with us.  You are excused.

THE CLERK:  The next JID number I will call is 206256941.  Please take seat number ten.

THE COURT:  Welcome.

THE PROSPECTIVE JUROR:  Good afternoon.  Thank you.

THE COURT:  You're welcome.  Welcome.

If you don't mind, if you could please answer one through five?

THE PROSPECTIVE JUROR:  Yes.  I've lived in Los Angeles for about the past six years.  I'm married.  I'm an environmental health and safety officer at a university.  My

spouse is a TV writer, and I've never served on a jury.

THE COURT:  How about six through 17?

THE PROSPECTIVE JUROR:  I do have a few yeses.  My father-in-law is a retired lawyer, and my best friend is currently finishing law school.  I don't really talk to them about any of that.

THE COURT:  Okay.  Do you know anything about your father-in-law's law practice while he was in practice?

THE PROSPECTIVE JUROR:  I do not.

THE COURT:  And your close friend?

THE PROSPECTIVE JUROR:  They are studying environmental law.

THE COURT:  So in law school?

THE PROSPECTIVE JUROR:  In law school.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  And then in regards to number ten, my main department that I work with at the university is the police officer and security officers, but I'm mainly just dealing with any of their injuries.  I don't have any contact with any of the things that they're doing on a regular basis aside from that.

THE COURT:  So you are dealing with occupational, occupation related injuries that they may suffer while working?

THE PROSPECTIVE JUROR:  Yes.

THE COURT: Okay. Otherwise, you're not involved in their day-to-day work?

THE PROSPECTIVE JUROR: Correct.

THE COURT: Okay. All right. Anything else?

THE PROSPECTIVE JUROR: That is everything.

THE COURT: If you're selected, will you decide the case based on nothing but the evidence that's presented?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. That means you can't go talk to your friend that's in law school or your father-in-law and strike up a conversation about this case. Understood?

THE PROSPECTIVE JUROR: Understood.

THE COURT: All right. And will you follow the instructions on the law that I will give to you?

THE PROSPECTIVE JUROR: Yes.

THE COURT: And can you be fair to both sides in this case?

THE PROSPECTIVE JUROR: Yes.

THE COURT: All right. Thank you. Pass for cause?

MR. BUTLER: Yes, Your Honor.

THE COURT: Defense?

MS. SOSA: Yes.

THE COURT: The next peremptory is with the

government.

MR. BUTLER:  The government passes peremptory challenge.

THE COURT:  All right.  The next peremptory is with the defense.

MS. SOSA:  Your Honor, the defense asks the court to thank and excuse juror number 11.

THE COURT:  All right.  Juror number 11, thank you, sir, for being with us.  You are excused.  Please go downstairs to the jury room.

THE PROSPECTIVE JUROR:  Thank you, Your Honor.

THE COURT:  Thank you.

*(The prospective juror exited the courtroom.)*

THE CLERK:  The next JID number I will call is 206357885.  Please take seat number 11.

THE COURT:  All right.  Good afternoon.  Welcome.  If you can please answer one through five.

THE PROSPECTIVE JUROR:  So I live in Verdemont Heights, 20 years.  I am married.  My occupation is caregiver.  My wife works, like, in a Chinese company in the office, and I served -- I was one time on a jury in a civil, civil case.  We reached a verdict.

THE COURT:  And what was the civil case about?

THE PROSPECTIVE JUROR:  A DUI.

THE COURT:  All right.  Somebody was charged with

driving --

THE PROSPECTIVE JUROR:  Yeah, a driving a motorcycle under the influence.

THE COURT:  Okay.  Understood.  All right.

THE PROSPECTIVE JUROR:  Six through --

THE COURT:  Can I just -- hold on a second.  With respect to your spouse, you said she works?

THE PROSPECTIVE JUROR:  For a Chinese company.

THE COURT:  Yes.  And what does she do there?  What's the nature of the business?

THE PROSPECTIVE JUROR:  She works in the office, answer the phone, computer working, and she -- fix the checks for doctors.  That's what I know.

THE COURT:  Understood.  Do you know what the company does?

THE PROSPECTIVE JUROR:  It's in Alhambra somewhere, but I don't know.

THE COURT:  No.  But what it does, like it's in the healthcare field?  You said --

THE PROSPECTIVE JUROR:  No.  They pay the doctors.  They make checks for doctors.  I don't know how they work.

THE COURT:  Okay.  All right.  And then you were about to say six through 17.  Do you have any yeses?

THE PROSPECTIVE JUROR:  No yes.

THE COURT:  No yeses at all?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  All right.  You've heard what I've had to say.  If you're selected, you won't be able to discuss the case with your wife or with anyone else.  Do you understand that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Will you decide the case based on nothing but the evidence that's presented here in the courtroom?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Is that a yes?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes?  Okay.  And will you follow the instructions on the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.  As to number 11, pass for cause?

MR. BUTLER:  Pass for cause, Your Honor.

MS. SOSA:  Pass for cause.

THE COURT:  All right.  The next peremptory is with the government.

MR. BUTLER:  I believe it's the defense still, Your Honor.

THE COURT:  No.  Government.  Any peremptory challenge?

MR. BUTLER:  No, Your Honor.

THE COURT:  All right.  Defense?

MS. SOSA:  Your Honor, I believe this will be defense challenge number seven?

THE COURT:  Correct.

MS. SOSA:  We ask the court to thank and excuse juror number 11.

THE COURT:  All right.  Juror number 11, sir, thank you for being here today.  You're excused.  Please go downstairs.

THE PROSPECTIVE JUROR:  Thank you.

*(The prospective juror exited the courtroom.)*

THE CLERK:  The next JID I will call is 205854439.  Please take seat number 11.

THE COURT:  All right.  Welcome.

THE PROSPECTIVE JUROR:  Hi.  Hello.

THE COURT:  Hi.  If you could answer one through five.

THE PROSPECTIVE JUROR:  I live in El Monte all my

111

life, so 23 years.  I'm single.  I'm a full-time student.  I live with my mom and my brother.  My mom is a quality assurance inspector, like a medical company.  And my brother does, like, food delivery.

THE COURT:  What do you study?

THE PROSPECTIVE JUROR:  I study -- I will get a bachelor in 3D art.  So I, like, do animation and special effects for games in film.

THE COURT:  And how far along would you say you are?

THE PROSPECTIVE JUROR:  Next quarter I'll be a junior.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Yeah, okay.  And I have never served on a jury.

THE COURT:  How about six through 17?

THE PROSPECTIVE JUROR:  No for all those.

THE COURT:  All right.  If you're selected, will you decide the case based on nothing but the evidence that is presented here in the courtroom?

THE PROSPECTIVE JUROR:  Yes, Your Honor.

THE COURT:  All right.  Will you follow the instructions on the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.  Pass for cause?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  Defense?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  Next peremptory is with the government.

MR. BUTLER:  Pass the peremptory challenge, Your Honor.

THE COURT:  Defense?

MR. WERKSMAN:  Your Honor, the defense accepts the panel as constituted.

THE COURT:  All right.  Ladies and gentlemen, we have a jury.  So let's have 12 of you rise to be sworn in as our jurors.

THE CLERK:  Please raise your right hand.  Ladies and gentlemen of the jury, do you solemnly swear that you will well and truly try the cause before this court and a true verdict therein render according to the evidence and the instructions of the court so help you God?

THE JURORS:  I do.

THE CLERK:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE JURORS:  YES.

THE CLERK:  Thank you.  You may be seated.

THE COURT:  Let's call two more jurors as alternates.

THE CLERK:  The next JID I will call is 205 -- I'm sorry.  I can't see, Your Honor.  205859586.  Top row, sir, next available seat.

And the next number I will call is 205825783.

THE COURT:  All right.  Welcome to each of you. We're going to go through the same exercise.  So I'm going to turn to the juror in -- we'll say alternate number one.

Sir, if you could please answer one through five.

THE PROSPECTIVE JUROR:  I live in Whittier.

THE COURT:  Oh, we can't hear you.  So the mic might be off.

THE PROSPECTIVE JUROR:  I live in Whittier.  I've been in the area my whole life, 62 years.  I'm married.  I'm a vice president of operations for a less-than-truckload transportation company.  My wife is an account executive for a wholesale office products company.

I've served on three juries, all criminal, and we reached verdicts in all three.

THE COURT:  And could you tell me what the charges were, generally, in the three cases?

THE PROSPECTIVE JUROR:  Attempted murder, child molestation, and a tax evasion.

THE COURT:  All right.  How about six through 17, any yeses?

THE PROSPECTIVE JUROR:  I have been involved in -- over the course of my career, I've been called as a witness and defended -- a company has been a defendant in wrongful termination, back wages, those types of things.  We were successful in both.

THE COURT:  All right.  So when you say you were a witness, does that mean you were deposed as a witness before trial?

THE PROSPECTIVE JUROR:  Right, right.

THE COURT:  Did you ever go to trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Some of the cases went to trial?

THE PROSPECTIVE JUROR:  Right.

THE COURT:  And you testified at trial as well?

THE PROSPECTIVE JUROR:  Right.

I have probably ten to 20 friends that are in law enforcement, LAPD, city of Whittier, L.A. sheriff.  I think that's it.

THE COURT:  All right.  If you are selected, you

won't be able to reach out to any of your friends or anyone back at the company to talk about the case or talk to your spouse about it.  Do you understand that?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.  And if you were to be selected, will you decide the case based on nothing but the evidence that's presented here in court in trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the instructions on the law that I will be giving to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Can you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.  If you wouldn't mind passing the mic on over to alternate number two.

Sir, if you could please answer one through five.

THE PROSPECTIVE JUROR:  Good morning -- good afternoon.  I've lived in Los Angeles for 18 years.  I'm married.  I'm a software designer for a tech company.  My spouse is a professor at a university, and my father is retired.

THE COURT:  What does your spouse teach at the

university?

THE PROSPECTIVE JUROR:  She's a film professor. Film production.

THE COURT:  And you said that your father is retired?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  What did he do before he retired?

THE PROSPECTIVE JUROR:  He was a chemist.

THE COURT:  In what, for a company?

THE PROSPECTIVE JUROR:  Yeah, a chemist, and he made like soaps and lotions and things for companies in North Carolina, and I moved him out here.  And I've never served on a jury.

THE COURT:  How about six to 17, any yeses?

THE PROSPECTIVE JUROR:  Yeah, a couple of yeses. I have close friends, and my cousin is a, is a U.S. District Attorney in New York working on kind of white-collar crime and was in narcotics before then.

My father was a victim of a money crime, like a telephone scam.  He lost like $8,000 throughout that whole thing, and that was maybe like seven years ago.  That happened, and that was really it.  Other than my friend that's a lawyer that I get legal advice from.  I talk to them quite often.

THE COURT:  For what purpose?  You know, I don't

want to get into the legal parts.

THE PROSPECTIVE JUROR:  Yeah, yeah.

THE COURT:  Generally, how do you use your friend?

THE PROSPECTIVE JUROR:  For employment stuff that I was dealing with as well as, yeah, just like financial stuff in general.

THE COURT:  So as part of your business?

THE PROSPECTIVE JUROR:  No, not -- well, one of them was part of my business, yes, when a previous company that I had an issue with and I had to, had to leave.  And I just started this new job, so that's kind of why.  Yeah. Does that answer your questions?  Oh, there was just one other thing that is somewhat related.

When I was younger, I suffered a kind of traumatic experience, kind of when I was in ninth grade or so, that kind of was like an extreme bullying.  And it kind of took me to giving up a lot of money and things like that, and it kind of traumatized me.  So I've been dealing with that stuff as part of some other therapy in general.

THE COURT:  Okay.  And that went on when you were quite young?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  In high school?

THE PROSPECTIVE JUROR:  Yes, in North Carolina.

THE COURT:  Understood.  Anything else?

THE PROSPECTIVE JUROR:  The only other thing was that next week is my daughter's spring breaks, and I was told that -- we're leaving on Wednesday.  But it sounds like it would be fine.  That's all.  They told me that I should still come up here anyway.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  That is our spring break, and we're taking them out, up to the Bay Area.

THE COURT:  When will you be leaving?

THE PROSPECTIVE JUROR:  Wednesday.

THE COURT:  So that's a week from tomorrow; is that right?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.  With respect to your -- I think you said you have a friend who is a federal prosecutor in New York; is that right?

THE PROSPECTIVE JUROR:  My cousin.

THE COURT:  Cousin.  All right.

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  Do you talk to your cousin much about the work that he does?

