*UNITED STATES DISTRICT COURT*

*CENTRAL DISTRICT OF CALIFORNIA*

*WESTERN DIVISION*

*THE HON. FERNANDO L. AENLLE-ROCHA, JUDGE PRESIDING*

United States of America,               )
                                        )
                    Plaintiff,          )
                                        )
          vs.                           ) No. CR 23-00149-FLA
                                        )
Daekun Cho,                             )
 aka "DK,"                              )
                                        )
                    Defendant.          )
_____)

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*

*Jury Trial Day 2*

*Wednesday, March 20, 2024*

*8:20 A.M.*

*Los Angeles, California*

*Wil Wilcox, CSR 9178*
*Official U.S. District Court Reporter*
*Los Angeles, CA  90012*

2

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:

        UNITED STATES ATTORNEY'S OFFICE
        BY:  JENA A. MACCABE
        BY:  KEVIN J. BUTLER
        Assistant United States Attorneys
        Violent and Organized Crime Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012

FOR THE DEFENDANT:

        WERKSMAN JACKSON & QUINN LLP
        BY: MARK J. WERKSMAN
        BY: KAREN M. SOSA
        888 West Sixth Street, Fourth Floor
        Los Angeles, California 90017

3

<u>I N D E X</u>

*WEDNESDAY, MARCH 20, 2024; VOLUME 2*

<u>CHRONOLOGICAL INDEX OF WITNESSES</u>

Party

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| DR. CRAIG TORRES-NESS | 6 | | | | | 2 |
| YUN SOO SHIN | 11 | 38 | 73 | | | 2 |
| YOUNG NAE KANG | 77 | 95 | 110 | | | 2 |
| JASON COLLINS | 112 | | | | | 2 |
| JASON COLLINS | | 116 | 120 | | | |
| KI YOUNG JUNG | 122 | | | | | 2 |
| KI YOUNG JUNG | | 136 | 149 | | | |

<u>ALPHABETICAL INDEX OF WITNESSES</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| TORRES-NESS, DR. CRAIG | 6 | | | | | 2 |
| SHIN, YUN SOO | 11 | 38 | 73 | | | 2 |
| KANG, YOUNG NAE | 77 | 95 | 110 | | | 2 |
| COLLINS, JASON | 112 | | | | | 2 |
| COLLINS, JASON | | 116 | 120 | | | |
| JUNG, KI YOUNG | 122 | | | | | 2 |
| JUNG, KI YOUNG | | 136 | 149 | | | |

4

EXHIBITS

| Party EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 27 | Document | | 16 | 2 |
| 12 | Document | | 18 | 2 |
| 13 | Document | | 18 | 2 |
| 122 | Document | | 21 | 2 |
| 123 | Document | | 21 | 2 |
| 124 | Document | | 21 | 2 |
| 130 | Document | | 26 | 2 |
| 52 to 59 | Documents | | 33 | 2 |
| 200 | Document | | 57 | 2 |
| 31 | Document | | 81 | 2 |
| 87 | Document | | 83 | 2 |
| 85 | Document | | 85 | 2 |
| 84 | Document | | 87 | 2 |
| 14 | Document | | 90 | 2 |
| 202 | Document | | 108 | 2 |
| 30 | Document | | 128 | 2 |
| 83 | Document | | 133 | 2 |

5

*LOS ANGELES, CA.; WEDNESDAY, MARCH 20, 2024*

8:20 A.M.

- - - - -

*(The jurors entered the courtroom.)*

THE CLERK:  Calling CR 23-00149-FLA, United States of America v. Daekun Cho.

Counsel, please make your appearances, beginning with the government.

MS. MacCABE:  Good morning, Your Honor.  Assistant United States Attorneys Jena MacCabe and Kevin Butler on behalf of the United States.  And with us at counsel table is Special Agent Michael Choi.

MR. WERKSMAN:  Good morning, Your Honor. Mark Werksman and Karen Sosa on behalf of Mr. Cho who is present here next to us.

THE COURT:  All right.  Good morning to everyone.

Good morning, ladies and gentlemen.  Welcome. Thank you for being on time.

We're ready to resume with the trial.

So Government, you may call your next witness.

MS. MacCABE:  The government calls Dr. Craig Torres-Ness.

THE CLERK:  Good morning.

THE WITNESS:  Good morning.

THE CLERK:  Please stand before me and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may be seated in the witness stand.

And if you will, please state and spell your full name for the record.

THE WITNESS:  My name is Craig Rowland Torres-Ness; C-R-A-I-G; middle name R-O-W-L-A-N-D; last name T-O-R-R-E-S hyphen N-E-S-S.

THE COURT:  You may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Good morning, Dr. Torres-Ness.

A.   Good morning.

Q.   What type of medicine do you practice?

A.   I practice emergency medicine.

Q.   And how long have you been a doctor?

A.   For going on ten years.

Q.   Will you briefly describe for the jury your education and training that you received to become a doctor.

A.    Sure.

I attended undergrad at Indiana University which is a four-year degree in biology and chemistry.  And then later on, I attended medical school which is another four years at the State University of New York.

Following medical school, I completed a four-year residency in emergency medicine at L.A. County USC and then have been an independent practice since then.

Q.    Where do you work now?

A.    Right now, I work for the University of Southern California, primarily at L.A. General Medical Center as well as USC Arcadia.

Q.    Were you working on May 8th, 2021?

A.    Yes.

Q.    Where were you working?

A.    I was working at Good Samaritan Hospital in Los Angeles.

Q.    Did you treat a person named Yun Soo Shin that day?

A.    Yes, I did.

Q.    What did you observe when you were treating him?

A.    This was a patient who came in after trauma. Specifically, per the patient, was hit multiple times with a baseball bat.  And on a head-to-toe assessment of the injuries, he had evidence of injuries throughout, including his neck, bilateral lower extremities, his right arm, as

well as an obvious deformity in his left arm.

Q.   Is there another term to describe the obvious deformity on his left arm?

A.   Yeah.  So subsequent to this, we obtained an X-ray that revealed a fracture of the mid shaft, or the middle of his left ulna, which is often referred to as a nightstick injury which is a defense injury which is basically obtained from trying to block a blow.  And traditionally, it was from a nightstick, is where it got the name.

Q.   You said that he was x-rayed.

Did you order any other tests on him?

A.   Yeah.  So we ordered what we refer to as a pan scan which is effectively a CT scan of everything that we can CT, looking for any signs of deeper injury that may not be immediately apparent.

So we got a CT scan of his head and brain.  We got a CT scan of his neck, specifically looking at the vessels because he had evidence of trauma to his neck, to make sure there was no vascular injury.  We got a CT scan of his chest, abdomen, and pelvis, looking for any internal injuries in those areas.  And then obtained X-rays where there was external signs of trauma on his extremities which were both arms and both lower -- both lower extremities, or legs.

Q.   And specifically, what made you want to look for more

9

internal injuries?

A.    The main thing that was concerning was the mechanism of injury.  So if a patient falls and twists their ankle, it's pretty obvious where the injury is going to lie.  But in someone who has experienced multiple blows from blunt trauma, it's really difficult to ascertain externally what internal injuries could have been obtained.

        So the main reason was the mechanism of injury that was told to us by the patient coupled with the external signs of pretty serious blows to him.

Q.    Did you also order any medication for the patient?

A.    Yeah.  The patient received a tetanus shot which is prophylaxis to infection, given the cuts he had.  And then he also received multiple rounds of pain medication.  I believe there were two rounds of Dilaudid which is one of -- that is the strongest pain medication we can give, as well as Toradol.  And all of these were given intravenously.

Q.    And for the Dilaudid pain medication you just mentioned, did you prescribe a high dose of that medication?

A.    Yeah.  The patient received two doses of 1 milligram of Dilaudid, which is the highest dose that we give.

Q.    And why did you prescribe such a high dose?

A.    Given the severity of his pain.  At the beginning, when I asked the patient what the degree of pain he had was at a scale of 1 to 10, he told me that it was a 10 out of 10;

therefore, the most severe pain.  And given how uncomfortable he looked, I gave him the best pain medicine I could at that time.

MS. MacCABE:  May I have one moment, Your Honor?

THE COURT:  Yes.

MS. MacCABE:  No further questions.

THE COURT:  Cross-examination?

MR. WERKSMAN:  We have no questions for the doctor.  Thank you.

THE COURT:  Thank you.

Is the witness excused?

MS. MacCABE:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Doctor, you're excused. Thank you for being here today.

THE WITNESS:  Thank you.

THE COURT:  You may call your next witness.

MR. BUTLER:  The government calls Yun Soo Shin.

THE CLERK:  Good morning.  Please stand before me and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may be seated in the witness stand.

11

Please state and spell your full name for the record.

THE WITNESS:  My name is Yun Soo Shin; Y-U-N, S-O-O, S-H-I-N.

THE COURT:  You may inquire, Counsel.

**DIRECT EXAMINATION**

BY MR. BUTLER:

Q.   Good morning, Mr. Shin.

What do you currently do for work?

A.   I'm currently doing IHSS.  I'm taking care of my parents.

Q.   You're a caretaker; is that what you said?

A.   Yes.

Q.   In 2020 to 2021, where did you work?

A.   I worked in a -- Koreatown as a driver.

THE COURT:  Would you mind moving the microphone just a little bit so that you can be heard.  Thank you.

THE WITNESS:  Okay.  Yeah.

BY MR. BUTLER:

Q.   Did you have your own company?

A.   Yes, I did.

Q.   Did you have a partner in that company?

A.   Yes.

Q.   Who was that?

A.   Joo Hun Lee.

12

Q.   What was that company called?

A.   Plus.

Q.   And you said you would drive.  Who would you drive?

A.   Some ladies to the -- yeah, the ladies.

Q.   And they are called doumis, right?

A.   Yes.

Q.   And where would you drive them to?

A.   To the karaokes.

Q.   How are you paid?

A.   By hour as, like, they worked.

Q.   Was that a flat rate?

A.   Yeah, it was a flat rate.

Q.   So if a doumi made more inside the club, you made the same amount per hour; is that right?

A.   Yes.

Q.   Who hired the hostesses or doumis?

A.   Both Joo and I did.

Q.   And how would you find them?

A.   We did advertisement through Craigslist.

Q.   And would you meet with them individually?

A.   Yes.

Q.   Did you have rules for your company?

A.   We did.

Q.   And did those rules say anything about drugs or sex?

A.   Yeah.  We made sure that they don't do those stuff in

the -- at work.

Q.   And were those rules written?

A.   Yeah.

Q.   Were there both drugs and sex rules on that written --

A.   Uh-huh, yes.

Q.   What hours did you typically drive?

A.   All the way from 8:30 p.m. to maybe 6:00 a.m.

Q.   Did the bars that you drove people to, did they accept credit cards?

A.   At the karaoke, they did.

Q.   Do you know if they served alcohol inside the bars?

A.   They did.

Q.   Did you ever drive hostesses or doumis from outside the state of California?

A.   No.

Q.   Did you ever drive doumis or hostesses who had moved here from another country?

A.   I did.

Q.   Do you know someone with the nickname D.K.?

A.   Yes, I do.

Q.   Do you see him in the courtroom here today?

A.   Yes, I do.

Q.   Can you identify him based on where he's sitting in the courtroom and a piece of clothing?

A.   He's wearing a suit at the -- right there (indicating).

14

Q.    Is that the table it my left?

A.    Yes.

MR. BUTLER:  Can the record reflect that the witness has identified the defendant?

THE COURT:  Yes.

BY MR. BUTLER:

Q.    When did you meet the defendant?

A.    At 2019, around July.

Q.    Under what circumstances did you meet him?

A.    Well, actually, he was collecting money from us.

Q.    When you say "us," who do you mean?

A.    The drivers.

Q.    Where at?

A.    At Koreatown karaokes.

Q.    And what was your personal interaction with him?

A.    Personal interaction?  I don't know --

Q.    What did he say to you?

A.    Oh.  He said if we want to work in K-Town, then we have to pay him for, you know, protections or stuff like that.

Q.    What did you understand the protection to be?

A.    Well, to be honest, I don't know about -- I didn't understand anything about the protection.

Q.    Did you know of anyone that you needed protection from?

A.    No.

Q.    After the defendant spoke with you, did you start

15

paying him money?

A.    We did.

Q.    How much?

A.    From, like, $100 per month to, like, $200 per month.

Q.    How often were you supposed to pay him?

A.    Every month, on the 15th of the month.

Q.    And did your company pay him from when you met him in 2021 until you left the business?

A.    We paid him from 2019, July, until I left the -- well, not until because a couple of months before that, we stopped paying him.

Q.    Thank you for the clarification.

     I meant from 2019 to 2021, did your company pay him monthly?

A.    Yeah, we did.

Q.    Did you pay him in cash?

A.    Sometimes in Venmo.  Most of the time in cash.

Q.    Can you turn in the exhibit binder in front of you to what's been marked as Government's Exhibit 27.

A.    Yes.

Q.    Are these -- well, do you recognize it?

A.    Yes, I do.

Q.    What are they?

A.    It's a Venmo payment that I made to him.

Q.    When you say "made to him," who did you mean?

A.    Oh.  D.K..

Q.    So these are the Venmo payments that you were discussing that you made to the defendant?

A.    Yeah.

        MR. BUTLER:  Your Honor, I move to admit Exhibit 27 into evidence and publish to the jury.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.

        THE COURT:  It's admitted.

        You may publish.

        *(Exhibit j received in evidence.)*

        *(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.    So just showing for the jury now, does that show two different 100-dollar payments in 2020?

A.    Yes.

Q.    And again, what were these payments for?

A.    According to D.K., it was for protection.

Q.    To your knowledge, was defendant doing anything for you or your company?

A.    No.

Q.    So why were you paying him?

A.    Because we were scared of him.

Q.    Why were you scared of him?

A.    Because I heard he was claiming that he was from a

gang.  And I heard, like, stories about him that he's been arrested, carrying guns.  So -- and I heard from multiple people that there are --

MR. WERKSMAN:  Objection.  Hearsay.  No foundation.  Move to strike.

THE COURT:  Overruled.

BY MR. BUTLER:

Q.  Continue, please.

A.  Oh.  And I heard from other drivers that they were beaten up by him, so . . . .

Q.  Did you -- you mentioned that you heard he was in a gang.  Did you know which gang?

A.  As I heard, it was Grape Street Crips.

Q.  Did you ever stop paying the defendant?

A.  Yes, I did.

Q.  Do you remember when?

A.  Ah, I don't exactly remember when.  I think it was, like, maybe beginning of 2021.

Q.  After you stopped paying him, did you hear from the defendant at all?

A.  Yes, I did.

Q.  Where?

A.  One time I met him in front of Shrine Karaoke.

Q.  Can you turn in your exhibit binder again to what's been marked as Government's Exhibits 12 and 13.

A.    Yes.

Q.    Do you recognize those?

A.    Yes, I do.

Q.    What are they?

A.    It's the dashcam footage that I had on my car.

Q.    And are those dashcam footage on CDs?

A.    Yes.

Q.    Did you review those CDs?

A.    Yes, I did.

Q.    Did you sign them?

A.    Yes, I did.

Q.    Do those videos on the CDs fairly and accurately depict the interaction that you had with the defendant?

A.    Yes.

Q.    And again, was this after you stopped paying him?

A.    Yes.

        MR. BUTLER:  At this time, the government would move Exhibits 12 and 13 into evidence and ask to publish.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No objection.

        THE COURT:  12 and 13 are admitted.

        You may publish.

        (Exhibit 12 received in evidence.)

        (Exhibit 13 received in evidence.)

        MR. BUTLER:  Thank you.

19

Before playing this exhibit, I would ask the Court that I read the stipulation of the parties regarding the accuracy of the Korean language transcript that will be playing at the bottom of that video.

THE COURT:  You may.

MR. BUTLER:  "Plaintiff, United States of America, by and through its counsel of record, and the United States Attorney for the Central District of California and Defendant, by and through his counsel of record, have stipulated as follows:

"First, Agnes Woo, a state and federal certified Korean language interpreter is deemed to have been called and received as an expert witness in the translation of the Korean language to English, duly sworn and to have testified as follows:

"A, Ms. Woo received the recordings in this matter that have been marked as Government's Exhibits 12 and 13.  A transcript of each of these recordings was created in which words spoken in Korean were translated from Korean to English;

"B, the translation in Government's Exhibits 122 and 123 correctly and accurately translate the original Korean statements in Government Exhibits 12 and 13 into English;

"C, Government's Exhibits 122 and 123 contain only

portions of Government's Exhibits 12 and 13 containing Korean statements translated into English.

"Should the Court admit Government Exhibits 12 and 13, the Korean to English translations, then Government's Exhibits 122 and 123 may be received into evidence at trial without objection.

"The parties agree and stipulate that this stipulation be entered into evidence at trial.  This stipulation constitutes conclusive proof of the above matter for all purposes."

THE COURT:  All right.  And the defense has stipulated to these facts?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.

So ladies and gentlemen, as I informed you yesterday, the parties are free to stipulate to agree to certain facts.  These facts have been agreed to by both sides.  They are now evidence in the case.  They have been proven.  You are to accept them as true.

And based on the stipulation, it sounds like Exhibits 122 and 123 are being offered and admitted without objection pursuant to the stipulation?

MR. WERKSMAN:  Yes, Your Honor.

MR. BUTLER:  Correct, Your Honor.  And the government would also just move Exhibit 124 into evidence as

21

well which is the stipulation that I just read.

THE COURT:  All right.  So 122, 123 are admitted.

*(Exhibit 122 received in evidence.)*

*(Exhibit 123 received in evidence.)*

THE COURT:  And no objection to the admission of the stipulation that was just read into the record by counsel?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  124 is also admitted.

You may proceed.

*(Exhibit 124 received in evidence.)*

MR. BUTLER:  Thank you, Your Honor.

BY MR. BUTLER:

Q.   Mr. Shin, I'm going to play a Government's Exhibit 12 for you.

*(The media was played.)*

BY MR. BUTLER:

Q.   Whose voices do we here on that dashcam video?

A.   D.K.'s and mine.

Q.   How are you recording this?

A.   It was being recorded on my dashcam.

Q.   What did you understand the defendant to mean when he said, "What's up with the whole company shit?"

A.   That if I'm still working with that company.  Like -- yeah, he was asking if I'm still working in this, like,

industry.

Q.    And what did you understand to mean when he said, "I need my shit"?

A.    That he wants to collect the money.

MR. BUTLER:  Okay.  I'm going to move to Exhibit 13.

*(The media was played.)*

BY MR. BUTLER:

Q.    Pausing Exhibit 13 at the 2-second mark.

What did you understand him to mean when he said, "I need my money"?

A.    That he wants us to pay for the protection that he was telling us before.

MR. BUTLER:  Resuming Exhibit 13.

*(The media was played.)*

BY MR. BUTLER:

Q.    Pausing Exhibit 13 at the 15-second mark.

What did you mean when you talked about how you weren't going to certain places?

A.    Because he said -- before this incident, he said he was protecting some karaokes, and he was running it.  So he said if he wants to go to that karaoke to drop off girls, then we need to pay him for that too.

Q.    And you were saying that you hadn't gone to those karaoke --

23

A.    Yeah, we haven't.

Q.    What did you understand defendant to mean when he said he set this shit up, that this is his shit?

A.    That he set up all this doumi, like, industry and he was -- I understand as he was running the whole doumi industry.

        MR. BUTLER:  Resuming Exhibit 13.

                (The media was played.)

BY MR. BUTLER:

Q.    Pausing Exhibit 13 at the 50-second mark.

        Did you hear the defendant ask you if you called the cops?

A.    Yeah, I heard.

Q.    Had you called the cops?

A.    At that time, no.

        MR. BUTLER:  Resuming Exhibit 13.

                (The media was played.)

