*UNITED STATES DISTRICT COURT*

*CENTRAL DISTRICT OF CALIFORNIA*

*WESTERN DIVISION*

*THE HON. FERNANDO L. AENLLE-ROCHA, JUDGE PRESIDING*

United States of America,       )
                                )
              Plaintiff,         )
                                )
       vs.                       )  No. CR 23-00149-FLA
                                )
Daekun Cho,                      )
 aka "DK,"                       )
                                )
              Defendant.         )
_____)

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*

*Jury Trial Day 3*

*Thursday, March 21, 2024*

*8:21 A.M.*

*Los Angeles, California*

*Wil Wilcox, CSR 9178*
*Official U.S. District Court Reporter*
*Los Angeles, CA  90012*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:

                UNITED STATES ATTORNEY'S OFFICE
                BY:   JENA A. MACCABE
                BY:   KEVIN J. BUTLER
                Assistant United States Attorneys
                Violent and Organized Crime Section
                1300 United States Courthouse
                312 North Spring Street
                Los Angeles, California 90012

FOR THE DEFENDANT:

                WERKSMAN JACKSON & QUINN LLP
                BY: MARK J. WERKSMAN
                BY: KAREN M. SOSA
                888 West Sixth Street, Fourth Floor
                Los Angeles, California 90017

I N D E X

*THURSDAY MARCH 21, 2008; VOLUME*

CHRONOLOGICAL INDEX OF WITNESSES

| Party WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| FRANK CANNATA | 11 | | | | | 3 |
| IVAN DAY KWAG | 15 | | | | | 3 |
| JACOB RICE | 38 | | | | | 3 |
| STEPHEN CAVAZOS | 63 | | | | | 3 |
| JOHN ARMSTRONG | 69 | | | | | 3 |
| KAREN GASPAR | 86 | | | | | 3 |

ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| CANNATA, FRANK | 11 | | | | | 3 |
| DAY KWAG, IVAN | 15 | | | | | 3 |
| RICE, JACOB | 38 | | | | | 3 |
| CAVAZOS, STEPHEN | 63 | | | | | 3 |
| ARMSTRONG, JOHN | 69 | | | | | 3 |
| GASPAR, KAREN | 86 | | | | | 3 |

4

EXHIBITS

| Party EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 37 | Document | | 13 | 3 |
| 38 | Document | | 13 | 3 |
| 19 | CD | | 23 | 3 |
| 20 | CD | | 23 | 3 |
| 23 | CD | | 28 | 3 |
| 141 | Photograph | | 59 | 3 |
| 21 | CD | | 66 | 3 |
| 22 | CD | | 66 | 3 |
| 74 | Photograph | | 72 | 3 |
| 71 | Photograph | | 73 | 3 |
| 66 | Photograph | | 75 | 3 |
| 67 | Photograph | | 76 | 3 |
| 73 | Photograph | | 77 | 3 |
| 208 | Photograph | | 85 | 3 |
| 93 to 113 | Documents | | 91 | 3 |
| 68 | Photograph | | 107 | 3 |
| 69 | Photograph | | 109 | 3 |
| 70 | Photograph | | 109 | 3 |
| 72 | Photograph | | 110 | 3 |
| 75 | Photograph | | 111 | 3 |

5

*LOS ANGELES, CA.; THURSDAY, MARCH 21, 2024*

8:21 A.M.

- - - - -

THE CLERK:  This United States District Court is now in session.  The Honorable Fernando L. Aenlle-Rocha, United States District judge, presiding.

Please be seated and come to order.

Calling LA CR 23-00149-FLA, United States of America v. Daekun Cho.

Counsel, please make your appearances, beginning with the government.

MS. MacCABE:  Good morning, Your Honor. Jena MacCabe and Kevin Butler on behalf of the United States.  And with us at counsel table is Special Agent Michael Choi.

MR. WERKSMAN:  Good morning, Your Honor. Mark Werksman and Karen Sosa on behalf of Mr. Cho who's present in court.

THE COURT:  All right.  Good morning to everyone.

I understand that counsel would like to address an issue before we bring the jury in.

MS. SOSA:  Yes, Your Honor, briefly.

THE COURT:  Go ahead.

MS. SOSA:  Your Honor, I would like to reraise the

motion in limine regarding Officer Rice and his expert testimony on Grape Street Crips.

When we left it at a pretrial conference, I believe the judge -- excuse me -- I believe the Court's ruling was denied, but that the Court would see how the evidence would come out over the course of trial.

I understand that the civilian witnesses, most, if not all, have said, "I heard that he was in a gang."  I believe one said a Black gang; one said Crips; one said Grape.  Understood.

But there is nothing -- the relevance of that is for the state of mind of those witnesses; why they were afraid of Mr. Cho and how that knowledge affected their view of -- of Mr. Cho and their interactions with Mr. Cho.

There is nothing for Officer Rice to interpret or explain to the jury unless -- for example, the Instagram photographs, one of his -- something he might testify to is that "LOC" in the defendant's username stands for "Love of Crips."  But there's no evidence that any of the witnesses knew that.  And so that would not have affected their state of mind.  Same thing with the color purple with the P.R.M. initials or some of the captions underneath the photographs.

Officer Rice can say what that means to him or what he knows that to mean to other people, but there was no testimony that any of that played into the victims' state of

mind in this case.

In fact, the only witness who testified about those Instagram posts was J.L., who pulled them off and showed them to Y.S.  And J.L. -- and for starters, J.L. only saw those after his extortion counts; same thing with Y.S. And there was no testimony that "I saw them making gang signs.  I saw him" -- anything, as I said for, Officer Rice to testify.  It was, "I saw him with some gangsters, and that made me more afraid."  That's fine, and that's sufficient to go to the jury to explain what impact that had on these witnesses' state of mind.

But anything that Officer Rice would have to offer, there's no evidence that the witnesses knew it.  And without that, there's no relevance to this case.

THE COURT:  All right.  Let me hear from the government.

MS. MacCABE:  Thank you, Your Honor.

My memory of the witnesses' testimony has been that at least one witness has identified him as being in the Grape Street Crips.  It was his decision to portray himself as such to these victims, to post these on Instagram, which is him displaying himself for the world.  This was on his public Instagram that the victim went and looked and took screenshots of.

THE COURT:  Which witness was that?

MS. MacCABE:  J.L. was the witness who we introduced those Instagram posts through.  And when you look at the Instagram posts, those were not dated the date he went and screenshotted them.  They were dated before that.

In addition, the government was not only seeking to introduce this evidence just with respect to the victims' state of mind, but it's also 404(b) evidence with respect to intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident, as we briefed.

And Officer Rice will be able to explain how Grape Street Crips extort people and how these protection rackets work.  That's how the defendant was representing these fees.  Officer Rice should be able to explain to the jury why seemingly innocuous behavior is actually criminal, particularly in the context of an extortion case.

In addition, as the Court issued an order when the government moved to take photos of the defendant's tattoos, he has Grape Street Crips tattoos all over his body.  So the defendant clearly wants to represent himself as such, and he did so to intimidate the victims.  He did so learning from these ways that this gang controls their neighborhoods and takes advantage of them and extorts them.

And so for all the reasons in the government's briefing, the Court should admit this evidence.  And we do not plan on keeping Officer Rice up on the stand very long.

As the Court noted, this is not going to turn into a Grape Street Crips trial.  But this evidence is still very relevant, very probative.  And the defense has not shown why 403 would mandate that this be excluded.

THE COURT:  All right.  My prior ruling is going to stand for the same reasons that I gave at the time of the pretrial conference.  I do continue to believe that this testimony will give the jury context and help it understand the meaning and effect of the defendant's statements.  And the defendant's statements have been admitted through witnesses that have testified.

And, yes, it goes to their state of mind.  But it is also -- there's also been a good deal of cross-examination of these witnesses concerning other possible schemes, for example, or reasons why the defendant was interacting with these drivers, essentially trying to create the impression that there was an innocent reason for this.

There also was a Black man that participated in the assault of the one victim with a bat.  Certainly, an argument could be made that that is a Grape Street Crip gang member.  There's no express evidence that he is.  But it's circumstantial evidence.

And then the photographs themselves, although they're not verbal statements, they're the equivalent of

10

statements, and the defendant is holding himself out as a member of this gang.  And these are extortion counts.  They involve the use of force, violence, fear, injury.

So for those reasons and the reasons that I set forth at the pretrial conference and as the government just stated, my ruling stands.

I believe we have all jurors ready.

THE CLERK:  Yes, we do, Your Honor.

THE COURT:  All right.  We're going to go ahead and bring them in.

*(The jurors entered the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  Good morning, ladies and gentlemen.  Thank you for being here again.  I'm sorry that we've delayed you a little bit.  I did have to attend to a legal issue with the attorneys, so we have been working.

So we're ready to resume the trial.

Government, you may call your next witness.

MR. BUTLER:  Thank you, Your Honor.

The government calls Frank Cannata.

THE CLERK:  Good morning, Mr. Cannata.  Please step forward.

Please stand before me and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall

give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may be seated in the witness stand.  Any chair is fine.

I'm going to need you to state and spell your full name for the record.

Project into the microphone, and speak slowly, please.

THE WITNESS:  Frank Cannata; F-R-A-N-K, C-A-N-N-A-T-A.

THE COURT:  You may inquire.

**DIRECT EXAMINATION**

BY MR. BUTLER:

Q.   Good morning, Mr. Cannata.

A.   Good morning.

Q.   Can you tell the jury what you do for a living?

A.   I work at PayPal.  I'm a custodian of records.

Q.   Can you explain what a custodian of records is?

A.   I -- we receive records -- record requests from law enforcement agencies, and we provide the data pertaining to whatever is required.

Q.   Does PayPal have a subsidiary or an application titled Venmo?

A.   Yes.

12

Q.    How long have you been at PayPal and Venmo?

A.    I've been there about seven years.

Q.    For those of us who may not be tech savvy, can you just describe what, very generally, Venmo is?

A.    Venmo is a payment platform where you can pay money person to person, or you can use it to pay for retail items to a business.

Q.    Does it require the use of a telephone?

A.    It doesn't require it.  But you can use it online or on your phone.

Q.    As an application?

A.    Yes.

Q.    Where are Venmo servers located?

A.    They're located in Virginia.

Q.    Do transactions that are conducted on the application necessarily have to travel through Virginia?

A.    Yes.  Anything that would occur through the Venmo platform would go through the servers in Virginia.

Q.    When a transaction is conducted on Venmo, does Venmo record the IP address of the -- of the users?

A.    It does, yes.

Q.    Did you review portions of Venmo records produced in this case?

A.    I did not.

Q.    Did you produce -- did your company produce Venmo

13

records, as you stated, to law enforcement in this case?

A.    Yes, we did.

Q.    Can you turn in your binder to what's been marked -- that large binder in front of you -- as Exhibits 37 and 38. You don't need to review all of it but just a bit of it. And then let me know when you've taken a look.

Do those appear to be Excel spreadsheets of Venmo transactions?

A.    Yes, there does.

MR. BUTLER:   Your Honor, the Court has moved these into evidence under Rule 902(11), but just for the record, I want to be clear that they are admitted.

MR. WERKSMAN:   No objection.

THE COURT:   All right.   37 and 38 are admitted.

If you would like to publish, you may.

*(Exhibit 37 received in evidence.)*

*(Exhibit 38 received in evidence.)*

MR. BUTLER:   Thank you, Your Honor.   No need.

BY MR. BUTLER:

Q.    Can you describe what a third-party payer is?

A.    That would be some sort of financial company that's attached to the Venmo account to fund transactions.

Q.    So any bank account that's set up with a Venmo account?

A.    Yes.   It has to be located within the United States.

Q.    And would -- when a Venmo transfer occurs that uses a

third-party payer, does that still go through Virginia?

A.   Yes.

Q.   Can Venmo be used to pay for online purchases?

A.   Yes, it can.

Q.   Does that include a website like Amazon or some other kind of retailer?

A.   Yeah.  If the retailer is set up to accept payments through Venmo, then that retailer can use it.

Q.   Does Venmo allow for credit card payments?

A.   Yes, it does.

Q.   Does Venmo have its own credit card that users can apply for?

A.   Yes.  Users can apply for a credit card and a debit card.

Q.   Does Venmo ever take a cut or a percentage of a transaction?

A.   Yes.  There's fees applied to credit card payments and instant bank account withdrawals or withdrawals to a credit card, as well as if you were to mark something as a sale or -- sale of an item or a good.

Q.   And is that the goods and services fee that you just referred to?

A.   Yes.

Q.   So if someone pays another user and lists it as goods and services, Venmo charges a small fee for that payment?

A.   Yes.  Venmo charges a fee for that.  Yes.

MR. BUTLER:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. WERKSMAN:  I have no questions.  Thank you.

THE COURT:  All right.  Is the witness excused?

MR. BUTLER:  He is, Your Honor.  Thank you.