THE PROSPECTIVE JUROR:  In the past I have because he's been working on kind of like interesting things, only after it's been finished.

THE COURT:  All right.  With respect to your

personal experience as a 14-year-old or thereabouts, you know, that has nothing to do with this case.

THE PROSPECTIVE JUROR:  No, it does not.

THE COURT:  All right.  Okay.

THE PROSPECTIVE JUROR:  It is a little triggering when I heard the counts is all.

THE COURT:  Understood.  So the question for you then, is if you were to serve as a juror in the case, will you set -- can you set that aside and decide the case based on just the evidence that's presented here in court during trial?

THE PROSPECTIVE JUROR:  I would like to think so, but I think there is maybe some kind of implicit bias I might have.  But that's all, because it has been something that I've been -- yeah.  I would try to, yes.

THE COURT:  All right.  Well, I guess I want to feel confident that, that you can do that if you, if you were to.  So again, that experience is completely unrelated.  It's many years removed and completely unrelated to what's going on here in this case.  So can you set that aside and decide this case based just on the evidence you will hear at trial?

THE PROSPECTIVE JUROR:  Based on the evidence I believe I could, yes.  Yes.

THE COURT:  All right.  Will you follow the law as

120

I give it to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And do you believe you can be fair to both sides?

THE PROSPECTIVE JUROR:  Yeah, I believe so.

THE COURT:  Okay.  All right.  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.

THE COURT:  And obviously you wouldn't be able to talk to anybody about the case while you're sitting here as a juror.  Do you understand that?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  You'll follow that instruction?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Anything else?

THE PROSPECTIVE JUROR:  No.  No thank you.

THE COURT:  All right.  Let me see the lawyers at sidebar.

        (*The following was held at the bench:*)

THE COURT:  All right.  Does either side wish to be heard in the form of a challenge for cause as to either of these two prospective alternate jurors?

MR. WERKSMAN:  Yes.

THE COURT:  You may.

MR. WERKSMAN:  With regard to alternate juror number two, Your Honor, he felt triggered by learning that this case is about extortion.  He will absolutely be terrified of a bully, and Mr. Cho is going to be characterized as the ultimate bully.  When the court pressed him, he responded with the yes, but.

There's also that but that concerns me.  It should concern the court.  Your Honor asked him can he be fair, and high said yes, but.  And then you asked him a second time, and he dropped the but, but it's there.  This man is going to be triggered.  He's got an emotional reaction to this case already.

I think for him to try to sweep aside this trauma and try to be a fair juror is going to be impossible for him, and I respectfully request that notwithstanding the that he ultimately said he could be fair, he was halting and hesitant in doing so.  And he even equivocated twice calling himself implicitly biased and saying yes, but.  So I would submit on that.

THE COURT:  Does the government wish to be heard?

MR. BUTLER:  Just briefly Your Honor.  Ultimately he answered yes to all those questions without that implicit but that the defense is arguing.  This is something that I think happened over 20 years ago.  This case is about businesses and adults and people in their 30s and 40s, not

schoolyard bullying.  I don't think it's relevant, and ultimately he said he could be fair to both sides.

THE COURT:  He did.  I'm going to sustain the objection.  I'm going to let him go.

MR. WERKSMAN:  Okay.  Thank you.

*(End of conference held at the bench.)*

THE COURT:  All right.  Alternate number two. Sir, thank you for being with us.  I'm going to excuse you. All right.  Please go downstairs to the jury room and let them know.

*(The prospective alternate juror exited the courtroom.)*

THE CLERK:  One moment, Your Honor.  All right. The next batch -- the next JID I will call is 206217576.

THE PROSPECTIVE JUROR:  Hello.

THE COURT:  Hello.  There you go.  All right. Great.  If you could please answer one through five.

THE PROSPECTIVE JUROR:  So I've lived in Los Angeles for six years, the last year of which is Santa Monica.  I am married.  I am a business systems analyst at UCLA.  My partner is working for a property management company, and I've never served on a jury.

THE COURT:  How about questions six through 17? Do you have any yeses to any of those?

THE PROSPECTIVE JUROR:  I have one cousin in England who works for the Met Police, but that's it.

THE COURT:  Are you in touch with that cousin much?

THE PROSPECTIVE JUROR:  Yeah, but we don't talk about work.

THE COURT:  You don't talk about his work?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  All right.  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  All right.  If you were to be selected as a juror in the case, will you decide the case based on nothing but the evidence that's provided and admitted here at trial?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you follow the instructions on the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  And can you be fair to both sides in this case?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.  Any challenge for cause as to either alternate?

MR. BUTLER:  No, Your Honor.

THE COURT:  For the defense?

MR. WERKSMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  The next peremptory is

with the government.

MR. BUTLER:  Pass its peremptory, Your Honor.

THE COURT:  The next peremptory is with the defense.

MS. SOSA:  Your Honor, the defense asks the court to thank and excuse alternate juror one.

THE COURT:  All right.  Alternate juror number one, thank you, sir.  You are excused.  Please go downstairs to the jury room.

*(The prospective alternate juror exited the courtroom.)*

THE CLERK:  The next number I will call is 206354247.

THE PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Okay.  Would you mind taking the empty seat immediately to your right?  Yes.  You would be in the alternate number one seat.

THE PROSPECTIVE JUROR:  Thank you.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  Okay.  Is it on?

Good afternoon.

THE COURT:  Good afternoon.  If you could please answer questions one through five.

THE PROSPECTIVE JUROR:  I lived in Los Angeles, the city of Los Angeles for over 50 years.  I am single.  I am a program coordinator for residents in low income

125

housing.

I've had never served in a jury before.  I'm a little nervous.  Sorry.

THE COURT:  That's okay.  Take it slow.  Do you have any yeses to six through -- no other adults in your household?

THE PROSPECTIVE JUROR:  I have a nephew.  He's in the IT department.

THE COURT:  For what kind of a business or company?

THE PROSPECTIVE JUROR:  It's a computer business.  They fix computers in different organizations.

THE COURT:  How about questions six through 17, do you have any yeses to any?

THE PROSPECTIVE JUROR:  I have a yes on number ten.  I have a niece that works -- that is a U.S. -- I mean, assistant for the -- I'm sorry.  Okay.  She's a D.A. assistant for the city of Minnesota -- the state of Minnesota.

THE COURT:  Okay.  Is she a lawyer?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  She's a prosecutor for Minnesota?

THE PROSPECTIVE JUROR:  I don't -- we don't -- I don't talk about what she does.  I know that she's with the state of Minnesota, but I don't know exactly what she's

126

doing.

THE COURT:  Okay.  I think you said D.A. assistant.

THE PROSPECTIVE JUROR:  Yeah, the D.A. assistant with a district attorneys.

THE COURT:  Okay.  So she's with the district attorney's office in Minnesota?

THE PROSPECTIVE JUROR:  Yes, yes.

THE COURT:  In some county in Minnesota perhaps?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  And do you know if she handles criminal cases?

THE PROSPECTIVE JUROR:  I wouldn't know.  We don't talk about, you know, what she's doing.

THE COURT:  All right.  Anything else that's responsive to any of these questions?

THE PROSPECTIVE JUROR:  No.  The rest of the questions is no.

THE COURT:  If you were to be selected as a juror, will you decide the case based on nothing but the evidence that's admitted here in court?

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  All right.  Will you follow the instructions on the law that I give to you?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you be fair to both sides?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Anything else you want me to know?

THE PROSPECTIVE JUROR:  No.  That would be all.

THE COURT:  All right.  Thank you very much.

Pass for cause as to alternate number one?

MR. BUTLER:  Pass, Your Honor.

MS. SOSA:  Yes, Your Honor.

THE COURT:  Peremptories with the government.

MR. BUTLER:  The government is fine with the alternates, Your Honor.

THE COURT:  All right.  Let's have the two alternates rise to be sworn in, please.  You are our two alternates in this case.

THE CLERK:  Please raise your right hand.  Lady and gentlemen, do you solemnly swear that you will well and truly try the cause now before this court and a true verdict therein render according to the evidence and the instructions of the court, so help you God?

THE ALTERNATE JURORS:  I do.

THE CLERK:  Thank you.  You maybe seated.

THE COURT:  All right.  We have selected a jury. To those of you in the gallery, thank you very much for being here today for your service in this matter, for your patience, and I'm going to excuse all of you.  So please

return to the jury room downstairs for instructions, and again, thank you.  Even though you weren't selected, you're extremely important to this process.  Thank you for being here.

(The prospective jurors exited the courtroom.)

THE COURT:  All right.  Let me see counsel at sidebar for a moment.

(The following was held at the bench:)

THE COURT:  All right.  So my courtroom deputy needs to orient the new jurors.  That takes a little bit of time, and I was going to give them a lunch break.  Everybody ready to move forward with trial?

MS. MacCABE:  Yes.

THE COURT:  That was not a verbal response to my question.

MR. WERKSMAN:  Yes.

MS. MacCABE:  Yes.

THE COURT:  All right.  She asked me to break until 2:00 which, you know, what's your preference?

MR. WERKSMAN:  What's our choice?

THE COURT:  I'm --

MR. WERKSMAN:  I'll come back at 2:00, Your Honor.

THE COURT:  It's not the old days, Mr. Werksman. What's your ideal return time to get started in terms of witnesses and getting going and making as much -- I mean,

look, I typically break at 2:30, but obviously we had to pick a jury today, so I'm willing to stay a little later into the day.

But I don't want to stay too late because it's just my experience has been with jurors is they get tired. They lose focus late in the day, so that's why I make a conscious choice to cut it off like mid-afternoon so that they're not exhausted and not processing.

MR. WERKSMAN:  The next thing would be opening statement.

THE COURT REPORTER:  I cannot hear.

MR. WERKSMAN:  I am sorry.  The next would be opening statement.  I think really the government should tell us how much time they need for opening so we can determine whether we can squeeze in both openings before we adjourn for the day.

MS. MacCABE:  Less than ten minutes.

MR. WERKSMAN:  Great.

MS. MacCABE:  Yeah, we'll be maybe about ten, 15.

MR. BUTLER:  The only other thing I would say, Your Honor, is the first witness is from out of state.  It would be nice.  It's a civilian witness, just to get him out today if we could.  But if that doesn't work with that timing --

THE COURT:  How long do you think that will take?

130

MR. BUTLER:  I think our estimation for our direct was 45 minutes.  It's a pretty short actual direct, but there is an interpreter.  So he'll be here either way.

THE COURT:  Understood.

MR. WERKSMAN:  Your Honor, that's going to be a critical witness.  If I'm thinking of who they're talking about, it's going to be the guy in Count 1 and 2 of the carjacking.

MS. MacCABE:  No.  I'm sorry.  I don't mean to interrupt you, but no.  It's the victim who's involved in Count 3 and 4, it's J.L.

MR. WERKSMAN:  He covers -- not the extortionist. That implicates the carjacking, so I wouldn't want to be constrained in my cross, but I'll go with the flow.

THE COURT:  Well, look, if he's not finished today he'll just come back tomorrow, right?

MR. BUTLER:  Of course.

THE COURT:  Let's just see how it's going, and I think we may as well make use.  I mean, the alternative is to just recess for the day now and come back fresh tomorrow, but I don't know if that's particularly good for anybody.

MR. BUTLER:  The government would certainly prefer to continue.

THE COURT:  You'd like to get him on the stand today?  I'm willing to stay.  It's not a problem for me to

stay.

MR. WERKSMAN:  I just don't want to be pressured to have to finish my cross today.

THE COURT:  You will not be pressured until 3:30 or 4:00 at this rate.

MR. WERKSMAN:  Okay.

THE COURT:  That's okay.  All right.  We'll see. We'll see what we're doing.  We'll see how the jury is doing, and if we break, we break.  The witness, I'm sure, is prepared to be here into tomorrow anyhow.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  Let's go ahead and take a break.  It's their first day, so it just takes them a little while to get oriented.  And then presumably they're going to go to the cafeteria and get something to eat, right?  So okay.  Thank you.

(End of conference held at the bench.)

THE COURT:  All right.  It's 12:45, ladies and gentlemen.  We're going to break till 2:00 p.m., and then the trial is going to commence, all right?  I'm going to give you some instructions on the law, and then we'll move forward to opening statements.  And we should be able to get started with the, at least the first witness.  I'm not sure if we'll finish with that witness today or not, but I think we'll be able to make a bit more use of the day.

So I'm going to give you a break until 2:00 o'clock.  There is a cafeteria downstairs.  My courtroom deputy, you're going to need to spend a little bit of time with her so she can orient you and give you an idea of how everything works.