BY MR. BUTLER:

Q.    Can you just describe the interaction between you and the defendant in that last portion of the video?

A.    I'm sorry?

Q.    Just describe your interaction with the defendant at the end of that video.

A.    So -- well, he asked me if I called the cops, and I said no.  And he was -- I don't know.  It sort of made me

24

think that he was trying to threaten me to pay up.  And he was -- I don't know -- trying to start all this fight, asking me, like, "Why are you looking at me?"  Because he was standing right next to my car; of course I'm going to be looking at him.  But he was telling me as -- like, you know, "Why are you trying -- looking at me like that?"  So I don't know.  I think -- yeah, I think that's what he was -- we were talking about, yeah.

Q.   Had the defendant done anything for you or your company such that you owed him money?

A.   No.

Q.   At this time, were you afraid of him?

A.   A little bit.

Q.   Did the defendant ever threaten you directly?

A.   Yes.

Q.   How so?

A.   He said I need to watch out.

Q.   What did you understand that to mean?

A.   I heard as, like, I gotta be careful because he's going to come after me or something.

Q.   After you stopped paying him and after these interactions that we just watched on the dashcam video, did anything happen to you physically?

A.   After this video, yes.

Q.   What happened?

A.   He came up with one other guy, and he beat me up with baseball bats, and I broke my arm by that incident.

Q.   Were you in a car that day?

A.   Yes, I was in a car.

Q.   Was it your car?

A.   It was a rental car.

Q.   Before we get to that incident, can you turn in your binder to what's been previously as Exhibit 130.

A.   Yes.

Q.   Do you recognize that document?

A.   It seems like it's the rent-a-car that I had.

Q.   Well, I guess I should ask, do you recognize the VIN number at the top?

A.   To be honest, I can't remember the VIN number of the rental car.

Q.   Did you provide the VIN number to the police?

A.   Yes, I did.

MR. BUTLER:  Permission to publish Exhibit 130, Your Honor?

THE COURT:  All right.  The parties are in agreement that this is in evidence?

MR. WERKSMAN:  Yes.

THE COURT:  Yes, you may publish.

And to be clear for the record, 130 is admitted.

*(Exhibit 130 received in evidence.)*

26

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   And so was the car you were driving a Honda Odyssey?

A.   Yes, it was.

Q.   And do you see at the top here that it says "Assembly Factory:  Honda Manufacturing of Alabama"?

A.   Yes.

Q.   Where did you rent the car?

A.   I rented -- I don't remember the rent-a-car company name.  But it was in Los Angeles.

Q.   And where were you driving it when this incident occurred?

A.   In Koreatown, at a karaoke.

Q.   Can you turn now in your binder to what's been marked as Exhibits 10 and 11.

A.   Yes.

Q.   Do you recognize them?

A.   Yes, I do.

Q.   What are they?

A.   It's video footage of me beating -- getting beat up.

Q.   And are those again CDs that you reviewed?

A.   Yes.

Q.   And signed?

A.   Yes.

Q.   Do they fairly and accurately depict the experience

27

that you described?

A.   Yes.

MR. BUTLER:   The government would move Exhibits 10 and 11 into evidence and ask to publish to the jury.

THE COURT:   Any objection?

MR. WERKSMAN:   No.

THE COURT:   All right.   10 and 11 are admitted.

You may publish.

*(The media was played.)*

BY MR. BUTLER:

Q.   Pausing Exhibit 10 at the 10-second mark.

Where are you currently in this video?

A.   I'm currently entering the parking lot of the -- one of the karaoke.

Q.   In the van that just pulled in?

A.   Yes.

*(The media was played.)*

BY MR. BUTLER:

Q.   Pausing at the 48-second mark.

Did you see two figures get out of the car at the top of the screen?

A.   Yes, I did.

Q.   Did they get out right after you pulled in?

A.   Yeah.

Q.   Did you see them at the time?

28

A.   No.

MR. BUTLER:  Resuming Exhibit 10.

*(The media was played.)*

BY MR. BUTLER:

Q.   Pausing at the 1 minute, 28-second mark.

Can you describe for the jury what's happening out of view of the camera, on the other side of the van?

A.   So I was on the driver's seat, and D.K. and one other guy pulled up to the driver's door.  And they opened the door, and they started hitting me with the baseball bat.

So at first, I only saw one other guy.  And I thought it was just a robbery.  So I was trying to give them my bag.  But they actually dragged me out from the car.  And they were just beating me up to the ground.

Q.   Did they say anything to you at the time?

A.   At this time, no.

Q.   And you said they were hitting you with the baseball bats while you were still in the car?

A.   Yeah.  They were actually, like, poking into the car.  And because it wasn't that big of a damage, so they dragged me out from the car and started, like, you know, throwing bats at me.

Q.   And were these metal or wooden baseball bats?

A.   It was a metal baseball bat.

MR. BUTLER:  Resuming Exhibit 10.

*(The media was played.)*

BY MR. BUTLER:

Q.   Pausing at the 1:35 mark.

It's hard to see with the reflection, but there appears to be two figures standing over you.

A.   Yeah.

Q.   Which one did you recognize?  You can circle on the screen, if you want.

A.   Oh.  This guy (circling).

Q.   So the person who's closest to the camera in the video?

A.   Yeah, uh-huh.

THE COURT:  Was that a "yes"?

THE WITNESS:  Yes.

MR. BUTLER:  Resuming Exhibit 10.

*(The media was played.)*

BY MR. BUTLER:

Q.   So as we saw, you were obviously on the ground for some time there.

Was it difficult for you to get up?

A.   Yeah, yes.

Q.   Why did you get up?

A.   Because later on, when they start the car, I thought they were going to hit me with the car.  So I had to get up.

Q.   Where did you go after you got up?

A.   To the karaoke.

30

MR. BUTLER:  Moving to Exhibit 11.

*(The media was played.)*

BY MR. BUTLER:

Q.   Is Exhibit 11 the same incident, just a different angle?

A.   Yes.

Q.   And I know it's still hard to see, but in -- pausing at 48 seconds, can you see two individuals standing over you?

A.   Yes, I do.

Q.   And again, could you circle which one was the defendant.

A.   (Circling.)

Q.   And is that the one closest to the camera?

A.   Yes.

And at this time, he was screaming, "Fuck him up. Fuck him up."  Right here.

Q.   Who was screaming that?

A.   D.K.

Q.   And did you recognize his voice?

A.   Yes, I did.

Q.   Could you see his face?

A.   He had a mask on.

Q.   Could you see any parts of his face?

A.   Yeah, his eyes.

Q.   And did you recognize them?

A.    Yes, I did.

MR. BUTLER:  I'm going to resume Exhibit 11 until the end.

*(The media was played.)*

BY MR. BUTLER:

Q.    Can you tell us what you did next?

A.    I went inside the karaoke to call for help.

Q.    And who did you call for help?

A.    I called my partner to come get me.

Q.    Did anyone report this to the police?

A.    We did.

Q.    How so?

A.    We were on our way to the hospital, and we met LAPD in the street, so we asked them for help.

Q.    So you ran into LAPD officers in the street?

A.    Yes.

Q.    And this was after you had been hit with the baseball bats?

A.    Yeah.

Q.    Were you disoriented at the time?

A.    What do you mean?  Like --

Q.    Confused.

A.    Confused in, like, what term?  Like --

Q.    Well, were you in a lot of pain?

A.    I was in a lot of pain, yes.

32

Q.   At the hospital, what were you diagnosed with?

A.   With the -- what do you call it? -- the painkiller.

Q.   What were you diagnosed with in terms of what injuries did you have?

A.   Oh.  Like broken arm, and my legs were cut open.  Yeah.

Q.   And they -- you said they gave you a painkiller.

A.   Yes.

Q.   Were you in a lot of pain at the hospital?

A.   Yes, I was.

Q.   Can you turn in your binder to what's been marked as Government's Exhibit 52 through 59, review those, and let me know when you're finished.

A.   Yes.

Q.   What are those exhibits?

A.   It's a picture of my bruises and broken arm.

Q.   When were they taken?

A.   On the same day as the incident.

Q.   And who took them?

A.   I took them.

Q.   Do they fairly and accurately depict the injuries that you had after the carjacking incident?

A.   Yes.

         MR. BUTLER:  At this time, the government would move Exhibits 52, 53, 54, 55, 56, 57, 58, and 59 and publish to the jury.

33

THE COURT:  Any objection?

MR. WERKSMAN:  No, Your Honor.

THE COURT:  All right.  Exhibits 52 through 59 are admitted.

You may publish.

*(Exhibits 52 to 59 received in evidence.)*

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   So Mr. Shin, I apologize for making you go through these, but is this one of the injuries that you received during the carjacking?

A.   Yes.

MR. BUTLER:  Moving to Exhibit 53.

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   Is this one of your injuries?

A.   Yes.

Q.   And what is this one?

A.   It's a picture of my broken arm.

Q.   And do you understand how your arm was broken?

A.   Yes.  I was trying to protect my head because he was trying -- he was aiming for my head.  So I was protecting it, like, by raising it up.

MR. BUTLER:  Moving to Exhibit 54.

*(The exhibit was displayed on the screen.)*

34

BY MR. BUTLER:

Q.   Is this another injury?

A.   Yes.

MR. BUTLER:  55.

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   Another injury?

A.   Yes.

MR. BUTLER:  Moving to 56.

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   Is this again another injury of yours?

A.   Yes.

MR. BUTLER:  57.

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   Is this an injury on your neck?

A.   Yes.

MR. BUTLER:  58.

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   Is this again you?

A.   Yes.

MR. BUTLER:  And 59.

*(The exhibit was displayed on the screen.)*

35

BY MR. BUTLER:

Q.   Is this your leg?

A.   Yes.

Q.   We just saw a photo of you in a cast.

How long did you have to wear that cast?

A.   For about six months.

Q.   You also mentioned that the defendant was wearing a mask during the incident.

Did you ever see a photo of defendant wearing a similar mask?

A.   Yes, I did.

Q.   Who showed that photo to you?

A.   My partner did.

Q.   Do you know where it was from?

A.   He said he got it from Instagram of D.K.'s.

MR. BUTLER:  I'm going to show you what's been previously admitted as Government Exhibit 60.

*(The exhibit was displayed on the screen.)*

BY MR. BUTLER:

Q.   Is this the photo that your partner showed you?

A.   Yes.

Q.   And is this the mask you described seeing on the night of the beating?

A.   Yes.

Q.   The next morning, did you report it to police again?

A.    Not in the morning, but I think it was the same day. Because the incident happened around 4:00 a.m., and I reported to another LAPD officer at around -- I don't exactly remember the time, but it was, like, afternoon.

Q.    Okay.  The next afternoon, did you report?

A.    Yeah.

Q.    Did you tell them who did this?

A.    Yes, I did.

Q.    And did you report that the defendant was the person who did it?

A.    Yes.

Q.    How sure are you that it was the defendant?

A.    100 percent.

Q.    Do you know of anyone else who wanted to hurt you at that time?

A.    No.

Q.    Did you ever find your rental car?

A.    Yes, I did.

Q.    How?

A.    I did the Google, like, Find My Phone.

Q.    So was your phone still in the car?

A.    Yes, it was.  One of the phone was in the car.

Q.    Where was your car?

A.    I don't exactly remember the cross-street, but it was in East L.A.

Q.   Did you just get in and drive the car away then?

A.   No, I didn't.

Q.   Why not?

A.   We -- we were actually scared that D.K. might be around.  So we called the cops to help us out, retrieve the car.

Q.   When was it that you found the car in relation to the carjacking?

A.   I think -- I believe it was the same night as the incident.

Q.   So the car had been abandoned the same night?

A.   Yes.

          MR. BUTLER:  One moment, Your Honor.

BY MR. BUTLER:

Q.   Mr. Shin, you mentioned that you weren't sure of the VIN number of the car you rented.

A.   No.

Q.   Would it refresh your recollection to see the rental agreement that you provided to law enforcement?

A.   Yeah.

          MR. BUTLER:  Your Honor, may I approach with an electronic copy of the rental agreement?

          THE COURT:  Yes.

BY MR. BUTLER:

Q.   Did that rental agreement refresh your recollection as

to the VIN number?

A.   Yes.

Q.   And is your name on that rental agreement?

A.   Yes.

Q.   And is the VIN number ending in 238?

A.   Yes.

MS. MacCABE:  No further questions, Your Honor.

THE COURT:  Cross-examination?

MR. WERKSMAN:  Thank you.

Excuse me, Mr. Butler.  This laptop -- thank you.

**CROSS-EXAMINATION**

BY MR. WERKSMAN:

Q.   Good morning, Mr. Shin.  How are you?

A.   I'm good.  Thank you.

Q.   My name is Mark Werksman.  I represent Mr. Cho.

I'm going to ask you some questions.

Is that okay?

A.   Yes.

Q.   And by the way, are you aware that your partner, Mr. Lee, testified in this courtroom yesterday afternoon?

A.   Yes, I heard.

Q.   You heard from him?

A.   Yes.

Q.   Did you guys talk about his testimony?

A.   No.

Q.   Did you talk about the fact that he came here and testified for about an hour and a half, late yesterday?

A.   I don't know how long he was here, but I heard he was here.

Q.   And did you talk to him about his experience as a witness?

A.   No.

Q.   Okay.

Now, you began cooperating with the police immediately after you were attacked in that parking lot; correct?

A.   Yes.

Q.   All right.  And you told us about the attack.  And we'll go over some of the details in a moment.  But I want to talk to you about your interaction with the police.

A.   Okay.

Q.   And so do you remember approximately what time on the morning of May 8th, 2021, this incident occurred, the one that was on the video you saw?

A.   I believe it was around 4:00 a.m.  I can't exactly remember the exact time.

Q.   And can you tell us where that parking lot is that we're looking at?

A.   It was on Melrose and -- it was a little past Melrose. I don't know the street name.  But it was on Western.

40

Q.   So it was at -- near the intersection -- well, Melrose and Western --

A.   Yeah.  Like, maybe two blocks down the Melrose to Norse.

Q.   And what was the name of the club that you were driving --

A.   It was called McQueen.

Q.   McQueen?

A.   Yes.

Q.   Okay.  And we saw two young ladies getting out of the van and going into McQueen.  Those were doumi?

A.   Yes.

Q.   Were those typical doumi in terms of their age, the way they dress, et cetera?

A.   I don't know what typical you're meaning.

Q.   Well, you saw two young ladies get out of the van and go inside McQueen in that video; correct?

A.   Yes, I did.

Q.   Were they fairly typical examples of doumi, or were they unusual for any reason?

A.   They're typical.

Q.   And so every night, you would bring a number of girls to the different clubs --

A.   Yes.

Q.   -- as part of your business, Plus; correct?

A.    Yes.

Q.    And now, so you -- you we saw you get up after the beating, and you went inside the club; correct?

A.    Yes.

Q.    And shortly after that, Mr. Lee came to pick you up; correct?

A.    Yes.

Q.    All right.  But when he came to pick you up, did you leave with him in his car?

A.    Yes, I did.

Q.    And did you take anybody else with you when you left?

A.    The doumis.

Q.    And what did you do with the doumis?  Did you drop them off at home before you went to see the police?

A.    Right -- Right before we saw the police, we dropped them off.

Q.    All right.  And so where did you drop them off?  Where in relation to McQueen did you drop off those two girls that we saw we enter?

A.    Their cars were on 6th and Chateau, between 5th Street and 6th Street.

Q.    So you took the two girls back to their own cars; correct?

A.    Yes.

Q.    And did you collect your money from them for having

42

delivered them to the karaoke bar?

A.    Well, at the time, I'm not too sure.  Because I was unconscious, so I don't know if my partner actually collected at that time.

Q.    And then after you dropped them off at their cars at 6th and Western -- or I'm sorry, where did you say --

A.    Chateau Place.

Q.    Chateau Place.

      And did you then flag down an LAPD cruiser?

A.    Yes.

Q.    And did you talk to the police around the intersection of 6th and Western to report that you'd been beaten?

A.    No.  6th and Vermont.

Q.    6th and Vermont?

A.    Yes.

Q.    Okay.  So you met two uniformed Los Angeles Police Department officers at 6th and Vermont to talk about what happened; correct?

A.    Yes.

Q.    All right.  And this is within how many minutes of the actual beating?

A.    Maybe one hour.  All the way from 30 minutes to an hour, I believe.

Q.    Okay.  So about an hour later, you were at a -- at the intersection of 6th and Vermont --

43

A.   Yes.

Q.   -- and you talked to two LAPD officers; correct?

A.   Yes.

Q.   All right.  And you told them that you'd been robbed; correct?

A.   Yes.

Q.   You told them you'd been robbed by two male Blacks while parked in the parking lot at 818 North Western; correct?

A.   No.

Q.   You didn't say you'd just been robbed by two male Blacks?

A.   No.  I told them I was robbed by two male.

Q.   Okay.  You didn't describe them --

                    (Simultaneous speakers.)

A.   I described them as one Black and one Korean.

Q.   Okay.  Did you describe one as a male Black at 5'9", 160 pounds?

A.   Well, I don't know their heights.  I don't know their weights.

Q.   Well, did you give the officers --

A.   Approximate, yes.

Q.   Okay.  So did you tell one -- did you tell the officers that one of the men who beat you was a male Black in a black shirt with black pants and a black hat?

44

A.    I don't think I described like that.  I'm not -- I don't think I described, like, that details.

Q.    All right.  Did you tell them that one of the assailants was 5'9" and weighed 160 pounds?

A.    I told them they were little taller than me.  And probably they're going to be heavier than me because they're taller.

Q.    Did you tell them that the second suspect was also a male Black with a black shirt, black pants, and a black hat?

A.    No.

Q.    Did you tell them the second assailant was also a male Black who weighed 150 pounds and stood 5'7"?

A.    No.

Q.    Did you tell them that the suspect had taken your wallet and your bag?

A.    I told them they took my bags, my car, my phone.  They took everything that I had in the car.

Q.    Now, you met with two officers at the intersection of 6th and Vermont first at approximately 5:20 a.m.

A.    Okay.

Q.    And then you went to Good Samaritan Hospital, and you met with more police officers a little later in the morning; correct?

A.    Yes, I did.

Q.    Did you tell the second set of police officers that

you'd been attacked by two male Blacks?

A.    No.

Q.    Did you ever tell any police officers that you'd been
attacked by two male blacks?

A.    I told them I was attacked by two male; one Black and
one Korean.

Q.    Did you always distinguish that one was Black and one
was Korean?

A.    Yeah, I did.  Well, I didn't say Korean -- I'm not even
too sure if I said Korean.  But I told them one Black guy
and on Korean guy or Asian.

Q.    Well, let's back up for a second.

As you sit here today, do you remember whether you
identified your attackers by race; yes or no?

A.    By race?  Yes, I did.

Q.    And do you remember identifying any one of your
assailants as being Korean?

A.    Yes, I think I did say Korean.

Q.    Or maybe you said Asian?

A.    Maybe.

Q.    Maybe you said Black?

A.    No.  I said -- yeah, of course I said Black because one
of them was Black guy.

Q.    And did you later tell the police that there were three
people at the assault?

46

A.    No.

Q.    Did you say that it was D.K. Cho and two Black men?

A.    No.  I told them one was D.K., and one was someone that I don't know, which was a Black male.

Q.    Now, when you were attacked in that parking lot, the assailants, did you see them -- where they went after they stopped attacking you?

A.    No, I didn't see them.

Q.    Did you see in the video that they went around the corner and --

A.    Yes, I saw the video.

Q.    What did you see the assailants do after they attacked you?

A.    They ranned [sic] off; they came back; took the car.

Q.    When you say they ran off, did you see where they went?

A.    Well, they were going around the block.

Q.    Okay.  And then --

A.    That's what I saw on the camera.

Q.    Sorry?

A.    That's what I saw on the footage.

Q.    And then sometime later, they came back for the car?

A.    Yes.

Q.    Do you know how many came back for the car?

A.    Well, as I seen on the footage, it was one guy.

Q.    And did you know who that was?

47

A.    I don't know who that is.

Q.    Could you tell from the video who it was who came back and got in the car and drove away?

A.    Well, I know it wasn't D.K.

Q.    How do you know it wasn't D.K.?

A.    Because the clothes that he was wearing is different.

Q.    Okay.  What was he wearing?

A.    At the footage?  Like, the guy came back --

Q.    Let me just --

          THE COURT REPORTER:  I'm sorry, one at a time, please.