THE COURT:  All right.  You're excused, sir.  Thank you.

You may call your next witness.

MR. BUTLER:  The government calls Ivan Day Kwag who will be assisted by a Korean language interpreter.

THE CLERK:  Good morning.  Please stand before me and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE CLERK:  Thank you.  You may be seated in the witness stand.  Please state and spell your full name for the record.

THE WITNESS:  Ivan Day Kwag; I-V-A-N, D-A-Y, K-W-A-G.  Three syllables.

THE COURT:  All right.  You may inquire.

MR. BUTLER:  Thank you, Your Honor.

**DIRECT EXAMINATION**

16

BY MR. BUTLER:

Q.   Good morning, Mr. Day Kwag.

A.   Yes.  Good morning.

Q.   What do you do for a living?

A.   I'm running a business.

Q.   What kind of business?

A.   I am running a karaoke studio and then a restaurant business, a restaurant serving food.

Q.   What is the karaoke bar called?

A.   On and Off.

Q.   And where is it located?

A.   In Koreatown.  It's located on Sixth Street and Ardmore.

Q.   What hours is your karaoke bar generally open?

A.   From 8:00 o'clock until 4:00.

Q.   Does your bar serve alcohol?

A.   Yes.

Q.   Does that include liquor, such as tequila or scotch or bourbon?

A.   Yes.

Q.   Does your bar accept credit cards?

A.   Yes.

Q.   One last question on your background:  Do you have what's called an American name that you go by?

A.   I use the name "Roy" a lot.

Q.    Thank you.

Do you know someone who goes by the name D.K.?

A.    Yes.

Q.    Do you see him in the courtroom here today?

A.    Yes.

Q.    Will you please identify him based on where he's sitting and an article of clothing.

A.    Yes.  To my right side, black-colored suit and also wearing a black necktie and then kind of a light-blue kind of shirt.

MR. BUTLER:  Your Honor, can the record reflect that the witness has identified the defendant?

THE COURT:  Yes.

BY MR. BUTLER:

Q.    When did you meet the defendant?

A.    I think it's approximately eight years ago or so, just approximately.

Q.    How did you meet him?

A.    At the time, I was working, and he was doing that kind of work, like doumi -- he was working at a company.

Q.    At some point, did defendant tell you that you needed to pay him money?

A.    That was some time after I started my own business. Yes.

Q.    After you started On and Off Karaoke?

A.    Yes.

Q.    So what did the defendant tell you about why you needed to pay him money?

MS. SOSA:  Objection, Your Honor.  402.  There was no404B motion on this.

THE COURT:  Let me see counsel at sidebar.

*(The following was held at the bench:)*

THE COURT:  All right.

MS. SOSA:  Your Honor, obviously they're going to try to present I.D.K. as another victim of extortion from Mr. Cho.  They presented 404(b) motion and argument on K.Y.J. and Y.K., who ended up being indicted, and on K.Y.J -- excuse me.  I apologize.  They ended up being indicted.  But there was no 404(b) motion as to I.D.K. or On and Off being a victim of extortion.  And so it's not relevant.

He's here to talk about the shooting that happened on July 15th.

MR. BUTLER:  It's true he was not involved in our motion, Your Honor.  He was not willing to testify until much later, after the superseding indictment.  We did not meet with him until after that.  But the evidence that we're trying to present is not only brief, but was involved -- or was reported to defense counsel in reports of investigation.

It's the same type of 404(b) evidence that we'd

already milled.  And I don't think a motion is necessarily required.  They were on notice of it, and it's the same type of conduct that we've already brought in multiple times over.

THE COURT:  Tell me what he would say if I allow it.

MR. BUTLER:  He's going to say that he was told to pay him.  He refused --

THE WITNESS:  By the defendant?

MR. BUTLER:  Yes, by the defendant.  He refused to pay him.  He did not pay him.  The shooting incident occurs, which we will present and the Court has already ruled on, and then after that, he began paying him $1500 a month.

THE COURT:  After the shooting.

MR. BUTLER:  After the shooting.

MR. WERKSMAN:  I mean, this is complete sandbagging that this is another extortion victim now that we have to defend against.  First of all, we didn't even have an interview with R. until just last week when he was interviewed prior to trial starting.  So anything coming in about On and Off being extorted and it happened after the shooting -- and this is just literally surprised in the middle of direct.  They're --

THE COURT:  You are required to give notice; are you not?

20

MR. BUTLER: We provided the reports of investigation that summarized his witness interview last week. He never paid the defendant himself. His manager did. And he provided the screenshots of that last night. We're not trying to introduce those, but we did provide them to defense counsel last night.

To be clear, he was steadfastly against testifying throughout -- that's sort of part and parcel with an extortion racket -- until we met. When we met with them for the first time was the first time we knew that he was actually going to be a witness. We would have included him in the superseding, had he been willing to.

MS. SOSA: And there's other ways to handle that. Then you make a motion, because we're working on getting him to testify, and you get the 404(b) approval. But to wait until literally -- and we had an email last night with the screenshots of the payments. We were told this morning they weren't coming into evidence.

There was no indication until this very minute that this witness was going to say anything about being extorted by the defendant. This is exactly the kind of surprise and sandbagging that the law disfavors.

THE COURT: All right. It is very late to be producing this. I recognize that the witness was reluctant. So the concern I have, though, is that obviously there's an

effort underway, through cross-examination, to create an innocent explanation for these relationships and the reason why the defendant is being compensated.  And that's been prevalent throughout the cross-examination.  This is not the defense's case-in-chief, but the government's case-in-chief.  And this has been prevalent throughout the cross-examination of multiple victims.

So this is what I'm going to do.  I'm going to exclude it for now.  This victim -- this witness is going to remain on call and subject to recall.  And I will reconsider it if, obviously, this sort of cross-examination continues.  And -- because the government should be entitled to rebut it.

So I'll exclude it for now.

MR. BUTLER:  Thank you, Your Honor.

MS. SOSA:  Thank you.

*(End of conference held at the bench.)*

BY MR. BUTLER:

Q.    Were you working at On and Off on July 15th, 2022?

A.    Yes.

Q.    Did you see the defendant that night?

A.    Yes.

Q.    Will you please tell us how that interaction began.

A.    First of all, he just appeared all of a sudden from behind.  At the time, I was standing at the parking lot.

Then he asked me a question, who are those in the car that were parked in front of the premises at the parking lot.

Q.    Okay.

Can you turn in your binder in front of you to what's been marked as Government Exhibit 19 and Government's Exhibit 20.

A.    Yes.

Q.    Do you recognize what's been marked as Exhibits 19 and 20?

A.    Yes.

Q.    What are they?

A.    This is what I had produced.  CCTV, surveillance camera footage recorded.

Q.    And is it from the night we just discussed?

A.    Yes.

Q.    And are those exhibits CDs that you signed after reviewing those videos?

A.    Yes.  Correct.

Q.    Do they fairly and accurately reflect the events that occurred On and Off on July 15th, 2022?

A.    Yes.  That is correct.  Yes.

MR. BUTLER:  Your Honor, at this time, the government would move Exhibits 19 and 20 into evidence and ask to publish for the jury.

THE COURT:  Any objection?

MS. SOSA:  No objection.

THE COURT:  19 and 20 are admitted.

You may publish.

*(Exhibit 19 received in evidence.)*

*(Exhibit 20 received in evidence.)*

MR. BUTLER:  Starting Exhibit 19.

*(The media was played.)*

BY MR. BUTLER:

Q.    Pausing Exhibit 19 at the 18-second mark.

Can you identify who can be seen in this video?

A.    Yes.

Q.    Can you tell the jury who they are?  And if you'd like, you can circle them on the screen.

A.    Yes.

(Circling.)  This is myself, me.

(Circling.)  And this is D.K. who's sitting over there.

(Circling.)  And this individual is my friend.

Q.    For the record, the witness has circled the third -- the person all the way on the left of the parking lot as himself; the person to the right of that as the defendant; and the person on the right of the screen as his friend.

So can you describe what is occurring on the screen right now?

A.    I was on the way to the car, which is in the very front

24

of the screen.  I was going to ask who that person was because D.K. was looking behind me, and I had the impression that he was going to go and ask the question too.  So I just wanted to go before him and then ask before he asked.

Q.   Why did you want to ask before he asked?

A.   Because my feeling at the moment is not that good.  So I just wanted to go before him and ask him because I was feeling that something dangerous might unfold.

Q.   What gave you the impression that something dangerous might unfold?

A.   He just appeared all of a sudden, right behind me, right behind where I'm standing in the video.  And then he had his hands in the pocket.  I was thinking by any chance, you know, that -- anyway, I wasn't feeling good.  And then also, previously, he -- the vehicle is company.  I was under the impression that he was trying to check out because there was certain companies that he didn't like.  So I thought he was going to check it out, what company they are.

Q.   Was there anything else about how the defendant was dressed that gave you a bad impression?

A.   Typically when he appears, he did not appear out of the blue like that.  But this time, he appeared from behind.  And he was speaking very quietly, and I sensed -- there's a certain sense of threatening.

         MR. BUTLER:  Okay.  I'm going to resume the

exhibit.

*(The media was played.)*

BY MR. BUTLER:

Q.   Pausing at the 30-second mark.

Can you just tell us what we just saw occur?

A.   Yes.

Okay.  When I went up to this car, I couldn't tell who this car was for.  So I was going to go to my manager and I was going to ask the manager to pull the car out.  Because earlier, I saw a girl getting into the car.  So I was going to tell him, "Just let them get out quickly."

The reason I pointed to my friend before I went inside, I just wanted to -- I just wanted him to watch if any problem occurs.  And then on this particular day, there was no security guard, so my friend was helping in place of the security guard.  And I was out as well on that day.

Q.   At the end of the clip we just saw, where did you go?

A.   Even after the business was closed?

Q.   No.  Where did you go in that video?

A.   I went inside the shop.

Q.   Thank you.

MR. BUTLER:  I'm going to play it till the end.

*(The media was played.)*

MR. BUTLER:  Moving to Exhibit 20, and pausing at about the 2-second mark.

*(The media was played.)*

BY MR. BUTLER:

Q.   What happened in between the last -- the end of the last video and this video?

A.   In between, I came out.  You know, I had gone inside, and I came out there.  And then I saw the cars leaving.

Q.   Do you know what happened to the hostesses who had gotten out of the car?

A.   Oh, when I went inside, I told my manager to let them out quickly, let them leave quickly.

Q.   So did they get back in the car?

A.   Yes.

Q.   Do you know where the defendant went?

A.   I'm not too sure at the time where he went.  But I just saw him just walking and left.  He was going -- I saw him when he was exiting -- when I was exiting.  When I was leaving the premises, the cars were all leaving.  And then he was walking up.  That's all I saw.

        Probably he moved before the car did, and he probably went out before the car.

Q.   Can you circle on the screen for the jury where the exits would be from the parking structure or the club?

A.   (Circling.)

Q.   So the witness has circled an open entrance at the top of the parking garage at the top of the screen.

MR. BUTLER:  Resuming the video.

(The media was played.)

BY MR. BUTLER:

Q.    Pausing about the 18-second mark.

Can you tell us what just happened?

A.    At the time, we heard a gun sound, so we were startled and we bent forward.

MR. BUTLER:  We'll resume the video.

(The media was played.)

BY MR. BUTLER:

Q.    Can you now turn in your binder to what's been marked as Exhibit 23.

A.    Yes.  I'm there.

Q.    Do you recognize that?

A.    Yes.

Q.    Is it another CD signed by you?

A.    Yes.

Q.    Is it another version of the same video we just saw?

A.    Oh, yes.

Q.    Does it fairly and accurately represent what you saw in the security footage you provided from On and Off that night?

A.    Yes.

MR. BUTLER:  Your Honor, the government would move Exhibit 23 into evidence and publish for the jury.

THE COURT:  Any objection?

MS. SOSA:  No objection.

THE COURT:  23 is admitted.

You may publish.

*(Exhibit 23 received in evidence.)*

MR. BUTLER:  Playing Exhibit 23.

*(The media was played.)*

BY MR. BUTLER:

Q.   Pausing a few seconds in.

Is the van at the top of the screen the same van that we saw pull in that you spoke to the driver?

A.   Yes.

MR. BUTLER:  Resuming.

*(The media was played.)*

BY MR. BUTLER:

Q.   After this incident, did you hear from the defendant?

A.   Yes.  There was a contact made.

Q.   What type of contact?

A.   The contents of the contact was something like, "What happened back then?  Was there anybody who got injured?" You know, that kind of questions.

Q.   Was this in person? a phone call? a text message?

A.   Phone call.

Q.   And when was the phone call?

A.   Though I cannot remember exactly when, I think it was

sometime within an hour.

Q.   Did he ask you about this security footage?

A.   Yes.

Q.   What did you tell him about the security footage?

A.   Ours wouldn't record.  That's what I told him.

Q.   That wasn't true; was it?

A.   Correct.

          MR. BUTLER:  One moment.