And of course, I will remind you now as I will throughout the case that you're not to discuss the case in any way whatsoever with anyone.  That includes your fellow jurors, and you're certainly not to form or express any opinion about the case until it's given to you for deliberations.  Have a nice break.  We'll see you back here at 2:00 p.m. sharp.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  We're in recess unless anybody wants to discuss anything.

MR. WERKSMAN:  Thank you, Your Honor.

THE COURT:  Thank you.

*(Recess.)*

THE COURT:  All right.  We are on the record outside the jury's presence.

Just two notations regarding jury instructions.  With respect to court's instruction number five, the parties did not include the example that is frequently given in this

direct versus circumstantial evidence instruction concerning the wet sidewalk.

Was that intentional?  I typically give it, but do you intentionally not want that?

MR. WERKSMAN:  No, Your Honor.  We have no objection to the court including that language.

MR. BUTLER:  The same, Your Honor.

THE COURT:  All right.  It will be included.  And then turning to number seven, which is the instruction on witness credibility.  After the eighth factor, the next two paragraphs from the stock, the Ninth Circuit instruction were not included.

MR. BUTLER:  I don't think that was intentional on the government's part, Your Honor.

THE COURT:  So any objection to my including the two paragraphs that are in the Ninth Circuit's instruction?

MR. WERKSMAN:  No, Your Honor.  Thank you.

MR. BUTLER:  No, Your Honor.

THE COURT:  All right.  Okay.  Let's proceed. Let's go ahead, and we will bring the jury in.

THE CLERK:  All rise.

(The jurors entered the courtroom.)

THE CLERK:  You may be seated.

THE COURT:  Welcome back, ladies and gentlemen.

I will now be providing to you an initial set of

instructions on the law.

COURT'S PRELIMINARY INSTRUCTIONS

Jurors, you are now the jury in this case, and I want to take a few minutes to tell you something about your duties as jurors and to give you some preliminary instructions.  At the end of the trial I will give you more detailed instructions that will control your deliberations.

When you deliberate, it will be your duty to weigh and to evaluate all the evidence received in the case and in that process, to decide the facts.  To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not.

You must decide the case solely on the evidence and the law before you.  Perform these duties fairly and impartially.  You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.  Like conscious bias, unconscious bias can affect

how we evaluate information and make decisions.

This is a criminal case brought by the United States government.  The government charges the defendant with interference and attempted interference with commerce by extortion in violation of Title 18, United States Code, Section 1951(a) and car jacking, in violation of Title 18, United States Code, Section 2119(2).

The charges against the defendant are contained in the indictment.  The indictment simply describes the charges the government brings against the defendant.  The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt.  In addition, the defendant has the right to remain silent and never has to prove innocence or to present any evidence.

The evidence you are to consider in deciding what the facts are consists of:  One, the sworn testimony of any witness; two, the exhibits which are received in evidence; and three, any facts to which the parties agree.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case:  One, statements and arguments of the attorneys; two, questions and objections of the attorneys; three,

testimony that I instruct you to disregard; and four, anything you may see or hear when the court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence. That is, it is proof of one or more facts from which one can find another fact.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night; however, other evidence such as a turned on garden hose may provide an explanation for the water on the sidewalk. Therefore, before you decide that effect has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

There are rules of evidence that can control what

can be received in evidence.  When a lawyer asks a question or offers an exhibit in evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered or the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case you must not consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:  First, the witness' opportunity and ability to see or hear or know the things testified to; second, the witness' memory; third, the witness' manner while testifying; fourth, the witness' interest in the

outcome of the case, if any; fifth, the witness' bias or prejudice, if any; sixth, whether other evidence contradicted the witness' testimony; seventh, the reasonableness of the witness' testimony in light of all the evidence; and eighth, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.

Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness' race, color, religious beliefs, national

ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

I will now say a few words about your conduct as jurors.  First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case; second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues that it involves during the course of your jury duty.

Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This restriction includes discussing the case in person, in writing, by phone, tablet, or computer, or any other means, via email, via text messaging, or any Internet chat room, blog, website or application, including but not limited to Facebook, YouTube, X, formerly known as Twitter, Instagram, LinkedIn, Snapchat, Tik Tok, or any other forms

of social media.

This restriction also applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else, including your family members, your employer, the media or press, and the people involved in the trial.

Although you may notify your family and your employer that you have been seated as a juror in this case and how long you expect the trial to last, but if you were asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter.  In addition, you must report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to with it.  Although I have no information that there will be news reports about this case, do not do any research such as: Consulting dictionaries, searching the Internet, or using other reference materials.  And do not make any investigation or in any other way try to learn about the case on your own.

Do not visit or view any place discussed in this case, and do not use the Internet or any other resource to

search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses, or the lawyers until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible. These rules protect checked each party's right to have this case decided only on evidence that has been presented here in court.

Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you've taken an oath to follow the rules, and it is very important that you follow these rules. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.

If any juror is exposed to any outside information, please notify the court immediately.

At the end of the trial, you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember the evidence.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  Do not let notetaking distract you from being attentive.

When you leave court for recesses, your notes should be left in the courtroom.  No one will read your notes.  Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The next phase of the trial will now begin. First, each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.

A party is not required to make an opening statement.  The government will then present evidence, and counsel for the defendant may cross examine.  Then, if the

defendant chooses to offer evidence, counsel for the government may cross examine.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments. After that, you will go to the jury room to deliberate on your verdict.

A language other than English will be used for some evidence during this trial. When a witness testifies in another language, the witness will do so through an official court interpreter.

When recorded evidence is presented in another language, there will be an official court translation of the recording. The evidence you are to consider and on which you must base your decision is only the English language interpretation or translation provided through the official court interpreters and translators.

Although some of you may know the non-English language used, you must disregard any meaning of the non-English words that differs from the official interpretation or translation.

You must not make any assumptions about a witness or a party based solely upon the use of an interpreter to assist that witness or party.

During the trial I may need to take up legal matters with the attorneys privately, either by having a

conference at the bench when the jury is present in the courtroom or by calling a recess.

Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.  Of course, we will do what we can to keep the number and length of these conferences to a minimum.

I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

That concludes my initial instructions to you, ladies and gentlemen.

Government, would you like to make an opening statement?

MS. MacCABE:  Yes, Your Honor.

THE COURT:  You may proceed.

*OPENING STATEMENT*

MS. MacCABE:  Pay me or face the consequence.  Pay me or get beat up.  Pay me or see the real demon.  Those were the only choices that the defendant, Daekun Cho, gave his victims.  That's what this case is about.

It is about the defendant extorting money from

karaoke bar operators and drivers in Koreatown, less than five miles from where you sit now.

You will hear from victims who owned or managed karaoke bars or who drove doumis, a colloquial Korean word for hostesses paid to party with karaoke customers.  You will learn that the defendant targeted them because they were the very people he thought would not go to the police. Many of them were undocumented.  Many of them did not speak English fluently, and the karaoke industry they worked in operated after hours.

For many, many years his plan worked.  Month after month he collected cash from his victims in person or demanded that they pay him on Venmo, but these payments were not in exchange for some good or service that the defendant was providing.  If the victims wanted to work, they had to pay him.  If they worked without paying him, he penalized them.

He called his monthly extortion taxes or protection fees, but you will hear that the person the victims needed protection from was the defendant himself.

The victims just had to pay the defendant. Otherwise, he would threaten them, or he would beat them up. He beat them up in front of others.  He even bragged about doing it afterwards.  He wanted other victims to know better than to try not to pay him.

You will hear from a few of his victims about how he threatened them, violently attacked them, or otherwise scared them into paying him every month.

The defendant pushed some of the victims to their breaking point, when they felt as though even not paying the defendant or paying the defendant would not protect themselves from him.  Some of those victims finally realized they had a third choice, get help from law enforcement.

You will hear from at least five of those victims during this trial:  Yun Soo Shin, Joo Hun Lee, Sang Heun Shin, Ki Young Jung, and Young Nae Kang.  One of those victims hit his breaking point when the defendant and his accomplice beat him with baseball bats until knocking him unconscious.

You will see the security footage of the two men beating the victim with baseball bats, and you will hear from the victim that one of those men is the defendant. They then stole the victim's car.  The defendant left the victim lying on the ground of the karaoke bar parking lot with a broken arm, multiple wounds needing stitches, and in extreme physical pain.

After being released from the hospital, the victim took evidence that he had of what the defendant had done to him to the police.  You will see that evidence during this trial.

You will hear the defendant threatening the victim on camera.  You will see the carjacking.  You will hear from the victim, and you will hear from the victim's business partner, who was on the phone with the victim during the carjacking.

A second of the defendant's victims hit his breaking point when the defendant hunted him down, punched him in his car, and threatened to kill him.  That second victim went to law enforcement and recorded the next month's payment.

In text messages and on recorded calls during that operation, the defendant repeatedly told the second victim to go to another location when the defendant thought that police officers were around.  The defendant did not want to get caught.  He wanted everyone in Koreatown to know about his power and that he had to be paid or else.

He did not want law enforcement to find out, so much so that when agents went to his house, he hid one of his phones under a bathroom sink -- not just any phone, but the phone containing his extortionate text messages.

You will hear that the defendant even tried to escape out that window where he had hidden the phone, but agents found the defendant's phone.  And you will see his text messages to his many, many victims during this trial.

I need this month and penalty or you want to face

the consequence.  You pick.

Those are the defendant's texts.  That's the choice that he gave to one of his victims.

Five hundred dollars or I come see you.  That's the choice the defendant gave to another victim.

You gonna see the real demon.

That's what the defendant said to yet another victim to make him pay.  You'll hear from this victim during this trial.

And this, getting beaten with baseball bats during a carjacking is what happens when you see the real demon.

You'll hear from this carjacking victim during the trial too.  The victim will tell you about what the defendant did to him.  You'll see photos like these of his injuries, and you'll hear from the emergency room doctor who treated him.

You'll also hear from someone who witnessed this assault, and afterwards the defendant bragged about doing it in text messages like this one.

A few months after the defendant was caught on camera punching that driver, he punched another.  Here is the defendant in green texting someone asking where one of his victims lives.

The defendant then said that he found that victim and socked him as a consequence for violating the rules.

You will hear from the victim that he punched during this trial, and that victim will tell you the defendant also threatened to kill him.

For his crimes the defendant is charged with 55 extortions, one attempted extortion, and one carjacking. After you have seen and heard all of the evidence, the United States will ask you to return the only verdict consistent with that evidence, guilty on all counts.

THE COURT:  Defense, would you like to make an opening statement now or reserve until your case in chief?

MS. SOSA:  We will make a statement now.

THE COURT:  You may proceed.

*OPENING STATEMENT*

MS. SOSA:  Good afternoon, ladies and gentlemen. My name is Karen Sosa.  This is my partner, Mark Werksman, and at the table with us is Daekun Cho.  Everybody calls him D.K.  He and we very much appreciate you giving up your time and your lives for this week to hear this case.

Mr. Cho is an innocent man who did not do what he is being accused of.  You've heard how the government wants you to interpret the evidence in this case, but their interpretation is not evidence.  And you are free to disregard it.  In fact, it is your job and your obligation as jurors to pay close attention and to reach your own conclusions if you can about what happened that night -- in

Koreatown over the course of these years.

Now, Koreatown has dozens of karaoke clubs, and these are what's called private room karaoke clubs where there's little rooms with a door where you and your friends have your own machine.  You can get food and drink delivered to your room.  You pick your own songs, and if you want, you can get girls delivered to your room.

These are young attractive women who men hire to party with them in the karaoke room for a few hours. Karaoke clubs make money off of this because when these men have girls with them, they stay longer, they spend more money, they buy expensive bottle service, which is a huge profit for the clubs.  The clubs want these girls to be available to their customers.

So you have drivers, and you are going to hear a lot about these drivers.  They call themselves companies, and you'll hear about companies with names like Queen, or Dream, Dior.  But these aren't legitimate companies who are incorporated and pay taxes.

These companies are just one or two guys who drive a van full of girls around Koreatown every night.  If the girls get hired inside the karaoke clubs, they get paid in cash by the customer.  And then at the end of the night the girls give a cut of that cash to the drivers, and that's how these drivers are making their money.

So here's the issue, one of the issues.  This system doesn't work if there's no order to it.  There's dozens of these drivers, and you can't have dozens of drivers driving van loads of girls all to the same karaoke club at the same time where maybe there's customers, maybe there's not.  It's inefficient.  Everybody loses out.