BY MR. WERKSMAN:

Q.    Mr. Shin, I apologize if I'm questioning you while you're still speaking.  I'll talk, then you talk, then I'll talk.

A.    Okay.

Q.    Okay?  We just did it again.  Okay.

          Question:  I'm going to ask you what you saw with your own eyes, not what's on the video.  Okay?  Yes or no?

A.    Okay.

Q.    You have to say out loud.

A.    Okay.

Q.    Did you see what D.K. was wearing while you were being beaten with your own eyes, not what you saw in the video in this courtroom?

A.    Yes.

Q.    What was he wearing?

A.    He was wearing short pants, jeans, and he was wearing a sweater and a mask.

Q.    Did you see him wearing a mask at the time?

A.    Yes.

Q.    And do you remember what the mask looked like?

A.    Yes.

Q.    What did the mask look like?

A.    It was a black mask with the shape of, like, bones.

Q.    Did you see that at the time, or did you conclude that's what he's wearing because the next day your partner, Mr. Lee, showed you a picture of that mask?

A.    I saw at the time.  And then when my partner showed me, I told him that it was the same mask that he was wearing at the time of attack.

Q.    Now, what was the other guy wearing?

      You said there were two guys beating you; D.K. and a male Black.

A.    Uh-huh.

Q.    What did the male Black look like?

A.    As I remember, he was wearing a black sweater with a hat and a mask.  And under the hat, it seemed like he had curly hair.

Q.    Now could you see any tattoos on either of the men who

was beating you?

A.   No, I couldn't see any tattoos.

Q.   Now, you were on the ground being beaten, so you were at ground level; correct?

A.   Yes.

Q.   And you said that Mr. Cho -- you call him D.K.; right?

A.   Yes.

Q.   That D.K. was wearing shorts.

A.   Uh-huh.

Q.   Yes?  You have to say "yes."

A.   Yes.  Sorry.

Q.   Did you see tattoos on D.K.'s legs?

A.   No, I didn't see any -- it's not like I didn't see it. I couldn't see it.

Q.   Why not?

A.   Because I was being attacked.

Q.   Okay.

A.   And I was covering my head with my arms, so I didn't have any visual.

Q.   All right.  I'd like to ask you to review again --

MR. WERKSMAN:  Can we look at Exhibit 10, please. We're going to go to Exhibit 10.

Oh, sorry.  I got it.  Thank you.

*(The media was played.)*

MR. WERKSMAN:  All right.  Wait just a second

50

here.

Can we advance it to about 1 minute, please.

*(The media was played.)*

MR. WERKSMAN:  Can we go to about 1 minute and 30 seconds, please.

*(The media was played.)*

MR. WERKSMAN:  Stop, please.

BY MR. WERKSMAN:

Q.   Okay.  Do you see the circled area?

A.   Yes.

Q.   All right.  And is it your testimony that Mr. Cho is the guy on the left?

A.   Yes.

Q.   And you can see he's wearing shorts?

A.   Yes.

Q.   All right.  Can you see any tattoos in this video?

A.   No.

Q.   Can you see Mr. Cho's face in this video?

A.   Not on this video.

Q.   All right.  Can you actually see Mr. Cho in this video?

A.   His face, are you talking about?

Q.   Well, if you didn't know -- if you didn't know that it was Mr. Cho -- you've told us that it was Mr. Cho; correct?

A.   Yes.

Q.   Could you identify the person from this picture alone?

A.    I think so.

Q.    Would you agree that it's virtually impossible to identify the two men who are beating you from these videos?

A.    Virtually, I don't think so.

Q.    No?

Can you tell the race of the two men who were beating you from this video?

A.    No.

Q.    Can you tell the face of the men, what they look like?

A.    From this video, no.

Q.    All right.  Can you tell the clothing they're wearing, aside from the fact that one of the men appears to have bare legs?

A.    No.

Q.    Okay.

MR. WERKSMAN:  And can we advance it, please, to about the 2-minute, 45-second mark.  Right there.  2 minutes and 45 seconds.  Yeah, okay.

BY MR. WERKSMAN:

Q.    Now, this is where you're getting up and staggering off; correct?

A.    Yes.

Q.    And at this point, someone got in the car, and he's driving away with your car; correct?

A.    Yes.

52

MR. WERKSMAN:  Can we shift now to Video 11, please.  Oh, I have to hit stop?  Thanks.

BY MR. WERKSMAN:

Q.   We're going to show you one other clip, if you don't mind, please.

A.   Okay.

MR. WERKSMAN:  Let's go to the last 30 seconds.

BY MR. WERKSMAN:

Q.   All right.  I'm showing you what's been marked -- well, it's admitted at Government's Exhibit 11.

*(The media was played.)*

BY MR. WERKSMAN:

Q.   Okay.  I just want to show you a little bit of this video.  We're going to go to approximately -- to 1 minute and about 15 seconds.

*(The media was played.)*

BY MR. WERKSMAN:

Q.   Okay.  Now at this point, the two assailants have left; correct?

A.   Yes.

Q.   And they're nowhere to be seen in this video; correct?

A.   Yes.

Q.   Now, one guy right --

MR. WERKSMAN:  Stop there, please.

BY MR. WERKSMAN:

Q.    One guy now starts peaking around the corner in the upper part of this screen; correct?

A.    Yes.

            MR. WERKSMAN:  Let's play again, please.  We're at 1 minute and 26 seconds.

                        *(The media was played.)*

            MR. WERKSMAN:  All right.  Let's stop here.

BY MR. WERKSMAN:

Q.    Now, this guy's coming back.  And we know from what happens next, that he gets in the car and drives away; correct?

A.    Yes.

Q.    And you're sure that's not D.K. Cho?

A.    That's not.

Q.    Okay.

            And how long after this incident did you recover the car itself?  You described how you airtagged it, and you found your phone.  How did you -- when did you get the car back?

A.    I didn't get the car, but we found the car on the same night.

Q.    You mean the night -- well, this incident occurred at about 4:00 in the morning on May 8th.

A.    Yes.

Q.   So later on May 8th, you found the car; correct?

A.   Yes.

Q.   Now, do you recall, earlier in your testimony, you were asked about this business of yours called Plus Entertainment?

A.   Yes.

Q.   And Plus Entertainment was the company that you formed with Mr. Lee to drive doumis to the different clubs; correct?

A.   Yes.

Q.   And did you incorporate this in the State of California, this company?

A.   Yes.

Q.   Okay.  And were you and Mr. Lee the officers or the owners of this corporation?

A.   I was.

Q.   You were.  Okay.

     And at the time you started this company, were you here in the United States legally?

A.   I was permitted to work.

Q.   Okay.  But you didn't have permanent residence; correct?

A.   No.

Q.   And after you began cooperating with the government in the prosecution of Mr. Cho, you were granted a special

immigration status; weren't you?

A.    They offered me.

Q.    Okay.  And did you accepted a special immigration status?

A.    They actually send me a certificate, but I actually didn't accept it.

Q.    What do you mean you didn't accept it?  You rejected it?

A.    Well, I didn't submit the certification.

Q.    You were offered what's called a U nonimmigrant status certification; correct?

A.    I didn't understand that.

Q.    Well, why don't you tell us in your words:  What was it the government offered you to enhance or improve your immigration status?

A.    They were offering me a U visa.

Q.    And the U visa would allow you to remain in the United States permanently; correct?

A.    That's what I heard.

Q.    And it would lead to citizenship eventually; correct?

A.    That's what I heard.

Q.    And the government offered you that because you were a witness cooperating with their investigation of Mr. Cho; correct?

A.    They offered me because I was a witness.

Q.   And it was conditioned upon you continuing to cooperate with the government; correct?

A.   I'm not too sure if they did that.  But I haven't received -- I mean I haven't submitted the certificate.  So I don't think it really matters for me.

Q.   Well, when you say it doesn't matter, what you're saying is you got a certificate it that allows you to get a U visa; correct?

A.   Yes.

Q.   And you haven't submitted that certificate yet; correct?

A.   No.

Q.   But you could submit it in exchange for a U visa; correct?

A.   No.  It's expired.

Q.   Okay.  And you let it expire?

A.   Yes.

Q.   When did -- when did it expire?

A.   They told me it was six months since the day that I get it.  But it's been over a year, so it's been expired.

Q.   Okay.  And you haven't renewed it?

A.   No.

Q.   And the government hasn't offered to renew it?

A.   No.

Q.   This company, Plus Entertainment, you testified earlier

57

that there were rules that you would apply to the doumi who worked for your company; correct?

A.    Yes.

Q.    And you told us some of them involved basic good behavior; correct?

A.    Yes.

Q.    And what I'd like to do is I'd like to show you -- there's a -- there's a small three-ring binder in front of you.  Inside of it, the first page should be -- that one -- the first one should be an exhibit that's marked for identification is Exhibit 200.

        Do you recognize that?

A.    Yes, I do.

Q.    And what is that?

A.    It's our rule book for the new employees, new doumis.

Q.    And would you give this -- these rules to each new hire that you would use, every new girl that you'd hire as doumi?

A.    So at every interview, we give them this rule book.

        MR. WERKSMAN:  All right.  And at this point, Your Honor, I'm going to move to introduce Exhibit 200.

        THE COURT:  Any objection?

        MR. BUTLER:  No objection, Your Honor.

        THE COURT:  200 is admitted.

        *(Exhibit 200 received in evidence.)*

        MR. WERKSMAN:  All right.  May I publish?

THE COURT:  You may.

*(The exhibit was displayed on the screen.)*

BY MR. WERKSMAN:

Q.   All right.  Mr. Shin, I'm showing you -- what you have in front of you on the screen, it's called Exhibit 200.

"These are your rules:  You must work at least four nights per week."

Correct?

A.   Yes.

Q.   So you expected this to be a full-time thing for the doumi, that you'd bring them every day to a different club; correct?

A.   We had full time and part times.

Q.   Okay.  One of the rules was:  "Do not use drugs."

That's number 7; correct?

A.   Yes.

Q.   And the reason you don't want them to use drugs is -- why?

A.   Because it's illegal.

Q.   Right.

What would happen if a doumi was caught bringing drugs into a karaoke club?

A.   If we find out, we'll fire them.

Q.   Right.

And the reason you'd fire them is because the

59

karaoke clubs all have liquor licenses; correct?

A.    Not all.  But most of them, they do.

Q.    The successful ones where you make the most money have liquor licenses; correct?

A.    I don't know because I don't know if they actually have the license or not.

Q.    They serve liquor whether they have licenses or not; is that what you're telling us?

A.    Yes.  Probably they should have it because they were selling alcohol.

Q.    And if -- if drugs were being used on the premises of these karaoke clubs, it could threaten the liquor license; correct?

A.    That, I don't know.

Q.    Well, the club owners would tell you, "Don't bring drugs into our clubs"; correct?

A.    Well, they never told us not to.  But we actually told our employees not to do so.

Q.    Rule Number 12 says, "No sex.  Do not engage in any sexual activities, period."

          Why is that on the rule list?

A.    Because that's illegal.

Q.    And what would happen if the doumis were caught by the police acting as prostitutes inside the karaoke clubs?  What would happen to the clubs?

A.    What happen to the clubs?

Q.    What would happen?

          MR. BUTLER:  Objection, Your Honor.  Speculation. Calls for --

          *(Simultaneous speakers.)*

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Would it be a problem for your relationship with the karaoke clubs if the doumis performed sexual services for hire inside the clubs?

A.    Well, I'm not too sure because it never happened to me.

Q.    Right.

          It never happened, that you're aware of?

A.    Yeah.

Q.    And now, it also says here -- Number 11, it says, "We only -- please don't lie to your clients and us about money."

          What was the financial relationship that you had with these doumi?

A.    They were actually charging clients $120 tips for first two hours.  And we get the $20 for every hour they work.

Q.    So you would get paid on an hourly basis regardless of how much money the doumi made; correct?

A.    Yes.

Q.    So if a doumi worked two hours, you'd get $40; correct?

A.    That's correct.

Q.    If she worked three hours, you'd get 60; true?

A.    Yes.

Q.    All right.  So why did you care what she collected, and why would she have to be truthful to you about the money she collected?

A.    Because there are a lot of doumis that were saying it's $200 for two hours plus tip, which is a lie.

Q.    But you get paid the same no matter what the doumi earns, so why do you care what she claims she earned?

A.    Because I want to be honest with the business.  It's a business for me.  So I want it to be honest to the clients.

Q.    Were there other doumi drivers besides you and Mr. Lee who we're bringing doumis to the different clubs?

A.    There were a lot of drivers.  Are you asking in my company or . . . ?

Q.    No.  Were you -- were you and your company in competition with other doumi drivers to bring doumi to the different clubs?

A.    Well, if you call that a competition, maybe.  But I never thought it was a competition.

Q.    Well, didn't -- let's put it this way.  If you would show up at a karaoke bar and that bar had already hired doumi for the night from a different driver, you wouldn't get any business; correct?

A.   Of course not.

Q.   So you'd find yourself in a competition with other drivers to supply the doumi; correct?

A.   Well, if you put it that way, yes.

Q.   And you and the drivers would sometimes coordinate your efforts through a group chat; correct?

A.   Yes.

Q.   And that group chat was on the platform called Kakao, K-A-K-A-O; correct?

A.   Yes.

Q.   And Mr. Cho, he hosted the group chat on Kakao regarding the drivers; correct?

A.   That's what I heard.

Q.   And did you participate in the group chat that was hosted by Mr. Cho?

A.   No, I never been.

Q.   Did you ever go on the group chat that Mr. Cho ran on Kakao?

A.   No.

Q.   Did you ever learn from Mr. Cho that there were certain clubs that you shouldn't go to?

A.   That's what he was telling me.

Q.   And do you know why he would tell you not to go to certain clubs?

A.   Because we were stop paying him.

Q.   Well -- okay.  Was the only reason because you weren't paying him?

A.   Yeah.

Q.   Okay.  Were there ever any issues with the clubs being -- facing raids by the police?

A.   There were a couple.

Q.   So would you be told occasionally by Mr. Cho, "Don't go to this club tonight; the LAPD may raid it"?

A.   Well, no.  I never heard from him.

Q.   Okay.  Did you hear from others?

A.   No.

Q.   Did you ever learn that a club was going to be raided?

A.   No.

Q.   I thought you just told us you did.

A.   I'm sorry.

Q.   Did you ever learn from any source anytime you were driving that a club was going to be raided that night and you should stay away from it?

A.   No.

Q.   All right.  How about the fact that certain doumis were known to bring drugs to different clubs; did you ever learn from any source that there were certain doumi that you shouldn't bring to clubs?

          MR. BUTLER:  Objection, your Honor.  Relevance.

          THE COURT:  Sustained.

MR. BUTLER:  Outside the scope.

BY MR. WERKSMAN:

Q.   Would you and the other drivers share information about certain doumi who were thought to be bearing drugs or lying about the money they'd make?

MR. BUTLER:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.   Did you -- tell us what time frame -- between what month of what year and what month of what year did you actually pay $100 a month to Mr. Cho?

A.   From July of 2019 until -- I don't remember the last month that I paid, if it was December 2020 or January 2021.

Q.   So you -- you -- you quit paying him.  And you quit paying -- but did you tell us because he doubled the amount of the fee from 100 to 200?

A.   Yes.

Q.   Was that why?

A.   Well, that too.  But it felt like we had -- I mean, there was no point of paying.

Q.   Okay.  So you reach the -- you paid him for about two years; correct?

A.   Yeah.

Q.   And then at some point, you just -- right --

A.   For one year and a half.

65

Q.   So for about 18 months, 19 months, you paid him $100 a month; right?

A.   Yes.

Q.   And during that time period, did he ever tell you, "Pay, or else"?  Did he ever use those words?

A.   Yes.

Q.   When did he say that to you?

A.   Like, when we stopped paying him.

Q.   So what I asked is while you were paying him during that 18 or 19 months, did he ever tell you, "Pay, or else"?

A.   Well, at the time, we were paying him, so he didn't say "Pay or -- what or else."  But he did say, "You have to pay."

Q.   Okay.  You said, "You have to pay"?

A.   Yeah.

Q.   And you paid him every month regularly; correct?

A.   Yes.

Q.   And you paid him because you wanted to continue having access to the clubs; correct?

A.   No.

Q.   You paid him because if you didn't pay him, you would be shut out from certain clubs that would tell you, "Don't bring your doumi here.  We work with Mr. Cho."  Correct?

A.   So at the time, I paid him because I was scared.  And I'm not -- I don't think it was about the karaokes that he

banned us from.

Q.    So at a certain point, you decided, "You know what, I've had enough."  And it was either in December of 2020 or January of 2021.  You said, "I'm done.  I'm not paying anymore."  Correct?

A.    Yes.

Q.    And then months went by; correct?

A.    Yes.

Q.    And you continued to bring your doumi to the different clubs; correct?

A.    Yes.

Q.    And you and Mr. Lee continued to make your money in doing your business; correct?

A.    Yes.

Q.    And then at some point, your partner -- were you aware that Mr. Lee asked for a meeting with Mr. Cho?  Were you aware of that?

A.    Like, on what date?

Q.    Well, do you know if on April 21st of 2021, your partner, Mr. Lee, texted Mr. Cho to say, "I want to meet you"?

A.    Yeah.  I think I remember.

Q.    All right.  Let me show you what's already been marked as Defense Exhibit 203.

         (The exhibit was displayed on the screen.)

67

BY MR. WERKSMAN:

Q.   Do you recognize the text that I'm showing you here, on the screen?

A.   Do I recognize?

Q.   Yes.

A.   No.

Q.   Were you a party to this text exchange?

A.   No.

Q.   Did you know that your partner sent this text to Mr. Cho on April 21st and April 22nd of 2021?

A.   Yes, he did.  He told me that he sent him the text.

Q.   Do you know why he sent him that text?

A.   Because I believe this was the day of the incident of the dashcam.

Q.   Okay.  And so the -- the text that Mr. Lee sent to Mr. Cho is why you met with Mr. Cho in that video that we were shown; correct?

A.   No.  But this text is after I met D.K..

Q.   The -- the dashcam video that we saw, that's Exhibits 12, and 13 is the transcript of the conversation you had.  And we're going to go to that in just a second.

          But when you -- are you telling us that this text, "I want -- we need to meet," came before the conversation that occurred in your car that we saw earlier?

68

A.    No.   After.

Q.    All right.   So why did your partner send a text to Mr. Cho after that meeting?

A.    Because it felt like he was threatening us, and we wanted to get over with it.

Q.    So did you have another meeting with Mr. Cho?

A.    No.

Q.    Did Mr. Cho ever respond to this text, to your knowledge?

A.    No.

Q.    Was there ever a second meeting that we didn't get to see a video of?

A.    No.

Q.    All right.   And in the first meeting -- we have the transcript of it.

        MR. WERKSMAN:   Can you put up 12, please.   The transcript.

BY MR. WERKSMAN:

Q.    We're going to show you what what's already been marked as Exhibit -- Exhibit 11 and 12.

        MR. WERKSMAN:   Let's go to 12, please.   We're going to show the transcript --

        Wasn't the transcript marked separately as Exhibit --

        THE COURT:   No.   It's embedded in the video.

69

MR. WERKSMAN:  Okay.  All right.  Let's put 13 on, please.  It's actually 122 and 123.  Okay.  This is Exhibit 123 -- isn't this Exhibit 123?

(Counsel conferring.)

MR. WERKSMAN:  All right.  Let's turn it off.  I see.  Okay.  I got it.  All right.

We're not going to -- we're going to take this down, and I'm just going to ask a few questions from the transcript that I have.