          No further questions, Your Honor.

          THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MS. SOSA:

Q.   Good morning, Mr. Kwag.

A.   Yes.  Good morning.

          *(Screenshot of video displayed.)*

BY MS. SOSA:

Q.   So looking at Government's Exhibit 19, starting at the beginning.  Just on the screen.  We'll look at the video together.

A.   Yes.

Q.   Over on the right-hand side of the screen, that's you, your friend, and Mr. Cho speaking; correct?

A.   Yes.

Q.   And Mr. Cho joined you and your friend from the left side of the parking lot, right, from over that direction

30

(circling).

A.    Yes, the direction the arrow is pointing.

Q.    Okay.  So he came to you guys from the right side of the screen, from over there?

A.    Yes.  He appeared from behind.

Q.    Okay.  And your back was to the right-hand side?

A.    Yes.  Because I was looking to my shop which is on this side.

Q.    Okay.  And you --

        MS. SOSA:  I'm going to play the video from the beginning.

                    *(The media was played.)*

BY MS. SOSA:

Q.    And sir, the van that just pulled up in the center of the screen and the girls that got out, those are doumi; correct?

A.    Yes.

Q.    And the person driving is a doumi driver?

A.    Yes.

                    *(The media was played.)*

BY MS. SOSA:

Q.    You approached the driver first; right?

A.    Yes.

Q.    And you had your hand in your pockets too; correct?

A.    Yes.

31

          MS. SOSA:  Continuing to play Exhibit 19.

                    *(The media was played.)*

BY MS. SOSA:

Q.   Now, sir, you provided this footage to the police;
correct?

A.   Yes.

Q.   Are the time stamps on your cameras correct?

          I will back up and play a few more seconds so that
the tool bar goes away.

                    *(The media was played.)*

BY MS. SOSA:

Q.   So you see the time stamp at the top of the screen?

A.   Yes.

Q.   And at the end of the video, it says 52:01.  It would
play to 52:02; is that right?

A.   Yes.

          MS. SOSA:  Now looking at Exhibit No. 20.

                    *(Screenshot of video displayed.)*

BY MS. SOSA:

Q.   This video starts at 53:19; right?

A.   Yes.

Q.   So there's 90 seconds in between the first video and
the second video.  Sorry, not even 90 seconds.

          There's 80 seconds been the first video and the
second video.

32

A.    Yes.

Q.    Did you cut this video into pieces like that?

A.    No.

Q.    So when you provided the video, it was one complete video; correct?

A.    No.

Q.    So did you cut the video into two, or you provided it as one video?

A.    No.

Q.    I think we don't understand each other.

When you gave the video to the police --

A.    Yes.

Q.    -- you gave them the whole video; is that right?

A.    No.

Q.    What did you give police, then?

A.    Because this happens to be a motion detector, so it was kind of -- it was recorded being cut, I think, because of the delay.  That's what caused that to happen.

Q.    Okay.  You will agree with me, then, that -- there's 80 seconds that there's not video of.

A.    I couldn't calculate exactly how long, whether it's 80 seconds or not.

Q.    Okay.  At the end of Exhibit -- at the end of Exhibit 19, the first video, we see Mr. Cho at the van; right?

33

A.    Yes.

Q.    And at the beginning of Exhibit 20, Mr. Cho is it not there; correct?

A.    Correct.

Q.    Mr. Cho had actually -- you've already come back outside; right?

A.    Yes.

Q.    And Mr. Cho had already left going this way (Drawing arrow); correct?

            MR. BUTLER:  Objection, Your Honor.  Misstates the testimony.

            THE COURT:  Sustained.

BY MS. SOSA:

Q.    Which way did Mr. Cho leave?

A.    When I came out of the shop, I saw him just walking at around this location (circling).

            THE INTERPRETER:  This is the interpreter.  He drew a blue line.

            THE WITNESS:  Perhaps when I got out, right around here (circling), there must have been some delay.  There was a door underneath.  So in front of that door, I think I -- after I opened that door, I told the manager, "Just hurry up.  Don't let other companies come here."

BY MS. SOSA:

Q.    Okay.  So there just happened to be no video from when

34

the --

A.    Yes, for that short time.  Yes.

Q.    Right.

And it stops when the individual in black clothing turns to face the camera.  That's at the end of Exhibit 19.

*(The media was played.)*

BY MS. SOSA:

Q.    The video stops when the person in black, in the middle of the screen, starts to face the camera; correct?

A.    Yes.

Q.    And we don't see that person again.

A.    Correct.

MS. SOSA:  One moment, Your Honor.

No further questions, Your Honor.

THE COURT:  Redirect.

MR. BUTLER:  No further questions, Your Honor.

THE COURT:  Sir, you are excused for now.  You remain on call in the event that the government should ask you to return to testify.

Do you understand?

THE WITNESS:  Yes.  Yes.

THE COURT:  Okay.  Thank you.  You're excused for now.

THE INTERPRETER:  Am I excused too?

MR. BUTLER:  Yes.

THE COURT:  You may call your next witness.

MS. MacCABE:  Thank you, Your Honor.

The government calls Los Angeles Police Department Officer Stephen Cavazos.

I apologize, Your Honor, for the delay.  One of the special agents has just stepped outside to call the witness to locate him.

THE COURT:  All right.

*(Pause in the proceedings.)*

MS. MacCABE:  Your Honor, as an update, I've just been informed that that witness is not answering.  So we'll be prepared to call Officer Jacob Rice which would be our next witness after Officer Cavazos.  If the Court could just give us just the briefest recess.  He is en route right now.

THE COURT:  All right.  Let's just take a brief recess, then.  We'll give everybody a break.  Hopefully, it'll be short.  It's intended -- it's meant to be short. All right.

I remind you of your obligation not to discuss the case with anyone, ladies and gentlemen, or to form or express any opinion about this case until it's given to you for deliberations.

We'll take a brief break.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

36

THE COURT:  All right.  The jury has exited the courtroom.

With respect to my ruling at the sidebar, I do want to point out, because I did not have the benefit of having the rule before me, but Rule 404(b)(2) does envision the possibility of such evidence being produced at trial. The prosecutor is required to provide reasonable notice of the general nature of such evidence that he or she intends to offer and to do so before trial or during trial if the Court, for good cause, excuses lack of pretrial notice.

The government has made a record that the witness was reluctant and unwilling to testify and cooperate.

So I will say again, the 404(b) evidence that I admitted previously touches on this area of other uncharged acts of extortion.  And I admitted them for purposes of proving motive, intent, knowledge, and so on, as set out at the pretrial conference.

So as I said, there's been a good deal of cross-examination of government witnesses, aimed at trying to explain a way the -- the reasons for the witness's contacts with the defendant.  So I am still -- I believe that showing of good cause has been made, given the witness's unwillingness to cooperate based on fear in this case.  But as of now, he's not testifying.  But I may still allow this.

37

Thank you.  We'll be on a brief break.

MS. MacCABE:  Thank you, Your Honor.

*(Recess.)*

THE CLERK:  All rise.

*(The jurors entered the courtroom.)*

THE CLERK:  All rise.  This United States District Court is once again in session.

Please be seated and come to order.

THE COURT:  Counsel, you may call your next witness.

MS. MacCABE:  Thank you, Your Honor.

The government calls Officer Jacob Rice.

THE CLERK:  Good morning.

THE WITNESS:  Good morning.

THE CLERK:  Please raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE CLERK:  Thank you.  You may be seated on the witness stand.

And if you would, please state and spell your full name for the record.

Project into the microphone, and speak slowly.

THE WITNESS:  Yes.  My name is Jacob Rice; J-A-C-O-B, R-I-C-E.

THE COURT:  You may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.    Good morning, Officer Rice.

A.    Good morning.

Q.    Can you introduce yourself to the jury, and tell them what you do for a living?

A.    Yes.  I'm a senior lead police officer for the Los Angeles Police Department.

Q.    And where do you work for the Los Angeles Police Department?

A.    I work in the Southeast Division which patrols the area of Watts in South L.A.

Q.    Can you please tell the jury about some of your training with the Los Angeles Police Department?

A.    Absolutely.

I have about 12 and a half years on job.  During the academy, you know, we had a block of training on gang membership, recognizing gang members, stuff like that.

From there, I went to Central Division which is, like, the Downtown area.

From there, I was trained by my various training

officers who had experience with gangs and other things like that who kind of taught me about gang culture.  We talked and had numerous conversations with gang members arrested, additionally numerous gang members.

From there, I went to the jails.  I worked the jails for six months.  In the jails, you are -- you have a training on how to recognize gang tattoos.  Part of our job in the jails is to actually document and photograph gang tattoos.  And in that setting, oftentimes gang members will even tell you about their tattoos, tell you a little bit about them, what they are and stuff in that setting.

We also get to kind of know in the jail system, which is different than prison, but in the jail system, kind of different cultures.

From there, I went back to Central Division which is, once again, the Downtown area.

In Downtown, I worked with what, at the time, was called the Safer Cities Initiative.  The Safer Cities Initiative was tasked with protecting and serving the homeless population of Skid Row.  With that, I was -- unfortunately, a lot of the homeless population down there are former gang members, you know, guys who've dropped out or got into narcotics and other things.

But also, what's extremely unfortunate is that a lot of gang members also take advantage of the addictions of

the homeless community down there.  And what I learned down there is I arrested numerous gang members, including the Grape Street Crips, which have a huge presence down there in doing narcotics.

From there, we got to recognize narcotics selling and instances where gang members had controls of certain area and stuff.

From there, I went to Southeast Division which I've been for the last ten years.  In Southeast Division, once again, it patrols the area of Watts.  I worked patrol. I also worked a unit that was called the Parole Compliance Unit.  The Parole Compliance Unit was tasked with monitoring those who are on probation and parole within Southeast Division, most, an overwhelming majority, which were gang members.

In that time, we got to serve -- we were tasked with searching those who are on probation and parolees homes, their rooms, seeing how they live, seeing the clothes they wear.  You get a lot of graffiti in their rooms and things of that nature.  We recovered a lot of firearms from their houses; their cars as well.  You get to learn a lot about kind of the gang culture there too, by seeing how they live.

From there, I worked the gang enforcement detail for five years in Southeast Division.  When you're in the

41

gang enforcement detail, you're tasked with monitoring and tracking the gang -- criminal gang activity within the division which is the Watts division.

We have many large gangs that have been around for a very long time within our division.

And from there, we take all the shooting reports, all gang crime reports.  So we got to talk to numerous witnesses, victims.  You obviously make countless, countless contacts with gang members, not just arresting, but, you know, a lot of consensual stuff.  You get to know them very well.  We take a lot of crime reports.

And also in that time, I had numerous trainings where I went to the basic gang awareness school which was a 40-hour block of training.  I had gang intervention training when you get to work with gang interventionists who are trying to get gang members off the streets.

And I also testified on numerous occasions as a gang expert at that time.

Additionally, after that, after five years in there, I went to a -- to be honest, a very exciting new unit called the Community Safety Partnership which is -- which is what I'm a part of now.  The Community Safety Partnership I've been in for three and a half years now as a senior lead.

And essentially what we're doing is we're tasked

42

with monitoring the housing developments within Watts.  And one of the -- the housing development I'm tasked with protecting and serving is Jordan Downs.  In Jordan Downs, I'm tasked with having -- going to numerous community meetings.

But also, Jordan Downs is controlled by a very violent street gang called the Grape Street Crips.  The Grape Street Crips have a stronghold over that community, which instills a lot of fear within that community.  I've made countless arrests of Grape Street Crips in that area and talked to many victims of violent crime.

But one of my sense of pride is also in the Community Safety Partnership, we provide a lot of resources to the community and, additionally, a lot of gang members. And I'm very proud to say that we've gotten many gang members jobs, got them out of that area.  We get them also mental health counseling.  We work tight -- we worked very closely with mental health.  And also recently went to a training called -- it was basically for trauma-informed personnel to help those who -- a lot of gang members have a lot of trauma and how to help them cope through that.

And what I've learned is really helping out those who have been in gangs and gang members and trying to get them jobs, they've been able to open up, talk about why they got in a gang, how they got in the gang, and just gang

43

culture in general.

And during that time, I've also testified as a gang expert while in Community Safety Partnership as well. And I believe all -- through all that -- you know, it's a lot of training and a lot of experience in that time.

Q.    Thank you.

You talked about the Grape Street Crips a little bit, in addition to all of your experience and training throughout the years.

Do you know how many members are in Grape Street Crips?

A.    That's an excellent question.  Their stronghold is it within Jordan Downs.  But they're, honestly, across the nation.

During my time in Community Safety Partnership, we've actually helped out Memphis.  They have a huge presence of Grape Street Crips.  And approximately, our best guess, is 3,000 gang members across the nation in Grape Street Crips.