Meanwhile, you might have another karaoke club that has customers looking for girls ready to pay, and there's no girls over there.  So then the karaoke clubs lose out.

This business model does not work if it's not organized, and that is what Mr. Cho attempted to do.  He organized everyone into what they called an association.

The club owners and the drivers paid Mr. Cho if they wanted to be part of this association, and in exchange -- and you'll see this in the evidence -- he was in Koreatown every night, driving by the clubs, calling and texting with his drivers.

He would find out which clubs had customers, which drivers were working on any particular night, who had girls, who needed girls.

He kept new clubs and drivers from getting in on the business that the association members enjoyed.  If there was an issue sprung up at a club one night, he would let his drivers know.

152

In short, he tried to bring some order into this otherwise chaotic gray market economy, and that order benefited everybody. Now, this cooperation and sort of self-structuring, self-organization, it's not a new thing. It's not unique to Koreatown karaoke.

If you think about a union, now, look. Obviously, we're not saying that this is the same thing as a big powerful union like United Auto Workers or the teachers union, right? It's not.

This is -- this is life on the street. This is a gray market economy. It's informal. Everything's kind of under the table, but think about a union. The point is that you pay union dues, and then your union rep will advocate for you. And you, the workers, will cooperate for your mutual advantage instead of fighting amongst each other and trying to charge different rates and ice each other out. That's kind of what these guys had in mind.

Now, you will hear from the evidence about how this particular association operated, but the idea is the same. We pay in to be part of this collective, and in exchange we get a piece of the action.

Everybody in this case was paying to play. All the witnesses in this case wanted a piece of the action.

So the evidence is going to show that these drivers and these karaoke club owners weren't paying Mr. Cho

153

because they were afraid not to.  They were paying him because it was good business.  It was lucrative for them. It kept their pockets lined.

Being in Mr. Cho's association meant that you got the call when karaoke clubs had customers who were ready to pay for your girls.  The clubs made money.  The girls made money; and therefore, the drivers made money.  Everybody made money, and nobody wanted to miss out on that, and that's why they paid Mr. Cho.

Now for every charge in this case, ultimately, the prosecutors are going to have to ask you to rely on the word of their witnesses.  Their witnesses are all drivers, and there's going to be one or two club managers.  But it's mostly these drivers who were making their money from bringing girls to the karaoke clubs.

And the question for you is going to be can you trust them?  Not only that, but can you believe them beyond a reasonable doubt, which is a very high bar.  And we'll talk more about it at the end of the trial, but that is the highest standard in any case in any courtroom in the country.

So when the witnesses sit in front of you and say, look, you have to take my word for it, you have to ask yourselves, do I know for a fact that this person is telling the truth, or do they have reasons why now they want to

describe things a little different from how it actually was at the time.

So they all benefited from being part of D.K.'s network, and now they are all going to benefit from testifying against him.  And you will hear the evidence of how.  So as you listen to the evidence, be skeptical.  Don't let their witnesses fool you because everybody here -- every one of their witnesses has something to gain from testifying against Mr. Cho, and they all have something to hide.

And at the end of the evidence when you're not sure who to believe, when you're not sure what was really going on at these clubs in the after-hours market in Koreatown, we will ask you to find Mr. Cho not guilty.

Thank you.

THE COURT:  You may call your first witness, government.

MR. BUTLER:  The government calls Joo Hun Lee to the stand, who will be assisted by a Korean language interpreter.

THE CLERK:  Do you solemnly swear that you will well and truly interpret from the English language into the Korean language and from the Korean language into the English language in the cause now before this court according to the best of your knowledge and ability, so help you God?

THE INTERPRETER:  I do.

THE CLERK:  Good afternoon.  Please stand before me and raise your right hand to be sworn.  Right here.  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may be seated in the witness stand.

THE INTERPRETER:  Should I cite my qualification on the record?

THE COURT:  I will ask you to do that in a minute.

THE CLERK:  If you will please state and spell your first -- your full name for the record.

THE WITNESS:  Yes.  Joo Hun Lee, J-O-O, H-U-N, L-E-E.

THE COURT:  If the interpreter could please state her appearance on the record.

THE INTERPRETER:  Nancy Hong, the court interpreter for the Korean language is certified by Judicial Council of the State of California with my certification number 300853, oath on file.

THE COURT:  All right.  Government counsel, you may inquire of the witness.

MR. BUTLER:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. BUTLER:

Q.    Good afternoon, Mr. Lee.

A.    Yes.

Q.    Do you currently live outside of California?

A.    Yes.

Q.    Did you previously live in California?

A.    Yes.

Q.    Where were you born?

A.    Yes.  I was born in Korea, in Seoul, Korea.

Q.    What's your current immigration status here in the United States?

A.    I had a student visa.  However, the visa has been expired.

Q.    Did you receive a U visa certification for assisting the government in providing evidence in this case?

A.    Yes.

Q.    Did you receive that certification after you had already went to law enforcement to report the crimes against you?

A.    No.  I was told they would provide me with that. However, I have already received it.

Q.    But were you told about that after you had already reported the crimes against you?

A.   Yes.

Q.   Okay.   Going back to when you were living in California, where did you last work when you lived in California?

A.   I was working in Koreatown.

Q.   And what were you doing?

A.   Yes.   I was working to transport party girls.

Q.   Did you have your own company?

A.   Yes.

Q.   What was it called?

A.   Yes, Plus.

Q.   Did you have a partner that ran Plus with you?

A.   Yes.

Q.   What was their name?

        THE INTERPRETER:   I'm sorry?

BY MR. BUTLER:

Q.   What was their name?

A.   Yun Soo Shin.

Q.   And you said you would drive party girls.   Are those hostesses and entertainers to karaoke bars?

A.   Yes.

Q.   How were you paid for driving these hostesses around?

A.   We would charge them $40 per hour.

Q.   So the hostesses would pay you directly?

A.   Yes.

Q.   How would you know which bars to take the hostesses to?

A.   The karaoke studio could contact us through our messenger.

Q.   How long did you do this for?

A.   About, I think I had done it for about two years.  That may not be precise, but I think I did for about two years or so.

Q.   The bars and studios that you drove to, do you know if they accepted credit cards at those establishments?

A.   Yes.

Q.   Do you know someone with the nickname D.K.?

A.   Yes.

Q.   Do you see him here in the courtroom today?

A.   Yes.

Q.   Can you identify him based on where he's sitting and an article of clothing?

A.   Yes.  He's now wearing a neck tie, and he's wearing a black suit.

Q.   Is he sitting to your left or your right?

A.   Right.

        MR. BUTLER:  Could the record reflect that the witness has identified the defendant?

        THE COURT:  Yes.

BY MR. BUTLER:

Q.   One last question on how these bars would contact you.

Did the karaoke bar contact you using a specific messenger application?

A.   Yes.

Q.   What was that called?

A.   Kakao.

THE INTERPRETER:   K-A-K-A-O, interpreter spelling.

MR. BUTLER:   Thank you.

BY MR. BUTLER:

Q.   Back to the defendant.   When did you first meet the defendant D.K.?

A.   At around the time I initially started doing that kind of work.

Q.   And how did you meet him?

A.   I came to know of him through a karaoke manager.

Q.   Did he ever approach you directly?

A.   No.   Because I was told if you want to start this kind of work, you will have to get a permission from the individual called D.K.   That's why I had to meet him.

Q.   And so at some point did you start paying the defendant money?

A.   As soon as I started working I did so, from the very first month I started paying him.

Q.   How often were you supposed to pay him?

A.   Once a month.

Q.   And how much were you paying him?

A.    One hundred dollars.  I paid him every month.

Q.    When you started, were you paying in cash?

A.    Yes.

Q.    Did you eventually pay the defendant on Venmo?

A.    Yes, ever since the onset of Covid.

Q.    Can you turn in the witness binder in front of you to what's been marked as Government's Exhibit 28.

A.    Yes.

Q.    Do you recognize what's been marked as Government's Exhibit 28?

A.    Yes.

Q.    What are they?

A.    Because I was unable to meet him in person during the Covid, I made a payment through Venmo.  That's what it shows.

Q.    So these are the Venmo records of the payments you just talked about?

A.    Yes.

          MR. BUTLER:  Your Honor, at this point I would move Government's Exhibit 28 in evidence and ask to publish for the jury.

          THE COURT:  Any objection?

          MR. WERKSMAN:  No, Your Honor.

          THE COURT:  Twenty-eight is admitted.  You may publish.

(*Exhibit 28 received in evidence.*)

BY MR. BUTLER:

Q.   So does this show two $100 payments?

A.   Yes.

Q.   And is that in January and February of 2021?

A.   Yes.

Q.   So what were these payments for?

A.   First of all, we were not able to work unless we make this payment.  And then consequently, we made a payment under the reason of doumis, the hostess.

Q.   Were you making these payments out of fear?

A.   First of all, unless I make this payment, I wasn't able to work.  The second, I had a fear.

Q.   Fear of what?

A.   Before the Covid when I was meeting with him in person to pay him, he would always give me a sense of threatening. And then he would tell me, he was a Korean gangster member.

Q.   Did you ever receive messages from the defendant about paying him?

A.   Yes.

Q.   Can you turn in your binder again to what's been marked as Government's Exhibit 86?

A.   Yes.

Q.   Do you recognize what's been marked as Exhibit 86?

A.   Yes.

Q.    What are they?

A.    These are the demands that I received from D.K. for making payment to him.

Q.    Did you provide these text messages to law enforcement?

A.    Yes.

MR. BUTLER:  At this time the government would move Exhibit 86 into evidence and ask to publish for the jury.

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  Eighty-six is admitted.  Go ahead.

(Exhibit 86 received in evidence.)

BY MR. BUTLER:

Q.    So are these messages in blue from the defendant?

A.    Yes.

Q.    And what did you mean on the right-hand side when you told him that, Venmoed?

A.    That means I have already sent the money.

Q.    And is that the money that we saw on the Venmo records in Exhibit 28?

A.    Yes.

Q.    At the bottom here it says it's 100 per driver.  Should I get it from Ben?  Who is Ben?

A.    The name I previously mentioned, Yun Soo Shin happens to be his Korean name, and the name Ben is his English name.

Q.    So Ben and Yun Soo Shin are the same person?

A.    Yes.

Q.    And they were -- Ben was your partner at Plus?

A.    Yes.

Q.    Again, was the defendant doing anything for you or your company?

A.    None.

Q.    You mentioned that you were afraid of him because he had stated that he was a Korean gangster.  Did he -- did the defendant ever tell you what gang he was in?

A.    No.  I hadn't heard of it, the name of the gangster.  I didn't hear.  However, there were a rumor that was going around.

Q.    After you left the industry, did you look at the defendant's Instagram page?

        THE INTERPRETER:  I'm sorry, counsel.  I didn't hear clearly.

BY MR. BUTLER:

Q.    After you left the industry, did you look at the defendant's Instagram page?

A.    Yes.

Q.    Did you take screenshots of the defendant's Instagram page and provide them to law enforcement?

        MR. WERKSMAN:  Objection.  Relevance.

        THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. BUTLER:

Q.   And those screenshots you took, did they, to you, suggest gang activity?

A.   Yes.

MR. WERKSMAN:  Objection.  No foundation.  Move to strike.

THE COURT:  Sustained.

BY MR. BUTLER:

Q.   Can you turn in your binder in front of you to Exhibits 45, 46, 47, 48, 49, 50, and 51.

THE INTERPRETER:  Do you mind, Your Honor, if I can come and just sit next to him?  I can kneel down.

THE COURT:  We could position another chair up there.

MR. WERKSMAN:  Your Honor, I'm going to renew my relevance objection at this stage and lack of foundation.

THE COURT:  All right.  Well, there is no question pending right now.  The witness has only been asked to refer to some exhibits.  Let's see if we can get a seat for the interpreter in the witness box.

THE INTERPRETER:  Appreciate it, Your Honor.

BY MR. BUTLER:

Q.   Have you reviewed those exhibits?

A.   Yes.

Q.   Are those screenshots that you took of the defendant's Instagram and provided to law enforcement?

A.   Yes.

Q.   And do they suggest anything to you?

MR. WERKSMAN:  Objection.  No foundation. Relevance.

THE COURT:  Sustained on foundation.

BY MR. BUTLER:

Q.   Did the defendant ever threaten you personally?

A.   Yes.

Q.   Did you ever stop paying the defendant?

A.   Yes.

Q.   Why?

A.   All of a sudden he asked me to raise the amount of money.

Q.   After you stopped paying him, did the defendant -- did you or your partner hear from the defendant at all?

MR. WERKSMAN:  Objection, hearsay with regard to anyone else but this witness.