BY MR. WERKSMAN:

Q.   You testified about a conversation you had with Mr. Cho in which Mr. Cho is not visible; correct?

A.   Correct.

Q.   That was your dashcam video showing inside the car where you sat with Mr. Shin -- with Mr. Lee; correct?

A.   Mr. Lee wasn't there.

Q.   It was just you, alone?

A.   Yes.

Q.   Okay.  And you were speaking to Mr. Cho in that conversation; correct?

A.   Yes.

Q.   And he starts saying to you things like, "Why are you looking at me like that, Bro?"  Correct?

A.   Yes.

Q.   And you interpreted that as a threat?

70

A.    Well, I thought he wanted to start, like, a fight.

Q.    Did you fight with him?

A.    No.

Q.    Did he hit you?

A.    No.

Q.    Did you try to hit him?

A.    No.

Q.    Were you looking at him in any kind of funny way?

A.    No.

Q.    Were you just looking at him in a neutral way while you were having this conversation?

A.    Yes.

Q.    And then you asked him, "Are you going to hit me?"

      Do you remember asking, "Are you going to hit me?"

A.    Yeah.

Q.    And he said, "Yeah.  Okay."

      And you said, "Yeah."

      And he said, "Yeah."

      And you said, "Come on."

      And then he said, "I didn't say I was going to hit you right now, dumb ass.  What -- what the hell?  What's wrong with you, Bro?"

      Do you remember that?

A.    Yeah.

Q.    All right.  And did you respond to that?

71

A.    No.

Q.    Did you say, "Are you threatening me right now?"

A.    Oh, yeah, I did say that.

Q.    And he said, "I'm not threatening you," right?

A.    Yeah.

Q.    All right.  When you left that conversation with him, at the end of that conversation, was there an understanding between you and Mr. Cho as to what would happen next between the two of you?

A.    That he might come after me?

Q.    But did you promise him that you would begin paying him again?

A.    No.

Q.    You stood your ground; correct?

A.    Yeah.

Q.    You said, "No, I'm not going to pay you anymore," right?

A.    Yes.

Q.    And then how much -- do you remember what day that conversation occurred?  Because there's no date on the dashcam.  But when did that happen?

A.    I believe it was April 21st.  Around that time.

Q.    Okay.  So was it later that day that your partner sent the text saying, "Hello, D.K.  We need to meet"?

A.    Yes.

Q.    And what was going to happen at the meeting?

A.    We were actually --

        MR. BUTLER:  Objection, Your Honor.  Speculation. Hearsay.

        THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Did you and Mr. Lee talk about what you would do at a meeting that you had requested with Mr. Cho?

A.    Yeah.

Q.    What did you guys agree that you were going to do if you got a meeting with Mr. Cho?

A.    Call the cops.

Q.    So were you going to basically invite him to a meeting and then get the police to come to the meeting?

A.    Yes.

Q.    So it was your purpose to set him up for a meeting with the police?

A.    That's what we were thinking, yes.

Q.    It never happened; correct?

A.    It never happened.

        MR. WERKSMAN:  Just a second, please.

        Thank you, Mr. Shin.

        I have no further questions.

        THE COURT:  Redirect?

        MR. BUTLER:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

Q.   How did you get the security footage that we watched today?

A.   From McQueen?

Q.   Yes.

A.   I asked one of the employees at McQueen to send it to me.

Q.   And did they give it up easily?

A.   Not really.

Q.   When -- you just mentioned on cross that you were unconscious after getting in the car with your partner.

Was that before you met with police?

A.   It was before I met the police.

Q.   And then when you met with police a second time, at the hospital, were you on the pain medication that you discussed?

A.   Yes.

Q.   You were asked by defense counsel about the U visa certification that you did not submit.

Why didn't you submit that?

A.   Because I'm waiting on my green card because it's been already submitted.  And I'm waiting for the dates to come up.  And my lawyer told me that it's only going to take me about a year to get my green card.  So I thought it would be faster for me to get the green card.

74

Q.   And so you don't need the U visa for citizenship?

A.   No.

Q.   Was your company ever cited by police for any
violations?

A.   No.

Q.   Any illicit drug use?

A.   No.

Q.   Any prostitution?

A.   No.

Q.   Did defendant ever call you and tell you to bring
hostesses to a certain bar?

A.   No.

Q.   Would a club ever tell you that you were not allowed to
bring people there unless you paid the defendant?

A.   One of them did.

Q.   And so other than that club, who would ban you from the
different clubs?  Was it the defendant, or was it the club
themself?

A.   Well, the defendant was banning us.

Q.   In that dashcam video the defense counsel was just
asking at the end, why did you ask the defendant if he was
going to hit you?

A.   Because the way that he was talking to me, and -- yeah.
I thought he was going to try to start hitting me or
fighting me or something.

Q.   Defense asked you -- and his words were if you stood your ground and didn't pay after that.

You didn't pay after the dashcam, right?

A.   No, I never paid after that.

Q.   And then within a few weeks, you were beaten with baseball bats?

A.   Yes.

Q.   By who?

A.   By D.K..

Q.   When you were paying him, were those payments out of fear?

A.   First, yes, it was.

MR. BUTLER:  No further questions, Your Honor.

THE COURT:  Any recross?

MR. WERKSMAN:  No.  Thank you, Your Honor.

THE COURT:  Is the witness excused?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  All right.  Sir, you're excused. Thank you for being here.

We're going to go ahead and take a 15-minute break this morning.

Ladies and gentlemen, I remind you of your obligation not to discuss the case with anyone whatsoever, in any way, and not to form or express an opinion about the case until it's given to you for deliberations.

76

We'll see you back here in 15 minutes.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  Defense, you elected to use exhibits during the government's case-in-chief, so that requires you to produce an exhibit list, which should have been provided to the Court at the same time that you handed us the exhibits.  So please make sure that you produce that to my CRD immediately so she can keep track of your exhibits and know which ones are in evidence.

We'll take a break for 15 minutes.

THE CLERK:  All rise.

*(Recess.)*

THE CLERK:  All rise.

*(The jurors entered the courtroom.)*

THE CLERK:  This United States District Court is once again in session.  Please be seated and come to order.

THE COURT:  All right.  We're back on the record.

Government, you may call your next witness.

MS. MacCABE:  The government calls Young Nae Kang.

THE CLERK:  Good morning.  Please stand before me, and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth,

the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you.

You may be seated in the witness stand.

Please state and spell your full name for the record.

THE WITNESS:  Young Nae Kang; Y-O-U-N-G N-A-E, K-A-N-G.

THE COURT:  You may inquire.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Good morning, Mr. Kang.

A.   Good morning.

Q.   What do you do for work?

THE INTERPRETER:  I'm sorry, Counsel?

BY MS. MacCABE:

Q.   What do you do for work?

A.   I am working as a doumi driver, a company driver.

Q.   Where were you born?

A.   In Korea.

Q.   When did you come to America?

A.   Approximately ten years ago.

Q.   What is your immigration status here?

A.   I don't have a status.

Q.   Going back to your profession, what hours generally are

78

you driving?

A.    From 9:00 p.m. up until 6:00 or 7:00 in the morning.

Q.    And what neighborhood are you driving in?

A.    In Koreatown.

Q.    How long have you been doing that?

A.    Approximately four years or so.

Q.    And are you driving to karaoke bars?

A.    Yes.

Q.    Do you know if the bars that you drive to serve alcohol?

A.    Yes, they do.

Q.    And do you know if they accept credit cards?

A.    Yes, to my understanding, they do.

Q.    Do you know someone who goes by D.K.?

A.    Yes.

Q.    Do you see him in the courtroom today?

A.    Yes.

Q.    Will you please identify him based on where he is sitting and something that he is wearing.

A.    Yes.

        MS. MacCABE:  Your Honor, will the record -- oh, I apologize.

BY MS. MacCABE:

Q.    Please identify where he's sitting, what he's wearing.

A.    Yes.  He's over there, on that side (indicating), and

he's wearing a dress suit.

Q.   And when you say "that side," is it to your right?

A.   Yes, my right side.

MS. MacCABE:   Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT:   Yes.

BY MS. MacCABE:

Q.   When did you meet the defendant?

A.   Approximately five years ago or so.

Q.   And at some point, did you start paying the defendant money?

A.   Approximately four years ago.

Q.   And why did you pay him money?

A.   Because I had to pay him in order for me to work; that's why I did it.

Q.   And what was he giving you for what you were paying him?

A.   There wasn't anything like that in particular.

Q.   So was he giving you anything in return for what you were paying him?

A.   No.

Q.   Did you own your own driving company when you started paying the defendant?

A.   Initially, I was doing it with another person.

Q.   Was that your company?

A.    When I started initially?

Q.    Yes.

A.    When I first started, I was working for a company -- another company.

Q.    Did you ever start your own company?

A.    Yeah.

Q.    And what is your company called?

A.    Queen.

Q.    Approximately when did you start Queen?

A.    About two years ago.

Q.    Did you pay the defendant after you started your own company?

A.    Yes.

Q.    Was that on Venmo?

A.    Yes.

Q.    Will you please turn in your binder to Exhibit 31; read it; and look up at me when you're done.

A.    Yes.

Q.    Did you look at the other pages as well?

A.    Yes.

Q.    Do you recognize that?

A.    Yes.

Q.    What is it?

A.    This is the records of a monthly payment that was made through Venmo.

Q.    Monthly payments from you?

A.    Yes.  The payment from me to the defendant, D.K..

        MS. MacCABE:  Your Honor, I move to admit Exhibit 31.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.

        THE COURT:  31 is admitted.

        *(Exhibit 31 received in evidence.)*

        MS. MacCABE:  Permission to publish?

        THE COURT:  You may.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Now showing pages 1 and 2 of Exhibit 31.

        Are all of these payments except for one for your company, Queen?

A.    Yes.

Q.    We'll get back to your company's payments in a minute.

        But first, looking at page 2, why did you make a payment on February 16th, 2023, with the description "Dream"?

A.    This is what I had received from a Dream driver in cash, and then I, in turn, sent that via Venmo.

Q.    Who is the Dream driver?

A.    You mean the name?

Q.    Yes, please.

82

A.    Sang Heun Shin.

Q.    And you said that he gave you cash to?

A.    Yes.

Q.    Did he tell you to make this payment to the defendant?

A.    Yes.

Q.    While you were paying the defendant, did you ever text with him?

A.    Yes.

Q.    Was that ever on the Kakao messaging application?

A.    Yes.

Q.    And were you ever in group messages with the defendant?

A.    Yes.

Q.    Will you please turn in your binder to Exhibit 87; read it; and look up at me when you're done.

A.    Yes.

Q.    Do you recognize that?

A.    Yes.

Q.    Are those some of the group messages with the defendant that you were just talking about?

A.    Yes.

        MS. MacCABE:  Your Honor, I would now move to admit Exhibit 87.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.  Thank you.

        THE COURT:  87 is admitted.

(*Exhibit 87 received in evidence.*)

MS. MacCABE:  Permission to publish?

THE COURT:  Yes.

(*The exhibit was displayed on the screen.*)

BY MS. MacCABE:

Q.   Looking at Exhibit 87, are the green messages on the right from the defendant?

A.   Yes.

Q.   What did you understand him to mean by, "No fucking McQueen, no Forest, no Concert"?

A.   These are the names of karaoke clubs.  I understood this means I do not go to those clubs.

Q.   And in this group message generally, who were the other individuals in it?

A.   The company drivers.

Q.   What did you understand the defendant to mean by, "You violated, you gonna get it.  Ask next driver what happens"?

A.   What I understood is it's kind of threatening.  Unless you keep what I told you, then you don't know what's going to happen to you.  Something to that effect.

Q.   And what did you understand, "No more warning, I'm straight to you; don't fuckin' cry when you see me," to mean?

A.   I took it a message when I violate this, that he might come up to me personally.  That's what I understood.

84

Q.   And what did you understand him coming up to you personally to mean?

A.   I thought either he would come in and beat me, or he would do something to me physically.  That's what I thought.

Q.   And what did you understand, "I'm coming straight to you, in your face," to mean?

A.   Saying that he would directly come to me, come to my face, in front of it.

Q.   And going back to the first couple of texts where you said he mentioned the karaoke bars.

A.   Yes.

Q.   Did you sometimes not go to the karaoke bars that the defendant had banned?

A.   Correct.

Q.   Will you please turn in your binder to Exhibit 85; read it to yourself; and look up at me when you're done.

A.   Yes.

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   This is the message asking me to pay a penalty because I went to Concert karaoke studio, although he had told me not to go there.

Q.   Is Exhibit 85 text messages between you and the defendant?

85

A.   Yes.

MS. MacCABE:  Your Honor, the government would now move to admit Exhibit 85.

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  85 is admitted.

You may publish.

*(Exhibit 85 received in evidence.)*

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Is that your first name in the first text?

A.   Yes, Young Nae.

Q.   What does "Jan Venmo" mean?

A.   Where?  Where?

Q.   On the second text.

A.   Can you read the message one more time?

Q.   Yes.

Are you looking at Exhibit 85?

THE COURT:  Counsel, why don't you approach and direct the witness.

MS. MacCABE:  Okay.  Thank you.

THE WITNESS:  Yes.  Yes.  I'm okay.

BY MS. MacCABE:

Q.   So now are you looking at Exhibit 85?

A.   Yes.

Q.    And do you recognize that?

A.    Yes.

Q.    Are those text messages between you and the defendant?

A.    Yes.

        MS. MacCABE:  Your Honor, to the extent there was any confusion about which exhibit, is this exhibit admitted?

        THE COURT:  Well, 85 was moved and admitted.

        MS. MacCABE:  Okay.  Thank you.

        Permission to publish?

        THE COURT:  Yes.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Looking at Exhibit 85, what does "Jan Venmo" mean?

A.    Asking me for the payment for the month of January. He's asking me for the payment.

Q.    And what did you understand him to mean by, "I just saw your driver.  You gotta pay 200 more"?

        THE INTERPRETER:  Can I clarify this?

        THE WITNESS:  Because I was working with another driver, so he's asking me to pay him $200 more per month.

BY MS. MacCABE:

Q.    And will you please turn in your binder to Exhibit 84; read it to yourself; and look up at me when you're done.

A.    Yes.

Q.    Do you recognize that?

A.   Yes.

Q.   What is it?

A.   This is asking me to pay penalty for going to the studio called Concert.

Q.   Are these text messages between you and the defendant?

A.   Yes.

MS. MacCABE:  Your Honor, I would now move to admit Exhibit 84 into evidence.

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  84 is admitted.

*(Exhibit 84 received in evidence.)*

MS. MacCABE:  Permission to publish?

THE COURT:  Yes.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   What is a penalty?

A.   Because I had gone to the studio called Concert, asking me to make a penalty payment for that.

Q.   Was Concert one of the banned karaokes?

A.   Yes.

Q.   And what did you understand "You gonna see the real demon" to mean?

A.   I took it as a threatening at -- made to me, which means that he wouldn't know what he's going to do to me if I

ever violate one more time.

Q.   Can you please explain a little bit more what you meant by it was "threatening" to you?

A.   I thought he might come and beat me or just he might visit me out of the blue.  And what -- I didn't know exactly what he might do at that time.

Q.   That's what you understood "You gonna see the real demon" to mean?

A.   Yes.

MS. MacCABE:  Turning to pages 2 and 3 of Exhibit 84.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   What are you and the defendant talking about here?

A.   He's saying that I had gone to Concert again.  So he's asking me to pay another $200 penalty.

Q.   For each Venmo payment that we looked at earlier, why did you pay the defendant?

A.   I had no other choice but do it in order for me to work.

Q.   You mentioned that you felt threatened that he might beat you.

A.   I'm sorry?

Q.   You mentioned that you felt threatened that the defendant might beat you.

A.    Yes.

Q.    Did you ever see the defendant beat anyone?

A.    Yes.

Q.    Where did you see the defendant beat someone?

A.    At the Forest studio.

Q.    Forest karaoke?

A.    Yes.

Q.    Is that also called Soopsok Karaoke?

A.    Yes.

Q.    Will you please turn in your binder to Exhibits 14, 15, and 16; look at each one; and let me know when you're done.

A.    Yes.

Q.    Do you recognize those?

A.    Yes.

Q.    How do you recognize them?

A.    These are the videos that shows that I had witnessed him beating someone at Soopsok Karaoke.

Q.    And are those CDs?

A.    Yes.

Q.    Did you sign those CDs?

A.    Yes.

Q.    And that was when you reviewed the videos that are on each CD?

A.    Yes.

Q.    Do they fairly and accurately depict what you saw?

90

A.   Yes.

          MS. MacCABE:   Your Honor, I move to admit
Exhibits 14, 15, and 16.

          THE COURT:   Any objection?

          MR. WERKSMAN:   No.

          THE COURT:   14, 15, and 16 are admitted.

       *(Exhibits 14 to 16 received in evidence.)*

          MS. MacCABE:   Permission to publish?

          THE COURT:   Yes.

                    *(The media was played.)*

BY MS. MacCABE:

Q.   Now playing Exhibit 14, and pausing at 7 seconds.

          Where is this?

A.   Soopsok studio.

Q.   And this is the parking lot of Soopsok Karaoke?

A.   Yes.

Q.   Were you there?

A.   Yes.

Q.   Could you please circle where you were.

A.   Around here (circling).

Q.   Okay.

          For the record, the witness has circled on the
right-hand middle side of the screen.

          Do you also see the defendant in that video?

A.   Yes.

Q.    Could you please circle the defendant on the screen.

A.    (Circling.)

Q.    And for the record, the witness has circled an individual on the bottom half of the screen, holding open a car door.

          MS. MacCABE:  Now playing Exhibit 14 again.

                    *(The media was played.)*

          MS. MacCABE:  Now playing Exhibit 15.

                    *(The media was played.)*

BY MS. MacCABE:

Q.    And pausing at the 8-second mark.

          Do you see the defendant in that video?

A.    Yes, I do.

Q.    Could you circle him?

A.    (Circling.)

Q.    And for the record, the witness has circled the second individual from the right of the screen.

          MS. MacCABE:  Now playing Exhibit 15 again.

                    *(The media was played.)*

BY MS. MacCABE:

Q.    And pausing at the 21-second mark.

          Is this still a video of the Forest, or Soopsok Karaoke, parking lot?

A.    Yes.

Q.    Is it just another angle?

A.    Yes.

MS. MacCABE:  Now playing Exhibit 15 again.

*(The media was played.)*

MS. MacCABE:  And now playing Exhibit 16.

*(The media was played.)*

BY MS. MacCABE:

Q.    Pausing at the 17-second mark.

Do you see the defendant in that video?

A.    Yes.

Q.    Could you please circle the defendant on that video?

A.    (Circling.)

Q.    And for the record, the witness has circled the individual that is second to the left.

MS. MacCABE:  Now playing 16 again.

*(The media was played.)*

BY MS. MacCABE:

Q.    When you were there that night, did you recognize anyone else who we saw in any of these videos?

A.    Anybody else, what do you mean by that?

Q.    Other than the defendant.

A.    Yes.

Q.    Who did you recognize?

A.    Those people who were working at Soopsok and other drivers as well.

Q.    And what were those people's interaction with the

93

defendant that night?

A.    He was beating the driver, blaming him to call other companies, although he told him previously not to call other companies.  And then because he was a waiter who did, he was beating the waiter.  That's what I witnessed.

Q.    So to be clear, the defendant was beating one of the waiters?

A.    Yes.

Q.    For calling a particular driving company?

A.    Yes.

Q.    Did you see the defendant at Forest, or Soopsok Karaoke, any other time?

A.    Yes.

Q.    Is there a specific time that sticks out in your mind?

A.    Bear with me just a minute.

Q.    Yes.

A.    Though I cannot remember the exact date, but there was a time that I saw.

Q.    Could you please describe the time that you saw that sticks out in your mind.

A.    I went inside Soopsok.  The defendant was holding a gun.

Q.    Could you please describe the gun.

A.    It was not a small-size gun.  It was approximately this

(indicating).