Q.    And this might be a difficult question, but approximately how many Grape Street Crips members have you encountered during your time with the Los Angeles Police Department?

A.    Oh, hundreds.  In the hundreds.

Q.    And about how often do you encounter them?

44

A.    Daily.  Every day at work.

Q.    When was the last time that you interacted with a Grape Street Crips member?

A.    Actually, yesterday.  We took a shooting report and spoke with some gang members inside Jordan Downs.

MS. MacCABE:  At this time, the government asks the Court to qualify the witness as an expert under Rule 702 and find that the witness's principles and knowledge are reliable because they are an application of his extensive case work, including years of community policing and otherwise in the Grape Street Crips territory; interaction and prosecution of multiple Grape Street Crips members; knowledge of the Jordan Downs Housing projects and gangs that operate in that vicinity; and shed light on the topics of the testimony that the Court has previously ruled admissible.

THE COURT:  All right.  The witness may testify as an expert in this area.

BY MS. MacCABE:

Q.    Can you describe some of the ways that Grape Street Crips members make money?

A.    Yes.

You know, they commit lots of robberies, narcotics selling, extortion, you know, things of that nature.  Burglaries, a lot of burglaries.  Lately, tax fraud.  Things

45

like that.

Q.    With respect to extortion, will you please describe the type of people or businesses that the Grape Street Crips would extort?

A.    Yeah.  A lot of times, it's -- it's businesses within the area that are controlled within the area.  You know, oftentimes, they'll offer a protection-free -- a protection fee.  Because unfortunately, in Watts, there's so many close gangs that are in rivals to them.  So they'll say, "Hey, if you want a protection, you gotta basically pay us," essentially.

Also, a lot of times, they take advantage of illegal illicit activity in the area.  Like if you want to sell narcotics in the area, you have to pay them a certain amount.  If you want to operate chop shops, things of that nature, you have to pay them a certain amount.  So they especially take advantage of those kinds of illegal activities within the area.

But local businesses -- it doesn't even have to be local.  Sometimes they just use the Grape Street name and themselves.  It's just so -- a way to collect those protection fees or anything like that, beyond the burglaries and everything else.  But especially, they like to take advantage of people and their fear that they have to collect their money.

46

Q.   You mentioned protection fees.

A.   Yes.

Q.   Who are they protecting these victims from?

A.   A lot of times, they'll even say it's themselves.  "If you don't pay us, we'll get you."  A lot of times, it's rival gangs or -- so other people don't rob them.  It's a lot of different things that someone could offer them.

          But the offer for rival gangs are that they won't -- they'll use their weight and their violence to make sure they don't get robbed or anything else.  And also, like I said, if they don't make it known that they're -- if they're around them, that they have to pay, or else they will feel violence from them.

Q.   And when you say "they will feel violence from them," could you describe "they" and "them"?

A.   Oh, yeah.  Whoever the victim is of the extortion.  And "them" being the gang.

Q.   So the Grape Street Crips --

A.   Yes, correct.

Q.   -- would be violent towards the victims --

A.   Correct.

Q.   -- if the victims didn't pay?

A.   Correct.  Correct.

Q.   Are those extortions usually reported?

A.   Very rarely, if any.

Q.   Why not?

A.   One thing I've learned, especially lately, being in Community Safety Partnership, working with the communities, I really learned just what fear does to a community and just how hard it is for them to report.

     And what I get told all the time is, "Officer Rice, you go home.  I live here.  I work here.  And if I don't pay, someone will get me."

     And the fear of cooperation with the police is always there.  They've seen what happens occasionally, you know, when people do cooperate.  Oftentimes, they're an extortion.  They'll let you know that if you do cooperate with the police, what will happen.

     But ultimately, it's fear.  And they're so afraid that if they do tell the police that something will happen to them.

Q.   How are you finding out about these extortions, then, if they're usually going unreported?

A.    I am very fortunate enough to have built a great relationship with the community I serve.  And it honestly blew me away, when I got into this Community Safety Partnership, how much stuff, honestly, was unreported to the police.

     And a lot of it is just relationships with the community.  They'll tell you, "You know, Officer Rice, this

48

has happened to me in the past or a friend I have, and we just -- we can't -- we don't know what to do.  You know, it's too hard to report.  What if they come get us?  They know where we live.  You know, we're here every day."

How I have learned is just by building that relationship with the community and going to meetings and everything.  Just building relationships, like I said.  And also meetings, going to countless meetings and being visible, they're able to trust me enough to tell me this stuff.  But I'm still actively working to get them the courage to report it more so we can do something more about it.

Q.   By "meetings," do you mean community meetings?

A.   Oh, yeah, community meetings.  There's plenty of community meetings in Jordan Downs.

Q.   In your training and experience, do you know how someone becomes a Grape Street Crips member?

A.   Yeah.  There's a few ways, actually.  Traditionally, you get jumped in.  When you get jumped in, essentially you want to join that gang, oftentimes at a young age, they'll gather around and they'll just beat you badly.

We've seen this on numerous occasions.  We actually have cameras equipped in most of the housing developments.  And we've seen quite a few people getting jumped in.  It's extremely violent.  And that's one way.

Another way is if you have a family member who's a very well respected member of the gang, oftentimes you can get in through blood, is what they say.  And you do see that.

And other times what we see is that sometimes if you provide enough money to the gang.  Gangs, essentially, in the end, are about money.  If you can bring in money, if you can provide that to the gang, either money or violence, the -- you can join the gang that way as well.

Q.   Are you familiar with Grape Street Crips symbols and tattoos?

A.   Yes.

Q.   Have you ever seen a non-Grape Street Crip member wearing their colors, using their symbols in gang territory, or with other Grape Street Crip members in photographs?

A.   No.

Q.   Would there be consequences for displaying those symbols or wearing those colors in the territory if you were not in the gang?

A.   Yes.  Multiple.

Q.   Such as?

A.   Such as, for one, if you don't -- if you're not part of the gang, you don't put in work for the gang and your tattooing yourself and your marking yourself, you'll be met with violence by that gang.  It's a sign of disrespect.

Additionally, other rival gangs would know that. And now -- gang members ultimately know violence. That's what they know. It's a culture within. And so you would be expected to be met with violence from either that gang or a rival gang.

MS. MacCABE: I'm going to publish what has previously been admitted as Government's Exhibit 45.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q. Is there anything on Exhibit 45 that, as an expert, you know to be Grape Street Crips related?

A. Yes.

Q. Can you walk the jury through that?

A. Yes.

The first thing I see is at the very top. "God King, Baby Loc." Baby Loc is a set within Grape Street Crips. God King could be a moniker, something that you would call someone. But Baby Loc is a reference to a set within Grape Street Crips.

The logo you see is -- it's in purple, which is the color for --

Q. I don't mean to interrupt you --

A. Yes.

Q. -- but you can also draw on the screen in front of you.

A. Oh, I didn't know that.

Q.    It's a touch screen.

A.    Just finger -- just use my finger?  Oh, wow.  Okay.

So we see the Baby Loc.  That's a reference to the Grape Street Crips, a set within the Grape Street Crips.

This logo we see right here, first thing I notice, right off the bat, is obviously, it's in purple.  Purple is the color for the Grape Street Crips.

And if you see within that, there's an upside down Jordan Downs -- I'm sorry, upside down Jordan logo.  That Jordan logo, when it's upside down, is a symbol used by the Grape Street Crips.  They come from Jordan Downs, so they flip the logo upside down.  That's why it's a Jordan logo.  So if you see it upside down, that's in reference to the Grape Street Crips.

You also see Jordan Downs which is the area controlled by the Grape Street Crips.  You see a W, which is a reference to Watts, oftentimes.  And once again, you see the Watts underneath it as well.

Underneath, right here (circling), you see a bunch of grapes which would be in reference to the Grape Street Crips.

You see P.R.M., which would be Peda Roll Mafia, which is another set within the Grape Street Crips.

We see right here (circling), "^10 TREY.  10 TREY is 103."  That's their biggest street, a street they claim,

103rd Street.  It's actually 103rd and Grape.

It actually says "Keep calm" -- and forgive my language -- "I'm a motherfucking Grape."  And you actually see that, in the F word, that there's two Cs instead of c-k. The Crips do not use a K after the C because it's a reference to "Crip killer."  So they'll use two Cs.

I also see right here (circling), it says "GIP Kill B."  GIP means "Grape in Peace."  The Kill B --

Q.   Sorry, you can do it again.  I just --

A.   Oh, yeah, no problem.

Right here (circling), it says "GIP Kill B."  And it looks like there's more to the B.  GIP would be "Grape in Peace," in reference to a dead Grape shooter.  And it says "Kill B" with more to it.  Off my expertise and and my knowledge, it probably is Kill Bill which was a Grape shooter who was killed a few years ago within Jordan Downs.

Right here (circling), we see to "Keep calm. ^This is our mf H103D day."  The H103D day is a reference once again to 103rd.  And it's saying "hood day."  Hood day -- not to get too long into this, but a hood day is basically a day of -- a gang celebrate their gang.

So for example, in Jordan Downs, the Grape Street Crips, they celebrate October 1st, October 2nd, and October 3rd.  That's where all -- most Grape -- or a lot of Grape shooters will come together and celebrate their gang.

They dress down in their gang colors.  They oftentimes go to party.  For us who work Jordan Downs, it's our hardest day because you will oftentimes have close to 1,000 people coming into -- attempting to come in to Jordan Downs to celebrate their gang.  So that's in reference to them basically celebrating their day.  So it's hood day, but 103 is their big day, October 3rd.

You have various pictures too in here.  Just -- right here (circling) is a picture that looks like a lot of Grape Street Crip gang members.  It's kind of hard to tell, but based off the hand signals and stuff, I kind of recognize a couple guys in here that are Grape Street Crips.  So basically, it's just a group photo of Grape Street Crip gang members, displaying hand signs.

The same thing right here (circling).  And next to it, displaying another hand sign, which is -- Grape Streets often use where they put their middle finger to the thumb.  And, you know, displaying it up here (circling).  But basically three fingers up, middle fingers to the front thumb.  And what that essentially is, is for Peda Roll Mafia.  At an angle, it looks like an M, a P, and an R.  So they'll often display that hand sign.

And then the other pictures, looks like he's at a funeral.  It looks like, if I had to zoom in, almost -- in purple, it look like it says -- I can't -- oh, it says "Kill

54

Bill."  There you go.  Billy Ray Louis was -- his moniker was Kill Bill.  He was killed within the Jordan Downs, I believe off 102nd Street, a few years ago.  So he's at the gravesite for him.

And he's also wearing, in that picture, a purple bandana as well, along with like a -- you see purple cuffs and a purple -- it looks like a vest.  So a lot of purple.

Q.   What's the significance of purple?

A.   Once again, to really reiterate, Grape Street wears the color purple for their gang.  It's one of their gang -- it's their gang color, which is an obvious reference to Grapes.

MS. MacCABE:  Moving to what's previously been admitted as Government's Exhibit 46.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Does anything in this photo stick out to you in your training and experience as a reference to the Grape Street Crips?

A.   Yes.  Once again, back to the P.R.M., you see that for Peda Roll Mafia.  We see the same thing, Baby Loc.  We don't have to go through that again.

You see a purple bandana.  Personally, I know these other gentlemen who are documented, known Grape Street Crips.  I know them very well.

We obviously see a firearm which, oftentimes, gang

members like to display, especially on their social medias, to show how violent they are.

Throwing up -- once again, displaying the hand signs for Peda Roll Mafia.  You see right there (circling), right there (circling), right there (circling).

So once again -- and -- and this gentleman -- once again, I know his name.  I won't give his name.  But he's wearing all purple.  And it looks like right here (circling), that's actually a necklace of a bunch of grapes.

MS. MacCABE:  And turning to Government's Exhibit 47, which has previously been admitted.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Same question.

A.   Once again, we see numerous hand signals of the Peda Roll Mafia, right here (circling), right here (circling).  Another Grape Street hand sign often used is simple for Grape.  They'll oftentimes put their thumb to, like, their pointer finger, and then put their fingers up to make it look like a G.  You'll see that.

You obviously see numerous firearms to display their violence.

You see purple bandannas.

Once again, I recognize quite a few members in here.  The gentleman who was killed who we discussed

56

earlier, Kill Bill, is right here (circling).

We see -- this is not in Jordan Downs.  To me, I believe this would be Memphis.  Yeah.  This is Memphis to nationwide.

And right here (circling), you see -- all that, to me, would be Eastside Jordan Downs Projects, Grape Street, Watts, Baby Loc Crip.  And you see the grape bunch.

Q.   And for the record -- I know you've circled a lot of things, but for the record, the last two circles were over the hashtag at the bottom of the screen and the emojis next to it.

A.   Yes.

MS. MacCABE:  Moving to Government's Exhibit 48, which has previously been admitted.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   What sticks out in this photo to you?