THE COURT:  All right.  I'll sustain as to your partner.  I want you to restate your question, counsel.

BY MR. BUTLER:

Q.   Did you -- after you stopped paying, did you hear from the defendant at all?

A.   I was contacted by him after I couldn't make a payment

to him.  And then there was a dash camera in the car, and then -- my partner ran into him at some parking lot.

MR. WERKSMAN:  Objection.  Hearsay.

THE COURT:  Hold on.  Overruled.  Ask your next question.

BY MR. BUTLER:

Q.    When you and your partner were working, would you be on the phone with each other throughout the night?

A.    Yes.

Q.    Can you tell us why you would be on the phone with him throughout the night?

A.    As for us, not only for that particular night, you know, we would always have a phone conversation while working to have a communication.

Q.    After you stopped paying the defendant, were you ever on the phone with your partner when someone attacked him?

THE INTERPRETER:  Someone what?  I'm sorry.

MR. BUTLER:  Attacked him.

THE WITNESS:  Yes.

BY MR. BUTLER:

Q.    Can you just describe what you heard during that incident.

MR. WERKSMAN:  Objection.  Vague as to incident and time and place.

THE COURT:  Overruled.

THE INTERPRETER:  Answer the question.

THE WITNESS:  Yes.  I was on my way to a different location.  My partner was on the way to a karaoke studio called McQueen.  We had been constantly talking on the phone together.  My partner --

MR. WERKSMAN:  Excuse me, Your Honor.  He's showing the jury an exhibit.

THE COURT:  I'm sorry?

MR. WERKSMAN:  The witness has got an exhibit displayed to the jury that's not in evidence.

MR. BUTLER:  Your Honor, he has a blue folder.  It's blank.  He can close it, but there's nothing facing the jury.

THE COURT:  I didn't see anything.  All right.  The witness' answer was interrupted.  Have you completed your answer, sir?

THE WITNESS:  I was on my way to a different location, and my partner was on the way to a karaoke studio called McQueen.  After my partner had arrived at the karaoke studio McQueen --

MR. WERKSMAN:  Objection, Your Honor.  This is hearsay.  There's no foundation for this.

THE COURT:  I thought I heard him say he was on the phone.  Counsel, why don't you just clarify that.

BY MR. BUTLER:

Q.    Were you on the phone with your partner during the entire time that you're testifying about now?

A.    Yes.

THE COURT:  The prior objection is overruled.  Go ahead.

THE WITNESS:  Suddenly the minivan opened up.

MR. WERKSMAN:  I'm going to object, Your Honor. May we approach?

THE COURT:  No.  Go ahead.  You have an objection to this answer?

MR. WERKSMAN:  Hearsay.  No foundation.  He's testifying about what he heard.

THE COURT:  Yes, he is.

MR. WERKSMAN:  Me said a minivan door opened.

THE COURT:  Yes, he did.  Overruled.  Go ahead.

THE WITNESS:  The minivan opened.  The girls who were in the car had already entered to karaoke studio.

MR. WERKSMAN:  Objection.  No foundation.  That would -- could only be based upon hearsay.  It's a phone, not a video.

THE COURT:  Overruled.

THE WITNESS:  After that, all of a sudden I heard a noise for a door getting opened, and then all of a sudden my partner was yelling ah, ah, ah, ah, ah.  And then a voice

was getting farther and farther away from me, and then I heard, I will pay you.

MR. WERKSMAN:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  After that I heard, I will pay you. I will pay you.  I will pay you.

BY MR. BUTLER:

Q.   What did you do after hearing that on the phone?

A.   At the time I was just shaking a lot.  I couldn't get myself composed, and I just repeatedly asked him what happened?  What's going on?  What's going on, but I didn't hear his answer.

And then after that, I hurried up to the location, which was McQueen Studio.

Q.   What happened when you arrived there?

A.   Before I arrived there, I received a text message from one of the girls who were inside there, and in her text message she --

MR. WERKSMAN:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MR. BUTLER:

Q.   Did you eventually arrive at McQueen?

A.   Yes.

Q.   And was Yun Soo Shin there?

A.   Yes.

Q.   What condition was he in?

A.   I didn't know what kind of condition he was at inside there.  However, I was told that he's not able to walk.  So to my recollection, I had gone to the very front of the entrance.  So can I just stand up and show gesture to describe?

Q.   I think it would be best if you just tell us -- tell the jury how Yun Soo Shin was acting when you actually met up with him.

A.   He couldn't walk well.  He was limping as well, and then he was holding onto his arm just like this (indicating).

Q.   What did you do next?

A.   First of all, I let Yun Soo Shin sit in the car next to me, and then I let the girls who were there get in the car, all of them, my car.  And then after that I dropped off the girls one at a time.  After that, while I was reporting to LAPD, and then when I was doing so, I had contacted my other friends.  After that, I met up with LAPD in the location in the Sixth Street and Vermont.

Q.   What happened next?

A.   Before I met up with a person, I repeatedly told him Yun Soo, are you okay?  Are you okay?  But then he was repeatedly saying, ah, ah, brother.  It was D.K.

          MR. WERKSMAN:  Objection.  Hearsay.  Move to

strike.

THE COURT:  Overruled.

BY MR. BUTLER:

Q.   Where did you go next?

A.   Because at the time there was another thing that I had to do to close up the situation.  So another person who was pretty close to Yun Soo.  That person came over and took Yun Soo to E.R.

Q.   Did you try to contact the defendant at all after that incident?

A.   Yes.  Right around that time, I made a phone call to him.

Q.   Did you speak to him?

A.   No.

Q.   Did you look up the defendant's Instagram after the incident?

A.   Yes.

Q.   Did you see anything on his Instagram?

A.   Yes.

Q.   What did you see?

A.   Other than the photos he was posting in the Instagram, there was an Instagram story he would post every day.

Q.   What was the story of?

MR. WERKSMAN:  Objection.  No foundation.

THE COURT:  Overruled.

172

THE WITNESS:  The background was dark, and then somebody was wearing something like a skeleton mask, which is a black color.

BY MR. BUTLER:

Q.   Did you show that photograph to Yun Soo Shin?

A.   Yes, I did.

Q.   Did he have any reaction to it?

A.   Yeah.

MR. WERKSMAN:  Objection.  Hearsay, Your Honor. He's about to give a hearsay response.

THE COURT:  What's the timing of this?

MR. BUTLER:  I believe it to be right after he was released from the hospital.  So he's -- a present sense impression and state of mind, his current state of mind.

THE COURT:  All right.  Why don't you ask those questions and lay the proper foundation.  Sustained for now.

BY MR. BUTLER:

Q.   When did you show Yun Soo Shin the photograph on the defendant's Instagram?

A.   Although I do not remember the date exactly, when I screenshot Yun Soo the skeleton mask, a picture on the very same day, I showed it to him.

Q.   And how quickly did he react to you showing it to him?

A.   Immediately.  Less than one second, I believe.

Q.   And was he still wearing the bandages and the cast from

his injuries?

A.    Yes.

Q.    And what was his response to the photograph?

A.    Brother, this is correct.  It is correct that he was wearing this at that time.

Q.    Can you turn in your exhibit binder in front of you again to what's been marked as Government's Exhibit 60?

THE INTERPRETER:  Sixty?

MR. BUTLER:  Yes.  Six-zero.

THE INTERPRETER:  Thank you.

BY MR. BUTLER:

Q.    Do you recognize that photo?

A.    Yes.

Q.    What is it?

A.    As I testified earlier, this is what I saw in D.K.'s photo, Instagram history.  This is the very same photo.

MR. BUTLER:  Your Honor, at this time the government would move Exhibit 60 into evidence.

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  All right.  Sixty is admitted.

(Exhibit 60 received in evidence.)

MR. BUTLER:  Permission to publish, Your Honor?

THE COURT:  Go ahead.

BY MR. BUTLER:

Q. Now that the jury can see it, is this the photo that you were talking about on the screen?

A. Yes.

Q. After this incident, did you keep working in the Koreatown karaoke business?

A. The very next day I quit.

Q. Why did you quit?

A. I was in fear.

Q. In fear of what?

A. I have a 12-year-old daughter with me, and then I am a house -- I am a head of a household. I am a husband as well. If I get injured, if I suffer from something like that again, my whole family would shake.

And then the very next day after that happened a very close friend of mine, who is a manager of karaoke, sent me a picture.

MR. WERKSMAN: Objection. Hearsay. This is a hearsay response.

THE COURT: Overruled.

THE WITNESS: (Responding.)

THE COURT: Hold on a second. Just stop the answer there. Ask another question.

BY MR. BUTLER:

Q. What were you in fear of? I understand why you were in

fear, but what were you scared of?

MR. WERKSMAN:  Objection, Your Honor.  Objection. It depends on when.  Is this after he left town or before he's left town?

THE COURT:  Why don't you just clarify the time line, counsel.

BY MR. BUTLER:

Q.   On the day after the incident when you decided to leave the industry, what were you scared of?

A.   I was in such a fear of D.K.

Q.   You testified that you were told he was a Korean gangster.  Did he ever tell you that he was in a gang himself?

A.   Yes.

Q.   Did that play into why you paid him and why you were scared of him?

A.   Yes.

Q.   Did you ever see photographic evidence that corroborated that he was in a gang?

MR. WERKSMAN:  Objection.  No foundation.

THE COURT:  Sustained.

BY MR. BUTLER:

Q.   Did you leave the state of California after you quit the karaoke business?

A.   Yes.

MR. BUTLER:  One moment, Your Honor.

BY MR. BUTLER:

Q.   You said that you saw photos that suggested that he was in a gang.  Can you describe those photos?

MR. WERKSMAN:  Your Honor, I will repeat my foundation objection.  This doesn't change.

THE COURT:  Overruled.

THE WITNESS:  There are multiple photos, you know, with other gangsters, about as many as about ten gangsters. And some of those gangsters were holding a gun in the photo.

BY MR. BUTLER:

Q.   And did you take screenshots of those photos after you saw them?

A.   Yes.

Q.   Did you provide them to law enforcement?

A.   Yes.

Q.   Did they contribute to your fear of the defendant?

A.   That photos made me feel even more fear.

Q.   Are the screenshots that you took and provided to law enforcement the same Exhibits 45 through 51 that you previously reviewed?

A.   Yes.

MR. BUTLER:  Your Honor, at this time the government would move those exhibits into evidence and ask to publish for the jury.

177

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  All right.  Exhibits 45 through 51 are admitted.

(*Exhibits 45, 46, 47, 48, 49, 50 and 51 received in evidence.*)

BY MR. BUTLER:

Q.   Showing you Exhibit 45 on the screen in front of you and in your binder.  Can you tell the jury what this is?

A.   This is the first page of D.K.'s Instagram.

MR. BUTLER:  Can we go to Exhibit 46?  I'm sorry.  Okay, 46, yeah.

BY MR. BUTLER:

Q.   Is this another screenshot that you took?

A.   Yes.

Q.   And do you see the defendant in that photo?

A.   Yes.

Q.   Where at?  You can circle on the screen if you'd like.

MR. BUTLER:  I'm sorry, Your Honor.  Does the courtroom deputy need to make the touch screen available?

THE COURT:  I think it just worked.

MR. BUTLER:  Oh, got it.  Sorry.

For the record, the defendant has -- or the victim -- the witness has circled the individual on the left-hand side of the back row.

THE COURT: All right. For the record, that is correct.

MR. BUTLER: Can we move to Exhibit 47, please.

BY MR. BUTLER:

Q. Again, do you see the defendant in these -- in this photograph, Exhibit 47?

A. Yes.

Q. Can you please circle him?

MR. BUTLER: For the record, the defendant has -- or the witness has circled someone on the left-hand side in the back row behind a man with a large assault rifle.

THE COURT: All right. He circled the third person from the left in the back row.

MR. BUTLER: Thank you, Your Honor. Exhibit 48.

BY MR. BUTLER:

Q. Again, do you see the defendant in this photograph?

A. Yes.

MR. BUTLER: We can move on to Exhibit 49.

BY MR. BUTLER:

Q. Again, do you see the defendant in this photograph?

A. Yes.

MR. BUTLER: Exhibit 50.

BY MR. BUTLER:

Q. Do you see the defendant in this photograph?

A. Yes.

MR. BUTLER:  And Exhibit 51, please.

BY MR. BUTLER:

Q.    Who's photographed in this picture?

A.    D.K.'s photograph.

MR. BUTLER:  One moment, Your Honor.  No further questions.