Q.   And can you please describe verbally what you were just doing with your hands?

A.   About 20 centimeter horizontally; and vertically, about 15 or 20 centimeters.

Q.   And were you making hand gestures also for the jury about shoulder width apart and may be through half of your chest to the top of your head?

That's okay.

What did you do when you saw this?

A.   I ran away.

Q.   And did you tell anyone about what you saw?

A.   Yes.

Q.   Who did you tell?

A.   I called my friend -- his name was Ki Young Jung -- who is working at Concert.

THE INTERPRETER:  The witness's spelling is K-I Y-O-U-N-G, and J-U-N-G.

MS. MacCABE:  Thank you.

BY MS. MacCABE:

Q.   You said he was working at Concert.

Is that another karaoke bar?

A.   Yes.

MS. MacCABE:  No further questions.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MR. WERKSMAN:

Q.   Hello, Mr. Kang.

A.   Hello.

Q.   My name is Mark Werksman.  I represent D.K. Cho.

     May I ask you some questions?

A.   Yes.

Q.   Those videos we just saw which were marked as
Governments Exhibits 14, 15, and 16, were you visible in
those videos?

A.   Not there because I was out of the scope of the camera.

Q.   So everything we just saw was of things other than you.
You were not in those videos; correct?

A.   Correct.  I wasn't in that video.

Q.   Where were you?

          MR. WERKSMAN:  Can we put on 14, please.

BY MR. WERKSMAN:

Q.   Where were you when this was all going on, if you
remember the layout?  I'm going to show you a picture in a
second.  But can you describe for us where you were standing
or walking when you saw what you've just described?

A.   I was standing here.

Q.   Okay.  So just to be clear, what we're looking at is --
this is the person you described as Mr. Cho; correct?

A.   Yes.

96

Q.    And if it wasn't clear for the record, this is
Government's Exhibit 14.

And there's a person in the driver's seat of this
vehicle where the door is open; correct?

A.    Yes.

Q.    Who is that?

A.    D.K..

Q.    No, no, no.  I mean who's inside the car?  D.K. is
outside the car.  Who's inside the car?

A.    Oh, inside the car.  Oh, I don't know who that is.
That is a company driver.

Q.    Okay.  Towards the end of your testimony, in response
to a question from the prosecutor, you said that that person
who was inside the car was a waiter at Soopsok; is that
correct?

MS. MacCABE:  Objection, Your Honor.  Misstates
the testimony.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Well, who was the person that got hit in the car; do
you know?  Oh, I'm sorry.  I'm sorry.  I understand now.

You said the person -- later, there's a guy on
the -- in the parking lot who gets swung at.  That was a
waiter; is that correct?

A.    Yes.

97

Q.    Right.

A.    In another video.

Q.    Correct.  In one of the later videos.

But in this video, there's a guy in the car who appears to get punched.

Do you know who that is?

A.    I don't.

Q.    Had you ever met the man before who was in the car that Mr. Cho is encountering?

A.    There may have been occasions that I saw while passing by, because while working there, you know, might have.

Q.    Now, let me ask you this.  And I want you to please listen to the question carefully.  I want to make sure I express myself.

If you're standing over here where the blue circle is, were you able to see what went on between Mr. Cho and the driver of that car when it was happening?

A.    Yes, I was able to.

Q.    And how could you see from two cars away on the other side, where you've -- drew the blue circle?  How could you see?

A.    I was able to see him through the front of this car here.  And then through this side, I was able to see him swing and the door open.

Q.    Okay.  And so aside from your word, we have no proof

from these three videos that you were there; correct?

A.    Correct.

Q.    And you stayed away from Mr. Cho during this entire encounter; correct?

A.    Of course, yes.

Q.    And you couldn't hear what was being said between Mr. Cho and the occupant of that vehicle; correct?

A.    That, I wasn't able to hear.

Q.    In fact, you never actually saw Mr. Cho hit the guy inside the car; did you?

A.    I saw him beating him.

Q.    Well, how many times did Mr. Cho hit the guy in the car?

A.    Once.

Q.    And then the driver drove away; correct?

A.    Yes.

Q.    Now, Mr. Kang, as you sit here today, you have no idea what dispute existed between Mr. Cho and that driver; correct?

A.    That, I wouldn't know, no.

Q.    In other words, you don't know why Mr. Cho swung a punch at the driver of the car; correct?

A.    Correct.  I wouldn't know that.

Q.    All right.  And it could have been for any reason unrelated to the karaoke business and the doumi business;

correct?

A.    However, because I was aware this person is one of the drivers, so I believe it must have something to do with those.

Q.    But you don't know for a fact?

A.    Correct.

Q.    Now, you were part of a group chat on Kakao; correct?

A.    Yes.

Q.    And tell us why you joined a group chat on Kakao.

A.    Because D.K. invited me.

Q.    Right.

      And the reason he invited you was so that you could be part of a community of doumi drivers who shared information online; correct?

A.    It wasn't exactly the kind of group chat that was initially created for that reason.

Q.    But you shared information on that group chat with other drivers; correct?

A.    Rather than that, it's kind of a chat room D.K. would use to let us know his rule one-sidedly; "Do this, and don't do this."

Q.    So Mr. Cho would tell you and the other drivers on this -- on this group chat what you should do; correct?

A.    Yes.

Q.    And you, in your turn, would share information with the

group that you thought would be helpful to them; correct?

A.    No.

Q.    Did you ever post any information on the group chat?

A.    No.

Q.    Did you ever participate in the group chat by sending any transmissions of your own?

A.    No, I haven't.

Q.    All right.  I'm going to ask you to take a look at -- there's a small three-ring binder in front of you.  And there's an exhibit -- there's a small one.  Do you see that? There you go.

        If you look at the second page, it says "Group 21" at the top.  It's a -- it's a set of chats.

        Do you have that in front of you?

A.    Yes.

Q.    All right.  Mr. Kang, is this an example of a group text sent to Group 21 on Kakao?

A.    Yes.

Q.    And at the top, there's a paragraph that describes the names or the monikers of the participants.

        Do you see that?

A.    Yes.

Q.    And you're listed on there as "Queen"; correct?

A.    Yes.

Q.    All right.  Did you receive and review the text that

you're looking at on what's been marked as Defense Exhibit 201?

A.    Yes.

MR. WERKSMAN:  All right.  Your Honor, we'd move to --

MS. MacCABE:  I don't have a copy.

MR. WERKSMAN:  Oh.  We gave that yesterday.  I'm sorry.  That's 201.  I'm sorry about that.

MS. MacCABE:  No worries.

MR. WERKSMAN:  Do we have a second copy.

THE INTERPRETER:  If I may, Your Honor, this may be a good time.  Is it okay?

THE COURT:  I'm sorry, what do you need?

THE INTERPRETER:  I just want to get your permission to ask Mr. Werksman to speak little bit slowly and clearly and give me short segment at a time.  Would it be possible?

THE COURT:  That would definitely be possible.

THE INTERPRETER:  Thank you, Your Honor.

MR. WERKSMAN:  Absolutely.

THE COURT:  Mr. Werksman, if you could please adjust your microphone a little bit to make sure that the interpreter who is assisting the Korean-language-speaking witness to hear you clearly and slow down a little bit, which will help the court reporter too.

MR. WERKSMAN:  Absolutely.  I apologize for any inconvenience.

THE INTERPRETER:  Thank you, Counsel.

MR. WERKSMAN:  Exhibit 201, move to introduce.

MS. MacCABE:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.   All right.  I'm going to ask you to look at the next page in your three-ring binder.

Oh, can we just go back to 201 for a second.  I apologize.  Go back to the previous one.

Did you write any of the messages that are in this group chat on page -- the exhibit that's 201?

A.   You mean in this page only?

Q.   Correct.

A.   Not in this page.

Q.   Okay.  Then let's go to the next one.

The next one contains a message that you sent out at the top; doesn't it?

THE COURT:  Are you referring to 202?

MR. WERKSMAN:  Yes, 202.

THE WITNESS:  Yes.

BY MR. WERKSMAN:

Q.   Okay.  So you sent the message that says there, "Please do not hire her, name Lucinda"; correct?

A.    Yes.

Q.    And that was published on the group chat that Mr. Cho had invited you to join; correct?

A.    Yes.

        MR. WERKSMAN:  Move to admit Exhibit 202 and publish to the jury.

        THE COURT:  Any objection?

        MS. MacCABE:  Your Honor, objection.  This is still hearsay.

        THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Why did you issue this admonition, "Please don't hire her"?

A.    I was letting other drivers know that -- because it says here she sold drug at the studio.  So she might be dangerous.  So do not hire her.

Q.    Okay.  So in other words, you were alerting all the members of the group chat that Mr. Cho invited you to join that you should stay away from a particular doumi because she was caught selling drugs at Recital; correct?

A.    Yes.

Q.    And did you get responses from the other members of the group chat?

A.    No.

Q.    Did D.K. Cho respond?

A.    No.  No.

Q.    Well, if you look down in the middle of the exhibit, do you see a transmission from D.K.?

        I didn't hear an answer.  I'm sorry.

A.    Yes.  Yes.

Q.    All right.  And he says, "What company she works for?"

        MS. MacCABE:  Objection, Your Honor.  Hearsay.

        THE COURT:  Sustained.

        MR. WERKSMAN:  Your Honor, I'm not offering for the truth.  I'm offering it for --

        THE COURT:  For what?

        MR. WERKSMAN:  Can we approach?

        THE COURT:  Sure.

        One moment, ladies and gentlemen.

        *(The following was held at the bench:)*

        MR. WERKSMAN:  Your Honor, the witness testified that he got nothing of value from his relationship with D.K. Cho and that Mr. Cho used the social chat to just tell people what they could and couldn't do.  This impeaches him because he was a willing participant in exchanging important information to the group.  I'm not introducing this to prove that Lucinda is a drug dealer.  But his participation is relevant.  He's acknowledged it.  He wrote this text.  It's his words.  And he's available for cross-examination.  So I would seek to introduce this exhibit and its contents

because he can vouch directly for these statements.  He is the declarant, and he's on the witness stand.

THE COURT:  He is.  But the document includes your client's statements, which are hearsay.  And that's what you just asked him for.  On -- the last question you asked was about your client's statement, not his own statement.

MR. WERKSMAN:  All right.  Well, we could leave that out.  But I would still renew my request to introduce his own statements.  I could redact the part of the exhibit that contains Mr. Cho's remarks, if the Court finds them to be hearsay.  But again, this is -- this is part and parcel of the government's case, is they've elicited testimony that the drivers got nothing of value and they only paid because they were afraid.  But here, we have a driver actively participating in the group chat that Mr. Cho invited him to.  And he's sharing helpful information for the -- for the group's benefit.

It's relevant.  And it's from his own words.

MS. MacCABE:  Also, this is extrinsic evidence of impeachment.  The witness already admitted to saying these things in the group chat.  But this is still hearsay.  The other witnesses would be hearsay.  I don't even know who they are.  I don't even know what the defendant is saying here.  And the time stamps don't even appear that it's a response, as you've asked the witness to say.  And it's

still -- I don't understand how this is relevant.

THE COURT:  If you want to redact everything that falls below what this witness has testified to that he stated, you can do that.

MR. WERKSMAN:  Okay.

THE COURT:  And I'll let the exhibit in, in redacted form so that only the witness's statement is visible.

MR. WERKSMAN:  Thank you, Your Honor.

In order to expedites things, may I use the ELMO, if they still call it that?  May I use the overhead -- like, just show me the exhibit -- we'll publish only the top half of the exhibit, Your Honor.

THE COURT:  Is it clear that these are statements by the witness?  Because there's two entries here.  Well, one is blocked off the top, but he has stated -- he has testified that it's his statement.  And I don't know what this is down below.  It's a symbol.

MR. WERKSMAN:  Well, I know.  I'm going to ask him about that next.

He's Queen, and that's his transmission.

THE COURT:  Okay.  Assuming the testimony comes out that way, then you can publish his statements to the jury.

MR. WERKSMAN:  So we'll cut it off right after

his -- after his statement, right about there.

THE COURT:  That's fine.

MR. WERKSMAN:  Thank you, Your Honor.

*(End of conference held at the bench.)*

BY MR. WERKSMAN:

Q.   Mr. Kang, let's go back to what you've been testifying about, the Exhibit 202 that's in front of you.

Now, you've already acknowledged that the top part, where it says, "Please don't hire her," the stuff about Lucinda, that's your transmission; correct?

A.   Yes.

Q.   And there's a time stamp to the right of it.  It's in Korean and regular letters, numbers.  It says 1051; correct?

A.   Yes.

Q.   And below it, there's another transmission in the name of Queen.  That's you; right?  Meaning you, Mr. Kang.

A.   Yes.  This is the photo of this girl I was referencing.

Q.   Right.

So what you did is you included a picture of the Lucinda that your text was about; correct?

A.   Yes.

Q.   Okay.

MR. WERKSMAN:  And now, Your Honor, with the Court's permission, we're going to admit that part of Exhibit 202, and we're going to publish it now.

THE COURT:  202 as redacted is -- according with the sidebar conference -- is admitted.

*(Exhibit 202 received in evidence.)*

*(The exhibit was displayed on the screen.)*

BY MR. WERKSMAN:

Q.   Okay.  So you give a name and a phone number.  Let's ignore the phone number.

And tell us what you're broadcasting to the group chat that Mr. Cho invited you to.

A.   This means do not hire this girl.

Q.   Why?

A.   Because it was that she sold drug at the Recital studio, and she had a lot of problems.  That's why.

Q.   Now, my question to you, Mr. Kang, is why did you think it was necessary to transmit this text message to the group chat?  What was your purpose?

A.   The purpose?  Because it seemed to me that she was a pretty dangerous girl.  So they -- they shouldn't work with her.  That's what I am going to advise them.

Q.   Now, you and the other drivers would frequently communicate about matters of common interest; correct?

A.   This kind of information was shared once in a while. Once in a while.

Q.   And you did it because you wanted to -- you wanted to

protect your business from doumi who would bring arrests, prosecutions.  That would be bad business; right?

A.   Not necessarily for such a purpose.  Just -- it wasn't for that purpose.

Q.   Well, you didn't think that bringing a drug dealing doumi to the karaoke clubs would cause a problem?

A.   That's not what I thought.

Q.   Now, Mr. Cho, he facilitated this group chat so that you could share information like that; correct?

A.   Yes, that.  As well as he had a purpose of telling other drivers his own rules.

Q.   And you participated in the group chat voluntarily; correct?

A.   Not voluntarily, no.

Q.   Were you forced to tell everybody not to hire Lucinda? Did somebody force you to post that text?

A.   It's not that anybody forced me to do it.

Q.   Okay.  So you weren't forced to do it; right?

A.   Correct.

Q.   Okay.  And you wanted to be part of a community of doumi drivers that protected the business; correct?

A.   Yes.

Q.   Thank you, Mr. Kang.

         MR. WERKSMAN:  I have no further questions.

         THE COURT:  Redirect?

MS. MacCABE:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. MacCABE:

Q.    In the videos that we watched earlier from Soopsok, do you know why the defendant swung at the waiter who you mentioned?

A.    Yes.

Q.    Why?

A.    He punched that driver because he had previously told him, "Do not call that company," but they called the company.  That's why he did.

Q.    For my own clarification, are you saying that the defendant told the waiter of the karaoke not to call the driver of the driving company?

A.    Yes.

Q.    And because the defendant thought that the waiter had called that driver, he swung at the waiter?

A.    Yes.

Q.    In the text messages that we just looked at, you did not want the doumis who you were driving to be selling drugs?

A.    Correct.  I did not want it.

Q.    And finally, is it your understanding that the defendant created the chat room to share information or to enforce his bans on karaokes and drivers?

MR. WERKSMAN:  Objection.  Calls for speculation.  No foundation.

THE COURT:  Overruled.

THE WITNESS:  Because he wanted to ban certain studios.

MS. MacCABE:  Thank you.

No further questions.

THE COURT:  Any recross?

MR. WERKSMAN:  No.  Thank you, Your Honor.

THE COURT:  All right.  Is the witness excused?

MS. MacCABE:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Sir, you are excused.  Thank you.

THE INTERPRETER:  Do I need to stay here?

THE COURT:  For the record, the last witness was assisted by the Korean language -- the certified Korean language interpreter we had yesterday.

Government, you may call your next witness.

MR. BUTLER:  The government calls HSI Special Agent Jason Collins.

THE INTERPRETER:  I'm kind of slow.  Sorry.

THE CLERK:  Good morning.  Please stand before me.  Raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth,

112

the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.

You may be seated in the witness stand.  You can sit in either chair.

Please state and spell your full name for the record.

THE WITNESS:  Jason Leonard Collins; J-A-S-O-N, L-E-O-N-A-R-D, C-O-L-L-I-N-S.

THE COURT:  Would you mind just either rolling up to or adjusting the microphone to make sure you can be heard.

THE WITNESS:  Is that better?

THE COURT:  Much.  Thank you.

Counsel, you may inquire.

**DIRECT EXAMINATION**

BY MR. BUTLER:

Q.   Good morning, Agent Collins.  Can you introduce yourself to the jury?  Just tell them what you do for a living.

A.   Again, Jason Collins.  I'm a special agent with Homeland Security Investigations.  And I'm a member of the Special Response Team which is essentially the SWAT team for our agency.

Q.   How long have you been a special agent?

A.    Since 2008.

Q.    And how long have you been on the Special Response Team?

A.    Since 2011.

Q.    Can you briefly describe some of your training as a special agent?

A.    Oh, as a special agent, we attend approximately six months of training in Georgia at the Federal Law Enforcement Training Center.  Half of that is for general investigations, and the second half is specifically for Homeland Security investigation-centered investigations.  So learning my particular job.  And then we have on-the-job training once you complete that.  And then once you get into a certain discipline, you'll have trainings within that as well.  So it's an ongoing training.  You always . . . .

Q.    And how about any special training as part of the Special Response Team?

A.    So initially, you have three weeks of training, also in Georgia, for Special Response Team.  That involves tactics, firearms, and different special tools that we utilize.

       We come back and we have in-service training once a year, which is about one week long.  And then we train every other Monday, so about eight hours a pay period.

Q.    Were you working an operation on March 16the, 2023?

A.    Yes.

114

Q.    What was that operation?

A.    We were assisting the HSI Los Angeles office, their Special Response Team.  Several agents from our office, San Francisco, came down to Los Angeles to assist with an operation down here.

Q.    Were you involved in the underlying investigation at all?

A.    No.

Q.    Do you recall whose property you were at that day?

A.    I don't recall the name.

Q.    Can you -- do you have a memory of the location itself?

A.    All I recall is it was a single-story house off of a main street.  It had a fence around it.  And it was expected to be occupied by one Asian male.  That's about what I remember.

Q.    And what time did the operation occur?

A.    I'm not sure if it was nights or not.  So either 6:00 a.m. or 7:00 a.m.

Q.    And was it well-lit at the time?

A.    I think the sun was probably just coming up, but there were streetlights in the area that kind of lit the area up for us.  So it was -- it was well-lit.

Q.    And can you describe just what occurred at the residence that day during the operation?

A.    Sure.

So we arrived at the location, the full team.  We had several vehicles there.  We positioned ourselves in front of the house.  And I took a position to the -- if you were facing the house, the left side.  So looking down the left side of the house, we call that the two side.  Front side is to one side, two, three, four.  So my assignment was the one-two corner.  So I was in the corner of the house at a fence, on a ladder, looking over the fence, down the side of the house.

So my role was to observe that for any activity while they conducted what is called a "knock and announce" at the front of the house.  So we usually have a loudspeaker.  They're knocking on the door.  There are lights going.  And they'll say, you know, "Residents of so-and-so house, this is the police.  Come out."  So they're doing that over and over again, over a loudspeaker.  And my job is to watch that two side of the house for any activity.

Q.    And is there any radio communication between you and other agents or officers during this?

A.    Not myself.  There is during the operation, yes.  I had a partner with me.  So when I see something, I make an observation, I call it out, and they would put it out over the radio or convey that to the team leader.