A.   The first thing that sticks out is this is Jordan Downs.

Additionally, we see -- we see numerous purple.

Once again, hand signs, the same hand signs we've mentioned.

I see countless Grape Street Crip gang members that I recognize and have arrested.  A few, I've gotten a job.  Also, we see a -- all the same stuff.  Eastside Jordan

Down Project, Grape Street Watts, Baby Loc Crips.

You see -- unfortunately, you see this a lot: Little kids involved in this.  And once again, you see numerous hand signs for Grape Street.  You see the colors, you know, the bandannas, the purple bandannas.  Just a lot of purple and hand signs.  And once again, this appears to maybe even be behind the gym which is used by the community in Jordan Downs.

MS. MacCABE:  And Government's Exhibit 49, which has previously been admitted.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  Going back to the same thing, we see the same hand signs.  And once again, this is Kill Bill, as they called him, right here (circling).  You see the purple bandannas.  You see the hand signs again.  The same hand signs over and over again.  The same hashtags, you know, Memphis to nationwide, Watts to Memphis to nationwide.  I can't really tell exactly where this one is.  But yeah, just hand signs.  You see a lot of the gang colors again.  And, once again, I recognize quite a few gang members in there.

BY MS. MacCABE:

Q.   In your experience, would these symbols and colors and locations of where these individuals were and everything you've already described, would this behavior be acceptable to Grape Street Crip members if one of the individuals was

not a member of Grape Street Crips?

A.    Absolutely not.

Q.    Can you please turn in your binder to what has been marked as Exhibit 141, and review it, and let me know done when you're done.  There's a binder right next to you.

A.    You said 141?

Q.    Yes.

A.    Okay.  I'm on 141.

Q.    Have you seen -- oh, please look at every page.

                (Witness reviewing exhibit.)

A.    Okay.  I reviewed it.

Q.    Thank you.

        Have you seen these before in preparation for your testimony today?

A.    Yes.

Q.    Do they show what you know to be Grape Street Crips tattoos?

A.    Yes.

        MS. MacCABE:  Your Honor, at this time, the government would ask to conditionally admit Government Exhibit 141 and publish to the jury.  And a future witness will authenticate those photographs being taken pursuant to an order of the Court.

        THE COURT:  Any objection?

        MS. SOSA:  No objection.

59

THE COURT:  All right.  141 is conditionally admitted, as stated.

You may publish.

*(Exhibit 141 received in evidence.)*

MS. MacCABE:  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please identify any Grape Street Crip-related tattoos on page 1 of Exhibit 141, which is displayed on the screen.

A.   Yes.  We see the obvious Grape Street -- it looks like a bunch of grapes.  The same thing right here (circling) that is actually in purple.  And you see a -- the same thing, a bunch of grapes, and it looks like a hockey-type ski mask.  Then you can see one of them's in, once again, purple.

MS. MacCABE:  And turning to page 2 of this exhibit.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Do you see any Grape Street Crips-related tattoos on page 2?

A.   Yes.  The first thing I notice is on the legs.  I mentioned Kill Bill earlier.  Once again, it's a Grape Street shooter who was killed within Jordan Downs.

Mafia Ray is also another Grape shooter who was killed a few years back, I believe in Hawthorne, who's a Grape shooter.  So these are two Grape Street Crips that are dead.

We see a -- P.R.M. once again, for Peda Roll Mafia.  And that's all you can kind of see on this, but you see those three.

MS. MacCABE:  And moving to page 3.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  Yeah.  The first thing I notice, upside down Jordan.  I mentioned that.  I also notice purple.  A lot of times, gang members will use their colors they use; oftentimes, just to just shade or just show that color a lot.  And you can kind of tell, like, when it doesn't look like it's in place, right.  Like this is a purple bandana.  So you see -- you see the purple.  And even the cartoon character's got a purple shade.  And you see the upside down Jordan once again.

MS. MacCABE:  And moving to page 4.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  Once again, you see a bunch of grapes.  You see the upside down Jordan on this side (circling), part of the Peda Roll.  It looks, you know, like a skeleton face.  I wouldn't say that's -- that's not Grape. But the skeleton holding a bunch of grapes with the upside

61

down jordan.  And then on the bottom here (circling), it looks like it could be the Watts Towers, which isn't exclusive to Grape Street.  But obviously, they're in the Watts area.

MS. MacCABE:  And page 5.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  This side, we don't really see too much in reference strictly to Grape.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   How about page 6?

A.   Once again, I circled it earlier, but the bunch of grapes.  That is very closely seen.  And it's in purple.

Q.   Are you familiar with the racial makeup of the Grape Street Crips?

A.   Yes.  Patrolling the area, you know, it's --
overwhelming majority is African American.

Q.   Have you encountered non-African American Grape Street Crips members?

A.   Yes.

MS. MacCABE:  No further questions.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MS. SOSA:

Q.   Officer Rice, good morning.

A.    Good morning.

Q.    You said that you've been patrolling Southeast Division for ten years; correct?

A.    Yeah, roughly, yeah.

Q.    And you've encountered hundreds of gang members.

A.    Well, thousands of gang members, specifically Grape Street Crips.

Q.    And you interact with them daily?

A.    Daily.

Q.    And you have never met my client; correct?

A.    Never.

Q.    Thank you.

          MS. SOSA:  No further questions.

          THE COURT:  Redirect?

          MS. MacCABE:  No, Your Honor.

          THE COURT:  Is the witness excused?

          MS. MacCABE:  Yes.  Thank you.

          THE COURT:  All right.  You're excused, sir. Thank you.

          THE WITNESS:  Thank you, Your Honor.

          THE COURT:  Thank you.

          You may call your next witness.

          MS. MacCABE:  Thank you, Your Honor.

          The government now calls LAPD Officer Stephen Cavazos.

THE CLERK:  Good morning.  Please stand before me, and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.  You may be seated in the witness stand.  You can -- it's the other chair.

THE WITNESS:  Thank you.

THE CLERK:  You're welcome.

If you could please state and spell your full name for the record.

Please project into the microphone, and speak slowly.

THE WITNESS:  Stephen Cavazos; S-T-E-P-H-E-N, C-A-V-A-Z-O-S.

THE COURT:  You may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Good morning, Officer Cavazos.

A.   Good morning.

THE COURT:  Would you mind moving the mic just a little bit up.  There you go.  Raising it.  There you go. Great.  Thank you.

64

BY MS. MacCABE:

Q.    Will you please tell us what you do for a living.

A.    I am a patrol officer with the Los Angeles Police Department.

Q.    And how long have you been with the Los Angeles Police Department?

A.    I've been with the Los Angeles Police Department approximately six years.

Q.    Were you working on July 15th, 2022?

A.    Yes, I was.

Q.    Were you wearing your body camera that night?

A.    Yes, I was.

Q.    Did the Los Angeles Police Department receive a call about a shooting after midnight on July 15th, 2022?

A.    Yes.

Q.    Do you remember what time?

A.    No, I can't recall.

Q.    Would it refresh your memory to look at an incident recall details log?

A.    Yes.

        MS. MacCABE:  Your Honor, may I approach?

        THE COURT:  Yes.

        THE WITNESS:  Thank you.

BY MS. MacCABE:

Q.    Will you please look at that; don't read it; and let me

65

know when you've looked at it.

A.    Okay.

Q.    Does that refresh your recollection?

A.    Yes.

Q.    When was the call made?

A.    According to the incident, about 1:57.

Q.    Did you respond to that call?

A.    Yes.

Q.    Do you remember where you went?

A.    Vaguely.

Q.    Could you describe where it was, not an address, but just what type of location.

A.    It was an underground parking structure.

Q.    What did you observe?

A.    I observed a van with three people inside; one female that had been struck by gunfire.

Q.    And will you please look in your binder at Exhibits 21 and 22, and let me know when you're done.

A.    Okay.

Q.    Do you recognize those?

A.    Yes.

Q.    How do you recognize them?

A.    They're a CD copy with my signature on it.

Q.    And did you review the recordings that are on those CDs?

A.    Yes.

Q.    Are those clips from your body camera footage the night we've been discussing?

A.    Yes.

Q.    And do they fairly and accurately depict what saw?

A.    Yes.

MS. MacCABE:  Your Honor, I move to admit Exhibits 21 and 22 into evidence and request permission to publish to the jury.

THE COURT:  Any objection?

MS. SOSA:  No objection.

THE COURT:  Exhibits 21 and 22 are admitted.

You may publish.

*(Exhibit 21 received in evidence.)*

*(Exhibit 22 received in evidence.)*

MS. MacCABE:  Thank you.

Now playing Exhibit 21.

*(The media was played.)*

BY MS. MacCABE:

Q.    And pausing just a couple seconds in.

What are we looking at in this screen grab?

A.    It's going to be a shattered back window in the underground parking structure where the radio call came out of.

MS. MacCABE:  Now playing Exhibit 21 again.

*(The media was played.)*

BY MS. MacCABE:

Q.   Are those the individuals you described seeing?

A.   Yes.

Q.   Can you identify which individual is the woman you saw shot?

A.   Someone laying down, being hovered over by the two other individuals.

          MS. MacCABE:  Now publishing Exhibit 22.

                    *(The media was played.)*

BY MS. MacCABE:

Q.   Did you then accompany the victim to the hospital?

A.   Yes, I did.

          MS. MacCABE:  No further questions.

          THE COURT:  Are you leaving your laptop up there?

          MS. MacCABE:  I was going to, Your Honor, depending on whether or not there's cross.

          THE COURT:  Cross-examination?

          MS. SOSA:  There is cross-examination.

          THE COURT:  All right.

                    **CROSS-EXAMINATION**

BY MS. SOSA:

Q.   Good morning, Officer Cavazos.

A.   Good morning.

Q.   You said that you went to the hospital with that

victim?

A.    Yes.

Q.    And what was her injury?

A.    I can't really recall at that time.  I believe it was a gunshot wound to her neck.

Q.    Was she actually shot, or was it a graze wound?

A.    I can't say if it was either or.

Q.    All right.  Just a moment.

            MS. SOSA:  No further questions.

            THE COURT:  Redirect?

            MS. MacCABE:  No, Your Honor.  Thank you.

            THE COURT:  Is the witness excused?

            MS. MacCABE:  Yes, Your Honor.

            THE COURT:  You're excused, sir.  Thank you for being here.

            THE WITNESS:  Thank you, sir.

            THE COURT:  You may call your next witness.

            MS. MacCABE:  Your Honor, the government calls Special Agent John Armstrong.

            THE CLERK:  Good morning.  Please approach and stand before me, and raise your right hand to be sworn.

            Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

            THE WITNESS:  Yes, ma'am.

THE CLERK:  Thank you.  You may be seated in the witness stand.  Either chair is fine.

If you will, please state and spell your full name for the record.

Project into the microphone, and speak slowly. Thank you.

THE WITNESS:  John Paul Armstrong; J-O-H-N, P-A-U-L, A-R-M-S-T-R-O-N-G.

THE COURT:  You may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Good morning, Special Agent Armstrong.

A.   Good morning, ma'am.

Q.   Will you please introduce yourself to the jury, and tell them what you do for a living.

A.   Like I said, I'm John Armstrong.  I'm a special agent with Homeland Security Investigations.  And I investigate federal crimes.

Q.   And about how long have you been a special agent with Homeland Security Investigations?

A.   Approximately two and a half years.

Q.   Did you do anything law enforcement related before becoming a special agent?

A.   No, ma'am, I did not.

Q.    Did you receive any training once you became a special agent?

A.    Yes, ma'am.  I attended the federal law enforcement training facility in Glencoe, Georgia, for six months.

Q.    And will you briefly describe the topics that are covered during that training.

A.    Topics include knowledge on federal law, federal crimes, conducting warrants, and conducting investigations.

Q.    Have you received any other types of training?

A.    We've received firearms training, training on conducting searches during warrants, and officer safety.

Q.    And will you please describe some of the search protocols that you were trained on.

A.    Yes, ma'am.

The search protocols that we use for our agency are always two agents per room.  If an item is found in the room, whatever agent or searcher who found the item will alert his partner in the room before touching it, before moving it.

They will call either the case agent or the team leader for that search, and they will make the determination whether it is something that we want to -- whether it is in the warrant that we are allowed to take it and if it is relevant for evidentiary purposes for the case itself.

At that point, they will call a photographer and a

notetaker who will take pictures of the item where it is and closeups.  And then whoever found the item and another agent will transport that to the evidence custodian so that there's always two people present with each item at the same time.