THE COURT:  All right.  Let's take a ten-minute recess.  Ladies and gentlemen, I remind you of your obligation not to discuss the case with anyone whatsoever, and you're not to form or express any opinion about this case until it's turned over to you for deliberations.  We'll get back with you in ten minutes.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  The jury is still outside.

Is it still realistic that we can finish with this witness today?

MR. WERKSMAN:  Your Honor, how long is the court going to be in session?

THE COURT:  Well, I guess my question to you is, how long do you expect the examination of the witness to go?  I mean, the complete examination, cross, redirect?  I know it's impossible to predict, but give me an idea.

MR. WERKSMAN:  Maybe an hour.  Can we start

tomorrow, Your Honor, fresh?

MR. BUTLER:  The government, I doubt will have very much redirect at all unless something that is unanticipated comes up, but I defer to defense counsel on how long he's going to take on cross.

THE COURT:  All right.  I'm going to think about it.  I'll tell you after the break.  Let's take a ten-minute break.

THE CLERK:  All rise.

*(Recess.)*

THE COURT:  All right, counsel.  I've made my decision.  Thank you.  We're going to go ahead and go forward and finish up the witness today.  So let's bring the jury back.

MR. WERKSMAN:  Thank you.

*(The jurors entered the courtroom.)*

THE COURT:  All right.  Defense, you may cross-examine.

MR. WERKSMAN:  Thank you.

**CROSS-EXAMINATION**

BY MR. WERKSMAN:

Q.   Good afternoon, Mr. Lee.

A.   Yes.  Good afternoon.

Q.   Mr. Lee, I represent Daekun Cho.  I'm going to ask you some questions now; is that okay?

181

A.    Yes.

Q.    Now, Mr. Lee, you told us that you had originally, when you entered this country, come on a student visa; is that correct?

A.    Yes.

Q.    Approximately what year was that?

A.    It was in the month of December 2007.

Q.    And you overstayed that visa, correct?

A.    Yes.

Q.    And as of the time you went into the business of driving doumis around, you were not in this country legally, correct?

A.    Correct.

Q.    You were in a cash business driving girls around to Karaoke clubs with your partner, Mr. Shin, correct?

A.    Yes.

Q.    And as a result of the things you've told us in this court today, you were granted special immigration status by the government, weren't you?

A.    Yes.

Q.    So the things you talked about in your testimony earlier happened in 2019 to 2021; correct?

A.    Yes.

Q.    And in March of 2023, approximately one year ago, when you were being prepared to be a witness in this federal

criminal trial, you were granted a special immigration status, correct?

A.   Yes.

Q.   You were granted that status by these prosecutors seated here at this table, correct?

          MR. BUTLER:  Objection, Your Honor.  Foundation.

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.   You were informed by these prosecutors that you would get this particular status, weren't you?

A.   Yes.

Q.   And they told you that you were going to get what's called a U, that's the letter "U," nonimmigrant status certification, correct?

A.   Yes.

Q.   Now there's a lot of legal terminology associated with that status, but the bottom line is you have a pathway to U.S. citizenship now because you're a witness in this case, correct?

A.   Is it okay if I tell you one thing?

Q.   Can you answer my question?  Are you now given a status that allows you a pathway to U.S. citizenship, yes or no?

A.   That's not what I think.

Q.   Well, are you told that as a result of being granted this status you can remain in the United States indefinitely

as a legal resident alien?

A.    If a U visa is applied for now, it would take about five years.

My daughter is a citizen of the United States, and now she's 13 years old.

When I inquired of this with an immigration attorney, I don't necessarily have to apply for this.  I would still be able to obtain the citizenship certificate.

Q.    All right.  But nevertheless, as a condition of you being a witness in this case, you were granted U nonimmigrant status, correct?

A.    Yes.

Q.    And that means you don't have to worry about getting deported because you overstayed by a dozen years your student visa, correct?

A.    As for me, sir, I have filed income tax every single year for eight years, and also I -- there was never a time I was living here like breaching the United States law, violating.

If I had to leave the country with my citizen daughter, then I would be able to.

Q.    Okay.  The question I have for you, sir, and maybe you can answer it yes or no is, did you get a benefit from being a witness in this case?  A benefit of a special status that allows you to remain indefinitely in the United States?

A.    Yes.

Q.    And a condition of that grant of special status is that it could be withdrawn at any time if you fail to cooperate with the government's criminal investigation, correct?

A.    Correct.

Q.    And if you commit any crime, including perjury, the certification may also be withdrawn, correct?

A.    Yes.  Any time they can cancel my status.

Q.    So in other words, if you said something on the witness stand that they didn't like, they could cancel your certification, couldn't they?

A.    It doesn't matter with me.

Q.    Well, it may not matter to you because you think you can go out of the country with your U.S. citizen daughter and return some day.  Is that what you mean?

A.    As for me, once I leave I wouldn't come back to this country.

Q.    Now, nevertheless though, you've been told that as long as you testify consistently with what the government wants you to testify to, you can remain with a U nonimmigrant status certification, correct?

A.    Yes.

Q.    Now you and Mr. Shin formed a company.  You called it a company, correct?

A.    Yes.

Q.   Is that a yes?

          THE INTERPRETER:   Could you repeat your question?

BY MR. WERKSMAN:

Q.   You and Mr. Shin formed a company?

A.   Yes.

Q.   What did you call the company?

A.   Plus.

Q.   Plus.   Now was Plus incorporated in the state of California?

A.   No.

Q.   When you call it a company, it means just you and Mr. Shin agreed to drive girls to karaoke clubs in exchange for money, correct?

A.   Yes.

Q.   You didn't have a limited liability corporation or a partnership or any formal structure to your company, correct?

          MR. BUTLER:   Objection, Your Honor.   Asked and answered and relevance.

          THE COURT:   Overruled.

          THE WITNESS:   Yes.   We had the corporation LLC. We were.

BY MR. WERKSMAN:

Q.   And who owned the corporation?

A.   Yun Soo Shin and Joo Hun Lee.   We, both of us had a

share.

Q.   Okay.  And did you tell the government that you had a formal corporation called Plus?

A.   No.  I haven't.

Q.   Now the business was to take girls to Karaoke clubs every night of the week, correct?

A.   Yes.

Q.   Now between 2019 and 2021, what's the average number of young ladies that you would transport on any given night to the karaoke bars in Koreatown?

A.   It depends on the circumstances, but to my recollection it's approximately ten to 15.

Q.   So that would be ten to 15 girls per night between you and Mr. Shin that you transport to karaoke bars in Koreatown, correct?

A.   Yes.

Q.   And the arrangement that you had with these young ladies was that if they got paid for their work, you got paid from their pay, correct?

A.   Yes.

Q.   If they didn't work, you didn't get paid, correct?

A.   Correct.

Q.   And the process, to be clear, you're the first witness to tell us about this.  So I'm going to ask you a few questions about this process.

A.    Yes.

Q.    You bring some karaoke hostesses, these doumis, to a particular establishment on a particular night, right?

A.    Yes.

Q.    They would get out of the car and go in and see if they could get hired, correct?

A.    Yes.

Q.    And would you wait around to see if they got hired?

A.    Yes.

Q.    So they'd go inside, and they would be paraded in front of middle-aged male patrons?

        MR. BUTLER:  Objection, Your Honor.  Foundation.

        THE COURT:  Well, let's hear the question.

BY MR. WERKSMAN:

Q.    These girls would go inside the clubs, and they'd be paraded in front of middle-aged businessmen between 10:00 p.m. and 3:00 in the morning.  And these middle-aged businessmen would decide whether to hire any particular girl based upon her looks, correct?

        THE COURT:  Hold on.

        THE WITNESS:  Yes.

        MR. BUTLER:  Objection, Your Honor.  Foundation. Relevance.  403 prior ruling.

        THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    So the better looking, the more likely they get hired, true?

MR. BUTLER:  Objection, Your Honor.  Same objection.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Now, were there nights when the girls would come back out and say no takers, we're going home?

A.    I can't understand this question clearly.

Q.    Were there times when you'd take a bunch of girls to a karaoke bar, drop them off, and they'd all come back ten minutes later and say, no one wants us?

A.    Yes.

Q.    Why would that happen?

MR. BUTLER:  Objection, Your Honor.  Foundation. Calls for hearsay.

THE COURT:  Sustained.

MR. WERKSMAN:  I'll rephrase it.

BY MR. WERKSMAN:

Q.    That would happen if somebody had gotten there first with their girls, correct?

THE INTERPRETER:  I'm sorry, counsel.  Can you --

BY MR. WERKSMAN:

Q.    If some other driver had arrived ten minutes before you

189

did with a bunch of doumis, they'd get the work, and your girls would be shut out, correct?

MR. BUTLER:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  I don't think this question is something I can provide an answer to because that depends on the situation of the customers there.

BY MR. WERKSMAN:

Q.    Well, okay.  So if the customers already had doumis when you arrived with your doumis, then your doumis would have no work, true?

A.    Probably so.

Q.    Now you had rules that you applied towards the behavior of the doumis that you transported to the clubs; correct?

A.    Yes.  There are many, many rules.

MR. WERKSMAN:  Your Honor, at this time I'd like to introduce some exhibits, and I'm going to give the prosecution a set.  There are only five, and they're all produced by the government.

THE COURT:  Make sure you stay near the microphone, Mr. Werksman, because the court reporter won't be able to hear you.

MR. WERKSMAN:  Yes.  And I'd like to give a three-ring binder to the witness to review, if I may, and

then, Ms. Freeman, Ms. Sosa will give you the official set.

And just for housekeeping purposes, shall we number it 200?  The government went up to about 150.

THE COURT:  That's fine.

MR. WERKSMAN:  Your Honor, how would you prefer that we enumerate?

THE COURT:  As long as there's no overlap with the government's numbering, you can start at 200.  That's fine.

MR. WERKSMAN:  Your Honor, may I approach?

THE COURT:  Yes, you may approach.  Is there is set for the court?

MR. WERKSMAN:  Yes, Your Honor.

BY MR. WERKSMAN:

Q.  Mr. Lee?

MR. WERKSMAN:  Sorry.  Are we ready to resume, Your Honor?

THE COURT:  Yes.

BY MR. WERKSMAN:

Q.  Mr. Lee, I'd like you to look at the very first exhibit in that three-ring binder.  It's a document that we will mark as Defense Exhibit 200, and it's Bates stamped 4706 for the benefit of the government.  Mr. Lee, do you recognize what I've marked and shown to you as Exhibit 200?

A.  Is this it?

Q.  Do you recognize that document?  It's the very first

page.

A.    Pink?

Q.    Yeah, pink.  It's pink.

A.    Yes.

Q.    Those are the rules that you promulgated, that you distributed to the doumis that you transported every night, correct?

A.    Yes.

Q.    It has the name of your company, Plus Entertainment on it, correct?

A.    Yes.

Q.    These rules require, among others, that each girl must work at least four nights a week full time, correct?

A.    Yes.

Q.    Positive attitude and smile is very vital and critical?

A.    Yes.

Q.    Please be kind and friendly to new ladies?

A.    Yes.

Q.    These are your --

            MR. WERKSMAN:  Your Honor, at this point may I move to admit Exhibit 200?

            THE COURT:  Any objection?

            MR. BUTLER:  Yes, Your Honor.  Relevance.  Prior ruling.  403.

            THE COURT:  All right.  Let me see counsel at

192

sidebar.

(*The following was held at the bench:*)

THE COURT:  All right, Mr. Werksman.  Why should I admit this?  Why does this not go beyond the scope of my prior ruling?  I had said during the pretrial conference that you can certainly introduce some evidence concerning background or provide context to the jury.  What is the relevance of this to the extortion charges?

MR. WERKSMAN:  Number one, Your Honor.  I'll note that Rule number 12 is no sex.  So I'm absolutely studiously and scrupulously adhering to the Court's ruling that we not suggest that this is a big prostitution scheme.

But more importantly, Your Honor, I'm going to have him explain why Rule 14 says should violate any of our policies you'll be removed and banned to work in our industry.

There's a culture in this industry of banning people that don't do what you tell them, and that's what he was afraid of being banned from the karaoke bars if he didn't cooperate with the rules of the association.

He wasn't afraid of Mr. Cho's physical threats.  He was afraid of being banned.  Everybody bans each other in this industry.  These are the rules that he held his workers to, and they're not very dissimilar to the rules that the association applied.

THE COURT:  But these aren't rules that apply to the drivers.

MR. WERKSMAN:  Correct.

THE COURT:  These are rules that apply to the women, right?