Q.    Thank you.

Do you have any specific memory of what you saw

that day?

A.    Yes.

Q.    Can you describe it for the jury?

A.    Sure.

So while I was observing the two side of the house and the knock and announce was going on, a window opened, and a head came out.  They were starting to come out of the window.  And I called out to them to show me their hands.  And at that point, they looked, and they ducked back into the window.  I think at one more occasion I may have saw them, like, kind of look out the window again, and I called it out.  But they never came back out.

Q.    Did you do anything else in response, other than announce yourself?

A.    No.  I announced myself.  Told them to show me their hands.  And they went back inside.

MR. BUTLER:  On one second, Your Honor.

BY MR. BUTLER:

Q.    Did you relay that information of what you saw to your partner?

A.    Yes.

MR. BUTLER:  No further questions, Your Honor.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

117

BY MS. SOSA:

Q.   Good morning, Agent Collins.

A.   Good morning.

Q.   You said that this operation might have happened around 6:00 a.m., 7:00 a.m.

Do you recall what time the operation was?

A.   The exact time, no.  We -- so typically, we have a set time of 7:00 a.m.  That's when operations can occur. Sometimes we get what's called "night service."  And that allows you to operate earlier.  And I can't recall which time it was.

MS. SOSA:  Just a moment, Your Honor.  I apologize.

BY MS. SOSA:

Q.   Would it refresh your recollection to review the report regarding the operation?

A.   Sure.

MS. SOSA:  May I approach?

THE COURT:  Yes.

THE WITNESS:  Thank you.

BY MS. SOSA:

Q.   When you're finished reviewing, let me know.

A.   Ah, much earlier.  So the night service --

Q.   Oh, sorry.

THE COURT:  There's no question pending.  Just

wait for her to ask you another question.

BY MS. SOSA:

Q.    Does that refresh your recollection?

A.    Yes.

Q.    What time was the operation?

A.    It was approximately 0400 hours, so 4:00 a.m.

Q.    When you arrived, was -- were there any signs of activity in the house?

A.    Not that I recall.

Q.    And when you entered, if you could tell, did it appeared that the defendant had been sleeping?

A.    I did not enter.

Q.    Okay.  Were there any lights on in the house?

A.    When?

Q.    When you arrived.

A.    When I arrived.  I personally did not observe any lights on.

Q.    So you saw the defendant, you said -- well, you saw a person, a head, look out the window on the side of the house.

A.    Correct.

Q.    All right.  And that -- did that person appear to be looking to see what was going on outside his house?

A.    No.

Q.    Did that person leave the house through the window?

A.    No.

Q.    How many officers arrived for this operation?

A.    I'm not sure.

Q.    Can you give us an approximation?  Are we talking about three officers, more than --

A.    At least 12.

Q.    And approximately how many vehicles?

A.    I'm not sure.  I would say at least three to four were in front of the residence.

Q.    Where those all, what I would call, like, a four-door sedan, or were any of them -- I've heard them called "Bearcats."  Were any of them larger SWAT vehicles?

A.    I would say there was probably at least one larger SWAT vehicle.

Q.    And of the least 12 officers who were there, how many of you were wearing body cameras?

A.    I'm not sure.

Q.    Were you?

A.    I was not.

Q.    Was your partner?

A.    No.

Q.    Can you tell us of anybody that you know that was wearing a body camera?

A.    I'm not aware of anyone that was wearing a body camera.

Q.    So there's no recording of your arrival and entry at

120

this house?

A.   I can't answer that.

Q.   Have you seen one?

A.   Have I seen one?  No.

Q.   And you said you're not aware of anyone wearing body cameras; is that a matter of policy, or was that special for this case?

A.   As policy, right now, HSI special agents are not wearing body-worn cameras.  I believe they're being tested. But we also sometimes work with local law enforcement who provide support, and they often have body cameras.  That's why I'm saying I'm not sure.

So if they were in perimeter, there may be video. If they were out of perimeter, there may not be video of the actual arrival.  I couldn't answer that.

Q.   But you're not aware of any existing?

A.   Not that I'm aware of.

MS. SOSA:  No further questions, Your Honor.

THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MR. BUTLER:

Q.   Agent Collins, you said on cross that it did not appear that the individual looking out the window was trying to see what was going on outside of his house.

What did it appear he was doing?

A.   So in my opinion, when we knocked and announced in the front of the house, all activity is there, when you're trying to determine what's going on, you will look in that direction.  When the head came out, he looked in the opposite direction.  So it looked to me that they were looking just for an avenue to get out.

Q.   And it sounds like, based on the report, that this occurred earlier than what you thought it might have.

Does that change your testimony or memory as to the well-lit nature of the environment?

A.   No, it does not.

Q.   And does it -- does the time change alter your memory or testimony as to someone peering out the window and looking the opposite way?

A.   No, it does not.

MR. BUTLER:  No further questions.

THE COURT:  Any recross?

MS. SOSA:  No.

THE COURT:  All right.  Is the witness excused?

MR. BUTLER:  Yes, he is, Your Honor.  Sorry.

THE COURT:  All right.  Sir, you're excused. Thank you.

THE WITNESS:  Should I leave the exhibit?

THE COURT:  You can maybe take that back to counsel.

122

All right.  Government, you may call your next witness.

MR. BUTLER:  The government calls Ki Young Jung.

THE CLERK:  Good morning.  Please stand before me, and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may be seated in the witness stand.  You may sit in either chair.

THE WITNESS:  Okay.  I want you to be close to the microphone, and I will need you to speak directly into it.

And please state and spell your full name.

Ki Young Jung.

THE CLERK:  Spell it for me, sir.

THE WITNESS:  K-I Y-O-U-N-G; last name, J-U-N-G.

THE COURT:  You may inquire.

**DIRECT EXAMINATION**

BY MR. BUTLER:

Q.   Good morning, Mr. Jung.

What do you do for work?

A.   I work at a karaoke.

Q.   What kind of karaoke?

A.   It's called Concert Karaoke.

Case 2:23-cr-00149-FLA    Document 150    Filed 02/18/25    Page 123 of 188    Page ID #:2031

123

Q.   Is that a bar?

A.   Yes.

Q.   What neighborhood is that located in?

A.   I'm sorry?

Q.   What neighborhood is it located?

A.   It's in Koreatown, Los Angeles.

Q.   How long have you been doing that?

A.   For the Concert, I've been working there for past three years.

Q.   How long have you been in the industry, generally?

A.   For about six years.

Q.   Does Concert serve alcohol?

A.   Yes.

Q.   Does it accept credit card?

A.   Yes.

Q.   Does that alcohol include hard liquors, such as tequila or whiskey?

A.   Yes.

Q.   The answer is "yes"?

A.   Yes.

Q.   Do you ever have customers at the bar from outside the United States?

A.   Yes.

Q.   What is your current immigration status?

A.   Illegal alien.

124

Q.    How long have you been in the United States?

A.    About 21 years.

Q.    Do you know someone with the nickname D.K.?

A.    Yes.

Q.    Do you see him in the courtroom today?

A.    Yes.

Q.    Could you identify him based on where he's sitting and what he's wearing, an article of clothing?

A.    Can I point at him?

Q.    Yes.

A.    He's right there (indicating).

        MR. BUTLER:  May the record reflect that the witness has identified the defendant?

        THE COURT:  Yes.

BY MR. BUTLER:

Q.    When did you meet him?

A.    About six years ago, when I first started at the karaoke as a waiter.

Q.    How did you meet him?

A.    He would often come there to drink, and other stuff describe me about him.

Q.    What did you know about him?

A.    The staff over there explained him that he's infamous for violence and controlling all the agencies.

        MS. SOSA:  Objection, your Honor.  Move to strike.

Hearsay.

THE COURT:  Let me see counsel at sidebar.

*(The following was held at the bench:)*

THE COURT:  All right.  There's a hearsay objection.  What's the government's response?

MR. BUTLER:  One of the elements is fear.  The reason he started paying is because what other people told him about the defendant's not only reputation for violence, but his willingness and ability to carry out those threats of violence.  He started paying him soon after.  His reputation is what caused him to pay him.

MS. MacCABE:  Prior 404(b) ruling.

THE COURT:  I see.  All right.

Then it's also offered for state of mind as to the witness?

MR. BUTLER:  Correct, Your Honor.

MS. SOSA:  Just for clarification, we didn't have a prior 404(b) ruling about what he's saying other people told him about.

THE COURT:  No.  But it's being offered as to the state of mind and as to the fear and the factors the government just described.

All right.  It's overruled.

MR. WERKSMAN:  Could the Court give a cautionary instruction to the jury as to why this is admissible because

the jury has just been told everyone thinks our client's a violent thug.  It's extremely prejudicial without the context that it's not offered for the truth.

THE COURT:  I'll do that.

MR. WERKSMAN:  Thank you.

MS. SOSA:  Thank you.

*(End of conference held at the bench.)*

THE COURT:  All right.  The last objection was overruled.  Ladies and gentlemen, you may consider the answer for purposes of evaluating the witness's state of mind as to the effect that it had on him and not as to the truth of the actual statement.

You may ask your next question.

MR. BUTLER:  Thank you, Your Honor.

BY MR. BUTLER:

Q.   At some point, did you start paying the defendant?

A.   Yes.

Q.   Why?

A.   Because he threatened that if we don't pay, we'll lose business, and he will do something to us.

Q.   What did you understand "do something to you" to mean?

A.   Physical harm.

Q.   Did the defendant ever threaten you?

A.   Yes.

Q.   What did he threaten to do?

A.    That if I don't comply with what he says, like, basically same thing, he will make sure that we lose business, that I will no longer able to work, and he will, you know, do something to me.

Q.    How much did the defendant tell you that you needed to pay him?

A.    It started from -- the amount was -- it started from $500.

Q.    And how often were you supposed to pay him?

A.    It was every month.

Q.    Was the defendant providing any service for you in exchange for that money?

A.    No.

Q.    Was that in cash, that you paid him?

A.    Sometimes I would pay him Venmo or cash.

Q.    Can you turn in your binder in front of you to what's been marked as Government's Exhibit 30.

A.    Yes.

Q.    Do you recognize what's been marked as Government Exhibit 30?

A.    Yes.

Q.    What are they?

A.    It's a payment that I made to him every month through the Venmo transaction.

Q.    Are those the Venmo payments that you were just

referring to?

A.    I'm sorry?

Q.    Are those the Venmo payments that you were just referring to?

A.    Yes.  Yes.

          MR. BUTLER:  Your Honor, at this time, the government would seek to admit Exhibit 30 and publish for the jury.

          THE COURT:  Any objection?

          MS. SOSA:  No objection.

          THE COURT:  All right.  30 is admitted.

          You may publish.

          *Exhibit 30 received in evidence.)*

          MR. BUTLER:  One moment, Your Honor.

BY MR. WERKSMAN:

Q.    Now that Exhibit 30 is on the screen for the jury.

          Again, are these the 600-dollar payments that you were making to the defendant?

A.    Yes.

Q.    Why is one of these payments for only $400?

A.    That -- as far as I remember, that time, businesses was slow.  So I told him I cannot make any payment.  So he said only then pay 400.

Q.    Did you ever impose a -- did defendant ever impose a ban on you?

A.    I'm sorry, "impose a ban"?

Q.    Yeah.

A.    Like what --

Q.    Where you were not allowed to have certain drivers come to your --

A.    Yes.

Q.    Do you know why he imposed a ban on certain drivers?

A.    I do not know.

Q.    What would he tell you about the ban?

A.    Well, he told me that I should not take them, or just he will threaten me to listen to him and comply with him.

Q.    What would happen if you allowed a banned driver to come to your bar?

A.    Then he will try to shut our business down and then do a physical harm on our staff.

Q.    You mentioned that when you started in the industry, you heard about defendant's reputation.

      Did you know which gang he was purported to be in?

A.    Black gang.

Q.    Do you know which one?

A.    Grape Street.

Q.    Did you ever personally witness the defendant threaten anyone else other than yourself?

A.    Yes.

Q.    When?

A.    It was -- it was around five years ago at the place called Chatterbox.

Q.    Can you tell the jury what happened that night?

A.    I was there with the owner of Chatterbox.  And then at that time, there was some issues with D.K. and -- as far as no other party of gang.  So I was there.  And then the owner didn't wanted to open up the place because he thought something was going to happen.  And D.K. showed up, and he threatened the owner that he must open up his karaoke or, if not, it will look -- it will make him look weak.  And owner keep resist.  He said he doesn't want to open up because he knows if he does, something's going to happen.  And then he pulled out his gun at the owner.

Q.    When you said "he pulled out his gun," who are you referring to?

A.    D.K. pulled out a gun at the owner.

Q.    Did he point the gun at the owner?

A.    Yes.

Q.    Did the owner open the bar at that point?

A.    No, he did not.

Q.    Did you ever see the defendant with a gun at any other time?

A.    Yes.

Q.    When was that?

A.    It was when I worked at a karaoke called Eight.  And

then there was some random guy, came to our store, on the first floor.  He was yelling D.K. was in the store.  And then he had arguments with him.  And then D.K. told me that he's going to -- he's going to shoot him.  So I stopped him.  And then that time, he had a gun in his pocket.

Q.   Did he show you the gun?

A.   I saw the gun in his pocket.

Q.   What happened with the argument between him and the other man?

A.   Oh, the other man just left, and nothing really happened afterward.

Q.   Did the defendant ever make a special request to you to use your bar for anything?

A.   I'm sorry.  Can you say one more time?

Q.   Did he ever ask you to shut off surveillance so he could bring people to the bar?

A.   Yes.

Q.   Can you tell the jury about that incident?

A.   So it was -- it was my day off.  Around midnight, he called me, and he asked me if there was a certain name of customer was inside our bar.  So I checked with the staff.  And the customer was inside.  And then he told me, "Whatever happens tonight, do not call the police, and open up the -- open up the door so I could bring my people inside."

Q.   Did you do that?

132

A.   No.

Q.   What happened?

A.   What happened was he was -- keep telling me to open up the door so his people could go in and he could handle his gang business with inside.

Q.   Did you open up the doors?

A.   No.

Q.   After that incident, did you hear from the defendant?

A.   Yes.

Q.   What did he say?

A.   He said, "You're done."

Q.   What did you understand that to mean?

A.   Like, our business is done, and he will eventually, like, do something to me.

Q.   Did you stop paying him at that point?

A.   After a short period of time.

Q.   Why did you stop paying him?

A.   Because I thought it was meaningless to pay him because he will eventually do something to me.

Q.   So after he told you you were done, you stopped paying him?

A.   Yes.  Yeah, a short period after that.

Q.   Did you ever hear anything else about the defendant in your business?

A.   I'm sorry?

Q.    Did you ever hear that the defendant was looking for you?

A.    Yes.

Q.    Did you ever have anymore interactions with him, though?

A.    He would often text message that if he ever see me in K-Town, he's going to do something to me.

Q.    Can you turn in your exhibit now to what's been marked as Government's Exhibit 83.

      Do you recognize those?

A.    Yes.

Q.    What are they?

A.    It's a text message he sent me.

Q.    Did you take screenshots of these text messages and provide them to law enforcement?

A.    Yes.

      MR. BUTLER:  At this time, the government would move Exhibit 83 into evidence and publish for the jury.

      THE COURT:  Any objection?

      MS. SOSA:  No objection.

      THE COURT:  83 is admitted.

      You may publish.

      (Exhibit 83 received in evidence.)

BY MR. BUTLER:

Q.    So on the screen now, are these all messages from the

defendant to you?

A.   Yes.

Q.   I'm going to ask you to just explain to the jury what you understood them to mean.

At the top it says, "Okay.  Stay away from Brian Crystal."

What did you understand that to mean?

A.   So he's a driver.  So it meaning that we should not -- he's referring that as ban this driver.

Q.   And then how about Ricky, David, Kim?

A.   That's also -- those guys were the other gang involved at the period of time.

Q.   What about Santos and Mikey Autum, et cetera?

A.   I think that's the name of him.

Q.   And then "Blue banned too"?

A.   Yeah.  That's the -- a -- the driver.

Q.   And then how about "Company friends banned for good"?

A.   Yeah, that's too.

Q.   Another company?

A.   Yeah, another company.

MR. BUTLER:  Can we go to the next page.

BY MR. BUTLER:

Q.   On page 2, are these still messages from the defendant to you?

A.   Yes.

135

Q.   And what did you understand "He's a snitch" to mean?

A.   I think he was talking about one of the companies, the van driver.

Q.   Do you know what being a "snitch" meant?

A.   It means he's on the other side of him.

Q.   And then how about at the bottom here, where he says, "I better not see you in K-Town, bitch," what did you understand that to mean?

A.   That he's going to do physical harm to me if he ever sees me.

Q.   During the years that you were paying him, did the defendant ever do anything for you or your club?

A.   Not to me.

Q.   Sorry.

        Did he ever do anything for you?  Did he provide --

A.   No.  No, no, no, no.

Q.   Before this case, did you ever report any of the defendant's actions to the police?

A.   Yes, I did.

Q.   Did you say that you only wanted to do it if it was anonymous?

A.   Yes.

Q.   Did they tell you that that wasn't possible?

A.   I'm sorry?

Q.   Actually, strike the question.

MR. BUTLER:  No further questions, Your Honor.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MS. SOSA:

Q.   Good morning.

You just testified that Mr. Cho told you -- and you said this a couple times -- that if you didn't pay, you would lose business.

A.   Yes.

Q.   And you absolutely did not want to lose business; correct?

A.   Yes.

Q.   All right.  And you said that Mr. Cho provided no benefit to your business, which was Concert Karaoke; right?

A.   Yes.

Q.   Isn't it true that Mr. Cho would send his drivers who were in the association to Concert to bring girls; isn't that what he did?

A.   It's not his driver.

Q.   But the association, you know about the -- drivers were paying him too, right?

A.   Yes.

Q.   And they called that "The Association," right?

A.   Well, I don't know.

Q.    Have you heard that before?

A.    I don't -- I don't know they were calling themselves as association.

Q.    Have you heard that phrase "The Association" in relationship to D.K. before?

A.    Yes.

Q.    Okay.  And so drivers who were involved with D.K., let's put it that way --

A.    Uh-huh.

Q.    -- he would send them to Concert; correct?

A.    It's not D.K. would send them.  We -- our staff would contact him independently if he were needed.

Q.    And they would come to you if you were paying D.K.; right?

A.    So they will only come to us if we're paying to D.K.; is that your question?

Q.    Yes.

A.    No.

Q.    Okay.  They stopped coming to you when you stopped paying D.K.; right?

A.    Some of the drivers still would came to our Concert.

Q.    But most stopped?

A.    Yes.

Q.    And isn't it true that Mr. Cho made sure that -- so these drivers are bringing girls --

A.    Yes.

Q.    -- to Concert.

A.    Yes.

Q.    And isn't it true that Mr. Cho made sure that these girls weren't creating problems; for example, bringing drugs into the club?

A.    No.

Q.    Okay.  Were these girls bringing drugs into the club?

A.    I do not know.

Q.    How many times have you practiced your testimony before today?

A.    One time.

Q.    Just once?

A.    Yes.

Q.    So everything you said to us today, you've only ever said that once before?

A.    Yes.

Q.    You are friends with Yun Soo Shin; correct?

A.    I know him.

Q.    And his partner, June Lee; right?

A.    June Lee?

Q.    Yes.

A.    I do not know him.  June Lee?  Who's June Lee?

Q.    Do you know who Yun Soo Shin used to drive with for Plus?

A.   Yes.

Q.   Who is that?

A.   He's -- what I know, his name is Man Man.

Q.   Man Man?

A.   Uh-huh.  But I don't know his real name.

Q.   Okay.  And you're also friends with Young Nae Kim?

A.   Yes.

Q.   All right.  And you know that all three of them have come and testified before the jury already; right?

A.   Yes.

Q.   Young Nae testified earlier today; right?

A.   Yes.

Q.   And you know that Yun Soo and his partner -- you know that his partner testified yesterday; right?

A.   I do not know that.

Q.   Okay.  But you know that Yun Soo testified today?

A.   Yes.

Q.   When's the last time that you spoke to Yun Soo?

A.   Over years ago.

Q.   Over years ago?

A.   Yeah.

Q.   How did you know that they testified today?

A.   I'm sorry?

Q.   How did you know that they testified today?

A.   I heard from other people.

Q.    Who did you hear from?

A.    I heard it from my friend.

Q.    Okay.  So Yun Soo had contacted your friend?

A.    No.  I heard it from my friend that -- who's actually coming out tonight -- today.

Q.    Who is that?

A.    My friend?

Q.    Yes.

A.    His name is Larry.

Q.    Okay.  So between Larry or other friends, you and Yun and Young Nae have all talked about the fact that you're involved in this case; right?