Q.   About how many searches have you conducted during your time as a special agent?

A.   I can't say exactly.  But probably between 30 and 40.

Q.   And were you involved in a search on March 16th, 2023?

A.   Yes, ma'am.

Q.   Was that of an address on Topanga Canyon Boulevard in Woodland Hills in California?

A.   Yes, ma'am.

Q.   Do you remember where in that residence you searched?

A.   Yes, ma'am.  I searched in the kitchen, in a bathroom, and in a bedroom.

Q.   Did you also search any vehicles that search time?

A.   Yes, ma'am.  I did search -- assisted in searching one vehicle in the driveway.  I believe it was a Mercedes.

Q.   Will you turn in your binder to Exhibit 74, and let me know once you've looked at it.

A.   Yes, ma'am.

Q.   Do you recognize what you're looking at?

A.   Yes, ma'am.  I believe that is the closet of the bedroom that I searched.

Q.    And does that fairly and accurately depict what you saw that day?

A.    I believe so, yes, ma'am.

MS. MacCABE:  Your Honor, at this time, the government would move to admit Exhibit 74 into evidence and request permission to publish to the jury.

THE COURT:  Any objection?

MS. SOSA:  No objection.

THE COURT:  All right.  74 is admitted.

And you may publish.

(Exhibit 74 received in evidence.)

MS. MacCABE:  Thank you.

BY MS. MacCABE:

Q.    So this is the closet of the bedroom that you searched?

A.    Yes, ma'am.

Q.    While you were searching, did you find any evidence in that residence that day?

A.    Yes, ma'am.  I found a cell phone in the bathroom.  And I found a few face masks in a drawer in the closet in the bedroom.  And I believe I also found a hat.  But I can't recall exactly what other items I found.

Q.    Let's start with Exhibit 71.  Can you look at that in your binder?

A.    Yes, ma'am.

Q.    Do you recognize that?

A.    Yes, ma'am, I do.

Q.    How do you recognize it?

A.    It appears to be the mask that I found in the closet.

Q.    Does it fairly and accurately depict what you saw?

A.    Yes, ma'am.

         MS. MacCABE:    Your Honor, at this time, the government would move to admit Exhibit 71 into evidence and request permission to publish.

         THE COURT:    Any objection?

         MR. WERKSMAN:    No objection.    Thank you.

         THE COURT:    71 is admitted.

         You may publish.

         *(Exhibit 71 received in evidence.)*

         MS. MacCABE:    Thank you.

         *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Is this the mask that you were talking about?

A.    Yes, ma'am.

Q.    You mentioned also finding a phone in a bathroom.

A.    Yes, ma'am, that's correct.

Q.    Will you please describe how you found that phone.

A.    I found the phone while searching under the sink in the cabinet.    It was against the back wall, underneath the sink.

Q.    What made you look in the cabinet?

A.    One of the things they teach us in the Law Enforcement

74

Training Center for searches is that people typically don't hide things on counters.  They'll often hide things in cabinets and other things.  And we're trained to search in all these areas.

Q.   And while you're searching, are you and other people involved with the search relaying information to one another?

A.   Yes, ma'am, we are.

Q.   And was any information relayed to you that day that made you look under that cabinet?

A.   Yes, ma'am.  We were informed by the personnel that were making entry into the house that an individual had attempted to climb out the bathroom window.  So I paid particular attention to the bathroom when I was searching.

Q.   Will you please turn in your binder to Exhibit 66.

          (The exhibit was displayed on the screen.)

          THE WITNESS:  Yes, ma'am.

BY MS. MacCABE:

Q.   Do you recognize that?

A.   Yes, ma'am, I do.

Q.   How do you recognize it?

A.   It appears to be the cell phone that I found underneath the sink during the search that day.

Q.   Does it also depict what else is underneath that sink?

A.   Yes, ma'am.  That is the exact position that I

discovered the phone.

MS. MacCABE:  Your Honor, at this time, the government would move to admit Exhibit 66 into evidence and publish for the jury.

THE COURT:  Any objection?

MR. WERKSMAN:  No objection.

THE COURT:  66 is admitted.

You may publish.

*(Exhibit 66 received in evidence.)*

MS. MacCABE:  Oh, I apologize.  I think I may have already published it.  I'm sorry.

BY MS. MacCABE:

Q.   So can you please circle on the screen in front of you what you were describing.

A.   That's it right there (circling), ma'am.

Q.   And for the record, the witness has circled a black rectangular shape behind some other items.

What did you do with the phone that you found?

A.   When I found it, I alerted the other person that I was in the room with.  We called for the team leader for that day to look at the item to see if it was something that we were going to be taking that day.

When that determination was made that we were, the photographer came and took this picture first, before moving it.  And then we -- me -- myself and my partner in the room

would have taken the item to the evidence custodian.

Q.    Will you now turn in your binder to Exhibit 67.

Do you recognize that?

A.    Yes, ma'am.

Q.    What is it?

A.    That is the cell phone that I found underneath the sink.

MS. MacCABE:  Your Honor, at this time, the government would move to admit Exhibit 67 into evidence and request permission to publish.

THE COURT:  Any objection?

MR. WERKSMAN:  No objection.

THE COURT:  67 is admitted.

You may publish.

*(Exhibit 67 received in evidence.)*

MS. MacCABE:  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    And that's the phone that you took to the evidence custodian?

A.    That's correct, ma'am.

Q.    You also mentioned searching a vehicle.

A.    Yes, ma'am.

Q.    Will you please turn in your binder to Exhibit 73.

A.    Yes, ma'am.

Q.    Do you recognize that?

A.    Yes, ma'am, I do.

Q.    How do you recognize it?

A.    I found that item in -- I believe in the trunk of the Mercedes.

Q.    And does that fairly and accurately depict what you saw?

A.    That's correct, ma'am.

        MS. MacCABE:  The government would move to admit Exhibit 73 into evidence and request permission to publish to the jury.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No objection.

        THE COURT:  73 is admitted.

        You may publish.

        *(Exhibit 73 received in evidence.)*

        MS. MacCABE:  Thank you.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Does this appear to be the trunk where you found that item?

A.    Yes, ma'am, it does.

Q.    And is that a normal-sized bat?

A.    No, ma'am.  It is a youth-sized baseball bat.

Q.    Do you know what material it was?

78

A.   I don't know what kind of metal, but it was a metal bat.

MS. MacCABE:  No further questions.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MR. WERKSMAN:

Q.   Good morning, Special Agent Armstrong.

A.   Good morning, sir.

Q.   I'm Mark Werksman.  I represent Mr. Cho.  I just have a few questions for you.

You testified about being part of a team that searched the residence of Mr. Cho on -- is that March 16th of 2023?

A.   Yes, sir.  I believe that's the correct date.

Q.   Approximately how long were you in the residence to conduct that search?

A.   I can't say the exact time, but I know it was several hours.

Q.   And did you take the photographs that you've been shown here in court today, or was somebody else taking pictures while you did the search?

A.   No, sir, I did not take the photographs.  Somebody else was taking the photographs.

Q.   But the photos you've looked at are -- accurately depict what you saw and what you testified about; correct?

79

A.    Yes, sir, that's correct.

Q.    I'd like to direct your attention back to that face mask you testified about, which has been introduced as Government's Exhibit 71.

Do you remember that?

A.    Yes, sir, I do.

Q.    And do you remember -- you testified that you found that in the defendant's residence; correct?

A.    That's correct, sir.

Q.    Where in the residence did you find it?

A.    I found it in the closet.

Q.    And it was in a drawer?  Was it hanging from a hanger? If you can tell us, please.

A.    I believe they were in a draw -- a set of drawers inside the closet.

Q.    Now, I noticed you said "they," and I was going to ask you about that.

There was more than one face mask; correct?

A.    Yes, sir, that's correct.

Q.    There were two; weren't they?

A.    I don't recall the exact number of masks, sir.

Q.    And do you remember how they were contained or packaged?

A.    No, sir, I do not.  I don't recall they were packaged.

Q.    Do you remember if they were contained in some kind of

80

packaging of some kind?  Do you remember?

A.    Yes, sir.  They might have been.

Q.    Well, would it refresh your recollection if I show you another photograph from that search?

A.    Yes, sir.

MR. WERKSMAN:  May I approach, Your Honor?  And I'm going to show the witness what's been -- it's a photograph Bates-stamped 160.

THE COURT:  You may approach.

MR. WERKSMAN:  Your Honor, I'm going to show him a computer screen.

BY MR. WERKSMAN:

Q.    Special Agent Armstrong, I'm going to show you what we'll mark for identification as Defense Exhibit 208 --

MR. WERKSMAN:  -- Your Honor, for identification.

BY MR. WERKSMAN:

Q.    Do you recognize what's depicted in this photograph?

A.    Yes, sir, I do.

Q.    And what is this?

A.    Those are -- look to be masks in a plastic package.

Q.    All right.  Does this refresh your recollection as to the condition of the masks when you saw them during the search?

A.    Yes, sir.

Q.    Now that you've had your recollection refreshed -- and

I'll get back to the microphone.  I know it drives the
reporter crazy.

Now that your recollection is refreshed, can you
tell us what condition the masks were in when you discovered
them?  Masks, plural.

A.    One of the masks was loose and unpackaged, and at least
two were in a package, in plastic wrap.

Q.    Were they all together?

A.    I do not recall exactly how they were.

Q.    Now, you also testified about a baseball bat that you
found in the residence; correct?  Or that was in a car.

A.    Yes, sir, it was in the car.

Q.    Did you personally discover that baseball bat?

A.    Yes, sir, I did.

Q.    And did you retrieve the baseball bat and mark it as
evidence?

A.    No, sir.  I followed the same evidentiary procedures
with all of our other items, per our policy.

Q.    And when you found that baseball bat, did you
personally examine it for its characteristics?

A.    I don't know exactly what you mean by that question,
sir.

Q.    Well, did you examine the baseball bat for bloodstains
or any markings of any kind that would have marred it in
some way or distinguished it?

82

A.    No, sir, I did not.

Q.    Did you -- did you oversee a process by which the baseball bat you retrieved was tested for the presence of DNA?

A.    No, sir, I did not.

Q.    As you sit here today, do you know whether or not any DNA was retrieved from the baseball bat that you recovered?

A.    No, sir, I do not.

Q.    Thank you, sir.

        MR. WERKSMAN:  I have no further questions.

        THE COURT:  Redirect.

        MS. MacCABE:  No, Your Honor.

        THE COURT:  All right.  Is the witness excused?

        MS. MacCABE:  Yes.  Thank you, Your Honor.

        THE COURT:  All right.  Sir, you're excused. Thank you for being here.

        MR. WERKSMAN:  Your Honor, may we approach briefly about a housekeeping matter?

        THE COURT:  Yes.

        One moment, ladies and gentlemen.

        MR. WERKSMAN:  On the record.

        *(The following was held at the bench:)*

        MR. WERKSMAN:  Your Honor, two things.  Number one is, I didn't want to do this in front of the jury in case the Court had a -- Your Honor, I didn't want to do this in

front of the jury in case the Court had an adverse reaction to what I'm going to request.

We don't have a copy of the photograph here in his physical presence.

I'd like to move 208 into evidence, but I won't be able to bring a hard copy until Monday.

The witness has testified about seeing the two -- the picture shows to masks in their little containers.  And so I wanted to ask --

THE COURT:  This was produced by the government?

MR. WERKSMAN:  Correct.

MS. MacCABE:  No objection.

THE COURT:  All right.  That's fine.  Then 208 will be admitted.  208; right?

MR. WERKSMAN:  Yes, sir.

Second of all, Your Honor, I'm not sure -- can I inquire about the schedule?  We may have a witness who we -- not knowing how fast things would proceed, we may have a witness outside, and I'd like to check on his or her status. I'm not being evasive.  There might be a male and a female. So what's the Court's schedule for the next hour or two? Just because I may need to spend a few moments checking on the status of a witness so I can have them either ordered back Monday or excuse them or whatever.

THE COURT:  As I told the jury, when we were

84

selecting the jury, on Thursday, we'd be in session until noon.

MR. WERKSMAN:  So do you anticipate any further breaks, or should we just -- I'll just tough it out or --

THE COURT:  Do you need a break?

MR. WERKSMAN:  No.  I was wondering if maybe --

Who's your next witness?

THE COURT:  Does the government intend to continue to present its case-in-chief through noon?

MS. MacCABE:  Yes.  But I have no problem with a break.

MR. WERKSMAN:  Could maybe me or Ms. Sosa, for three minutes, go into the hallway and just check on the status of a witness?  We don't really need to break the entire proceedings.  I just wanted to make sure we're not missing something out in the hallway.

THE COURT:  Yes, that's fine.  Either one of you can go step outside for a minute or two.

MR. WERKSMAN:  I didn't want to do that without the Court's permission.

THE COURT:  All right.  Well, thank you.

MR. WERKSMAN:  Thank you, Your Honor.

THE COURT:  We're ready to move on with the next witness?

MR. BUTLER:  We should have two available to go,

85

Your Honor.  That'll take us through noon.  That's -- we have a few more witnesses, but they'll be Monday.

MR. WERKSMAN:  Can I ask who it is?  Because depending on who it is, either me or Ms. Sosa will go outside for two minutes.