MR. WERKSMAN:  Correct.  And he's telling the women, I'll ban you if you don't observe these rules.

THE COURT:  But again, what does that have to do with testimony we've heard on the charges as to whether the women are banned or not?  What's the relevance of that?

MR. WERKSMAN:  Because the testimony --

THE COURT:  I didn't hear anything on direct that it all speaks to any of this.  So why does it matter?

MR. WERKSMAN:  Well, because when his penalty, if he didn't cooperate with the rules and regulations of the association that was run by Mr. Cho was that he'd be banned from certain clubs, and this is what they do if you don't follow the rules in this community.  You're not allowed to go to certain clubs.  You're banned.  This is the rules they live by.

THE COURT:  This isn't your client's rules?  This isn't your client's association's rules, right?

MR. WERKSMAN:  Correct.

THE COURT:  But he's allegedly a member of?

MR. WERKSMAN:  Right.

THE COURT:  But this is his business as rules with respect to the women.

MR. WERKSMAN:  And he testified that he was told he couldn't go to certain clubs, or he'd be banned if he didn't pay Mr. Cho.  He wanted access to the clubs.  I'll develop that more in my cross, but that's part of the whole theme of the government's case, is that Mr. Cho was imposing some restrictions by force on these drivers to force them to pay him.  In fact, this is, this is the common practice.  If you don't follow the rules, you can't go certain places. You're banned.

MR. BUTLER:  If I may, Your Honor, on the first point.  I think the exact opposite is true.  He specifically only read the things that would allow him to actually argue that this is a prostitution ring, and that was exactly what we were worried about when we tried to mill this out.

As to the second, I don't understand how the defense can be that, that my client extorted people, banned people, violently assaulted people, this guy might have to. That doesn't make this relevant to this case.

THE COURT:  I mean, look, I'm sensitive to time here and the fact that we're trying to wrap up with the witness, but I think as of now I don't think there's sufficient showing of relevance tying this document and practices between this witness and the women being

sufficiently connected to the charges at issue in the case. So as of now the objection is sustained.  I'll let you continue your cross-examine.

MR. WERKSMAN:  Thank you.

(*End of conference held at the bench.*)

BY MR. WERKSMAN:

Q.   Mr. Lee, between 2019 and 2021, when you were plying your craft as a doumis driver, were you aware of how many other drivers were out there going to the same clubs you are every night like you and Mr. Shin were?

A.   I do not know exactly how many because there were so many.  I wasn't able to count the number of them.

Q.   Would you agree that there was a lot of competition among drivers to supply doumis to the different karaoke clubs?

THE COURT:  And can you please adjust the microphone so that you can be heard when you answer the question?

THE INTERPRETER:  Oh, yes, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  Yes.

BY MR. WERKSMAN:

Q.   And every time one of the doumi got hired, she'd get at least $160 for spending two or three hours at the club, correct?

A.   That I wouldn't know exactly.

Q.   But what was your pay from each doumi who worked on any particular night?

A.   Forty dollars per hour.

Q.   So it was a flat rate whether or not she worked?

A.   No.  Unless she worked, I, you know, I wouldn't get paid.

Q.   All right.  So if she worked at the end of the night, was she required to tell you how many hours she'd worked?

A.   No.  I was checking all of that out myself.

Q.   How would you do that?

A.   Well, I would just make a note in a small piece of paper.

Q.   And?

A.   I would just write it down on a piece of paper.  That's it.

Q.   What would you write down, what the young lady would tell you after she left the club?

A.   I -- all I write down is just from what time to what time the particular lady had worked.

Q.   And then when you take her home at the end of the night, you take your money from her, correct?

A.   Yes.

Q.   So if she worked for three hours, you'd tell her to give you $120, which is three times 40, correct?

A.   Yes.

Q.   And she'd give it to you in cash, correct?

A.   Yes.

Q.   And she could keep whatever else she made that night?

A.   Yes.

Q.   And you're telling us you would have no idea how much she earned?

A.   There was no reason for me to find that out.  You know, that's not my money.  So I was not interested in that amount of money.

Q.   But you cared that these doumis would make the money legally, correct?

         MR. BUTLER:  Objection, Your Honor.  Relevance. Prior ruling.

         THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.   Now, when you first met D.K. Cho, he was working in the doumis business as well, correct?

A.   No.

Q.   Did you know him to be a driver before you began to work with him as the association?

A.   Oh, I think I may have heard of this somewhere, but when I met him first, he was not.

Q.   Now, one of the advantages of paying Mr. Cho his monthly fee was that you would be allowed to join a group

chat called Kakao, K-A-K-A-O, correct?

A.    No.

Q.    Well, do you know what Kakao is?

A.    I do know.  However, the benefit for the payment is not that.

Q.    When you began paying Mr. Cho, he invited you to join a group chat on Kakao, correct?

A.    Initially I wasn't joined there.

Q.    Did you join a chat room on Kakao with other doumi drivers that you were invited to as a result of working with Mr. Cho, yes or no?

A.    Could I have the question slowly and loudly?

Q.    Did you join a group chat on Kakao with other doumi drivers as a result of working with Mr. Cho?

A.    It's just unless I make a payment, I wouldn't have been worked.  I joined it later on.  In the beginning I had not joined.

Q.    All right.  Did you know about this group chat with other doumi drivers that Mr. Cho had run?

A.    Yes.

Q.    And you were part of it, weren't you?

A.    As I testified earlier, I didn't join immediately.  I ended up joining after a long time.

Q.    Now tell us what kind of things you'd communicate about with the other doumi drivers on this group chat on Kakao.

A.    It's something like this.  If D.K. told us not to go to a certain location, no matter what, we couldn't go there.

Q.    All right.  I'm going to ask you to look at the next exhibit in order there in your book.  It's Bates number 776, and we'll call it Defense Exhibit 201 for identification.

      Do you recognize what's been put before you as Defense Exhibit 201?

A.    Is this the Exhibit 201?

Q.    That's what I'm asking you about.  Yes.

A.    Yes.

Q.    There's a list of participants here at the top, and one of them is Shin Dream.  Is that your partner, Mr. Shin?

A.    No.

Q.    But you were part of this chat, weren't you?

A.    No.

Q.    Did you receive this particular set of messages?

A.    No.

Q.    Do you remember receiving messages like the one that's depicted here before you as 201?

A.    Similar.  What do you mean by that?

Q.    Well, would you get group chats like the one you're looking at, which would tell you where to go and where not to go on any particular night?

      MR. BUTLER:  Objection, Your Honor.  Calls for hearsay.  There's no foundation regarding his involvement in

this or that he's ever seen it.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Mr. Lee, would you look at the next exhibit in order?
It's Bates stamped 771.  We'll call that Defense Exhibit 202
for identification.  Do you recognize that?

A.    Although I have already testified to this earlier, I
wasn't present in this chatting room.

Q.    Okay.  So you didn't get the text that I'm showing you
in Exhibit 202?

A.    Correct.  No.

Q.    Would you get texts in the Kakao chat room about
certain things going on at the different karaoke clubs, like
a club was going to be raided by the police that night.

Would you get communications like that?

MR. BUTLER:  Objection, Your Honor.  Relevance.
Calls for hearsay.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Would you ever be told in these group chats about
certain doumis that were troublemakers who shouldn't be sent
to different clubs.  Were you ever told that in your group
chat with Mr. Cho?

MR. BUTLER:  Same objections, Your Honor.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    You've told us that you believe you had no value from your relationship with Mr. Cho, correct?

A.    None.

Q.    You paid him and got nothing in exchange for paying him $100 a month, correct?

A.    Correct.  No.

Q.    But in fact, he would send you texts as part of the group chat to warn you if there was a particular doumi who was bringing drugs to the clubs, correct?

          MR. BUTLER:  Same objections, Your Honor.

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    As a result of paying Mr. Cho to be in the group chat, you would be informed about certain clubs that were better to go to than other clubs, correct?

          MR. BUTLER:  Same objections, Your Honor.

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Mr. Lee, look at the very last exhibit in that.  It is -- I don't see a Bates number on it, but it was produced by the government.  I'm going to mark that as Defense Exhibit 203 next in order.

          Do you recognize what's depicted in that document that's been marked?  It's a -- it's a picture of a text

exchange.

A.    Yes.

Q.    Okay.  Who sent this text to whom?

A.    I sent to D.K.

Q.    Okay.

        MR. WERKSMAN:  I'm going to ask that this be admitted.  Moved to admit 203 and publish to the jury.

        THE COURT:  Any objection?

        MR. BUTLER:  No objection, Your Honor.

        THE COURT:  All right.  203 is admitted.

        (Exhibit 203 received in evidence.)

BY MR. WERKSMAN:

Q.    Can you see that?  That's you writing hello. W-Y-A-D-I, then D.K.?

A.    Yes.

Q.    What does W-Y-A stand for?  Is that where you at?

A.    Yes.

Q.    Would you communicate these texts to Mr. Cho in English?

A.    I did it in Korean.  When I personally met him, I did it in Korean language.

Q.    But this text is in English, correct?

A.    Because at the time I thought when he reads a message, I figured English will be easier for him to understand.  But when I met him in person and communicated, I did it in

Korean.

Q.   You know he speaks perfect English.  You know that, right?

A.   He would always speak English only.

Q.   So you write here, where you at, Bro?  That's WYA, Bro?  Where you at, Bro, right?  I want to meet you.  Those are your words, correct?

A.   Yes.

Q.   And the date on this -- you correct me if I'm wrong.  It appears the date is April 21st, 2021; is that correct?

A.   Yes.  That's correct.

Q.   All right.  Do you remember setting up a meeting with Mr. Cho via this text?

A.   Yes.

Q.   And in this text, did you -- are you afraid when you wrote this text?  Were you crumbling with fear when you wrote, where you at, Bro, I want to meet you?

A.   Trembling, and I was in fear.  The reason why I sent this message to him is one night D.K. had threatened my partner.  If you don't pay, be careful.  That is why I attempted to have a conversation with him, although, I was in fear.

Q.   So just to be clear, you weren't personally threatened.  You're saying Mr. Shin was threatened, and that's why you asked for a meeting with Mr. Cho, correct?

A.   No.  I was threatened as well.

Q.   Well, I thought you just told us that Mr. Shin had been threatened, so you then, in turn, asked to meet Mr. Cho?

A.   As to Mr. Shin, he was in the meeting with him, and then he got directly threatened by him.  And I was threatened by text message.  You will become unable to work in the future.

Q.   All right.  The threat that you had gotten was not that you would be physically harmed.  It was that you would not be allowed to go to the karaoke clubs, correct?

A.   Yes.  That kind of threatening.  However, the very threatening he did to my partner is exactly the same thing as he threatened me, because we were working together, I and my partner.

Q.   Well, what you were afraid of was not getting beaten.  You were afraid that you would not be allowed to go to the karaoke clubs where you made your money, correct?

A.   No.

Q.   Now, Mr. Lee, let's talk about this incident with the baseball bats that you told us about.

A.   Yes.

Q.   Now just to be clear, you weren't there, and you didn't see with your own eyes anybody beating anybody with a baseball bat, correct?

A.   Correct.  Although I didn't see it with my own eyes,

205

but I was told very vividly.

Q.   All right.  I'm going to ask you -- if I ask you for a yes-and-no answer, you can just feel free to answer yes or no.

You didn't see the beating, correct?  Yes or no?

A.   Yes.

Q.   And this thing that you talked about happened on May, the first week in May, May 8th or on May 7th.  It happened in, like, in the wee hours of May 8th, in the early morning hours of May 8, 2021, correct?

A.   Because it had passed midnight.  So the date may have changed.

Q.   So it was in the early morning hours of May 8th, yes or no?

A.   I am unable to remember the date accurately.

Q.   Do you remember if it happened in May of 2021?

A.   Yes.

Q.   And that would make it about two and a half weeks after you sent the text to D.K. Cho saying, where you at, Bro?  I want to meet you?

A.   I don't know.

Q.   Okay.  Well, if you wrote a text to Mr. Cho saying, where you at, Bro?  I want to meet, and that text was sent on April 21st of 2021, if the incident that you talked about happened on May 8th of 2021, that would be about two and a

half weeks later, correct?

A.    Yes.

Q.    And after you heard what you heard on the phone, you told us about that.  You went rushing over to the karaoke club parking lot where you thought Mr. Shin would be, correct?

A.    Yes.

Q.    And when you went there, you found Mr. Shin in the condition you've described?

A.    Yes.

Q.    And you stayed with him until two LAPD officers arrived to take a report, correct?

A.    Yes.

Q.    And you were standing right next to Mr. Shin while he talked to the police and told them what had happened to him, correct?