A.    No.

Q.    You all know that one another are involved in this case; correct?

A.    So I only talked to Young Nae.  I did not talk to Yun Soo about this.

Q.    So you and Young Nae have talked?

A.    Yes.

Q.    And you've talked about what each of you is going to say?

A.    No.

Q.    Okay.  So what do you talk about?

A.    Just that we're going to -- we're going to testify.

Q.    Okay.  You have known for a long time that Yun Soo --

excuse me -- yes -- Yun Soo was working with the police against D.K.; correct?

A.    No.

Q.    When did you first find out that he was working for police against D.K.?

A.    Not till this moment.

Q.    Right now?

A.    No, I mean I do not know that he worked with the police law enforcement.

Q.    You knew that he made a report against D.K.; correct?

A.    I do not know that he made a report.

Q.    Okay.  You know that -- well, let me put it this way.

      You did not go to police as yourself, not anonymously, but as yourself.  The first time you did that was in July of 2023; correct?

A.    I'm sorry?

Q.    The first time that you made a report to police as yourself, using your name, was in July of 2023; correct?

A.    I went to -- the first time that I went to the police -- the police station to make a report about him, it was the right next day of that incident where he threatened me to cut off the surveillance.

Q.    And when was that?

A.    That was, as far as I remember, around March 2022.

Q.    And was that anonymous?

A.    Yes, it was anonymous.

Q.    So my question, then, is -- we understand you went to the police.  You wanted to be anonymous.

A.    Uh-huh.

Q.    But you decided to become involved using your name in this case in July of last year; right?

A.    The first time -- July.  I don't really remember the exact date.

Q.    Okay.  Does that sound about right, last summer?

A.    I don't really remember.

Q.    That's the first time that you met Special Agent Choi who is sitting here at the table?

A.    I don't -- I don't exactly remember the exact date when I first spoke to him.

Q.    Okay.  Would it refresh your memory to see a report about that conversation?

A.    Yes.  I mean, yeah.

        MS. SOSA:  May I approach, Your Honor?

        THE COURT:  Yes.

BY MS. SOSA:

Q.    Just read the first couple paragraphs to yourself, and let us know when you're finished.

A.    Highlight it or everything?

Q.    Just read to yourself quietly.

A.   Oh, okay.

Q.   And let me know when you're finished.  Just the first two or three paragraphs.

A.   Yes.

Q.   Does that refresh your recollection --

THE COURT:  All right.  Counsel, why don't you come and retrieve the document.

MS. SOSA:  Okay.

BY MS. SOSA:

Q.   Does that refresh your recollection that the first time you spoke with Mr. Choi to be involved in this case against D.K. was July of 2023?

A.   Yes.

Q.   And by that time, you already knew that Yun Soo Shin was testifying against D.K.?

A.   No.

Q.   And you already knew that Young Nae Kim was testifying against D.K.?

A.   No.

Q.   By that time, didn't Yun Soo Shin tell you that he had already received a U visa for his participation in the case against D.K.?

A.   No.

Q.   When did he tell you about that?

A.   He did not tell me anything about this.

Q.   So in July of last year, you basically decided to go along with your friends Yun Soo and Young Nae and help against -- help them against D.K.; correct?

A.   Yun Soo is not my friend.

Q.   Okay.  And Young Nae is?

A.   Yes.

Q.   Okay.  So in July of last year, you decided to go along with them to help against D.K.; correct?

A.   Yes.

Q.   And it doesn't help them if you testify that you paid D.K. voluntarily because it was good for business.  That wouldn't help Young Nae, for example; would it?

A.   I did not pay D.K. voluntarily.

Q.   Do you know Officer Felipe Pardo with LAPD?

A.   Yes.

Q.   How do you know Officer Pardo?

A.   Officer Pardo was the first officer that I met when I went to the LAPD to make a police report on him about the incident where he called, threatened me to cut off the surveillance.

Q.   Okay.  Officer Pardo works Koreatown VICE; correct?

A.   Yes.

Q.   All right.  And you've been in this business for several years, so you know that Officer Pardo and officers working with him will often come out to the clubs and see

145

what's going on; right?

A.   What do you mean by "come out to the club"?

Q.   They'll come to the karaoke clubs; right?

A.   For his job?

Q.   Right.  Yes.  Yes.  I apologize.  Yes, as part of his job, he will come to see what's going on?

A.   Yes.

Q.   Okay.  And sometimes when the officers come around, waiters or doumi girls or drivers might get citations; correct?

A.   Yes.

Q.   And they might get tickets?

A.   Yes.

Q.   The club itself might get a citation if there's some kind of violation; correct?

A.   Yes.

Q.   And this can have -- I mean, this isn't -- this is not good for business; right?

A.   Yes.

Q.   It makes customers nervous?

A.   I do not know of that.

Q.   It makes club owners nervous?

A.   Yes.

Q.   Partly because you might lose your liquor license; correct?

Well, do you have a liquor license?

A.   Yes.

Q.   Okay.  And you might lose it if LAPD officers are coming around and you're getting citations?

A.   I do not know.  That's not the reason of making us nervous.

Q.   What's the reason making you nervous?

A.   It's just if -- it's if they come, it's something experienced that we've never experienced before.  That's why we're nervous.

Q.   Okay.  Officer Pardo knows that you're involved in this case against D.K.; right?

A.   Yes.

Q.   And he has -- you and he have spoken about that; right?

A.   Yes.

Q.   And he's told you that if you are involved in this case against D.K., he's going to lift up a little bit on Concert; right?

MR. BUTLER:  Objection, Your Honor.  Hearsay.  Calls for hearsay.

MS. SOSA:  It's not offered for the truth of the matter.  It's motive to lie.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Sorry, can you say it one time?

BY MS. SOSA:

Q. Yes.

Officer Pardo has told you that if you go through with this case against D.K., that he'll kind of cut you a break at Concert; correct?

A. What do you mean by "cut you a break"?

Q. What -- well, what would that mean to you? If Officer Pardo were going to cut you a break, what might that look like? Maybe come around less often? Would that cut you a break?

A. I'm sorry?

Q. Let me rephrase the question.

A. Yeah.

Q. Officer Pardo said that he would help you out --

A. No.

Q. -- if you cooperate in this case D.K..

A. No. No.

Q. Okay. Did he express that he would visit Concert a little less often?

A. No.

Q. All right. He's not going to ticket your waiters as much?

A. No. He never said anything like that.

Q. All right. What did he say he would do in exchange for your cooperation in this case against D.K.?

A.    Nothing.  We didn't have any kind of conversation like that.

Q.    But you have talked about the fact that you're doing this?

A.    Yes.

Q.    All right.  You stopped paying D.K. in May of 2021; correct?  We saw that on the exhibit.

A.    Yes.

Q.    And that was almost three years ago.

      D.K. -- when you stopped paying in May of 2021, D.K. never beat you up; correct?

A.    No.  Yeah, he never beat me up.

Q.    He never assaulted you?

A.    Well, he assaulted me over the phones and through the text messages.

Q.    All right.  Well, physically, never laid a hand on you; correct?

A.    No.

Q.    So when you stopped paying D.K., nothing physical happened to you; correct?

A.    Yes.

Q.    And you kept working in Koreatown.

A.    I had to stay at home.

Q.    And you kept working in Koreatown.

A.    Not physically.

Q.    I'm sorry.

You -- did you continue to work in Koreatown karaoke after May 2021?

A.    Not physically.

Q.    "Not physically."  What does that mean?

A.    I would not be there, but I would still be involved in, like, managing the karaoke.  But myself, physically, would not be there.

Q.    Okay.  And you still, to this day, work in Koreatown karaoke?

A.    Yes.

MS. SOSA:  No further questions, Your Honor.

THE COURT:  Redirect.

MR. BUTLER:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. BUTLER:

Q.    You testified that you would pay the defendant because you didn't want to lose business.

How would you lose business because of the defendant?

A.    He would come to -- as far as I know, he would come to our karaoke, use a violent -- use violence.

Q.    Did you ever call the defendant and ask him to bring doumis or hostesses to the club?

A.    No.

Q.   Did the defendant ever call you and ask if you needed doumis or hostesses brought to the club?

A.   I'm sorry?

Q.   Did he ever call you and ask you if you needed doumis or hostesses brought to the club?

A.   No.

Q.   You just testified that after you stopped paying him, you had to stay at home.

What do you mean by that?

A.   Because I knew that he was looking for me.  And I know -- like, through the text message that he sent me, I know if he ever sees me in K-Town, he's going to do a physical harm.  So I had to stay at home.

Q.   You just testified that when you first went to police, you wanted to be anonymous.

Why did you want to be anonymous?

A.   Because I was concerned about my safety.

Q.   Is that the same reason that you paid the defendant?

A.   Yes.

MR. BUTLER:  No further questions, Your Honor.

THE COURT:  Any recross?

MS. SOSA:  No recross.

THE COURT:  All right.  Is the witness excused?

MR. BUTLER:  Yes, Your Honor.

THE COURT:  All right.  Sir, you're excused.

Thank you for being here.

We're going to take a 40-minute recess.

I remind you of your obligation not to discuss the case with anyone in any way whatsoever; that includes your fellow jurors.  And you're also not to form or express any opinion about this case until it is given to you for deliberations.

We will resume trial in 40 minutes.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

*(Recess.)*

THE CLERK:  All rise.  This United States District Court is once again in session.  Please be seated and come to order.

THE COURT:  All right.  Welcome back, ladies and gentlemen.  We will resume with the trial now.

Government, you may call your next witness.

MS. MacCABE:  The government calls Sang Heun Shin.

THE CLERK:  Good afternoon.  Please stand before me, and raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you.

You may be seated in the witness stand.

Please state and spell your full name for the record.

THE WITNESS:  S-A-N-G; H-E-U-N; S-H-I-N.

THE COURT:  All right.  The witness is being assisted by the court-certified Korean language interpreter.

Counsel, you may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Good afternoon, Mr. Shin.

A.   Good afternoon.

Q.   What do you do for work?

A.   I am doing doumi work.

Q.   Where were you born?

A.   I was born in Korea.

Q.   When did you come to America?

A.   I came over about 11 years ago.

THE COURT:  Would you mind moving the microphone just a little bit in your direction?

THE INTERPRETER:  Thank you for reminding, Your Honor.

BY MS. MacCABE:

Q.   What is your immigration status here?

A.    I am a illegal alien.

Q.    You said that you do doumi work.

Does that mean that you drive doumis or hostesses to karaoke bars?

A.    Yes.

Q.    What hours, generally, are you driving?

A.    I start doing it at 9:00 o'clock at night, and I end up my work at about 6:00 a.m. in the morning.

Q.    What neighborhood are these karaoke bars in?

A.    In K-Town.

Q.    Is that Koreatown?

A.    Yes.

Q.    How long have you been driving?

A.    It's been six years.

Q.    Do you know if the karaoke bars you drive to serve alcohol?

A.    Yes.

Q.    And do you know if they accept credit cards?

A.    Yes.

Q.    So they do sell alcohol and accept credit cards?

A.    Yes.

Q.    Do you know someone who goes by DK?

A.    Yes.

Q.    Do you see him in the courtroom today?

A.    Yes.

Q.   Will you please identify him based on where he is sitting and a piece of clothing that he is wearing?

A.   Right side, the third person sitting, and he's wearing a neck tie and a dress suit.

          MS. MacCABE:  Your Honor, will the record reflect that the witness has identified the defendant?

          THE COURT:  Yes.

BY MS. MacCABE:

Q.   When did you meet the defendant?

A.   I think I personally saw him about six months after I started working.

Q.   Working as a driver?

A.   Yes.

Q.   At some point, did you start paying the defendant money?

A.   Prior to then, my previous boss were paying him.  And then as the boss started not coming to the business, he told me to pay him first.  So that's why I started to paying him.

Q.   To clarify, did your boss tell you to pay the defendant, or did the defendant tell you to pay him?

A.   Because the defendant told boss, so -- just because I happened to be there and working there.  So I did.

Q.   Did you ever start your own driving company?

A.   Yes.

Q.   What is your driving company called?

A.    The name is Dream.

Q.    Did you pay the defendant after you started your own company?

A.    Yes.

Q.    Why did you pay him?

A.    I did for the purpose of him protecting me.

Q.    Who is he protecting you from?

A.    I thought he would be protecting me from gang or -- you know, that kind of danger.

Q.    And did he protect you from gangs or that kind of danger?

A.    No.

Q.    So why did you pay him, then?

A.    I was afraid that I might suffer any kind of a disadvantage unless I pay him.  That's why I continued to pay him.

Q.    And who would you suffer the disadvantage from?

A.    From the defendant.

Q.    And what do you mean by "disadvantage"?

A.    I was afraid that he would ban me from going to the studio so I won't be able to make income.

Q.    And how often were you supposed to pay the defendant?

A.    Once a month.

Q.    Did you pay him in cash at first?

A.    Yes.

Q.    Did you ever pay him on Venmo?

A.    Yes.

Q.    And how did you know when to pay the defendant?

A.    When the time has come, then I would receive a text message, asking me to pay.

Q.    Who did you receive the text message asking you to pay from?

A.    From the defendant.

Q.    Will you please turn in your binder in front of you to Exhibit 88; read it; and look up at me when you're done.

A.    Yes, I'm done.

Q.    Thank you.

        Do you recognize Exhibit 88?

A.    Yes.

Q.    What is it?

A.    So what's on this Exhibit 88?

Q.    Let me rephrase.

        Are those text messages between you and the defendant?

A.    Yep.

        MS. MacCABE:  Your Honor, I move to admit Exhibit 88 into evidence and ask permission to publish to the jury.

        THE COURT:  Any objection?

        MS. SOSA:  No objection.

THE COURT:  88 is admitted.

You may publish.

*(Exhibit 88 received in evidence.)*

MS. MacCABE:  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Showing page 1 of Exhibit 88.

What is "Jan Venmo"?

A.   Payment for the month of January.

Q.   Is that the defendant asking you to pay for the month of January?

A.   Yep.

Q.   And now will you please turn in your binder to Exhibit 29; read it; and look up at me when you're done.

A.   Yes.

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   It shows the monthly payment that I made through Venmo.

Q.   Who are those monthly payments to?

A.   To the defendant.

MS. MacCABE:  Your Honor, I now move to admit Exhibit 29 into evidence and request permission to publish to the jury.

THE COURT:  Any objection?

MS. SOSA:  No objection.

THE COURT:  29 is admitted.

You may publish.

*(Exhibit 29 received in evidence.)*

MS. MacCABE:  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Now showing pages 1 and 2 of Exhibit 29.

Did you include descriptions in the Venmo payments that you made to the defendant?

A.   I didn't add any explanation.  I just did a memo randomly.

Q.   And are some of those random memos now displayed on the screen?

A.   Yes.

Q.   Were you paying the defendant for drink or food or other descriptions that you used in your Venmo payments?

A.   You mean these Venmo payments, are you referring to?

Q.   Yes.  In the Venmo payments where you put a description, were you paying the defendant for food or drink or those other descriptions?

A.   Are you now asking me whether I had to purchase for him something like a food or a drink or whether or not I did the Venmo payment, part of which is for those?

Q.   I'm asking whether you purchased food or drink from the

defendant?

A.    No.

MS. MacCABE:  Now displaying page 3 of Exhibit 29.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Are these more of your Venmo payments to the defendant?

A.    Yes.

Q.    And here, I've highlighted.

Did you put the description "Month" and then, for another payment, the description "Dream"?

A.    Yes.

Q.    And Dream is your driving company?

A.    Yes.

Q.    Did you ever try to stop paying the defendant?

A.    Yes.

Q.    Why?

A.    Because I was thinking that I was not being protected.

MR. BUTLER:  And I'm now going to display pages 1 and 2 of what has previously been admitted as Exhibit 88.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  1 and 2?

BY MS. MacCABE:

Q.    Yes.  The pages on the screen.

A.    Oh.

Q.    What does "penalty" mean?

A.    I was asked to pay the penalty after I had gone to Concert and Soopsok.   Those are karaoke studios.

Q.    And why did you have to pay a penalty for going to Concert and Soopsok Karaoke?

A.    Because the defendant told me not to go there, but I did.   That's why.

Q.    And did your company sometimes not go to karaoke bars that the defendant told you not to go to?

A.    Correct.

Q.    Do you know why you were told not to go to Concert or Soopsok Karaoke?

A.    I was told not to go there because Concert or Soopsok did not pay.

Q.    Concert or Soopsok did not pay who?

A.    The defendant.

        MS. MacCABE:   Now showing pages 3 and 4 of Exhibit 88.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    I'll display it on the screen.

A.    Yes.

Q.    Are these texts in green from the defendant, still demanding that you pay a penalty?

A.    Yes.

Q.    Did you see the defendant in person roughly around this

time period?

A.    No.

Q.    Did you see the defendant in January of 2023 in person?

A.    Yes.  Yes.

Q.    Will you please describe for the jury what happened when you saw him in person that month.

A.    In the month of January, the payment -- hmm.  I can't remember for sure.

Q.    Did you pay the defendant this penalty when he was texting you, as shown on the screen right now?

A.    Yes.

Q.    And before you paid that penalty, did you see the defendant?

A.    I can't recall for sure.

Q.    Did you ever see the defendant while you were in your car at an apartment complex?

A.    Yes, yes, yes.

Q.    Will you please describe what happened when you saw the defendant, for the jury.

A.    I think it was about 10:00 o'clock or so.  Anyway, I came out to work.  I was going to pick up doumi girls at 404 Shatto Place.  I was waiting there.  I had a window open on the driver's side, and I was waiting.  And all of a sudden, the defendant showed up there and then punched me in the face with his fist.

Q.   Did the defendant say anything to you?

A.   Yes.  And then he told me these profanities and also told me that, "I will kill you."

Q.   The defendant said that he will kill you?

A.   Yes.

Q.   Did the defendant do anything else besides punch you in the face and say that he will kill you?

THE INTERPRETER:  Bear with me just a second.

MS. MacCABE:  It's okay.

THE INTERPRETER:  Bear with me.

MS. MacCABE:  That's okay.

Q.   Did he take anything from you that night?

A.   Oh, yes, yes.  From my wallet.  Yes.

Q.   What did he take?

A.   Money.

Q.   Did he keep your wallet?

A.   He had it; however, he just threw it away on the ground and he left right away.

Q.   Did you immediately get out of your car and go grab the wallet?

A.   I did so after he had left.

Q.   Why didn't you do it immediately?

A.   I wasn't able to do it right away because I didn't even know what's inside his car -- what he has in his car.

Q.   What were you worried about him having in his car?

A.    Because it was likely that he had some kind of weapon or anything.

Q.    Why did you think he might have a weapon?

A.    Because he was a gang.  Anyhow . . . .

MS. SOSA:  Objection, Your Honor.  Move to strike. The answer lacks foundation.

THE COURT:  Overruled.

BY MS. MacCABE:

Q.    Do you know what gang?

A.    Grape.  I think what I had heard of is Grape.

MS. SOSA:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained as to the second sentence.