MS. MacCABE:  We're going to call Karen Gaspar next.

MR. WERKSMAN:  Oh, okay.  Thank you.

MR. BUTLER:  Unless Mr. Beltran is here, we would call him first, but we had him scheduled for later.

MR. WERKSMAN:  Thank you.

THE COURT:  All right.  So we'll plan on two more witnesses for today.

Thank you.

MS. MacCABE:  Thank you.

*(End of conference held at the bench.)*

THE COURT:  Defense Exhibit 208 is admitted.

*(Exhibit 208 received in evidence.)*

THE COURT:  You may call your next witness.

MS. MacCABE:  Thank you.

The government calls Special Agent Karen Gaspar.

THE CLERK:  Good morning.  Please approach.

Please stand before me, and raise your right hand to be sworn.

Do you solemnly swear that the testimony you shall

give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I swear.

THE CLERK:  Thank you.  You may be seated in the witness stand.

Please state and spell your full name for the record.

Project into the microphone, and please speak slowly.

THE WITNESS:  Yes, ma'am.

Karen Gaspar.  That is kilo alpha Romeo echo November.  Last name Gaspar; golf alpha Sierra papa alpha Romeo.

THE COURT:  You may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION**

BY MS. MacCABE:

Q.   Good morning, Ms. Gaspar.

A.   Good morning, ma'am.

Q.   What do you do for a living?

THE WITNESS:  Good morning, members of the jury. Thank you for being here today.

I am a special agent with the United States Homeland Security.

BY MS. MacCABE:

Q.    And how long have you been a special agent with Homeland Security?

A.    I've been a special agent for almost three years.  It will be three years in April.

Q.    And will you please describe some of your training and experience as a special agent.

A.    Yes.

       As a special agent -- or before becoming a special agent, you have to go through a six-month academy.  Our training facility is located at the Federal Law Enforcement Training Center in Glencoe, Georgia, where we learn investigative techniques, how to talk to people and gain evidence, information.

       And that is my primary duty as a special agent, is to gather facts to prove elements of a crime that I can present to the AUSA, or the Assistant United States Attorney.

Q.    Were you involved with a search on March 16th, 2023?

A.    Yes, I was.

Q.    And was that of an address on Topanga Canyon Boulevard in Woodland Hills, California?

A.    Yes, it was.

Q.    What was your role with that search?

A.    My role in that search warrant was the evidence

custodian.

Q.    And what does that mean?

A.    So an evidence custodian is the agent or officer in charge of maintaining custody of all the evidence that was recovered at the property stated in the search warrant.

Q.    And have you served as an evidence custodian in other cases as well?

A.    Yes, ma'am.  Prior to that, I served at least on five other occasions, if not more.

Q.    And do you retain custody of the evidence throughout the pendency of a case?

A.    Yes, ma'am.

Q.    Will you please walk us through how you take custody of evidence during a search.

A.    Yes, ma'am.

       So while at the search warrant, I have my table set up just like this.  Make sure it's clear of anything else.  And I wait for the officers or other agents to hand me pieces of evidence that they have recovered from the property.

       I then take possession of it.  I log it into my system.  I ask where the item was located.  I describe it. And then I keep the item with me no more than an arm's length away.  And if I do have to step away, I make sure to call another person with me or another person there to watch

it while I take care of my business and come back to it.

Q.   And what do you do with the evidence after that?

A.   So after I've taken custody of the evidence, I -- we take it back to our office -- it's located in El Segundo, California -- where I bag it tag it, label it, and secure it in our evidence room.

Q.   And to review the evidence at a later date, are requests made to you to do so?

A.   Yes, ma'am.  They're made to me or another evidence custodian.  There are only about four of us in our office who have access to that room.

Q.   And do you have to approve the signing out of evidence?

A.   Yes, ma'am.

Q.   In this case, could you describe some categories of evidence that you took custody of.

A.   Yes, ma'am.

         Some of the items that I took custody of at the property were firearms, masks, baseball bats, and electronics, to include cell phones.

Q.   And specifically, did you take custody of a Motorola cell phone on that day?

A.   Yes, ma'am, I did.

         MS. MacCABE:  Now displaying Exhibit 67, which was previously admitted into evidence.

         *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Is this the cell phone that you just described?

A.    Yes, ma'am.

MS. MacCABE:  May I have one moment, Your Honor?

THE COURT:  Yes.

BY MS. MacCABE:

Q.    What steps did you take with this phone once it was handed to you?

A.    So once an item -- this one in particular was handed to me.  I asked the agent or officer who handed it to me, "Where did you find it?  Who did you find it with?"

I also double-check our Attachment B which is an item in our search warrant of all items that have been approved to be seized.  Make sure that is good to go.  And then I record it in my log of all other pieces of evidence that have been recovered from the property.

I also then put it in a bag.  And I keep the bag open so that I can go to my office and then seal it there.

Q.    And do you know whether or not this phone was ever checked out of evidence?

A.    Yes, ma'am.  It has been.

Q.    It was?  So did you or one of your supervisors approve that being checked out?

A.    Yes, ma'am.

Q.    And do you know who took that phone or where they took

it?

A.    No, ma'am.  All those movements can be tracked on our chain of custody form.

Q.    Understood.

MS. MacCABE:  Your Honor, the government would seek to conditionally admit some phone exhibits with this witness that will be admitted through, hopefully, our next witness, if he's here.  I would ask to do so.  And I can list out what those exhibits are.

If the Court would like a range or just each number?

THE COURT:  A range is fine if they're sequential.

MS. MacCABE:  They are sequential.

THE COURT:  Go ahead.

MS. MacCABE:  Those would be Exhibits 93 through 113.

THE COURT:  All right.  Any objection to the conditional admission of Exhibits 93 through 113, as stated?

MR. WERKSMAN:  No, Your Honor.

THE COURT:  All right.  Exhibits 93 through 113 are conditionally admitted, as stated.

(Exhibit 93 to 113 received in evidence.)

MS. MacCABE:  Thank you.

Permission to publish?

THE COURT:  Yes, you may.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    And now displaying page 1 of Exhibit 93.

I would just ask if you recognize these as a text message conversation?

A.    Ma'am, I recognize it as a text message just because I own a cell phone myself.

Q.    Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    And I'd like to just talk through a few of these text messages.

So the first text message in green on page 2 of Exhibit 93, will you just read that to the jury, please.

A.    Yes, ma'am.

It reads:  "Okay.  There's a starting fee of 1600, and from next month 200 association fee, 15th of every month."

Q.    And will you please read the next text message in green.

A.    "You are banned from tonight."

MS. MacCABE:  And now page 4 of Exhibit 93.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Will you please read the third and fourth green text

message bubbles for the jury.

A.    "You can Venmo or CashApp me."

      "Okay."

      And it's an "at" sign.  And the letters read:
Golf October December kilo zulu October.

      THE COURT:  Can you just read the letters?

      THE WITNESS:  Yes, sir.

      "God KZO."

      Is that what you asked, Your Honor?

      THE COURT:  I did.

      THE WITNESS:  Thank you, sir.

      MS. MacCABE:  Thank you.

      Now turning to Exhibit 94.

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    What does the first message appear to be?

A.    Ma'am, confirming.  The green bubble?

Q.    I apologize.  The blue bubble.

A.    Yes, ma'am.

      It reads:  "Payment declined."  It's a screenshot
reading, "Payment declined."

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    And will you please read the text messages on this page
which is page 2 of Exhibit 94.

A.   Yes, ma'am.  Starting with the blue one -- the blue bubble?

Q.   Please.

A.   Yes, ma'am.

So it's from Elon.  "I'm using Venmo."

The green bubble:  "And set it as" -- well, I'm not sure what that says, but it looks like it says "^prist at the time."

And then it reads:  "Private, not publish."

Blue bubble:  "Okay.  I try."

Green bubble:  "I don't think it's the amount. Either your card has a limit or your balance is not enough."

MS. MacCABE:  And now turning to Exhibit 95.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read -- this is page 2 of Exhibit 95.

Will you please read the first green bubble.

A.   "Okay.  Starting fee 1500, sir.  Association fee.  Then monthly/driver."

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   And on page 3 of Exhibit 95, will you please read just the first green bubble.

A.   "Okay.  I'll meet the driver.  And Venmo or CashApp is fine."

MS. MacCABE:  Now displaying page 1 of Exhibit 96.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read the first four messages on this page?

A.   "Jim, I need Venmo for Nov."

"Okay.  I only could send 180.  I will send 20 more tonight."

Okay."

MS. MacCABE:  And turning to page 2 of Exhibit 96.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Can you read the bottom green bubble?

A.   "Hey, Jim, can you Venmo for DEC?"  December.

MS. MacCABE:  Now turning to Exhibit 97.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Can you read the bottom green bubble?

A.   "What you mean?  Not quite.  If you did, you gotta tell me.  There's companies starting fee.  Every company paid."

MS. MacCABE:  And showing page 3 of Exhibit 97.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read the first three green bubbles.

A.   "No more Concert.  No more Forest.  What's up my

friend?  Venmo, por favor."

MS. MacCABE:  And page 7 of this exhibit.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read the second and third message.

A.   "Yo, Jay.  You been trying Soop?"

And then there's a screenshot, it looks like, of another message.

Q.   And how about the blue bubble in between the screenshot and that first message you read?

A.   "What's up, Bro.  To be honest, I was never told not to.  Steve never mentioned anything to me."

MS. MacCABE:  And now displaying pages 9 and 10 of Exhibit 97.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Starting with page 9, can you please read the second-to-last green bubble?

A.   "This time I'm going to collect penalty.  200 Dream paid.  Any companies did paid.  Second time is double and banned Recital, On Off."

Q.   And on page 10, which is shown to the right here, will you please read all of the messages.

A.   "Dior.  And you don't have to worry about them.  When I tell you not try, you shouldn't go.  We have rules."

"Yeah, I understand.  I'll have Steve pay the other half of penalty.  I'm not always up to date with what's going on."

"You can ask me.  That's not a good reason."

"Yeah, I'll start asking you directly."

MS. MacCABE:  And now turning to Exhibit 99.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read the messages on this page.

A.   "Let's ban Dream for a week.  He's violating association rules."

"What happened to him?"

"Just everything.  He's being headed.  He goes to everywhere."

"Like Shrine?"

MS. MacCABE:  And page 2 of Exhibit 99.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read that as well.

A.   "Forest, Concert.  Ryan, he's violating our rules."

"Okay, Bro.  I banned Dream at On and Off too."

"Oh, okay."

MS. MacCABE:  And finally, page 3 of Exhibit 99.

*(The exhibit was displayed on the screen.)*

THE WITNESS:  "You didn't ban Dream yet?"

98

"I did.  What's up?"

"Okay."

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   And now reading pages 100 -- from Exhibit 100, pages 1 and 2, please.

A.   "I knew it.  But now I'm 100 percent sure.  Mr. Bay is telling his cop friends rumors."

"He has cop friends?"

"He knows someone, either retired or current detectives.  That's why cops always D.K this or D.K. that, because his influence."

"I see."

"Even saying, Roy is helping me for that one incident.  Ha, ha, ha, they really saying dirty.  Playing, ha, ha."

MS. MacCABE:  And now turning to Exhibit 101, pages 9 and 10.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read the bottom green message on page 9.

A.   "Venmo, por favor."

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    And on page 10, will you please read the bottom three messages, including the blue ones?

A.    "What is your Venmo?"

      At sign.  "GOD KZO."

      "Sent."

      MS. MacCABE:  And turning to Exhibit 102, pages 2 and 3.

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Can you please read on page 2 the bottom three messages, including the blue one?

A.    "What's up, Eson.  Cash app."

      "Okay."

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    And on page 3, will you please describe what that first blue message looks like.

A.    The first blue message is of a screenshot, and it reads:  "You sent $400 to Mr. Grape Juice."

      MS. MacCABE:  Turning to page 5 of the same exhibit.

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Will you please read the messages, starting with the

second green bubble.

A.    "I need this month."

      "Sure."

      "And penalty.  Or you want to face the consequence?  You pick."

      MS. MacCABE:  So now turning to Exhibit 103.

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Will you please read this page.

A.    "Did you go to Soop last night?"

      "Sorry, Hyung-nim.  Tried once.  It was really slow.  Nobody wasn't booked.  I was so panic.  It's my bed."

      "No, man.  How is that an excuse?"

      "Yes, you're right.  Sorry again."

      "Okay.  You choose you ban for two weeks or 500."

      "Ban.  And I come see you."

      MS. MacCABE:  And turning to Exhibit 104.

      *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Will you please read this for the jury.

A.    "Either I kick you out of K-Town, or you pay the fine.  We are the association.  You violated."

      "Okay.  But can you give me three weeks?  I make shit every day now.  And payday is next week.  It's going to be 900.  I can't afford weekly 300.  I can make it."

"Jack.  Anyways, rule is rule.  I'm very disappointed, homie.  300?"