A.    Yes.

Q.    And you gave your name and identifying information to the Los Angeles police officers who were at the scene, correct?

A.    I gave them my ID.

Q.    And standing there in front of you, you watched and heard Mr. Shin tell the police officers that he was attacked and beaten by two black men whom he couldn't identify, correct?

MR. BUTLER: Objection, Your Honor. Calls for hearsay.

THE COURT: Sustained.

BY MR. WERKSMAN:

Q. Well, did you watch Mr. Shin tell the police what had happened to him in the parking lot of the karaoke bar at Sixth and Vermont Avenue?

A. Yes.

Q. And did you hear him say that he'd just been robbed by two male blacks?

MR. BUTLER: Same objection, Your Honor.

THE COURT: I want to see counsel at sidebar.

(*The following was held at the bench:*)

THE COURT: All right, counsel. With respect to these statements you're attempting to elicit from this witness that were made by Mr. Shin, what's your basis for getting these in evidence? You're getting hearsay objections.

MR. WERKSMAN: Yes, I understand, but the Court has already allowed over my objection this witness to basically describe the entire incident that occurred to his partner. I don't know what the Court's thinking was, but the Court let it in when it came from the Government's questioning, and now I'm simply filling in what he didn't tell the jury, which is that they lied to the officers about

who did the beating.  And it goes directly to the heart and credibility of the government's case and this witness' credibility.

THE COURT:  Okay.  And do you have a basis?  Can you tell me why it's not hearsay or why there's an exception?

MR. WERKSMAN:  Well, it's an excited utterance. They're standing there together in this police -- in front of the, in the parking lot where a beating has occurred, and they lie.  Or maybe they tell the truth.  I don't know.

But this is what they told the police.  They didn't mention D.K. Cho as being the assailant.  They said it was two unidentified black men, and they gave heights and weights of people that don't match my client's description.

I mean, if I don't get to ask him this, then the jury will have the mistaken impression that he's telling the truth about what happened with him and his partner that night.

MR. BUTLER:  In regards to his statements that were let in on direct, those were present sense impressions, excited utterance that were contemporaneous with the actual beating.

THE COURT:  They also went to the identification of the defendant.

MR. BUTLER:  Correct.  They are going to have --

209

THE COURT:  Why are these statements not also present sense impression made --

MR. BUTLER:  They were --

THE COURT:  Hold on -- made while or immediately after the declarant perceived it or excited utterances as counsel is arguing?

MR. BUTLER:  I believe as you heard from the testifying witness now, he dropped off a bunch of people before they actually saw the police.  This is not in the immediate aftermath, and there's no new information that's being presented in which he's going to make an excited utterance.  Also, he's going to testify tomorrow.  They can ask him about what he said to the police officer.

This isn't even his -- the witness' statement or the victim's statement.  This is the statement of a police officer who has not been called as a witness.

THE COURT:  Uh-huh.

MR. WERKSMAN:  On the contrary.

THE COURT:  Hold on.

Did the witness, did this witness testify to statements made by Mr. Shin to the police previously on direct?

MS. MacCABE:  No.

THE COURT:  And this interview that's conducted is how long after the alleged assault?

MR. BUTLER:  It's impossible to exactly know because of the time stamp on the video doesn't exist, and the victim himself had to threaten the establishment to get the video.

But I believe the witness just testified that he drove there, found him inside, brought him out to the car with the doumis, dropped them off one by one and then saw police in a parking lot, which is where this happened.

THE COURT:  All right.  And these were Mr. Shin's statements to the police, not this witness' statements, right?

MR. BUTLER:  Right.

THE COURT:  Did this witness make statements to the police?  Can I just get an answer to that?  Did this witness make statements to the police subsequently?

MS. MacCABE:  My belief is not with respect to the police report that counsel is talking about now.  He did subsequently meet with the police.

THE COURT:  So the impeachment you're offering is really as to Mr. Shin, not as to this witness, right?

MR. WERKSMAN:  No.  Because it says in the police report that these two officers, who we subpoenaed, were flagged down by the Victim X, Y, and Witness C.L.  And of course the government redacted it, but C.L. is clearly this dude, Mr. Lee, and he'll acknowledge that.  I believe he'll

211

acknowledge that.

THE COURT:  That they flagged down the police?

MR. WERKSMAN:  Yes.

THE COURT:  But again, but again, these are Mr. Shin's statements, and Mr. Shin hasn't testified yet.

MR. WERKSMAN:  That's correct.

THE COURT:  Thus, he has not made an inconsistent statement at this moment in time.  All right.  Sustained.

MR. WERKSMAN:  Okay.

(*End of conference held at the bench.*)

BY MR. WERKSMAN:

Q.    Where did this -- what karaoke bar did this incident occur at?

A.    McQueen.

Q.    McQueen, and you said that when you heard this, the blood curdling shrieking of your partner, you went straight over to McQueen to retrieve him; correct?

A.    Yes.

Q.    And how long did it take for you to get there physically to go check on him?

A.    It may not be precise.  I believe approximately six minutes or seven minutes.

Q.    When you got there, did you call the police immediately?

A.    No.  Once I arrived there, I got everybody in the car,

and then I called the police.

Q.    All right.  So how long -- how long after you got there did you call the police?  How long after you got to McQueen, to be specific, did you call the police?

A.    At McQueen, I think it was within about three or four minutes, I got everybody on board, and then I left right away because I myself was scared to be there.

Q.    So did you leave with Mr. Shin in the car?  Did you drive away with him before you came back to talk to the police?

A.    Yes.

Q.    So how long after you took him for a ride to go drop doumis off at their homes before you went back to talk to the police?

A.    Yes.

Q.    I thought he was the walking dead, and you just took him for a ride around town to go drop people off before you got him medical care or talk to the police?

        MR. BUTLER:  Objection, Your Honor. Argumentative.

        THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Well, did you believe that he was in dire medical need when you saw him in the parking lot, having been beaten?

A.    Yes.

Q.   But he wasn't so badly beaten that it couldn't wait until after you took the doumis home and got your money from the girls, right?

A.   That's not exactly what I did.  I just took those -- only those who were in the car to their home.

Q.   How many were there?

THE INTERPRETER:  I'm sorry?

THE COURT:  Don't interrupt.  Allow the witness to finish his answer.

THE WITNESS:  Oh, the reason why I did what I did is because the girls who were behind me in the car, they were just tremendously trembling from the fear.

BY MR. WERKSMAN:

Q.   Were they in worse shape than Mr. Shin?

A.   It was pretty dark.  I wasn't able to see quite to that extent; however, the ambiance of the girl talking and then the tone of the voice, they were extremely concerned and scared and trembling.

Q.   Did you get your money from them before you took them home?

A.   Oh, I can't recall.  Indeed, I can't remember as to that because it's something that happened such a long time ago.

Q.   You remember other details about what happened, but you don't remember whether you collected your fee from the

214

doumis before you took your partner to the hospital, correct?

A.   I'd have to retain a lot of memories, what had happened about three years ago on that particular day.  I just remember, like, roughly here, there, and here.

However, the collecting money for me is a very minor factor, minor matter.

Q.   I want to just try to get a straight answer from you if I may, please.  So just listen to the question and answer yes or no, if you can.

Did you speak to the police with Mr. Shin in the parking lot of McQueen after Mr. Shin was beaten?

A.   It was not exactly McQueen parking lot.  You know, Sixth Street, Vermont, and you know, Walgreen.  It was exactly, like, on a Sixth Street.

Q.   Did you meet with the police in a parking lot at Sixth and Vermont after the beating to talk to the police, yes or no?

A.   Yes.

Q.   Was that meeting after you had driven the doumis home and come back?

A.   After I dropped them off, and then I had a meeting with a police officer.  And then there were more people who were remaining.

Q.   So the answer would be that after you took the doumis

home, you came back with Mr. Shin to report what happened to the police, yes or no?

A.   Yes.

Q.   Now, is it your testimony that Mr. Shin had already told you when you retrieved him that night, that he'd been beaten by Mr. Cho?

A.   Yes.

Q.   Now, you watched Mr. Shin talk to the police when they interviewed him in the parking lot at Sixth and Vermont, correct?

A.   Yes.

Q.   Now, answer this.  Just listen to the question carefully, and answer yes or no.  Did you watch and hear Mr. Shin lie to the police about who had beaten him, yes or no?

          MR. BUTLER:  Objection, Your Honor.  Calls for hearsay.  Argumentative.

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.   Now, you took it upon yourself to do some online research of Mr. Cho's social media presence, correct?

A.   Yes.

Q.   And you were the person who provided the police and the FBI with pictures from Mr. Cho's Instagram feed, correct?

A.   Yes.

Q.    And the first time you showed Mr. Shin Instagram was after he claimed he had been beaten by Mr. Cho, correct?

THE INTERPRETER:  Could I have this question slowly repeated, counsel, with all due respect.

MR. WERKSMAN:  Sorry.  Thank you.

BY MR. WERKSMAN:

Q.    The first time you showed any pictures on Instagram to Mr. Cho from Mr. Shin was after Mr. Shin said he had been beaten, correct?

A.    I can't understand what you're asking.

Q.    Well, you went on Mr. Cho's Instagram feed and got pictures of him, correct?

A.    Yes.

Q.    And when you were questioned by the prosecutor, your answers were crisp and right on point.  You told us that you had showed the pictures you got of Mr. Cho on Instagram to Mr. Shin, correct?

A.    Yes.

Q.    And it was your showing Mr. Shin pictures of Mr. Cho that got him to say, oh, yeah, that's the guy who beat me.  The guy with the face mask, right?

A.    Yes.

Q.    And he abandoned his story that he'd been beaten by two black guys after you showed him a picture of Mr. Cho, correct?

MR. BUTLER: Objection, Your Honor. Misstates the evidence. Argumentative. Calls for hearsay.

THE COURT: Sustained.

MR. WERKSMAN: May I have a second, Your Honor?

Thank you, Mr. Lee. I have no further questions.

THE COURT: Redirect?

MR. BUTLER: Very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. BUTLER:

Q.   Mr. Lee, when you first reported any conduct about the defendant to the police, did you know about a U visa?

A.   Not at all. I did not know it.

Q.   And you testified on cross that if you were to commit perjury today by lying on the stand, your understanding is that could be revoked?

A.   Yes.

Q.   Who would call you when you were working in the industry and tell you that they needed hostesses to be brought to a certain location?

A.   Karaoke managers would contact me.

Q.   Did the defendant ever contact you and tell you to bring hostesses to any location?

A.   No.

Q.   You testified on cross that you were told to be careful after you stopped paying the defendant. What did you

218

understand that to mean?

A.    The first I understood it as you won't be able to work now, from now on, and the second is just be careful.  You might get your -- you might get physically harmed.

Q.    And just to confirm, we talked about it.  Did you pay the defendant $200 on Instagram -- or sorry, on Venmo?

A.    I paid the $200 initially.  In some other month Ben, which is used his American name, and he would pay as well.  That's how we've been paying.

Q.    So you both paid the defendant?

A.    When I'm too busy to make a payment to him, I used to make a payment on behalf of me.

Q.    And what was that payment for?

A.    By name only, it's a protection fee.

Q.    Who did you need protection from?

A.    I don't know.

            MR. BUTLER:  No further questions, Your Honor.

            THE COURT:  Any recross?

            MR. WERKSMAN:  No.  Thank you, Your Honor.

            THE COURT:  All right.  Is the witness excused?

            MR. BUTLER:  Yes, Your Honor.

            THE COURT:  All right.  You're excused, sir. Thank you.

            Ladies and gentlemen, thank you.  I'm going to excuse you for the balance of the day.  We'll see you back

here tomorrow at -- I'd like you in your seats at 8:15 in the morning, and we'll do our very best to end promptly at about 2:30.

I remind you of your duty not to discuss the case with anyone whatsoever back home, at work, or with your fellow jurors, and not to form or express any opinion about this case until it's given to you for deliberations.  Have a pleasant rest of the afternoon and evening, and we'll see you back here tomorrow morning.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  Thank you, everyone, for completing this witness' testimony.  We'll see you back here tomorrow to start at 8:15.

MS. MacCABE:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  Have a good night.

MR. WERKSMAN:  Good night.

(At 5:07 p.m. proceedings were adjourned.)

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  February 14, 2025


                              /S/____WIL S. WILCOX _____

                               U.S. COURT REPORTER
                                 CSR NO.  9178