BY MS. MacCABE:

Q.    Was there any other reason you were worried the defendant might have a weapon?

A.    Oh, something that I had heard of prior to then, you know.  That's another . . . .

Q.    What did you hear?

A.    Prior to then, he had fired a gun.  He had his friends fire the gun.  That kind of thing.

MS. SOSA:  Your Honor, objection.  We could either approach, or I would ask for a limiting instruction.

THE COURT:  All right.  Again, ladies and gentlemen, this statement by the witness is being offered to -- as to the witness's state of mind and the effect it

had on him as the listener of the statement, not to prove the truth of the actual statement.  So it's only admitted for that purpose.  You may only consider it for that purpose.

BY MS. MacCABE:

Q.   Did you pay the defendant again after this incident that you just talked about?

A.   What incident?

Q.   Him punching you in the face.

A.   Yes.  One more last time.  That was the last time.

Q.   So you paid him again after this.

     Why?

A.   Because I was afraid.

Q.   Did you ever tell Homeland Security about what the defendant had done to you?

A.   Yes.

Q.   Did you agree to wear a recording device and allow Homeland Security to watch you pay the defendant?

A.   Yes.

Q.   Even though Homeland Security was involved, were you still afraid of the defendant?

A.   Yes.

Q.   Will you please turn in your binder to Exhibit 89; read it; and look up at me when you're done.

A.   Yes.

165

Q.    Do you recognize that?

A.    Yes.

Q.    Are those text messages between you and the defendant?

A.    Yes.

MS. MacCABE:  Your Honor, I move to admit Exhibit 89 and request permission to publish it to the jury.

THE COURT:  Any objection?

MS. SOSA:  No objection.

THE COURT:  All right.  89 is admitted.

You may publish.

*(Exhibit 89 received in evidence.)*

MS. MacCABE:  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Now displaying page 1 of Exhibit 89.

Is this you in blue and the defendant in green?

A.    Yes.

Q.    And are you asking the defendant if you could pay him the February payment in cash?

A.    Yes.

Q.    Did Homeland Security give you cash for this payment?

A.    Yes.

MS. MacCABE:  Turning to page 2 of Exhibit 89.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Is the second blue text you asking where to meet the defendant?

A.    Yes.

Q.    And looking at the last green text on the screen.

A.    Yes.

Q.    What did you understand "P1" to mean?

A.    This means P1 of the parking structure of the karaoke studio called Recital.

Q.    And had you been to P1 before?

A.    Yes.

Q.    Had you ever paid defendant there before?

A.    Yes.  When I paid him in cash, most of the times, I paid him at P1.

        MS. MacCABE:  Now showing page 3 of Exhibit 89.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Is this first text the defendant asking you if you called the cops?

A.    Yes.

        MS. MacCABE:  And now showing page 4.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Is this first text from the defendant saying, "There's cops.  Meet me somewhere else"?

A.    Yes.

Q.    Did the defendant change the meeting location a few times that night?

A.    Yes.

Q.    Did the defendant also call you?

A.    Yes.

MS. MacCABE:  Now showing pages 5 and 6 of Exhibit 89.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.    Are these text messages -- or notations on this message conversation the defendant and you trying to call each other until you actually spoke on the phone?

A.    Yes.

Q.    Will you please look in your binder at Exhibits 17 and 18, and let me know when you're done.

THE INTERPRETER:  Did you say 16 and 17, Counsel?

MS. MacCABE:  17 and 18.

THE INTERPRETER:  Oh, I'm sorry.

THE WITNESS:  Yes.

BY MS. MacCABE:

Q.    Do you recognize those?

A.    Yes.

Q.    How do you recognize them?

A.    It looks like the phone conversation that I had.

168

Q.    Are those CDs in Exhibits 17 and 18?

A.    Yes, yes.

Q.    And did you sign those CDs?

A.    Yes.

Q.    And did you listen to the recordings that are on those CDs?

A.    Yes.

Q.    And did those recordings fairly and accurately capture your phone conversations with the defendant that night?

A.    Yes.

          MS. MacCABE:   Your Honor, I'd move to admit Exhibits 17 and 18 into evidence and request permission to publish.

          THE COURT:   Any objection?

          MS. SOSA:   No objection.

          THE COURT:   Exhibits 17 and 18 are admitted.

          They may be published.

BY MS. MacCABE:

Q.    Before I play the first one, I just want to ask you, this last text on page 6 of Exhibit 89, what did you mean by these two words?

          *(The exhibit was displayed on the screen.)*

          THE WITNESS:   You know, there's a Korean culture. You know, if one is older than you and one is a male person, I would call him Hyung-nim.

THE INTERPRETER:  This is the interpreter.  That translates into English like a brother, respective way of referring to a brother.

BY MS. MacCABE:

Q.   Respectful way of referring to that?

A.   Yes, yes.

MS. MacCABE:  Now playing Exhibit 17.

*(The media was played.)*

THE WITNESS:  Yes.

BY MS. MacCABE:

Q.   So can you please just describe where the defendant is having you go in that call?

A.   He's asking me to come over to where -- Chase Bank in Larchmont -- Larchmont.

MS. MacCABE:  And now displaying page 7 of Exhibit 89.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   What were you sending the defendant on the screen?

A.   The arrival time.

Q.   To go to Chase Bank in Larchmont?

A.   Yes.

MS. MacCABE:  And now displaying page 8 of Exhibit 89.

*(The exhibit was displayed on the screen.)*

170

BY MS. MacCABE:

Q.    On the right, is that another call that you had with the defendant?

A.    Yes.

MS. MacCABE:  Now playing Exhibit 18.

*(The media was played.)*

BY MS. MacCABE:

Q.    Did you meet with the defendant in person in Larchmont after this call?

A.    Yes -- no.  No.

THE INTERPRETER:  I'm sorry.  Interpreter's correction:

THE WITNESS:  No.

BY MS. MacCABE:

Q.    No.

MS. MacCABE:  Now displaying pages 8 and 9 of Exhibit 89.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Will you please explain what these texts mean after the call that we just listened to?

THE INTERPRETER:  Can I clarify this?

THE WITNESS:  This is regarding a monthly payment to be made.

171

BY MS. MacCABE:

Q.   The monthly payment we've been discussing where Homeland Security gave you cash?

A.   Yes.

Q.   Who is "Tiga"?

A.   A waiter who is working at the Recital club, his name.

Q.   And Recital is where P1 is?

A.   Yes.

MS. MacCABE:   Now looking at pages 10 and 11 of Exhibit 89.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please explain what these texts mean?

A.   That's exactly the same contents because of the payment, because of that.

MS. MacCABE:   And now displaying pages 12 and 13 of Exhibit 89.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   In the green messages at the bottom of page 13, the defendant is asking you to pick a driver?

A.   Yes.

Q.   And did you pick a driver to give the cash to?

A.   I was going to pay via Venmo.

Q.   Did you give cash to another driver to Venmo the

defendant for that month?

A.   Yes.

Q.   Which driver?

A.   At Queen, there's a guy called Young Nae.

THE INTERPRETER:  The witness doesn't know how to spell that name.  Interpreter's phonetic spelling is Y-O-U-N-G N-A-E, just to help the reporter.

BY MS. MacCABE:

Q.   And what company is Young Nae?

A.   The Queen -- company of Queen.  The name is Queen.

Q.   And before I move on to the next page, is the last text from the defendant on page 13, "I seen many undercovers."

A.   Yes.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   On page 14 of Exhibit 89, what do you mean by "Got locked; too many Venmo from girls"?

A.   I was lying here.  Because during this time, I was receiving a payment from the girls via Venmo, so, you know, I just lied.

Q.   Was that so that you could meet the defendant in person to give him cash?

A.   Yes.

Q.   So that you could record the payment with Homeland Security?

A.    Yes.

MS. MacCABE:  And finally, looking at pages 15 and 16 of Exhibit 89.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.    Is the first text that you sent, "I didn't call the cops"?

A.    Yes.

Q.    And are these other texts you showing the defendant the payment you just discussed Queen making for you?

THE INTERPRETER:  Could you repeat it?

MS. MacCABE:  Yes.

BY MS. MacCABE:

Q.    Are these other text messages you sending the defendant proof of the payment that Queen made for you on Venmo?

A.    Yes.

Q.    And did you pay the defendant the following month, like normal, on Venmo?

A.    Yes, yes.

MS. MacCABE:  No further questions.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MS. SOSA:

Q.    Good afternoon, Mr. Shin.

A.    Yes.  Good afternoon.

Q.    You told us that you worked as a doumi driver for about
six years.

A.    Yes.

Q.    And you're still working as a driver; correct?

A.    Yes.

Q.    Your company was called Dream.

A.    Yes.

Q.    Did you file any paperwork with the government to
establish that company?

A.    No.

Q.    So you just -- you call it a company; correct?

A.    Yes.

Q.    How many drivers work for Dream besides you?

A.    Two more drivers.

Q.    How many girls do you drive around?

A.    Six to eight.

Q.    And so you drive these girls around to karaoke bars,
hoping that they'll get hired by customers in the bar;
correct?

A.    Yes.

Q.    And you make money because you require the girls to
give you part of what the customer pays them.

A.    Yes.

Q.    And you only make money if one of your girls gets
hired; correct?

A.    Yes.

Q.    How many other drivers drive these girls around the karaoke clubs?

A.    Are you now asking me my drivers, how many?

Q.    No.   In the Koreatown karaoke business, in general.

A.    If you say drivers, it will be about 30 or 40 drivers.

Q.    And there's competition between the drivers in order to get their girls hired at the karaoke clubs; right?

A.    Yes.

Q.    How did you find girls to work for you?

A.    Craigslist.   I put it on the advertisement.

Q.    Is that Craigslist?

A.    Yes.

Q.    Would the drivers sometimes warn each other not to work with particular girls?

A.    Yes.

Q.    And you would share that kind of information over a group chat on Kakao; correct?

A.    Yes.

Q.    And that group chat was set up by DK; right?

A.    Yes.

Q.    And that was for his association; correct?

A.    Yes.

Q.    DK would sometimes tell you guys that the association was closed, meaning you weren't accepting any new companies

into the association; correct?

A.    Correct.

Q.    And that was in order to -- strike that.

One moment.

That meant that there was more business for the drivers who were in the association; right?

A.    I don't understand what you mean.

Q.    I'll move on.

One of the issues that sometimes came up with girls that you had was that the girls wouldn't pay you; correct?

A.    Yes.

Q.    Do you remember having that problem with a girl named Chanel?

A.    Yes.

MS. MacCABE:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

MS. SOSA:  And if I could, the next question will establish the relevance.

THE COURT:  The objection to the last question is sustained.

BY MS. SOSA:

Q.    Did you ever go to DK when you were having trouble with girls not paying you?

A.    I think I probably discussed with him about that via

text.  I don't think I have ever personally visited him. And then -- what I can remember as of now, yes.

Q.   Okay.  If you could look in the small black binder at tab 205.

Do you recognize these text messages?

A.   Yes.

Q.   And these are messages between you in blue and Mr. Cho in green; correct?

A.   Yes.

Q.   Okay.  And this is it an example of you asking Mr. Cho for help getting money from one of your girls; right?

A.   Bear with me just a second.

Q.   Of course.

A.   Yes.

MS. SOSA:  Your Honor, motion to admit Exhibit 205.

THE COURT:  Any objection?

MS. MacCABE:  Yes.  Objection.  Hearsay. Relevance.  And 403.

THE COURT:  Sustained.

BY MS. SOSA:

Q.   So you found DK helpful when you had issues with your girls; correct?

A.   Back in those days, yes.

Q.   Okay.  And we're talking about July of 2022, correct,

in these messages?

A.    Yes.

Q.    Okay.  If you could please -- well, just a moment.

If you had a problem with one of your girls -- strike that.

Do you remember having a problem with one of your girls named Magali?

MS. MacCABE:  Objection, Your Honor.  Relevance. 403.

THE COURT:  Sustained.

BY MS. SOSA:

Q.    Did you go to Mr. Cho for help with one of your girls named Magali?

MS. MacCABE:  Same objection.

THE COURT:  Sustained.

BY MS. SOSA:

Q.    Do you recall saying to Mr. Cho, "What should we do about this girl Magali"?

MS. MacCABE:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MS. SOSA:

Q.    Did you go to Mr. Cho when you found out that girls who had been banned were still working in Koreatown karaoke?

A.    I texted him -- text him.

Q.    Okay.  I apologize.  And that's what I meant.

So you would text Mr. Cho to ask what we should do about girls who had been banned but were still working in the karaoke clubs; right?

A.    When?

Q.    September of 2022.

A.    What number -- what exhibit number should I look?

Q.    Well, let me direct your attention to Exhibit 207.

In September of 2022, you texted Mr. Cho, "Hyung, I have a question.  Banned girls going to new company.  What should we do?"  Correct?

A.    Yes.

Q.    And that's because you knew that he would help protect your business against drivers and girls who were not part of the association; correct?

A.    Can you -- I can't understand this.  Can you rephrase your question to easier terms?

Q.    In September of 2022, you went to DK about -- you texted DK about girls who were banned but were still working at the karaoke club because you thought he would help you.

A.    Yes.  At that time, I was to report it to him.

Q.    Okay.  Now I want to talk to you about January 24, 2023.

And if you'd look at Exhibit 88 in the big book which my colleague just showed you.  If you start on page 4, please.

180

A.    Yes.

MS. SOSA:  And Your Honor, may I publish this to the jury?

THE COURT:  Yes.

It's in evidence; correct?

MS. SOSA:  Yes.  Yes, Your Honor.

THE COURT:  All right.  You may.

*(The exhibit was displayed on the screen.)*

BY MS. SOSA:

Q.    Now, page 4 shows your first text messages between you and DK on January 24th of 2023; correct?

A.    Yes.

Q.    And if we look through page 5.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  Yes.

MS. MacCABE:  Page 6.

*(The exhibit was displayed on the screen.)*

MS. SOSA:  Page 7.

*(The exhibit was displayed on the screen.)*

BY MS. SOSA:

Q.    So on page 6, we get to January 25th; correct?  At the bottom.

A.    Yes.

Q.    And page 7 ends with 3:30 p.m. on January 25th; correct?

A.    3:30, is that what you're referring to?

Q.    At the bottom of the page.

A.    Yes.

Q.    Now, you told investigators that this encounter between you and DK at 404 Shatto Place, you said that that happened on January 24th at around 10:30 p.m.; right?

THE INTERPRETER:  Could you repeat your question, Counsel.

BY MS. SOSA:

Q.    You told investigators that the incident in your car at 404 Shatto Place happened on January 24th around 10:30 p.m.

A.    Yes.

Q.    So on January 24th, looking at page 4 of Exhibit 88 --

(The exhibit was displayed on the screen.)

BY MS. SOSA:

Q.    -- Mr. Cho says, "Send penalty the first time 200, second time 400."

And you said, "Total 600"; correct?

Do you see that?

A.    Yes.

Q.    And he says, "No.  You paid 200 for the first time. This is second, so 400."

A.    Yes.

Q.    Okay.  So you were ready to pay him 600, but he stopped you from overpaying, essentially?

A.    Okay.  No.  If you see the messages above, then the first penalty was 200; the second was 400.  So I was asking him:  Together, the total of 600, is that what I pay?

That's what I asked him.

Q.    Okay.  And he said, no, it's just 400.

A.    Yes.

Q.    Okay.  And then your last message to him on January 24th -- well, you say, "$400 I need to send you?"

He says, "Yeah.  No Forest, no Concert."

And you say, "Nay."

A.    Yes.

Q.    That's at 10:30 p.m. on January 24th; correct?

A.    Yes.

Q.    And there's nothing else from -- between you and him until 3:04 p.m. the next day; correct?

A.    Yes, yes.

Q.    So nowhere here do you refer to him -- to having just seen him in person; right?

A.    Correct.

Q.    And nowhere do you say anything about him having just hit you.

A.    Correct.

Q.    And you don't say, Hey, you just took some money out of my wallet.  Why do I need to pay more?

There's nothing like that.

A.    Correct.

Q.    In fact, you were so not afraid that you fell asleep and didn't contact him until 3:00 o'clock the next day.

A.    I was not afraid?  What do you mean by that?

Q.    Where did you say anything to show that you were afraid?

A.    Do I have to express such a thing via text message?  I wouldn't do it via text.

Q.    Everything else has been via text.  That's what you've told us.

A.    Yes.

Q.    You've shown the jury no photos of any injury; correct?

A.    Correct.

Q.    And you don't have anybody else to say they saw this happen.

A.    Correct.

Q.    So switching topics.

You're friends with Yun Soo Shin; correct?

A.    Yes.

Q.    And Joo Hun Lee?

A.    Who's Joo Hun Lee?

Q.    Did you know Mr. Shin's partner?

A.    Oh, yes, yes.

Q.    So he's a friend as well.

A.    Yes.

Q.   And you've told us already that you're friends with Young Nae Kang.

A.   Yes, yes.

Q.   So you knew that Yun Soo and his partner had gone to the police against DK in May of 2021; right?

A.   That, I didn't know.

Q.   You know they're involved in this case; right?

A.   I didn't know it.

Q.   Do you know that Yun Soo testified in this case?

A.   Yes, yes.

Q.   Okay.

A.   Yes.  I saw him today.  Yes.

Q.   Okay.  And you also know that -- strike that.

When you became involved in this case, meaning when you went to police, you've told us that was in January of 2023.

A.   Yes.

Q.   You already knew that your friend Yun Soo Shin was going to get a visa for participating in this case; correct?

A.   No.

Q.   Well, you are also going to get a visa for testifying in this case; correct?

A.   No.

Q.   Isn't it true, Mr. Shin, that the government has authorized a U visa for you in exchange for helping them

against DK?

A.    No.

Q.    All right, Mr. Shin.

Today, you told us that you stopped paying DK because you felt you were not being protected.

A.    Yes.

Q.    You paid him in order to get a service.

A.    What service?

Q.    You told us you paid him in order to get protection.

A.    Yes, yes.

Q.    You felt you were not getting that service.

A.    Are you now asking me that I didn't feel being protected from a gang?  Or are you now asking me that I was not getting calls from a studio?

Q.    Let me rephrase my question.

You've told us two things:  One, that you stopped paying him because he was not protecting you.

A.    Yes.

Q.    You still work in Koreatown karaoke; correct?

A.    Yes.

MS. SOSA:  One moment, Your Honor.

BY MS. SOSA:

Q.    Just to return what we were just talking about with the U visa.

Sir, isn't it true that on March 8th, 2023, the

Department of Homeland Security provided you with a certification for a U visa application?

A.   U visa, yes.

Q.   Thank you.

        MS. SOSA:  All right.  No further questions, Your Honor.

        THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Did the defendant ever collect money from doumis to give to you?

A.   I can't understand.

Q.   Was the defendant paying you money?

A.   Pay me?

Q.   Yes.

A.   No.

Q.   No.

        MS. MacCABE:  No further questions.

        THE COURT:  Any recross?

        MS. SOSA:  No recross, Your Honor.

        THE COURT:  All right.  Is the witness excused?

        MS. MacCABE:  Yes, Your Honor.  Thank you.

        THE COURT:  All right.  Sir, you're excused. Thank you.

        THE WITNESS:  Thank you.

THE COURT: All right. We're going to take our recess for the day. We will resume trial tomorrow at 8:15 in the morning, so please make sure you're here in time to resume tomorrow so that you're in your seats by 8:15.

Your duty not to discuss the case with anyone or communicate with anyone about the case remains in effect, and you are also not to form or express an opinion about this case until it's given to you for deliberations.

All right. Have a pleasant rest of your afternoon and evening. We'll see you here tomorrow morning at 8:15.

THE CLERK: All rise.

*(The jurors exited the courtroom.)*

THE CLERK: You may be seated.

THE COURT: All right. We're in recess.

MR. BUTLER: Thank you, Your Honor. See you tomorrow.

MR. WERKSMAN: Thank you, Your Honor.

(At 2:46 p.m. proceedings were adjourned.)

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.

Date:  February 14, 2025


                              /S/_____WIL S. WILCOX_____

                                 U.S. COURT REPORTER
                                   CSR NO. 9178