MS. MacCABE:  And now displaying pages 1 and 2 of Exhibit 105.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read the first message on page 1.

A.   "That fool Shin lives at Mercury."

Q.   And the second green bubble on that page.

A.   "What's his phone number?"

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   And on page 2, will you please read the second blue bubble through the end.

A.   "Here's he's number.  That's his."

"Name?  What's his last name?"

"That, I don't know, Hyung."

"Maybe Shin is last name?"

MS. MacCABE:  And turning to pages 3 and 4 of Exhibit 105.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read these for the jury.

A.   "Ask him:  Is Shin your last name?"

"Okay."

102

"Or is he calling himself God, like I do?"

"Waiting for reply."

"Okay."

"Shin is he's last name."

"Okay.  Shin SangHun?"

"Yeah, Hyung."

"Asked he's friend."

"Okay.  If you see him driving around, tell me."

MS. MacCABE:  And page 5 of Exhibit 105.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read that too.

A.   "Okay, Hyung."

"All good.  I got him.  Ha ha."

"LOL.  Where?"

"K-Town.  I socked his ass."

Q.   What's the date on these messages?

A.   The date reads 1/24/23.

MS. MacCABE:  Turning to Exhibit 106.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read this for the jury.

A.   "I want to find out who Domonic is."

"Can be the fool got socked by and got 26 stitches?"

"I think he's bitches are able to try other places through him.  Just my theory."

"At Forest, I socked his bitch ass."

MS. MacCABE:  And Exhibit 107.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   Will you please read that.

A.    "Eric."

"Okay."

"You wanna get beat-up or pay penalty?"

"Can I ask something?"

"I ask first."

"Okay."

MS. MacCABE:  And Exhibit 108.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   Will you please read that.

A.    "My English bed."

"Can I call you?"

"Google translate."

"Sometimes I help the Ruby company.  I want to know if I can't go back then."

"No.  And you need to pay penalty 'cause I don't want to punch you this time."

MS. MacCABE:  And displaying pages 1 and 2 of

104

Exhibit 109.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   Will you please read those.

A.   "Yo yo."

"What's up, Hyung?"

"You know where Shin lives?"

"No."

"I found him and socked him."

"LOL.  Damn.  What happened?"

"We have rules, you know.  First time, just pay penalty, but from second time, different consequences."

"For sure."

MS. MacCABE:  And displaying Exhibit 110.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   Will you please read that.

A.   "I went to Soopsok.  Saw Dior driver.  Soopsok didn't even call them.  I punched him twice.  Ha ha ha."

"Oh shit."

"Ha ha."

MS. MacCABE:  And Exhibit 111.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   Will you please read the first three messages.

A.  "Bro, I feel like hunting tonight."

"I say you stay low.  It's Friday.  Last day of the month.  May be a lot of piggies."

Q.  And will you read the second green message after that.

A.  "Fuck pigs.  I kill them too."

MS. MacCABE:  And Exhibit 112, displaying pages 1 and 2.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.  Will you please read these for the jury.

A.  "What's Dream van license?"

"I only remember the one ending 707."

"Okay.  That's enough good."

"They have two cars, I think."

"Yeah."

"I need both."

"I'll try and find out.  But probably not until tonight" -- excuse me.

"I'll try and find out but prob not until tomorrow night."

"Fo sho, Bro."

"Heard Shin drives a BMW X-something.  White SUV."

"Okay."

MS. MacCABE:  And now displaying Government's Exhibit 113.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please read this.

A.   "Do you know where Shin pick up his girls?"

"Sorry.  Just woke up.  I think Shadow and Walgreen's."

"Okay.  WYD?"

"Home, taking a shit.  You?"

"Ima go to L.A."

MS. MacCABE:  May I have one moment, Your Honor?

THE COURT:  Yes.

BY MS. MacCABE:

Q.   Will you please turn in your binder in front of you to Exhibit 68, and let me know when you're done.

A.   I'm on Exhibit 68, ma'am.

Q.   Do you recognize that?

A.   Yes, ma'am.

Q.   How do you recognize it?

A.   I seized that, the drum magazine.

Q.   Oh, I'm sorry.  I may have misunderstood.  Can you say that again?

A.   Pardon me?

Q.   How do you recognize that?

A.   The drum magazine stands out because it's not something you see all the time.  So I recognize this photo based off

of that image.

Q.    Is that a drum magazine you've seen before?

A.    No, ma'am.

Q.    You have not?

A.    Not until this seizure.  Or I saw it the day of the seizure.  Excuse me.  Yes.

Q.    Oh, okay.  So during the search we were talking about earlier on March 16th, 2023, did you take custody of the items that you're looking at right now?

A.    Yes, ma'am, I did.

Q.    Does that photo fairly and accurately depict what you seized?

A.    Yes, ma'am.

        MS. MacCABE:  Your Honor, at this time, the government would move to admit Exhibit 68 into evidence and request permission to publish to the jury.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No objection.

        THE COURT:  68 is admitted.

        You may publish.

        (Exhibit 68 received in evidence.)

        (The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.    Will you please describe what we're looking at here.

A.    So on the bottom left is a multicolored duffle bag.

Just above that are our boxes of ammunition.  There's a pistol and three magazines.

Q.    What is that?

A.    That is a drum magazine, ma'am.

Q.    And for clarification, is a magazine something that carries ammo that's attached to a firearm?

A.    Yes, ma'am.

Q.    Will you please turn your binder to Exhibit 69, and let me know when you're done.

A.    I'm at Exhibit 69.

Q.    Do you recognize that?

A.    Yes, ma'am.

Q.    How do you recognize it?

A.    It was the item I seized on the day of the search warrant.

Q.    Does it fairly and accurately depict what you saw?

A.    Yes, ma'am.

          MS. MacCABE:  At this time, the government would move to admit Exhibit 69 into evidence and request permission to publish to the jury.

          THE COURT:  Any objection?

          MR. WERKSMAN:  No.

          THE COURT:  Exhibit 69 is admitted.

          You may publish.

          *(Exhibit 69 received in evidence.)*

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    What type of firearm is that?

A.    It's a pistol, ma'am.

Q.    And this is one of the firearms that you took into custody?

A.    Yes, ma'am.

Q.    Will you please look in your binder at Exhibit 70, and let me know when you're done.

A.    I'm at Exhibit 70.

Q.    Do you recognize that?

A.    Yes, ma'am.

Q.    How do you recognize it?

A.    It was an item I seized on the day of the search warrant.

Q.    Does it fairly and accurately depict what you seized?

A.    Yes, ma'am.

        MS. MacCABE:  The government moves to admit Exhibit 70 into evidence and requests permission to publish.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.

        THE COURT:  Exhibit 70 is admitted.

        You may publish.

        *(Exhibit 70 received in evidence.)*

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   What are we looking at in this photo?

A.   It is a firearm with an attached barrel and a magazine.

Q.   What is an attached barrel?

A.   It is the cylindrical piece right at the very end of the main compartment of the firearm.

Q.   Will you please look at Exhibit 72 in your binder, and let me know once you've looked at it.

A.   I've looked at it, ma'am.

Q.   Do you recognize that?

A.   Yes, ma'am.

Q.   How do you recognize it?

A.   It was another item I seized on the day of the search warrant.

Q.   Does it fairly and accurately depict what you seized?

A.   Yes, ma'am.

        MS. MacCABE:  At this time, the government moves to admit Exhibit 72 into evidence.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.

        THE COURT:  72 is admitted.

        You may publish.

         (Exhibit 72 received in evidence.)

        MS. MacCABE:  Thank you.

         (The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.   Will you please describe the items depicted in this photo.

A.   In this photo, there's an ammunition can with ammunition inside and two gun cases.

Q.   And will you please look at Exhibit 75 in your binder, and let me know when you're done.

A.   Yes, ma'am.  I've seen the image in Exhibit 75.

Q.   How do you recognize it?

A.   This was another piece of evidence I seized on the day of the search warrant.

Q.   Does it fairly and accurately depict what you seized?

A.   Yes, ma'am.

        MS. MacCABE:  The government moves to admit Exhibit 75 into evidence.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.

        THE COURT:  75 is admitted.

        You may publish.

         *(Exhibit 75 received in evidence.)*


        MS. MacCABE:  Thank you.

        *(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Will you please describe what we're looking at in this

photo.

A.   I am looking at a black rifle, ma'am, with an attached scope at the top.

Q.   What do you mean by "scope"?

A.   It's a firearm accessory used to assist the person using the firearm.  Usually -- I can't tell just by looking at it from here.  Sometimes there's a dot on there, or sometimes it zooms in on what the person is trying to aim at.

Q.   And were these firearms seized by you and taken into evidence?

A.   Yes, ma'am.

MS. MacCABE:  May I have one moment, Your Honor?

THE COURT:  Yes.

MS. MacCABE:  Nothing further at this time, Your Honor.

MR. WERKSMAN:  I have no questions of this witness.  Thank you, Your Honor.

THE COURT:  All right.  Is the witness excused?

MS. MacCABE:  No, Your Honor.  And --

THE COURT:  That's all right.

Ma'am, you remain under subpoena, subject to recall.  The government will notify you.  Thank you. Otherwise, you're excused for now.

THE WITNESS:  Yes, sir.

MR. BUTLER: Can we be heard at sidebar, Your Honor?

THE COURT: Yes.

*(The following was held at the bench:)*

MR. BUTLER: The reason that we're going to recall that witness, Your Honor, is to bring in the physical exhibits, which I think will take some time, not only their end, but here, with the marshals. We weren't expecting to do it until Monday. And our foundation witness for the phone, which will be very brief, is not here yet.

THE COURT: All right. So you don't have another witness available right now, is what you're telling me; right?

MR. BUTLER: I think so, yeah.

THE COURT: Okay. All right. We'll just recess for the day. We're close to noon, anyhow. So we'll recess and resume on Monday.

MR. WERKSMAN: Your Honor, before you let the jury go, we have a witness we'd like to be ordered back.

THE COURT: Happy to do it.

MR. WERKSMAN: Thank you. We'll remain in session for just two more minutes.

THE COURT: That's fine. Not a problem.

*(End of conference held at the bench.)*

THE COURT: Ladies and gentlemen, you'll recall I

114

mentioned to you on Tuesday, when the jury was being selected, that I would need to recess earlier today.  So we're going to go ahead and take our recess for the day today.  We will resume the trial Monday at 8:15 in the morning.

So, again, your duty to not discuss the case remains in effect.  Obviously, there's about three days between now and then.  So please make sure you honor and obey that instruction and have no communications with anyone whatsoever about the case or do any research or conduct any investigation on your own of any kind.  As I've said before, you're also not to form or express any opinion about this case until it's actually handed to you for deliberations.  All right?

Thank you for your service.  I appreciate you.  See you back here Monday, in your seats, at 8:15.

Have a pleasant weekend.

THE CLERK:  All rise.

Leave your notebooks in your chair, please.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  Any remaining business that we need to take care of before we recess?

MR. WERKSMAN:  Yes, Your Honor.

We have two witnesses from Los Angeles Police

115

Department here, and we're going to ask the Court to order them back.  I'm assuming at this -- at this stage, we're moving it pretty quickly.  I'm going to just estimate the government will probably rest sometime Monday morning at this rate.

MR. BUTLER:  Agreed.

MR. WERKSMAN:  Okay.

So we have one LAPD officer.  Your Honor, we have a witness here named Officer Natalie Morales from the Los Angeles Police Department.  She's here pursuant to a defense subpoena.  May we have her ordered back for Monday at, Your Honor, maybe 9:00, 9:30?

THE COURT:  You tell me.  Your witness.

MR. WERKSMAN:  What do you think?

MR. BUTLER:  We only have a handful of witnesses left.  I would say we would rest by 10:00, if not earlier.

MR. WERKSMAN:  If we can have here at 9:00 o'clock, Your Honor.  You never know what'll happen with the government, the speed of their presentation. They've always exceeded their expectations with regard to their actual speed on the ground.  So . . . .

THE COURT:  Yes.  It does tend to happen.

All right.  Officer Morales, I'm going to -- I'm ordering you back to this courtroom on Monday at 9:00 a.m. for purposes of your testimony.

Understood?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  We'll see you then, ma'am.  Have a nice weekend.

Anyone else?

MR. WERKSMAN:  Thank you, Your Honor.

THE COURT:  My pleasure.

Anyone else?

MR. WERKSMAN:  No.  Thank you, Your Honor.  That's it.

THE COURT:  Government need anything?

MS. MacCABE:  No, Your Honor.  Thank you so much.

THE COURT:  All right.  You're welcome, everyone.

Have a good weekend.  We'll see you back here Monday at 8:15 in the morning.

(At 11:38 a.m. proceedings were adjourned.)

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:    February 14, 2025


                                    /S/_____WIL S. WILCOX_____

                                       U.S. COURT REPORTER
                                         CSR NO. 9178