UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. FERNANDO L. AENLLE-ROCHA, JUDGE PRESIDING

United States of America,          )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      ) No. CR 23-00149-FLA
                                   )
Daekun Cho,                        )
  aka "DK,"                        )
                                   )
                    Defendant.     )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial Day 4

Monday, March 25, 2024

8:21 A.M.

Los Angeles, California

Wil Wilcox, CSR 9178
Official U.S. District Court Reporter
Los Angeles, CA  90012

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:

       UNITED STATES ATTORNEY'S OFFICE
       BY:  JENA A. MACCABE
       BY:  KEVIN J. BUTLER
       Assistant United States Attorneys
       Violent and Organized Crime Section
       1300 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012

FOR THE DEFENDANT:

       WERKSMAN JACKSON & QUINN LLP
       BY: MARK J. WERKSMAN
       BY: KAREN M. SOSA
       888 West Sixth Street, Fourth Floor
       Los Angeles, California 90017

I N D E X

*MONDAY, MARCH 25, 2024; VOLUME 4*

CHRONOLOGICAL INDEX OF WITNESSES

| Party WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| KAREN GASPAR | | 24 | 28 | | | |
| NATALIE MORALES | 38 | | | | | 4 |
| NATALIE MORALES | | 41 | 44 | | | |

ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | VOL |
|---|---|---|---|---|---|---|
| GASPAR, KAREN | | 24 | 28 | | | |
| GASPAR, KAREN | 12 | | | | | 4 |
| MORALES, NATALIE | 38 | | | | | 4 |
| MORALES, NATALIE | | 41 | 44 | | | |

EXHIBITS

| Party EXHIBIT | DESCRIPTION | FOR IDENTIFICATION | IN EVIDENCE | VOL |
|---|---|---|---|---|
| 93 to 113 | Documents | | 16 | 4 |
| 114 | Document | | 16 | 4 |
| 152 | Document | | 16 | 4 |

4

*LOS ANGELES, CA.; MONDAY, MARCH 25, 2024*

8:21 A.M.

- - - - -

THE COURT:  This United States District Court is now in session.  The Honorable Fernando L. Aenlle-Rocha, United States district judge, presiding.

Please be seated and come to order.

Calling CR 23-00149-FLA, United States of America v. Daekun Cho.

MS. MacCABE:  Good morning, Your Honor. Jena MacCabe and Kevin Butler on behalf of the United States.  And with us at counsel table is Special Agent Michael Choi.

MR. WERKSMAN:  Good morning, Your Honor. Mark Werksman and Karen Sosa on behalf of Mr. Cho who's present in court.

THE COURT:  All right.  Good morning to everyone.

So I understand that counsel would like to address a matter outside the jury's presence.

MS. SOSA:  Yes, Your Honor.

THE COURT:  All right.

MR. BUTLER:  Yes.  Go ahead.

MS. SOSA:  Your Honor, we were made aware over the weekend that the government intends to recall witness I.D.K.

to testify as to 404(b) acts, allegedly additional extortion by the defendant against I.D.K.

The Court, last week, initially said there was insufficient notice, but we would see where cross-examination went because of how cross-examination had been going.

Therefore, my cross-examination of I.D.K. did not go anywhere near his involvement with Mr. Cho other than that night. There wasn't a single question about any kind of engagement with Mr. Cho or Mr. Cho's activities in the karaoke nighttime economy.

There is, in general, a pretrial notice requirement for this kind of evidence. I understand the government said that I.D.K. was a reluctant witness. I.D.K. has been on their witness list. It was first filed on February 23rd which was nearly a month prior to his direct examination which was the first time we were notified that he would be presenting evidence about extortion.

We were provided a report of an interview with I.D.K. that happened in July of 2023. And that entire interview was just around what he observed as to the shooting.

We were then provided a report of an interview that occurred on March 6th of this year, right before trial. And again, there was nothing in that interview regarding

6

extortion or payments to Mr. Cho by I.D.K.  It was all about the shooting.

So they knew for at least a month that he was going to be testifying in this trial.  Everything we were given was that it was just going to be about the shooting. If the Court were to find -- first of all, there's not good cause to excuse pretrial notice.  Secondly, even if there were, there's mid-trial notice, for example, on Tuesday or Wednesday.  And then there's in the middle of his direct examination.  That is absolutely not notice.

And for these reasons, I maintain the position that this for 404(b) evidence should not be permitted.

MR. BUTLER:  Your Honor, as to notice, I think the Court's already made a finding that there is good cause.

I will note that the -- when the government obtained the defendant's text messages months and months ago and produced those forthwith, they included text messages with I.D.K. under his American name, Roy, which show extortion.

Although the government had him on their witness list over-inclusively, I can assert that he was reluctant to testify.  And we were unsure whether he was going to testify even after posting or filing that -- that witness list.

And finally, as to sort of the cross-examination and whether or not they had noticed during trial, in our

interview, the witness had said that he had been -- that there was an attempt of extortion.  But he had never paid him directly.  His manager did.

When we -- he provided the text to Homeland Security last week, the night before his testimony, screenshots that his manager had provided to him showing those extortions, those were the first confirmation of the actual payments that we ever received.

We gave them over that night.  So it wasn't during the testimony.  But that was the first we had ever seen them.  We provided them immediately.  And then now it's been several days since then, almost a week.  I don't think that there has been no notice, and any late notice is for good cause.

As to any of the other 404(b) issues, those are fully briefed in our 404(b) motion as to Y.K. and K.Y.J., who eventually became actual victims in this case when we superseded.  All of the same facts apply.

To the degree I.D.K. was not cross-examined on the extortion, it would have been outside the scope.  But I don't think there's any doubt that when closings commence, it will be that all of these victims were paying out of some sort of association fee for which they were getting some kind of due benefit from their association with the defendant.

8

I believe that I.D.K. will testify that that isn't the case for him either, that he refused to pay, was met with anger, and then paid only after the shooting incident, which he already testified about. I believe it will be four to five questions, a very brief witness, Your Honor.

THE COURT: And you're considering recalling him during your case-in-chief?

MR. BUTLER: Correct, Your Honor.

THE COURT: And can you give me a sense of the timeline? Counsel talked about him being on your exhibit list back in February, and then I guess there was some information that was provided in March. But can you just tell me what it is that was disclosed with respect to this --

MR. BUTLER: Yes, Your Honor.

THE COURT: -- witness?

And I have admitted other 404(b) witnesses, right, in evidence?

MR. BUTLER: Evidence, yes, Your Honor. I don't think we have necessarily a 404(b) witness other than the gang expert. But not in this regard, into factual 404(b). But we do have defendant's text messages, the defendant's words, and what was found at the search, which are all other acts.

THE COURT: All right.

MR. BUTLER:  In terms of disclosure, again, the text messages between this witness and the defendant were disclosed months -- many, many, months ago and show at least corroborative text messages of extortion, if not outright extortion itself.

We included this victim witness on our February witness list.  I believe at that time, still under just his American name, initial R., because we were uncertain as to whether or not he was going to testify.

I can tell the Court he told Homeland Security many, many times that he would not testify.  Once we found out that he would be willing, we met with him.  He had not provided those screenshots of the extortion payments.  We did not get those until the night before his testimony.  But we did provide his full initials and added him to our witness list, under those Korean initials, just before trial.

THE COURT:  So the first time he discloses the fact that he too was a victim of extortion is when exactly?

MR. BUTLER:  Well, I think --

THE COURT:  When does he first tell you that?

MR. BUTLER:  I think he said -- I don't want to speak out of turn.  But I think he said he believed that his manager started paying the defendant after the shooting. But we had no corroboration of that, and he said he didn't

have any records of that.  He obtained them from the manager and sent them to us.  But that would have been during the interview a week before trial.

THE COURT:  All right.  What can we expect -- once the government rests, what can we expect from the defense?  I know there's a police officer that I ordered back.  What do you expect in terms of defense?

MS. SOSA:  As far as the defense case, Your Honor --

THE COURT:  Yes.

MS. SOSA:  -- it will be just Officer Morales.

THE COURT:  That's it?

MS. SOSA:  Yes.  And she does not touch on this at all.

THE COURT:  Okay.  I'm going to leave my ruling in place.

Just to explain myself, again, I am concerned about the -- sort of the lateness of the production.  I'm not blaming the government for this late production.  It's clearly not the government's fault.  But the witness has had a good amount of time to come forward and speak his truth.  And obviously, he made a decision to delay disclosure of what happened to him.  And there has been some cross-examination of other witnesses regarding other alleged benefits or services provided by Mr. Cho.

But when I ruled as I did, I really wanted to see what the defense's case-in-chief was going to consist of, and then would -- if requested, would have considered allowing the witness to be recalled as a rebuttal witness to rebut additional, we'll say, exculpatory or explanatory evidence.

So I'm going to leave my ruling as is.  Obviously, if things change, it's always subject to reconsideration.

MR. BUTLER:  Understood, Your Honor.  We thank you.

Our next witness, I believe, in that case, will be our last, just for the Court's knowledge.

THE COURT:  Okay.  Great.  Appreciate that.

And the defense is ready to go?  Well, we ordered the officer back for 9:00 o'clock; right?

MS. SOSA:  We did, yes.

THE COURT:  Yeah.  So she should be here soon.

All right.  Well, I believe our jury is ready.

Anything else?

MR. WERKSMAN:  No.  Thank you, Your Honor.

THE COURT:  All right.  Let's go ahead.  We'll bring in the jury.

(The jurors entered the courtroom.)

THE CLERK:  You may be seated.

THE COURT:  All right.  Good morning, everyone.

12

Welcome back.

THE JURORS:  Good morning.

THE COURT:  We are ready to resume with the trial.

Government, you may call your next witness.

MS. MacCABE:  The government recalls Special Agent Karen Gaspar.

THE CLERK:  Please approach and be seated in the witness stand.

You've already been sworn, but I would like you to please state and spell your full name for the record.

THE WITNESS:  Yes, ma'am.

Karen Gaspar --

THE COURT:  Letters.  Okay?

THE WITNESS:  Yes, sir.

K-A-R-E-N; last name, G-A-S-P-A-R.

THE COURT:  Thank you.

You may inquire.

MS. MacCABE:  Thank you.

**DIRECT EXAMINATION** (Continued)

BY MS. MacCABE:

Q.   Good morning, Special Agent Gaspar.

A.   Good morning, ma'am.

Q.   Since it's been a few days since you last testified, will you please remind the jury what you do for a living.

A.   Yes, ma'am.

13

THE WITNESS:  Good morning, jury members.  Thank you again for your time.

As a special agent, my job is to collect facts, and I do that through a variety of methods, whether it is going on surveillances, conducting interviews, collecting evidence, and testifying in court.

BY MS. MacCABE:

Q.    And again, were you involved in a search on March 16th, 2023?

A.    Yes, ma'am.

Q.    And was that of the defendant's residence?

A.    Yes, ma'am.

Q.    Were you the custodian of evidence seized during that search?

A.    Yes, ma'am.

Q.    Did that include a Motorola cell phone?

A.    Yes, ma'am.

Q.    I would like to show you what has been marked as Exhibit 4, which is in the possession of HSI Special Agent Choi.

MS. MacCABE:  Your Honor, may Special Agent Choi approach the witness with Exhibit 4?

THE COURT:  Yes.

BY MS. MacCABE:

Q.    Special Agent Gaspar, do you recognize that?

14

A.    Yes, ma'am, I do.

Q.    How do you recognize it?

A.    This is the phone I seized on the day of the search warrant.

MS. MacCABE:  At this time, Your Honor, the United States moves to admit Exhibit 4 into evidence.

THE COURT:  Any objection?

MR. WERKSMAN:  No objection.

THE COURT:  4 is admitted.

*(Exhibit 4 received in evidence.)*

MS. MacCABE:  And next, Your Honor, I'd request permission to read the parties' stipulation in Exhibit 152.

THE COURT:  You may.

MS. MacCABE:  "Plaintiff United States of America, buy and through its counsel of record the United States Attorney for the Central District of California and Assistant United States Attorneys Jena A. MacCabe and Kevin J. Butler, and defendant Daekun Cho, also known as D.K., by and through his counsel of record, Mark Werksman and Karen Sosa, hereby agree and stipulate as follows:

"Keanu Beltran, a Federal Bureau of Investigation digital forensic examiner, is deemed to have been called and received as a witness regarding the download, extraction, and preservation of text messages duly sworn and to have testified as follows:

"Digital Forensic Examiner Beltran received Government's Exhibit 4 and downloaded and reviewed the contents of Government's Exhibit 4.

"Digital Forensic Examiner Beltran extracted and preserved the contents of Government's Exhibit 4, including text messages from that exhibit.

"Digital Forensic Examiner Beltran reviewed government's Exhibits 93 through 114 and confirmed that Government's Exhibits 93 through 114 correctly and accurately depict the text messages extracted from Government's Exhibit 4.

"The Court previously conditionally admitted Government's Exhibits 93 through 113.  By this stipulation, the parties agree that Exhibits 93 through 113 as well as Exhibit 114 may be received into evidence at trial without objection.

"The parties agree and stipulate that this stipulation may be entered into evidence at trial.  The stipulation constitutes conclusive proof of the above matter for all purposes."

THE COURT:  All right.  The parties have so stipulated, ladies and gentlemen.  So as I've mentioned to you before, that means that they've agreed to all of the facts that the attorney just read into the record.  So you are to accept those facts as proven.  And Exhibits 93

16

through 113 that were conditionally admitted are now admitted as --

Did you say 114?

*(Exhibit 93 to 113 received in evidence.)*

MS. MacCABE:  Yes, Your Honor.

THE COURT:  And sorry, which one is that?

MS. MacCABE:  That was not previously conditionally admitted by the Court, but it has been offered -- well, it will be offered into evidence today.

THE COURT:  Oh, very well.  All right.

MS. MacCABE:  Based on the parties' stipulation, the United States would request to move Exhibits 114 and Exhibit 152 into evidence as well.

THE COURT:  All right.  And the parties have so agreed, pursuant to their stipulation.  So 114 and 152 are admitted.

*(Exhibit 114 received in evidence.)*

*(Exhibit 152 received in evidence.)*

MS. MacCABE:  Your Honor, permission to publish Exhibit 114?

THE COURT:  You may.

MS. MacCABE:  I apologize, Your Honor.  One moment.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Special Agent Gaspar, will you please read the photo attachment in the first text bubble.  And I will try to zoom in, but if it's not clear on the screen, it's also in the binder in front of you at Exhibit 114.

A.   Okay.  It reads:  "Thanks."

"Of course."

THE COURT:  Can you speak into the mic?

THE WITNESS:  Yes, sir.

THE COURT:  You're welcome to move it.

THE WITNESS:  So starting from the top, it reads:

"Thanks."

"Of course."

"2022."  And it looks like in perhaps Korean characters:  "1/16."

"Becca, these are the karaokes currently banned from all the company:  Concert, Soopsok, Shrine.  We cannot try those places until D.K. says they are good to go.  Tell your regular to go to other place.  You will not be able to go to Soopsok."

"Okay.  I'll tell him.  But I understand.  I met him at Recital, but he says he likes to move from place to place often."

"Okay.  Well, tell them anywhere but those three places.  Sorry.  Rule is rule."

BY MS. MacCABE:

Q.    And will you now read the rest of the text message conversation.

A.    "Not us, LOL.  Don't say 'D.K.'  Say association."

      "Got it."

Q.    In addition to the Motorola phone that you seized during that search, did you also seize two baseball bats?

A.    Yes, ma'am, I did.

Q.    I would like to show you what has been marked as Exhibits 6 and 7, which are in the possession of HSI Special Agent Choi.

      And Your Honor, once Special Agent Choi has removed those exhibits, may he approach the witness?

      THE COURT:  Yes.

BY MS. MacCABE:

Q.    Special Agent Gaspar, do you recognize Exhibits 6 and 7?

A.    Yes, ma'am, I do.

Q.    How do you recognize them?

A.    I seized these items on the day of the search warrant.

      MS. MacCABE:  At this time, Your Honor, the government asks to move Exhibits 6 and 7 into. evidence.

      THE COURT:  Any objection?

      MR. WERKSMAN:  No.

19

THE COURT:  6 and 7 are admitted.

You may show them to the jury.

*(Exhibit 6 received in evidence.)*

*(Exhibit 7 received in evidence.)*

MS. MacCABE:  Special Agent Choi, will you hand them back to Special Agent Gaspar to display them?  Thank you.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.   Did you also seize skeleton masks from the defendant's house?

A.   Yes, ma'am, I did.

Q.   I would like to show you what has been marked as Exhibit 5, which is in the possession of HSI Special Agent Choi.

MS. MacCABE:  May Special Agent Choi approach?

THE COURT:  Yes.

MS. MacCABE:  Thank you.

BY MS. MacCABE:

Q.   Special Agent Gaspar, do you recognize Exhibit 5?

A.   Yes, ma'am, I do.

Q.   How do you recognize it?

A.   I seized these items on the date of the search warrant.

MS. MacCABE:  At this time, Your Honor, the United States would move Exhibit 5 into evidence.

20

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  5 is admitted.

You may publish.

*(Exhibit 5 received in evidence.)*

BY MS. MacCABE:

Q.   Will you please hold up one of the masks for the jury?

THE COURT:  Can I see that, please?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

BY MS. MacCABE:

Q.   Special Agent Gaspar, did you also seize firearms from the defendant's house?

A.   Yes, ma'am, I did.

Q.   I would like to show you what has been marked first as Exhibit 1, which is in the possession of HSI Special Agent Choi.

Special Agent Gaspar, do you recognize Exhibit 1?

A.   Yes, ma'am, I do.

Q.   How do you recognize it?

A.   I seized this item on the day of the search warrant.

MS. MacCABE:  At this time, Your Honor, the government would move Exhibit 1 into evidence.

THE COURT:  Any objection?

MR. WERKSMAN:  No.

THE COURT:  1 is admitted.

You may publish.

(Exhibit 1 received in evidence.)

BY MS. MacCABE:

Q.   And I would now like to show you what has been marked as Exhibit 2, which is in the possession of HSI Special Agent Choi?

MS. MacCABE:  And ask, once he's opened it, if he may approach the witness, Your Honor?

THE COURT:  Yes.

BY MS. MacCABE:

Q.   Special Agent Gaspar, do you recognize Exhibit 2?

A.   Yes, ma'am, I do.

Q.   How do you recognize it?

A.   I seized this item on the day of the search warrant.

MS. MacCABE:  Your Honor, the United States would move Exhibit 2 into evidence.

THE COURT:  Any objection?

MR. WERKSMAN:  No, Your Honor.

THE COURT:  2 is admitted.

You may publish it.

(Exhibit 2 received in evidence.)

BY MS. MacCABE:

Q.   And I would like to show you what has been marked as Exhibit 3, which is also in the possession of HSI

22

Special Agent Choi.

MS. MacCABE:  And request, once he's opened it, if he may approach the witness?

THE COURT:  He may.

BY MS. MacCABE:

Q.    Special Agent Gaspar, do you recognize Exhibit 3?

A.    Yes, ma'am, I do.

Q.    How do you recognize it?

A.    I seized this item on the day of the search warrant.

MS. MacCABE:  At this time, Your Honor, the United States would request to move Exhibit 3 into evidence.

THE COURT:  Any objection?

MR. WERKSMAN:  No objection.

THE COURT:  Exhibit 3 is admitted.

You may publish.

(Exhibit 3 received in evidence.)

MS. MacCABE:  Now publishing Exhibit 72, which was already admitted into evidence.

(The exhibit was displayed on the screen.)

BY MS. MacCABE:

Q.    Special Agent Gaspar, did you seize ammunition from the defendant's house?

A.    Yes, ma'am, I did.

Q.    Did that include revolver ammunition?

A.    Yes, ma'am.

23

Q.    But did you seize any revolver firearm?

A.    No, ma'am.

Q.    Did you accompany another agent to photograph the defendant's tattoos on March 15th, 2024?

A.    Yes, ma'am.

Q.    Will you please turn in your binder to Exhibit 141, and let me know once you've reviewed it.

A.    I'm done reviewing it, ma'am.

Q.    Do you recognize Exhibit 141?

A.    Yes, ma'am.

Q.    How do you recognize it?

A.    I was there on the day that these photos were taken.

Q.    Do those photographs fairly and accurately depict the tattoos that you saw?

A.    Yes, ma'am.

        MS. MacCABE:  Your Honor, the Court conditionally admitted Exhibit 141 on March 21st, and the United States now moves to officially admit it into evidence.

        THE COURT:  Any objection?

        MR. WERKSMAN:  No.

        THE COURT:  All right.  141 is now fully admitted.

        *(Exhibit 141 received in evidence.)*

        MS. MacCABE:  No further questions, Your Honor.

        THE COURT:  Cross-examination.

        MR. WERKSMAN:  Briefly.

**CROSS-EXAMINATION**

BY MR. WERKSMAN:

Q.   Good morning, Special Agent Gaspar.

A.   Good morning, sir.

Q.   You testified about the masks that you were shown that were -- that you observed during the search of the defendant's apartment; correct?

A.   Yes, sir.

Q.   That's Government's Exhibit No. 5; correct? Government's Exhibit No. 5 is what you were just shown a few minutes ago, the masks?

A.   I believe so, yes, sir.

Q.   And when you were shown them in the courtroom, they were loose, freestanding masks, two of them; correct?

A.   Yes, sir.

Q.   Do you remember the condition they were in when you first saw them when you were at the defendant's apartment during the search itself?

A.   No, sir, I do not.

Q.   Do you remember they were in plastic wrapping when you first saw them, when they were seized from the defendant's apartment?

A.   No, sir, I do not recall.

Q.   I'm going to show you --

        MR. WERKSMAN:  Your Honor, may I approach to show

25

the witness?

THE COURT:  Yes.

BY MR. WERKSMAN:

Q.   Would it refresh your recollection if I show you a picture of the condition of the masks when they were originally found in the defendant's apartment?  Might that refresh your recollection?

A.   Sure, sir.  Yes, sir, it may.

MR. WERKSMAN:  I'm going to show the witness what's been previously admitted as Defense Exhibit 208.

May I approach?

THE COURT:  Yes.

BY MR. WERKSMAN:

Q.   Special Agent Gaspar, do you recognize what's depicted in that photograph?

A.   Yes, sir.

Q.   What is that?

A.   They are two masks in plastic wrapping, sir.

Q.   All right.  Does that refresh your recollection as to what the masks looked like when you first seized them from the defendant's apartment?

A.   Yes, sir.

Q.   So what did the masks actually look like when they were first brought to your attention during that search?

A.   They're in plastic wrapping, sir.

26

Q.   The kind of plastic wrapping that you get when you buy something new from the store; correct?

A.   Yes, sir.

Q.   And that's how they were when you first took possession of them?

A.   According to this photo, sir, possibly.  I go on many search warrants, so I can't specifically say if it really was handed to me in this condition, sir.

Q.   Do you know what happened to the plastic wrapping?

A.   No, sir.  If it was with the item, they should have been in the seizure bag.

Q.   Did you see them in the seizure bag?

A.   Sir, I didn't go through the seizure bag.

        MR. WERKSMAN:  May I respectfully request that Special Agent Choi give the witness the original evidence bag in which Government's Exhibit 5 is contained?

        THE COURT:  Yes.

BY MR. WERKSMAN:

Q.   If we have you take a look at the original evidence bag, might that help you find the missing wrappers?

A.   Yes, sir, it may.

Q.   Let's take a look.

        MR. WERKSMAN:  Let the record reflect that Special Agent Choi is going to hand the witness two plastic evidence bags.

27

THE COURT:  Yes.  And they were previously sealed, and Special Agent Choi opened them here in the courtroom before handing the contents to the testifying witness.

BY MR. WERKSMAN:

Q.   Ms. Gaspar, those evidence bags you're looking at that Special Agent Choi just gave you, are those evidence bags that you use to bag the evidence when you first retrieved it?

A.   Yes, sir.

Q.   And have you had a chance to inspect the contents of those bags, sitting there right now, here in court?

A.   Yes, sir, I have.

Q.   Did you find anything in the bags that's different from what you were handed by Special Agent Choi?

A.   Yes, sir.

Q.   What did you find?

A.   The bags are empty, sir.

Q.   Okay.  So all you were given in court today were two masks without any wrappers; correct?

A.   Yes, sir.

Q.   But when you originally seized the evidence, according to the photographs that you have there, which are Defense Exhibit 208, these masks were in original store plastic wrapping; correct?

A.   Yes, sir.

Q.    Thank you.

MR. WERKSMAN:  I have no further questions.

THE COURT:  Redirect.

MS. MacCABE:  Briefly, Your Honor.

**REDIRECT EXAMINATION**

MS. MacCABE:  Now publishing What has previously been admitted as Exhibit 71.

*(The exhibit was displayed on the screen.)*

BY MS. MacCABE:

Q.    Special Agent Gaspar, is this one of the masks that you seized on the day of the search?

A.    Yes, ma'am.

Q.    And was that search in 2023?

A.    Yes, ma'am.

MS. MacCABE:  No further questions.

THE COURT:  Any recross?

MR. WERKSMAN:  No.  Thank you, Your Honor.

THE COURT:  All right.  Is the witness excused?

MS. MacCABE:  Yes, Your Honor.

THE COURT:  All right.  Special Agent, you're excused.  Thank you, ma'am.

Government, you may call your next witness.

MS. MacCABE:  The United States rests, Your Honor.

THE COURT:  All right.  That concludes the presentation of evidence by the government, ladies and

gentlemen, in its case-in-chief.

Defense, will you be presenting a definitive defense?

MR. WERKSMAN:  Your Honor, may we have a moment to --

THE COURT:  Yes.  Do you need a break or just a moment?

MR. WERKSMAN:  I think a break would be appropriate, a short break, Your Honor, so that we can get ready to move on.

THE COURT:  Okay.

All right.  We're going to take a break -- brief break, ladies and gentlemen.  I would attempt to predict how long it will be, but I would likely be wrong.  So it'll be brief.  We'll get you back here as soon as we can.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.

MR. WERKSMAN:  Your Honor.

THE COURT:  You need to speak with me?

MR. WERKSMAN:  Yes.

Perhaps in order to economize, I'd like to make a brief oral motion to dismiss based upon Rule 29.  May I?

THE COURT:  Yes.  You may be heard.

30

MR. WERKSMAN:  Your Honor, I'm going to move to dismiss the indictment, all counts between 1 and 56, the extortion counts, on the grounds that the government has failed to present adequate evidence of a nexus to interstate commerce.

All they've shown is that some Venmo payments may have bounced through a server in Virginia, according to the oral testimony of the Venmo witness.  I submit to Your Honor that's inadequate.  And on that basis, there's insufficient evidence for any reasonable juror to conclude that Defendant Cho is guilty of Counts 1 through 56, based upon the insufficiency of the proof of the interstate commerce nexus.

And with regard to the extortion count, Your Honor, this is a little more nuanced.  And I'd invite the Court to review the exhibits that are in evidence. There are two videos that show the carjacking.  This is Count 57.

In order for there to be a carjacking, a defendant must take somebody's vehicle through force or violence.

In this case, what we have is a beating of Mr. Shin who, in the video, you can see him fall to the ground and being beaten by two men.  The two men then are seen leaving the scene and going around the side of a building.

A couple of minutes later, one of the two men, a man absolutely not Mr. Cho, according to Mr. Shin himself, comes back, creeps around, goes to Mr. Shin's Honda Odyssey, gets in it, and drives away.

I submit to Your Honor, we have two separate crimes.  There is a beating which is an assault with a deadly weapon under California Penal Code Section 245(a)(1) or assault with force likely to produce great bodily injury or call it whatever you like.

Then separated in time, minutes later, one dude, not Mr. Cho, comes back and chooses to steal a vacated vehicle whose driver is lying on the pavement 20 or 30 feet away.

The grand theft auto which occurs or the joyriding under the California Vehicle Code where somebody takes a vehicle, not necessarily permanently, but just to drive it around, or somebody takes a vehicle permanently which would be grand theft auto, is separate and apart from the beating which is separate and apart from any alleged extortion attempt.

So in short, Your Honor, there's no carjacking. The vehicle is taken as an afterthought by someone other than Mr. Cho, detached from the basic corpus of the alleged extortion charges and the beating.

The beating -- according to the government, the

beating, was in order to enforce the protection racket to spread fear in the hearts of the doumi drivers so they continued to pay their shakedown money.

The theft of the vehicle has nothing to do with an extortion scheme.  It has nothing to do with the beating of Mr. Shin.  It was a separate act of grand theft auto or joyriding by a man who is unidentified and not charged in this indictment.

I'll submit on that your, Your Honor.

THE COURT:  All right.  Thank you.

Government?

MR. BUTLER:  Thank you, Your Honor.

Under the Rule 29 standard, the government has more than met its burden.

In terms of the extortion counts, the Hobbs Act only requires a de minimus effect on interstate commerce.  Here, it's not just -- and also, the Hobbs Act does not require that the subject themselves effect interstate commerce.

Here, it's not just that they just pass through servers in Virginia, but that every Venmo payment originated in California, went to Virginia.  One of the Venmo payments actually originated to in Las Vegas, went to Virginia, came back.  But also, the fact that the defendant used and utilized instant withdraw.  Some of the extortion payments

33

were paid with the goods and services fee.  These fees are paid directly to Venmo.

So by having the extortion done and paid through Venmo, interstate commerce is effected.

There are also various ways that we established through testimony in that the bars themselves operate in interstate commerce.  They all accept credit cards.  They have alcohol which are necessarily shipped from out of state.  They also have clients and workers from various states and various countries.  And the doumi driver companies themselves are driving people from out of state, from out of the country.

By banning those drivers from certain bars, the defendant was affecting not only the companies that are driving, but also the bars themselves, all of which are operating in interstate commerce.

Paying penalties also depletes the resources of these bars.  And when there is violence, like we've seen in the Soopsok video, in the On and Off video, obviously there is deterrence from clients and workers from going to these bars.  And even the victims in this case, like J.L. and Y.S., shut down their company and no longer worked at all.

All of this affects interstate commerce, particularly on a de minimis standard, particularly on a Rule 29 standard.

As to the carjacking, even if defense counsel's position was correct, I would point out that it was not -- the government's theory is not just that the carjacking was to stop people from not paying, but it's also from to cease those who are not paying from working.  And these are driving companies.

How do you stop a company who is not paying you from working?  Well, one way is to commit a heinous act of violence.  Another is to take the vehicle by which they are using to drive the doumis around.

In addition to that, there's aiding and abetting.  And all you need to do is aid, abet.  Counsel induced at least one element of this crime.  Pulling someone out of the car, beating them with a baseball bat, and telling your accomplice who then later steals the car to "fuck him up" is certainly aiding and abetting.  And the intent as -- in terms of that a carjacking be committed is certainly there.  On a Rule 29 standard, I don't think there's any doubt.

But unless the Court has further questions, I would submit on that.

THE COURT:  All right.  Rule 29 requires me to view the evidence in the light most favorable to the nonmoving party; in this case, it's the government.  There is more than sufficient evidence on the points raised by the defendant to send the case to the jury as just articulated

by the government.  So I won't repeat all of the facts just set forth in the record by government counsel.  But for those reasons.

I did watch, obviously, the video here in the courtroom of the carjacking.  And there's not any sort of meaningful substantive time gap between the beating and then the taking of the car.  Yes, there is an intervening act in that they do leave the scene of the camera, and then one person, a coconspirator, returns and takes the vehicle.  But it's -- I viewed it as part of the same course of conduct that occurred within a relatively short period of time.

So the Rule 29 motion is denied.

Is there anything else that we need to attend to?

MR. WERKSMAN:  No.  Thank you, Your Honor.

We're going to go see if our witnesses here, and we'll just need a minute.

THE COURT:  All right.

MR. WERKSMAN:  Ms. Sosa went outside for that purpose.

May I inquire, Your Honor?  Assuming we have our witness and she testifies, unless the government's going to put on a rebuttal case, will we go straight into closing argument?  Is that the plan?

THE COURT:  I pre-instruct.

MR. WERKSMAN:  Oh, you do.  Okay.

36

THE COURT:  So I would like to just -- I probably will excuse the jury again so we can make sure that we're in agreement on the final set of instructions.  And then I will instruct.  And then you can argue.

MR. WERKSMAN:  Okay.  Thank you, Your Honor.

Can I bring her in the courtroom, Your Honor?

THE COURT:  Sure, you can bring her in.  I assume you want to call her in front of the jury?  So --

MR. WERKSMAN:  Yes.  I mean, I will.

THE COURT:  She can have a seat in the --

(Simultaneous speakers.)

MR. WERKSMAN:  -- little so we don't have to go get her.

THE COURT:  She can take the witness stand, if you'd like.  She obviously needs to be sworn in.

All right.  We'll go get the jury.

MR. WERKSMAN:  Your Honor, may we have her -- I think the optics of her already being on the witness stand might seem a little suspicious.

THE COURT:  She can sit in the gallery.

MR. WERKSMAN:  Can we just have her sit, please?

THE COURT:  Yes, that's fine.

THE CLERK:  Counsel, please make sure you're speaking into the microphone or project.

MR. WERKSMAN:  Yes, ma'am.  Thank You.  Will do.

THE CLERK:  Thank you.

(Pause.)

THE CLERK:  All rise.

(The jurors entered the courtroom.)

THE CLERK:  You may be seated.

THE COURT:  All right.  Counsel for the defendant, you may call your first witness.

MR. WERKSMAN:  The defense calls Officer Natalie Morales.

THE CLERK:  Good morning, Ms. Morales.

Please stand before me, and raise your right hand to sworn.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

THE CLERK:  Thank you.

You may be seated in the witness stand.

Please state and spell your full name for the record.

Please project into the microphone, and speak slowly.

THE WITNESS:  Natalie Morales; N-A-T-A-L-I-E, M-O-R-A-L-E-S.

THE COURT:  You may inquire.

38

**DIRECT EXAMINATION**

BY MR. WERKSMAN:

Q.   Good morning, Officer Morales.

     Can you please tell this jury what you do for a living?

A.   Good morning.

     Yes.

     I work for the Los Angeles Police Department as a police officer.

Q.   And how long have you been so employed?

A.   Approximately four years.

Q.   What are your basic duties and assignments as an LAPD officer?

A.   Taking reports, meeting with victims, adhering to calls for service.

Q.   Directing your attention to May of 2021, what was your occupation then as an officer for the Los Angeles Police Department?

A.   I was a probationary officer out of Hollywood Division.

Q.   Were you working in uniform?

A.   Yes, sir.

Q.   And were you on the streets of Los Angeles, patrolling in your capacity as a new LAPD officer?

A.   Yes, sir.

Q.   And do you recall specifically the early morning hours

of May 8th, 2021, at approximately 5:20 a.m.; do you recall being on duty then?

A.   Yes, sir.

Q.   And at that time, on that date, did you report to the intersection of 6th and Vermont in the Los Angeles area?

A.   Yes, sir.

Q.   Do you remember why you reported to that intersection on that morning, at that time?

A.   I believe we got a radio call for a robbery investigation.

Q.   Did you go there, to the corner of 6th and Vermont?

A.   Yes, sir.

Q.   And when you got there, what did you see?

A.   I do not have independent recollection of what was going on in that intersection.

Q.   Do you remember seeing other officers there when you arrived?

A.   I don't remember, sir.

Q.   Do you remember seeing any individuals there who claimed that they'd been the victim of a crime?

A.   No, sir.

Q.   Okay.  And would it refresh your -- did you participate in the drafting of any police reports with regard to that incident?

A.   My partner wrote the report, sir.

Case 2:23-cr-00149-FLA    Document 153    Filed 02/19/25    Page 40 of 147    Page ID #:2253

40

Q.    And have you reviewed that report prior to coming here to testify?

A.    Yes, sir.

Q.    And after reviewing that report, did you then recall what you did and saw in the early morning hours of March -- of May 8th of 2021?

A.    I can testify to what is written.  I have no independent recollection of the activity.

Q.    Okay.  Do you remember speaking to any individuals who claimed to be the victims of a crime at that time, on that date?

A.    Not at that location.

Q.    Okay.  Did you go to a hospital after you were at that intersection sometime later that morning?

A.    Yes, sir.

Q.    And when you went to the hospital, did you talk to any individuals who claimed to be the victims of a crime?

A.    Yes, sir.

Q.    Do you remember talking to a gentleman named Yun Soo Shin?

A.    Yes, sir.

Q.    And do you remember what Mr. Shin told you about being victimized early that morning?

A.    Yes, sir.

Q.    What did he tell you?

41

A.    He was in a parking lot, I believe.  And he had been approached by two male Blacks.  He was beaten up by these individuals.  And they ended up commandeering his vehicle.

Q.    Okay.  So in short, he told you that earlier that morning, he had been attacked by two male Blacks in a -- in a parking lot; correct?

A.    Yes, sir.

Q.    And that one of the two Blacks then stole his vehicle; correct?

A.    Yes, sir.

Q.    Thank you.

        MR. WERKSMAN:  I have no further questions.

        THE COURT:  Cross-examination.

        MS. MacCABE:  Thank you.

                        **CROSS-EXAMINATION**

BY MS. MacCABE:

Q.    Good morning, Officer Morales.

A.    Good morning, ma'am.

Q.    You said that you started working as a police officer about four years ago?

A.    Yes, ma'am.

Q.    About how many calls have you received during your time working as a police officer?

A.    Well over a thousand calls, ma'am.

Q.    So is it fair to say that you don't remember the

42

specifics of every call that you responded to?

A.    Yes, ma'am.

Q.    And is it even more true of calls that you responded to three years ago?

A.    Yes, ma'am.

Q.    You testified that you don't remember going to the intersection or what you observed there.

A.    Yes, ma'am.

Q.    But you remember what you saw at the hospital?

A.    Yes, ma'am.

Q.    And you were a trainee at the time of the incident?

A.    Yes.

Q.    Were you involved in any follow-up investigation?

A.    No.

Q.    Did you go find the car?

A.    No.

Q.    Did you locate the assailants?

A.    No, ma'am.

Q.    Did you ever interview the victim again?

A.    No, ma'am.

Q.    And you did not write a report in this case?

A.    No, ma'am.  My partner did.

Q.    And did the defense subpoena your partner?

A.    I haven't seen him, ma'am.

Q.    Did you provide HSI with some photographs of the

43

victim's injuries at the hospital?

A.    Yes, ma'am.

Q.    And was that, when you provided those photos, about a month ago or so?

A.    Yes, ma'am.

Q.    And at that time, you said that you did not have an independent recollection of any of the events or speaking with the victim; is that right?

A.    I'm sorry.  Can you repeat the question?

Q.    You did not have an independent recollection of the events or speaking with the victim; is that right?

A.    No, ma'am.

Q.    But you remember today?

A.    Yes, ma'am, after looking at the report.

Q.    And so at the hospital, do you know if the victim was sedated?

A.    I don't recall, ma'am.

Q.    And do you know what type of pain medication he was on or in what state he was?

A.    No, ma'am.

Q.    And you do not remember any of that, but you do remember him saying who the assailants were?

A.    Based on the report, yes.

Q.    So it's not based on your independent recollection, but just based off the report?

44

A.    Yes, ma'am.

          MS. MacCABE:  No further questions.

          THE COURT:  Redirect?

          MR. WERKSMAN:  Yes.

**REDIRECT EXAMINATION**

BY MR. WERKSMAN:

Q.    Officer Morales, your partner was an Officer Rodriguez; correct?

A.    Yes, sir.

Q.    And he wrote a report, which you looked at before coming to testify, correct?

A.    Yes, sir.

Q.    And in that report, Rodriguez wrote that the alleged victim said he was assailed by two male Blacks; correct?

          MS. MacCABE:  Objection.  Hearsay, Your Honor.

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    The report you're referencing was by your partner, Mr. Rodriguez; correct?

A.    Yes, sir.

Q.    And that report's consistent with what you've testified to here in court; correct?

          MS. MacCABE:  Objection, Your Honor.  Hearsay.

          THE COURT:  Sustained.

BY MR. WERKSMAN:

Q.    Is there any doubt in your mind that what you're testifying about is what you recall from the incident after reviewing your report on the incident?

A.    Can you repeat the question, sir?

Q.    Is there any doubt in your mind that what you're testifying about today was a result of refreshing your recollection from the report that you and your partner had of that incident?

Are you sure that what you're testifying about was based upon on what you read in your own report?

A.    Yes, sir.  But I did not write the report, so it is hearsay.

MR. WERKSMAN:  Thank you.

THE COURT:  Any recross?

MS. MacCABE:  No, Your Honor.

THE COURT:  Is the witness excused?

MR. WERKSMAN:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  You may step down, Officer.  Thank you.

THE WITNESS:  Thank you.

MR. WERKSMAN:  Your Honor, the defense rests.  Thank you.

THE COURT:  All right.  That concludes the presentation of evidence by the defense.

46

Government, any rebuttal evidence?

MS. MacCABE:  No, Your Honor.

THE COURT:  All right.  That concludes the presentation of all evidence, ladies and gentlemen.

So next steps are I will be instructing you on the law.  And then the lawyers for the parties will have an opportunity to make closing arguments to you.

Before I can instruct you on the law, I have to confer with counsel to finalize the instructions on the law. That will take a few minutes.  I'm not sure how many.  But we'll bring you back here as soon as possible.  All right?

So we're going to take a brief recess.

My admonition to you has remained in effect and is in effect.  You're not to discuss the case with anyone whatsoever, including your fellow jurors, or form or express any opinion until the case is handed to you for deliberation.  All right?

So we'll see you back here as soon as we can.

THE CLERK:  All rise.

(The jurors exited the courtroom.)

THE CLERK:  You may be seated.

THE COURT:  All right.  Let's turn to the instructions.

All right.  I gave the jury 1 through 13 after the jury was impaneled and before opening statements.  So I

believe we can go forward from there.

I believe the next instruction in order is the one that applies to stipulated facts.

Everybody in agreement?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  Okay.

MR. WERKSMAN:  Are you expecting feedback from us, Your Honor?

THE COURT:  Am I expecting what?

MR. WERKSMAN:  Do you want us to basically go through each instruction and affirm our --

THE COURT:  That was the plan, yes.

So the set I have in front of me starts at page 17.  It's the instruction that applies to stipulated facts.  So I will be giving that instruction in light of multiple stipulations that the parties have entered.

Any objection?

MS. MacCABE:  No objection, Your Honor.  Thank you.

MR. WERKSMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  Then there's an instruction at the next page that has to do with transcriptions that accompany recordings.

There's no independent transcripts; correct?

MS. MacCABE:  Correct, Your Honor, not of the

English.   There's just the Korean translations.

THE COURT:   All right.   Which are embedded into the various videos that have been admitted into evidence; yes?

MS. MacCABE:   Yes, Your Honor.

THE COURT:   Okay.   So technically, each of them has not been given a transcript of the recording.

MS. MacCABE:   That's correct, Your Honor.

THE COURT:   So the instruction should probably say something like, "A transcript of the recording is embedded in the videos"?

MS. MacCABE:   Your Honor, it was only embedded in the videos shown during the trial.   The videos that are going back with the jury do not have the transcripts embedded.

THE COURT:   Ah, all right.   So this instruction is not necessary?   Or do you still want me to give it?

MS. MacCABE:   The Court could -- and the government's happy to make the changes.   But the Court could give it with respect to them having seen the transcript during the trial, because they saw it a couple of times.   But the government does not have a strong preference on that.

THE COURT:   Would you like the instruction given, Mr. Werksman?

MR. WERKSMAN:  We'll defer to the Court on that, Your Honor.

THE COURT:  Well, I think it's probably prudent. I mean, you know, it's just a reminder that the evidence is the recording itself as opposed to any transcription. Although, you know, I mean they saw it in the courtroom.  So it was admitted into evidence with the embedded transcription.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  All right.  So if the government could just modify the language to the circumstances in our case, I would appreciate that.

MS. MacCABE:  Will do.

THE COURT:  All right.  Turning to the next one. The next one is at page 19.  Also touches on the use of a transcript.

Do we have any Korean-language recording?

MS. MacCABE:  Yes, Your Honor.  The dashcam footage had a couple of Korean portions where they switched between English and Korean.

And the government provided the translations, Exhibits 122 and 123, which were admitted into evidence. And Exhibit 124 is a stipulation related to those translations.

THE COURT:  All right.  So we did give the jury

50

transcripts, physical transcripts -- or they will have physical transcripts in the jury room?

MS. MacCABE:  Of the Korean portions only, yes, Your Honor.

THE COURT:  Yes.  Okay.  And those are the exhibits that you just identified?

MS. MacCABE:  Correct.

THE COURT:  All right.  So it sounds to me as if this instruction should be given.

Any objection?

MR. WERKSMAN:  No, Your Honor.

MS. MacCABE:  Not from the government, Your Honor. Thank you.

THE COURT:  All right.  The next instruction I have is at page 20.  It has to do with the accuracy of transcripts.

Are you asking for this?

MS. MacCABE:  No, Your Honor, the government is not asking for that.

THE COURT:  Was there a stipulation as to the accuracy?  I think so; right?

MS. MacCABE:  Yes, Your Honor.

THE COURT:  Because we didn't have an interpreter actually take the witness stand and testify to the accuracy.

MS. MacCABE:  That's correct, Your Honor.  The

51

stipulation was at Exhibit 124 and was admitted into evidence.

THE COURT:  All right.  So it sounds like this instruction is not necessary.

Are we in agreement?

MR. WERKSMAN:  Yes.

THE COURT:  Okay.  All right.  It will not be given, then.

The next instruction is a page 21.  It has to do with foreign language testimony, which seems appropriate.

MR. WERKSMAN:  Your Honor, can I make sure that we're all operating from the same pleading?  Your pagination is not the same as what I have for the Amended Joint Proposed Jury Instructions filed March 8th.  Is Your Honor referring to those?  Because Your Honor's giving page numbers that are different than the joint proposed instruction numbers and the pages in the pleading.

Am I wrong?

MS. MacCABE:  No.  Those are the page numbers we have as well.  But I've been following along with just the content.  But, yes, I agree.  It's Docket 88.

MR. WERKSMAN:  Your Honor, we agree that Your Honor's pagination is off.  See, we finally agree on something.

THE COURT:  Okay.  I am working off, essentially,

52

the Word document that the parties submit.  And we work with it during the trial to get it as close to final as possible.  So that's probably why the pagination isn't perfectly matching up.  But I can switch to your Docket 88, if you like.

MR. WERKSMAN:  Or, Your Honor, if we could just go by the proposed jury instruction number, that way they'll be --

THE COURT:  Yeah, that's fine.  It's not on my set either because my set is closer to final set that we would give the jury, which doesn't have the parties' proposed numbers.  I'll just switch to 88.

So which one are we on at 88?

MR. WERKSMAN:  We're on page 25.

MS. MacCABE:  Yeah, page 25, at the bottom.  But the docket header page would be page 33.  And it's Joint Proposed Instruction No. 19.

THE COURT:  Okay.  I have it in front of me.

All right.  So I think we're all on the same page, literally.

Everybody agree this instruction should be given?  Obviously, it has to be modified to "have heard," past tense.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  Mr. Werksman?

53

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  Yes?  Okay.

All right.  Then turning -- so I will take those instructions that we just went through, which are instructions that the Ninth Circuit suggests be -- could be given during trial, and I will incorporate them into the final set of instructions.  All right?  So they won't be read first.

The first instruction the jury will hear will be the parties' Joint Proposed Instruction No. 20.  And I'll incorporate the ones we just went through after this, at some point.

So No. 20, introductory final instruction, everybody okay with that one?

MR. WERKSMAN:  Yes, Your Honor.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  All right.  Joint Proposed Instruction 21?

MR. WERKSMAN:  Yes, Your Honor.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  Okay.

MR. WERKSMAN:  Well, actually, this one, in regards to the defendant making a statement, maybe that's moot now.  I think that's moot.

THE COURT:  It could apply to statements that

54

witnesses claim the defendant made.

MR. WERKSMAN:  Very well.

MS. MacCABE:  Yes, Your Honor.  The government agrees.

MR. WERKSMAN:  I have no objection.

THE COURT:  All right.  The next one, Joint Proposed Instruction 22, this is concerning other acts under 404(b).

MS. MacCABE:  Yes, Your Honor.  And I believe the Court gave it a couple of times to the jury during the trial as well.

THE COURT:  All right.  Agree it should be given?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  23 hasn't been modified.  This is impeachment.

Would you like it to be given?

MR. WERKSMAN:  Yes, Your Honor, with regard to Mr. Shin's testimony.

THE COURT:  All right.  Would you like to modify the instruction and submit it to the Court?  The two of you can get together and, ideally, agree --

MS. MacCABE:  Yes, Your Honor.

THE COURT:   -- as to the prior inconsistent statement?

MS. MacCABE:  Yes.

THE COURT:  All right.  Turning to Joint Proposed Instruction 24.  This applies to what we call expert witnesses.  But not all of these individuals testified, I don't believe.

MS. MacCABE:  That's correct, Your Honor.

THE COURT:  It's just Mr. Rice; right?

MS. MacCABE:  Yes.

THE COURT:  Okay.  So delete the other names, and give the instruction with just Officer Rice's name included?

MS. MacCABE:  Yes, Your Honor.  Would the Court like the government to provide a revised list of this and all the other modifications we've been --

THE WITNESS:  That would be great.  If you could just -- and we can work off your set.  If you could just modify the Word document you previously submitted to the Court and get it cleaned up, move the prior instructions into later into the body of the other instructions, and then I will review the instructions in chambers.

MS. MacCABE:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Werksman, do you agree this instruction should be modified to just include Officer Rice?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  25, use of charts and summaries.  I believe there are some charts summarizing the Venmo

56

payments; right?

MS. MacCABE:  Yes, Your Honor.  And the government would ask -- because these were alternative instructions at Joint Proposed Instruction No. 25 and No. 26, because the Court admitted the charts into evidence, the government would ask that the Court provide Joint Proposed Instruction No. 26 and not No. 25.

MR. WERKSMAN:  We agree with that, Your Honor.

THE COURT:  All right.  We will not give 25. We'll give 26.

Turning to 27, standard instruction on the indictment.

MS. MacCABE:  Yes, Your Honor.

MR. WERKSMAN:  Yes, of course.

THE COURT:  Of course.

All right.  28 will be modified so that it reflects that Mr. Cho did not testify.

And tell me if there's an objection.

MS. MacCABE:  No objection.

MR. WERKSMAN:  No objection.

On that subject, Your Honor, is the Court -- does the Court have a practice of admonishing a defendant about his right to testify for the record?

THE COURT:  Yes.  Thank you for that, Mr. Werksman.  I do usually address that.

MR. WERKSMAN:  This would be a good time or whenever the Court --

THE COURT:  This would be a good time.  So thank you for that.

So Mr. Cho, your lawyer has properly raised the issue of your right to testify, as I'm sure has been explained to you.  Every individual in a criminal case who's charged has an absolute constitutional right to testify.  You also have the right to remain silent and not testify.  And if you elect not to testify, the fact that you do not testify cannot be used against you.  That's what this instruction goes to.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  It tells the jury that it cannot draw any negative inference from your decision not to testify.

I just want to confirm with you -- because this is an individual right, and I just want to confirm with you -- it's not your lawyer's right.  It's your right.  It's your personal right to either testify or not testify.  I just want to confirm with you that it is, in fact, your decision to not testify in this case and to exercise your right to remain silent under our Constitution?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Is that right?

THE DEFENDANT:  (Nods head.)

58

THE COURT:  Okay.  All right.  Thank you.

One moment.

And, you know, we've had this happen with the initial set of instructions.  Sometimes there's a little bit of a dissonance between the instruction that the parties are giving me and the Ninth Circuit's model instruction.

Can you look at the -- I think Instruction 6.3 states that, "In arriving at your verdict, the law prohibits you from considering, in any manner, that the defendant did not testify."  And that's not in this instruction.

So unless the parties are intentionally modifying a standard Ninth Circuit instruction, and you want me to instruct otherwise -- and, obviously, I want to hear you out on it -- I would like you to follow the Ninth Circuit instruction; again, absent a reason not to.

MR. WERKSMAN:  And we request the Court do so.

MS. MacCABE:  Yes.  The government will modify this in the set it will send to the Court.

THE COURT:  Okay.  Thank you.

All right.  The next is the standard proof beyond a reasonable doubt instruction, Joint Instruction 29.  That will be given.

Joint Instruction No. 30 has to do with evidence.  I will give that.

The next instruction, 31, I will give that.  That

59

also has to do with evidence, Ninth Circuit model Instruction 6.7 as to what is and is not evidence.

Then the direct and circumstantial evidence, again, this was one that didn't include a paragraph that I added in the preliminary instruction.  It is an optional paragraph.  But I think everybody agreed to give it, the example that's contained in the Ninth Circuit instruction.

MS. MacCABE:  Yes, Your Honor.  And we will add that.

THE COURT:  Okay.

Any objection, Mr. Werksman?

MR. WERKSMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  The next instruction has to do with the credibility of witnesses, 6.9 of the Ninth Circuit model instructions.  So I will give that.  That's your No. 33.  I think this one is also missing a couple of paragraphs from the Ninth Circuit model instruction, and it should be in my original instructions to the jury, which we included after discussing it with the parties.

MS. MacCABE:  Yes, Your Honor.  We'll make that change.

THE COURT:  Okay.  The government might want to go back and look at its stock instructions because this isn't the only case where this has happened.

60

MS. MacCABE:  Understood, Your Honor.

THE COURT:  And we can't limit it to any one unit within the office, so you might want to just look at all your instructions.

MS. MacCABE:  We will make that known.

THE COURT:  All right.

And Joint Proposed Instruction 34, use of notes at trial.  I'll give that.  That's jury notes taken during trial.

The Joint Proposed Instruction 35 on punishment, I will give that.

Joint Proposed Instruction 36 telling them that -- what the defendant is not on trial for, I will give that.

MS. MacCABE:  No objection.

THE COURT:  All right.  Since these are jointly proposed, I'm assuming you're all in agreement.  So I will just go through them just to confirm I'm giving them.  If anything has changed, then we'll discuss it.

Joint Proposed Instruction No. 37, separate consideration of multiple counts, one defendant.  I will give that.

Joint Proposed Instruction 38, this is the "on or about" definition from the Circuit.  I will give that.

And then Joint Proposed Instruction 39, this is the instruction -- this is the aiding and abetting

instruction.  And I guess it only applies to the carjacking offense.

Is that the government's theory?

MS. MacCABE:  Yes, Your Honor.

THE COURT:  All right.  As submitted, I will give it.

Joint Proposed Instruction No. 40, this is another aiding and abetting instruction.

MS. MacCABE:  Yes, Your Honor.  This is Section 2(b).  The previous instruction is the aiding and abetting theory under Section 2(a).

THE COURT:  All right.  If you can please remove the parens around "crimes and acts."

MS. MacCABE:  Yes, Your Honor.

THE COURT:  I will give that.

Joint Proposed Instruction 41 is the circuit instruction on knowingly.  I will give that.

Joint Proposed Instruction 42, this applies to all of the Hobbs Act counts.

All right.  The victims are all named by initials.  The initial -- I just want to make sure the initials are all accurate.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  All victims are included?

MS. MacCABE:  Yes, Your Honor.

62

THE COURT:  And that's how you want me to read it to the jury, right, as initials instead of names?

MS. MacCABE:  Yes, Your Honor.  And that's consistent with the indictment as well.

THE COURT:  All right.  I will give that.

Then Joint Proposed Instruction 43 applies to Count 56, which is an attempted extortion count.  I will give that.

Joint Proposed Instruction 44 applies to Count 57.  All right.  This is the actual substantive carjacking offense?

MS. MacCABE:  Yes, Your Honor.  There was no Ninth Circuit model instruction.

THE COURT:  Ah, okay.

And the parties are in agreement on this, obviously.

MR. WERKSMAN:  Yes, Your Honor.

MS. MacCABE:  Yes, Your Honor.

THE COURT:  All right.  Then Joint Proposed Instruction 45, standard instruction concerning the jury's duty to deliberate.  I will give that.

Joint Proposed Instruction 46, standard instruction on the consideration only of evidence that's admitted at trial.  I will give that.

47 applies to a verdict form.  I will give that.

63

And 48, standard instruction on communication with the Court during deliberations.

And there's also a final instruction once the jury is done deliberating which is not included, which I typically do give at the end when the jury is discharged. But that doesn't go back into the jury room with them, and I only give it to them after.  It would be part of the final set of instructions that's posted on the docket but doesn't go back into the jury room because, obviously, I have not discharged them yet.

MS. MacCABE:  Understood, Your Honor.  Thank you.

THE COURT:  All right.  Anything else on instructions?

MR. WERKSMAN:  No.  Thank you, Your Honor.

MR. BUTLER:  Just to save time, Your Honor, and maybe we would agree on this, but I think the basis for impeachment for Y.S. on Joint Instruction -- Proposed Instruction 23, I think we would argue and will argue that he may have given an inconsistent statement.  I think they would say that he did give an inconsistent statement.

How would the Court like us to put that in the jury instruction?

MS. MacCABE:  And that's Joint Proposed Instruction No. 23.

THE COURT:  Let me find it.

Well, one suggestion is you could simply say, "You've heard evidence that the witness made a prior inconsistent statement." If you want it to be fact specific, it can be. Otherwise, the two sides, I'm sure, will be arguing to the jury as to the weight the jury should give to that evidence.

MR. BUTLER: Understood, Your Honor. We'll use that.

THE COURT: Okay.

All right. Anything else?

MR. WERKSMAN: No. Thank you, Your Honor.

THE COURT: All right. Thank you, everyone.

We'll be in recess. We'll await the government's set of instructions. We'll get them cleaned up and ready. And then we'll resume the trial and instruct the jury.

And we'll be able to go straight into arguments? I assume everybody's ready?

MR. WERKSMAN: Yes, Your Honor.

MS. MacCABE: Yes, Your Honor. Thank you.

THE COURT: Okay. Very well.

THE CLERK: All rise. Ma'am in the gallery, please rise.

                    (Recess.)

THE CLERK: All rise.

          (The jurors entered the courtroom.)

THE CLERK:  This United States District Court is once again in session.

Please be seated and come to order.

THE COURT:  All right.  Welcome back, everyone. And thank you for your patience while we finalized my instructions to you.

So I will now begin my final set of instructions to the jury.

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case, and in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.

You must decide the case solely on the evidence and the law.  Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you.

You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

66

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.  You will recall that you took an oath, promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others.

They are all important.  Please do not read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return. That is a matter entirely up to you.

The evidence you are to consider in deciding what the facts are consists of:

One, the sworn testimony of any witness;

Two, the exhibits received in evidence;

And, three, any facts to which the parties have agreed.

In reaching your verdict, you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are:

One, questions, statements, objections, and

arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you must consider a lawyer's questions to understand the answers of a witness, the lawyers' questions are not evidence.

Similarly, what the lawyers have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Two, any testimony that I have excluded, stricken, or instructed to disregard is not evidence.

In addition, some evidence was received only for a limited purpose.  When I have instructed you to consider certain evidence in a limited way, you must do so.

Three, anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.

Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you can find

68

another fact.  By way of example, if you wake up in the morning and see that the sidewalk is wet, you they find, from that fact, that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

One, the witness's opportunity and ability to see or hear or know the things testified to;

Two, the witness's memory;

Three, the witness's manner while testifying;

Four, the witness's interest in the outcome of the case, if any;

69

Five, the witness's bias or prejudice, if any;

Six, whether other evidence contradicted the witness's testimony;

Seven, the reasonableness of the witness's testimony in light of all the evidence;

And eight, Any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.

Also, two people may see the same event but remember it differently.  You may consider these differences.  But do not decide that testimony is untrue just because it differs from other testimony.  However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs,

70

national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testified. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

The indictment is not evidence. The defendant has pleaded not guilty to each of the charges. The defendant is presumed to be innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant does not have to testify or present any evidence to prove innocence. The government has the burden of proving every element of the charges beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense, and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from the lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable

doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The parties have agreed to certain facts that have been stated to you.  Those facts are now conclusively established.

You have watched a recording that has been received in evidence.  Each of you was shown a transcript of the recording to help you identify speakers and as a guide to help you listen to the recording.  However, bear in mind that the recording is the evidence, not the transcript.  If you heard something different from what appeared in the transcript, what you heard is controlling.

You have watched a recording partially in the Korean language.  Each of you will be given a partial transcript of the recording that has been admitted into evidence.  The transcript is an English-language translation of the recording.  Although some of you may know the Korean language, it is important that all jurors consider the same evidence.  The transcript is the evidence, not the foreign language spoken in the recording.  Therefore, you must accept the English translation contained in the transcript

72

and disregard any different meaning of the non-English words.

You've heard testimony of a witness who testified in the Korean language.  Witnesses who do not speak English or are more proficient in another language testify through an official court interpreter.  Although some of you may know the Korean language, it is important that all jurors consider the same evidence.  Therefore, you must accept the interpreter's translation of the witness's testimony.  You must disregard any different meaning.

You must not make any assumptions about a witness or party based solely on the fact that an interpreter was used.

You have heard testimony that the defendant made a statement.  It is for you to decide, one, whether defendant made the statement; and two, if so, how much weight to give to it.  In making those decisions, you should consider all the evidence about the statement, including the circumstances under which the defendant may have made it.

You have heard evidence that the defendant committed other crimes, wrongs, or acts not charged here.  You may consider this evidence only for its bearing, if any, on the question of the defendant's intent, motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, or absence of accident and for no other purpose.

73

You may not consider this evidence as evidence of guilt of the crime for which the defendant is now on trial.

You have heard evidence that Y.S., a witness, made a prior inconsistent statement.  You may consider this evidence in deciding whether or not to believe this witness and how much weight to give to the testimony of this witness.

You have heard testimony from Los Angeles Police Department Officer Jacob C. Rice who testified about his opinions and the reasons for those opinions.  This opinion testimony is allowed because of the specialized knowledge, skill, experience, training or education of this witness. Such opinion testimony should be judged like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training or education, the reasons given for the opinion, and all the other evidence in the case.

Certain charts and summaries have been admitted into evidence.  Charts and summaries are only as good as the underlying supporting material.  You should, therefore, give them only such weight as you think the underlying material deserves.

A defendant in a criminal case has a constitutional right not to testify.  In arriving at your

verdict, the law prohibits you from considering, in any manner, that the defendant did not testify.

A separate crime is charged against the defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

The indictment charges that the offenses alleged in Counts 1 through 57 were committed on or about a certain date.  Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged or the dates alleged in Counts 1 through 57 of the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the dates charged.

A defendant may be found guilty of carjacking even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its commission.  To aid and abet means to intentionally to help someone else commit a crime.

To prove a defendant guilty of carjacking by aiding and abetting, the government must prove each of the following beyond a reasonable doubt:

First, someone else committed carjacking;

Second, the defendant aided, counseled, commanded, induced, or procured that person with respect to at least

one element of the carjacking;

Third, the defendant acted with the intent to facilitate carjacking;

And fourth, the defendant acted before the crime was completed.

It is not enough that the defendant merely associated with the person committing the crime or unknowingly or unintentionally did things that were helpful to that person or was present at the scene of the crime.

The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit carjacking.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime.  The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

A defendant may be found guilty of the crimes charged even if the defendant did not personally commit the acts constituting the crime if the defendant willfully caused an act to be done, that if directly performed by him, would be an offense against the United States.

A defendant who puts in motion or causes the commission of an indispensable element of the offense may be found guilty as if he had committed this element himself.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.

You may consider evidence of the defendant's words, acts, or omissions along with all the other evidence in deciding whether the defendant acted knowingly.

The defendant is charged in Counts 1 through 55 of the indictment with extortion by force, violence, or fear in violation of Section 1951 of Title 18 of the United States Code.

For the defendant to be found guilty of those charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant induced Y.S., J.L., S.S., K.Y.J., or Y.K. to part with property by the wrongful use of actual or threatened force, violence, or fear;

Second, the defendant obtained the property with Y.S., J.L., S.S., K.Y.J. or Y.K.'s consent;

Third, the defendant acted with the intent to obtain the property;

And fourth, commerce from one state to another was effected in some way.

The defendant is charged in Count 56 of the indictment with attempted extortion by force, violence, or fear in violation of Section 1951 of Title 18 of the United

77

States Code.

For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant intended to induce S.S. to part with property by the wrongful use of actual or threatened force, violence, or fear;

Second, the defendant obtained the property with S.S.'s consent;

Third, the defendant acted with the intent to obtain the property;

Fourth, commerce from one state to another would have been effected in some way;

And fifth, the defendant did something that was a substantial step toward committing the crime.

A substantial step is conduct that strongly corroborates a defendant's intent to commit the crime.

To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.

Mere preparation is not a substantial step toward committing the crime.

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial

78

step toward the commission of a crime.

The defendant is charged in Count 57 of the indictment with a violation of Section 2119 of Title 18 of the United States Code.

This law makes it a crime to take from a person by force and violence or intimidation a motor vehicle that has moved in interstate commerce.

To find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First, the defendant took a Honda Odyssey minivan from Y.S.;

Second, the defendant did so by means of force and violence or intimidation;

Third, the motor vehicle had been transported, shipped, or received in interstate or foreign commerce;

Fourth, the defendant intended to cause death or serious bodily harm;

And fifth, Y.S. suffered serious bodily injury as a result of the crime.

Serious bodily injury means injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those your fellow jurors.

The punishment provided by law for the crimes charged is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

You're here only to determine whether the defendant is guilty or not guilty of the charges in the indictment.  The defendant is not on trial for any conduct or offense not charged in the indictment.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here, in court.  You will then discuss the case with your fellow jurors to reach agreement, if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come

to a decision simply because other jurors think it is right. It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.

Do not change an honest belief about the weight and affect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should also not be influenced any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement, if you can do so.  During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and on these instructions, I

remind you that you must not be exposed to any other information about the case or to the issues it involves.

Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.

This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any internet chat room, blog, website, or any other form of social media.

This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.

If you're asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it.

Do not do any research, such as consulting dictionaries, searching the internet, or using other reference materials.

And do not make any investigation or in any other

way try to learn about the case on your own.

The law requires these restrictions to ensure that the parties have a fair trial based on the same evidence that each party has had an opportunity to address.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.

If any juror is exposed to any outside information, please notify the Court immediately.

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you're ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk signed by any one or more of you.

No member of the jury should ever attempt to communicate with me except by a signed writing.  And I will respond to the jury concerning the case only in writing or here, in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the

answer to any question.  Remember that you're not to tell anyone, including me, how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged.

That concludes my instructions to you, ladies and gentlemen, on the law in this case.

It is now time for closing arguments by the attorneys for their respective clients.

Government, you may make your initial closing argument.

MR. BUTLER:  Thank you, Your Honor.  Just a moment to set up, please.

(Pause.)

MR. BUTLER:  May I proceed, Your Honor?

THE COURT:  Yes.

*CLOSING ARGUMENT*

BY MR. BUTLER:

Night after night after night, for months and months and years, the defendant, Daekun Cho, was a predator. He prayed and stalked and hunted, as he called it, his victims:  People in Koreatown who he thought either could not or would not go to police.  And he gave each one of them an impossible false choice:  Pay him or get banned.  Pay him

or face the consequence.  Pay him or flee the state.  Pay him or get ripped out of your car and beaten with aluminum baseball bats.  Pay him or get shot in the neck.

But this was a shakedown.  It didn't matter if you paid, both things would happen.  And the defendant was paid over and over and over again.

Fifty-six counts in this case all tied to an extortion payment.  And you know from his text messages and from testimony that is just a fraction of the real amount of extortions that he was responsible for.

But his victims still got beat.  They still faced the consequences.  They were beaten with baseball bats, assaulted, intimidated, shot, carjacked.  They paid the defendant, and they still saw the real demon, just as he said they would.

For these crimes, the defendant is charged with 55 counts of extortion, one count of attempted extortion, and one count of carjacking.

Now, you've heard all the evidence in this case. You've heard from the victims.  You know he's guilty of these crimes.  But I'm going to ask just a bit more of your time to walk you through the elements that the judge has just instructed you on, what the government must prove beyond a reasonable doubt, so that when you're filling out that jury -- those verdict forms back in the deliberation

room, after you've been deliberating, every time you are checking "guilty" on each one of those 57 counts, you know that you've conclusively heard evidence that proved the defendant's guilt.

So the charges.  You've heard them from the judge. You've heard them just now.  There are a lot of them. Fifty-seven counts.  Fifty-five being extortion, one attempted extortion, and carjacking.

So we'll start with all of those extortion counts. Counts 1 through 55, although there are a voluminous amount, they all have the same elements.  You just heard these from the Court.

First, that the defendant induced victims to part with property by wrongful use of actual and/or threatened force, violence, or fear;

Second, the defendant obtained the property with victims' consent;

Third, the defendant acted with intent to obtain the property;

And fourth, that commerce from one state to another was effected in some way.

So simplifying each of these:  Force or fear, obtaining property intentionally, and that there was some effect on interstate commerce.

Now, again, there's 55 counts.  But luckily, many

of these can be knocked out right away.

Starting with the second element:  Obtaining of property.  We know the property was obtained with the victims' consent.  You saw Venmo record after Venmo record on those charts, and you know that they sent the money to the defendant, who accepted it.  And make no mistake, those exhibits that you will have in the deliberation room with you are the defendant's Venmo records; records from J.L., Y.S., Y.K., K.Y.J., and S.S. making the payments to the defendant.

Just to be clear, we'll be using their initials throughout this because that's what they are on the verdict form and in the jury instructions.

If you look at the exhibits, the Venmo charts that have been admitted into evidence, you'll see that they match up directly with the counts in this case.

So with Y.S., the Venmo payments in November and December of 2020 from California and from Las Vegas were paid to the defendant, and those line up directly with Counts 1 and 2 of the indictment.

Moving to J.L., you'll see the exact same thing. Two payments in 2021, lining up directly with Counts 3 and 4 of the indictment.

With S.S., there are many, many, many more payments, pages of them.  But if you compare them to the

counts in this case, again, Counts 5 through 20 and Counts 21 through 32 will line up perfectly.

K.Y.J., 33 through 39.

And Y.K., again, pages of Venmo payments. They all line up to the Counts 40 through 55.

If you compare Exhibits 27 through 31 to the counts, you will see that they match exactly. These were consensual payments, although made out of fear, that the defendant accepted. And the second element is met for every one of these 55 counts.

Similarly, the third element is easy for you to determine: That the defendant intended to obtain property. There is no doubt. You've seen the defendant's texts. You've heard his words. You've seen the Venmo records. Defendant's only purpose for this scheme was to obtain money from his victims.

This racket, this extortion, was to obtain property. You never saw or heard testimony of him paying others, giving money back. Instead, it was always pay him, or else.

And his text messages show him accepting and demanding those payments. Just a few examples from different victims in this case: The defendant asking for the Venmo, receiving it. And you've also seen what happens if you don't send the payment.

For all those counts, it's that easy.  The defendant acted with the intent to obtain property with each of those extortion payments.

The fourth element is similarly simple:  That there was some effect on interstate commerce.  Now, you heard that these Venmo payments all originated here or in Las Vegas -- the IP addresses on those Venmo charts will show you that -- and that they all went through the Venmo servers in Virginia, the only place that Venmo has servers.

Venmo, while it operates in all 50 states on phones and has third-party sources -- paying sources that are banks in other states, all of them go through Virginia.  All of these transactions went through Virginia.

And you also heard testimony that Venmo takes a percentage on certain types of withdrawals or payments, whether that's instant withdrawal or goods and services payments which, you can see in the Venmo records, were used by some of the victims in this case.  That means Venmo is taking money from some of the extortion payments.

Again, all originating on the West Coast, traveling to Virginia and back to California, to the defendant's Venmo account.

But there are various other ways that commerce was effected.  You heard from K.Y.J. and I.D.K. that they own or manage karaoke bars.  They order alcohol from other states,

things that come from Mexico, from Tennessee, like bourbon. But the bars and drivers hire people from other states and countries. And they have customers from other states and other countries. They all accept credit cards. And the defendant affected all of these institutions, whether it was the managers of the drivers or the managers of the bar, because he affected their ability to work.

Drivers would not go to certain clubs that were banned and vice versa, depleting the resources of both the managing companies and the bars.

Interstate commerce was effected in each of these Venmo payments and throughout defendant's extortion scheme.

You even heard that J.L. shut down his business and fled to another state, obviously effecting interstate commerce.

So again, for all of these counts, it is easily met.

So what remains is only the first element: That the defendant caused these payments by fear, by violence, by intimidation, fear of losing business because of the defendant's violence.

This too is very clear by the evidence in this case. But I'm going to walk you through each victim in the counts that are tied to them so you know exactly what evidence proves this element beyond a reasonable doubt.

And let's start just with their testimony.

Y.S. testified that if he wanted to work, he had to pay the defendant; that he paid him because they were scared of him; that he knew his reputation for being in a gang, carrying a firearm, beating up other drivers, and he knew he was a Grape Street Crip member.

You heard both him and his partner testify that they were paying a protection fee, but they didn't need protection from anyone other than the defendant.  And you know that ended up being true when Y.S. was pulled out of a car and beaten with baseball bats.

J.L. testified similarly.  He said that the defendant wasn't doing anything for him.  He received no benefit for his relationship with the defendant.  But the defendant threatened his partner, Y.S., which equally applied to J.L.

He testified that he was told to be careful, which he understood to mean physical harm would come to him if he didn't pay.  And he too was on the phone with Y.S. after they stopped paying, and he heard that beating.

S.S. also testified that he paid out of fear.  And you saw defendant's texts, looking for S.S., hunting him down, as a predator, by name, by address, by car, and then bragging about punching him after he found him.  S.S. testified that when he did punch him, he also threatened to

kill him.

And the text messages themselves prove S.S. was extorted.

And there's really no response to this.  You heard, in cross, that the defense's only response was that the defendant stopped S.S. from paying $600 when he could have extorted him for that much and only demanded 400 as a penalty.  This is right after the defendant punched him in the face and told S.S. he was going to kill him.

Defense wants you to believe that because S.S. did not text the defendant about the violent act or the fear, that it doesn't exist.  But the defendant himself was the one bragging about it, texting about it.  As he told S.S.: "First time, pay the penalty.  Second time, different consequence."

Then, after looking for him, asking many people where he was:  "I found him.  K-town.  I socked his ass.  I found him and I socked him."  On the same day or the day after you heard the testimony that S.S. said he was hurt.

K.Y.J. similarly testified that the defendant was infamous when he joined the karaoke industry for violence and for controlling karaokes.  He knew the defendant to be in what he called Grape Street and that he paid the defendant because the defendant threatened him and his business to do something, which he understood to be physical

harm.

K.Y.J. also said there was no service for the payments he gave to the defendant.

He also witnessed the defendant demand that a karaoke bar be opened and point a gun at the owner when he was met with resistance.  He saw the defendant with a gun and threatened to shoot someone else at a different karaoke bar during a different dispute.

And then you saw the text to him after he stopped paying:  "I better not see you in K-Town."

K.Y.J. testified that he worked from home after that and reported the defendant to the police, but only if he could be anonymous.  Because that's why -- how scared he was of the defendant, and that is also why he paid the defendant.

And finally, Y.K., who testified he was scared he would beat him.  And he saw the defendant personally beat a driver, what appeared to be a waiter, and a random customer outside of Forest or Soopsok Karaoke.

And you saw the text about "seeing the real demon."  He testified that he thought he would get beat like a demon if he didn't pay.  That's their testimony.  The victim's testimony in this case, what you just heard, is direct evidence.

What's also in your jury instructions is that you

93

determine the credibility of these witnesses.  But I submit they were -- they provided credible uncontroverted testimony that proves defendant's guilt in this case for all of these counts in this element.

But you do not have to rely solely on the victims' testimony in this case, as you know.  Far from it.  There are other victims and the defendant's own words and actions that prove this same element.

There are threats to others.  You've seen these texts, some of them multiple times.  There's a starting fee, 200-dollar association fee, 15th of every month, just like people testified.  Then bans, penalties.  Or you face the consequence.  You pick.  We all know what the consequence is:  "Banned for two weeks.  Ban.  And I come see you."

And we know what happens when the defendant comes to see you.

"Either I kick you out of K-Town, or you pay the fine."

"Can be the fool got socked by and got 26 stitches?"

"At Forest, I socked his bitch ass."

This is what happens to people who violate or don't pay.

And again, the defendant's extortion laid bare in his own words:  "You wanna get beat up, or do you want to

94

pay the penalty?  You need to pay the penalty because I don't want to punch you this time.  Pay me or get hurt."

Again, you saw him punch multiple people at Forest or Soopsok.  Here's him admitting it:  "And as I started hunting."

He is a hunter, a predator.  He's the one instilling fear, which is why these victims were paying him. These are his words about his scheme, about his extortion, about his crimes.

So you don't have to just take the victims' word for it.  You can take his own.  The crimes he's charged with here are the ones he's talking about in his text messages.

This is the defendant admitting and proving his own crimes to each and every one of you.  He's telling you what you know from the evidence in this case:  That he is guilty.

You also saw that he bragged -- not only bragged about his crimes, but he cultivates a reputation as a violent person and a violent gang member.

You heard from LAPD Officer Jacob Rice about his membership in the Grape Street Crips, as witnessed on his own social media.  A reputation cultivated by him, spread by him, and broadcast to the world by him.  You heard that this is the Jordan Downs housing project in Watts.  Ten Trey, a Grape Street Crips-related street, the hood day that they

all participated in, the defendant visiting the grave of prominent Grape Street Crip members and posting that on his social media.

You heard about his click, the Peda Roll Mafia, and the multiple hood days with multiple firearms that he posted to his social media.

There is no doubt that the defendant is a Grape Street Crip member.  And he didn't want there to be any doubt in the community.  That's how he continued to extort people.  Maybe they hadn't seen him beat a driver in a parking lot, but they for sure knew that he was violent and dangerous.  And he didn't want there to be any doubt, so much so, that he put it on his own body from head to toe.

And you saw and heard about all these tattoos, the bunch of grapes on the hockey mask, again, the Peda Roll Mafia click.  In the bottom, again the upside down Michael Jordan holding a firearm and the literal Grim Reaper, bearer of death, holding grapes on his leg. Again, more grapes.  And the defendant's moniker on his wrist.  D.K., as everyone knew him.  Except instead of a K, an assault rifle.  Just like the one found at his house, just like the one sitting on the table in front of you, just like the one in the hood day photos that we just saw.

Defendant's reputation as a gang member, as a Grape Street Crip was earned, and it was loud, as was his

96

reputation for violence.

By design, you saw the defendant would attack people in front of others in Koreatown, at places he wanted to extort, people he wanted to control.

This is in the Forest parking lot.  First, assaulting a driver.

*(The media was played.)*

Then you heard who was a waiter.

*(The media was played.)*

And then what appears to be a random customer.

*(The media was played.)*

And again, there's no response to this.  In the cross-examination questions of the witness who introduced this, you heard that it focused on why, that you didn't know -- the witness couldn't tell you why he was assaulting these people.

But there's no question about if.  This is the defendant in his own area, in his area of hunting, hunting down people.

And then again, something you've already seen at On and Off Karaoke.

*(The media was played.)*

Now, you've heard direct testimony that the figure in black is the defendant.  That he showed up out of nowhere, hoodie up, apparently carrying something in his

pocket.

He tells the van to leave.  They leave.  A figure in black leans out.  A gunshot.  And then the van slams on its brakes before driving away.

And you also know the outcome of that:  A passenger shot in the neck.  But there's corroborating evidence in this video you just saw that the defendant was the shooter.

*(The exhibit was displayed on the screen.)*

First, it appears the defendant is holding something in his pocket, even when he starts to take his hands out, still hanging low.  But the defendant also pulls his sleeves up so that he can open up the door without leaving a fingerprint on the van, every time he's touching the van door, ensuring that his fingerprints are not going to be there because he knows what he's about to do.  Again, he's making his preparations.  He's preying on his victims. He's hunting.

*(The exhibit was displayed on the screen.)*

And finally, at the end, you see the defendant's face.  And you also know what happens next.

*(The media was played.)*

You also heard testimony that the bar owner, I.D.K., was called by the defendant that night and asked about the security footage, which is similar to what K.Y.J.

testified:  That the defendant called him on a different occasion asking him to turn off his security cameras.

And finally, just like he showed you in that shooting at On and Off, defendant's reputation was not hypothetical.  It was real, and it was earned.  He had the ability to follow through, to follow through with this; his hunting gear; his own personal arsenal; masks he wore to commit acts of violence; bats he used to beat his victims; even a phone, hidden under the table, that he used to extort his victims.

This element is met as to each defendant -- victim and as to each count against the defendant.

For all of these, you have a victim tied to a count, all of whom testified here that those payments were born of and made out of fear.  They all testified that he was doing nothing for them.

*(The exhibit was displayed on the screen.)*

You then have his own words and his words to others, texts extorting others and bragging about his successful extortion here.

His reputation that he put out into the world, the one he covered his body with, his acts throughout Koreatown, and his ability to follow through with the arsenal in front of you.

This element is also met.  And he is guilty on all

55 counts of extortion.

Now moving to Count 56 which is attempted extortion.  These elements are actually simple:  Force or fear, obtained property intentionally, interstate commerce in a substantial step.

It's the same thing.  What makes this attempt rather than extortion is that it was Homeland Security's money.  This is the undercover operation that you heard about.  All of this still applies to S.S.  It was made out of fear.  It was just Homeland Security's money.  So the same fear we just went through applies to this count.

The defendant was eventually paid on Venmo through an intermediary, which you heard about, because he was spooked by the undercover cops that he saw and kept moving to locations.

The defendant accepted the money and had asked for the money multiple times, which you saw in texts.  And Venmo still applies, effecting interstate commerce.

The substantial step also is not at issue here because the entire thing was complete.  It just didn't count as a full extortion because it was Homeland Security's money.

So moving to Count 57.  This is the carjacking count.  And here are the elements.

Again, first, the defendant took a Honda Odyssey

van from Y.S.  The defendant did so by means of force and violence or intimidation; the Honda Odyssey had been transported or shipped or received in interstate commerce; that he did so by intending to cause death or serious bodily harm; and that Y.S. suffered a serious bodily injury.

Here they are, simplified.  Took the Odyssey by force, which was from out of state, intending to cause serious bodily harm, and that Y.S. was seriously injured.

Starting with that first element, we know that the defendant and his accomplice to took the Honda Odyssey from Y.S.

Y.S. testified, and he told you, he was 100 percent sure that it was him.  He saw his eyes.  He heard his voice.  He was the only person who wanted to hurt him or that he needed protection from or owed money to.

He told his partner, J.L., that night, who testified in front of you.  J.L. was on the phone and heard Y.S. yell out:  "I will pay.  I will pay."

And you heard that Y.S. didn't owe money to anyone else other than the defendant.

The defendant is also the person who had just told him on dashcam video that he needed his shit.  They had just stopped paying him, and that's who Y.S. was promising to pay as he was getting beaten with baseball bats.

Y.S. told J.L. that night, as I just said, and he

told police at least the next day.

And more importantly, there is just no one else that this crime makes sense for other than the defendant. Just like I've been saying throughout this argument, the defendant was hunting.  He felt like hunting tonight, and he would hunt his pray in Koreatown.

*(The media was played.)*

So on the video, when you see Y.S. pull in, you will almost immediately see the car doors open behind him from where the carjackers come from.

*(The media was played.)*

People have barely finished getting out of the car by the time the carjackers are pulling up.  When Y.S. pulled in, just a few months after he stopped paying the defendant and less than a month after the defendant threatened him on that dashcam footage, the defendant and his accomplice immediately get out of that car because they were lying in wait, not for a Lamborghini or a Maserati or something to steal, a minivan, a Honda Odyssey minivan that they abandoned that very same night.

No one else had the motive, the opportunity, or the reason to do this except the defendant.

You also heard that Y.S. testified he was wearing a mask that night and that they saw the defendant on social media, wearing that same mask, a mask that was found in his

house with the same hat and a bat, an aluminum or metal bat just like the ones Y.S. was beaten with.

*(The exhibit was displayed on the screen.)*

I just want to be very clear, very quickly, about the timeline here.

In February 2021, J.L. makes the final company payment to the defendant.

*(The media was played.)*

In April 2021, the defendant demands money from Y.S.  This is that dashcam footage that saw and Y.S. talked about.

Less than a month later, he's carjacked, and they closed their business, and J.L. flees the state.

If this was some random assault, you wouldn't take such drastic measures.  It was because they knew it was the defendant, and the defendant was hunting them.

First element of carjacking is met.

Taking the second and fourth elements together, the by force and intent to cause serious bodily harm, this is obvious as well.  All you have to do is watch the video.

*(The media was played.)*

The veracity, the force, blow after blow being levied on the victim after he's already out of the car, on the ground, throwing his hands up, trying to protect his head.

And his condition afterwards shows you the same thing.

*(The media was played.)*

This carjacking was by force and with the intent to cause serious bodily harm.  You don't beat someone with metal baseball bats unless you intend to cause serious bodily harm.

The third element is also very easily met.  You saw this in evidence.  The car that Y.S. had rented, the VIN number showed that the Honda had been manufactured and assembled in Alabama, that it had been sent to Riverside, and that he had rented it here, in California.

The third element is also met.

Which goes to the fifth element which, again, is related to what you just saw:  Y.S.' condition after he was beaten with those baseball bats.

You've seen these photos, and you've heard about his injuries from Y.S. himself; lacerations, bruises, cuts, a broken arm, that necessitated a full-body scan and two doses of the highest dose of the most potent and powerful pain medication that the hospital had.

The fifth element is also met.

Now, you've heard some questions in cross.  And you just heard from the judge about aiding and abetting.  So in cross, they seem to ask Y.S.: "Well, it wasn't the

defendant who took the vehicle, right?"

Which is true.  You can see on the camera that another man, still holding a baseball bat, comes back and takes the car.  And just as sure as Y.S. was that the defendant is the one who beat him, he said just as adamantly that the defendant was not the one who took the car.  That does nothing to absolve the defendant of guilt.

Under the jury instructions you just heard, he is just as liable for the carjacking count under multiple aiding and abetting theories.  Someone else committed the carjacking, and the defendant aided, abetted, counseled, commanded, induced, procured at least one element of that.

Again, he's the only one with motive here.  He was trying to stop people who were disobeying him, who weren't paying him from operating in the industry.  What better way to do that than to strike fear in someone and to take their vehicle.

The same in causing an act to be done.  If he puts in motion or causes the commission of an indispensable element, like pulling someone out of the car and beating them what the metal baseball bat, he's just as guilty.

I'm going to leave you with the most important things in this case:  The victims of defendant's reign of terror.

When you are deliberating in that room, think

about all the evidence.  I've only gone through a portion because there is a mountain of it that tells you the defendant is guilty.

But think about the victims.  And I want you to remember the words of multiple victims in this case, including the doumi, a word that you heard over and over and over again from defense.

There was insinuation about clients, about clothing, about age, about appearance.  But those insinuations made it seem like these were nameless, faceless young women who can be shot in the neck without consequence.

But they are not nameless.  They are not faceless. And even though you did not hear from them in this trial, they are not voiceless.

*(The media was played.)*

"Help."  That's what she asked for.

And regardless of what profession they are in or what they are doing, please compare on the left, before they encountered the defendant, and on the right, after.

*(The media was played.)*

On the left, just moments before encountering the defendant who had just appeared.

These are the consequences of the defendant's actions.  When he tells the victims over and over, Pay or see the consequences, these are what they are.

And again, remember her words when you're thinking about the evidence in this case.

*(The media was played.)*

"Help.  Help.  Please help."

Now, I want you to think about victims like Y.S., who was mercilessly beat with a baseball bat for ceasing his payments to the defendant.

*(The media was played.)*

And you've seen this many times now, Y.S. writhing in pain on the ground, only getting up after his car starts to back up as it's being stolen.

And this is what you heard defendant sarcastically call "the walking dead."

Y.S. was just beaten with baseball bats.  But that's the same attitude that you've seen from the defendant in his text messages and in his conduct.  For whatever reason, their pain is meaningless, something to brag about, something to mock, just like those defendant text messages in which he said:  "I found him.  I socked his ass.  Ha ha."

And so defense gets to speak with you next, and my colleague will address everything that they have to say.

But I want to take just a moment to address what they already have said.  In cross-examining these victims, it seems that they believe if you're here illegally, if you're undocumented, if you don't incorporate your

corporation properly in California, or if you're working in a gray market, well, you don't deserve the protection of the law; justice doesn't apply to you; you have no right to safety.

That's not what the law in this case says, which are the jury instructions that you'll have with you.  They don't say that anywhere.  It doesn't matter who the victims are.  What matters is who the defendant is and what his actions are.

With that in mind, I want to play this clip one more time from a different angle.  And remember Y.S.' words.  "I will pay.  I will pay."  He knows who is attacking him, and he knows why.  The defendant's violence and threats were incredibly effective throughout Koreatown.  And when you're deliberating, I want you to think about the victims, like Y.S., and his words, "I will pay."

"I will pay.  I will pay."

"Help.  Help.  Please help."

These are the words of the people that the defendant hunted and prayed upon for years in Koreatown.

They show not only the terror that he inflicted on the victims and the people of the community, but they prove his guilt in this case on all counts.

And we ask that you return a verdict, the only verdict that is consistent with the defendant's words, with

108

the victims' words, with the defendant's actions:  A verdict of guilty on all 57 counts.

THE COURT:  All right.  Let's go ahead and take a midday recess.  We're going to break for 40 minutes, and then we'll resume with closing arguments.

My instructions to you continue to apply.  Do not discuss the case with anyone whatsoever, in any way.  And don't form or express any opinion until it's given to you for deliberations.

All right.  We'll resume with closing arguments in 40 minutes.

Thank you.

THE CLERK:  All rise.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  All right.  We're in recess for 40 minutes.

*(Recess.)*

THE CLERK:  All rise.

*(The jurors entered the courtroom.)*

THE CLERK:  You may be seated.

All rise.  This United States District Court is once again in session.  Please be seated and come to order.

THE COURT:  All right.  We'll continue with closing argument.

Defense, would you like to make a closing argument?

MR. WERKSMAN:  Yes, Your Honor.

THE COURT:  All right.  You may.

MR. WERKSMAN:  Thank you, Your Honor.

*CLOSING ARGUMENT*

BY MR. WERKSMAN:

Counsel, ladies and gentlemen of the jury, good afternoon.

First, I'd like to thank you on behalf of myself, on behalf of my partner, Karen Sosa, and the defendant, Mr. Cho.  I'd like to thank you for your patience and attentiveness throughout this trial.  It's been a relatively short trial, only four calendar days, but they've been long days.  And it's not lost on us that every morning you've been here at 8:15; you've been paying scrupulous attention; you've been taking notes; you've been fully engaged.  And so for that, we thank you.

Now, before I discuss the facts and the law, I'd like to spend a moment talking about why you're all here, why you've given up time from your jobs, your lives, your families, your homes, to come downtown every morning at 8:15, to sit in judgment of a fellow citizen.

Now, the glib answer is you were subpoenaed, and

110

so you were compelled to report for jury duty.  But we all know that people who really don't want to serve somehow always find a way not to serve.  But you're different.  And by serving, you're fulfilling one of the greatest sacrifices we ask of our citizens, second only to military service.

You're here because, in some small part, you must agree that this is the best system of justice that's ever been developed by any civilized people.  This is a system that's devoted to the integrity and the liberty of the individual, not the state.  We don't come to court and have these trials so the state can prove people are guilty.  We come to court so that a defendant can have a fair shot at defending against the awesome power of the state.

This system exists to protect the individual and the liberty of the individual, which is why every defendant is presumed innocent.  That's why the government, at all times, has the burden of proof.  And that's why any verdict you reach must be unanimous.  It is in order to prevent the worst nightmare we can think of as a free people, that you might make a mistake and convict an innocent person of a crime he didn't do.

Now, in this case, the defendant has certain rights.  He as a right to a jury like you who will be patient, attentive, and will square the facts of the case against the law.

And what you owe him is not to reach any particular verdict that I might request or that they might request.  What you owe him is that when this process is over, that he knows you treated him fairly and you treated him justly.  And if you do so, you will find him not guilty of all 57 counts in this indictment.  And the reason is that the government has failed to prove its case beyond a reasonable.

Now, the instruction about reasonable doubt -- excuse me.

The instruction about reasonable doubt describes reasonable doubt basically as proof beyond a reasonable doubt.  It's proof that leaves you firmly convinced the defendant is guilty, firmly convinced.

It's evidence that's so stout, so firm, so convincing that you would rely upon that evidence to base the most important decisions in your own lives.

I ask you:  Would you base the most important decisions of your lives on the testimony of Mr. Shin? of Mr. Lee? of S.S.? of Mr. Kang?  Surely not.  Because their evidence, as purported -- as proffered to you from that witness stand, was muddled; it was evasive; and it was incomplete.

*(The exhibit was displayed on the screen.)*

Let me first start by showing you a text that came

112

in which was a text sent by Mr. Lee, the partner of Mr. Shin.

And it says: "Hello. WYA, D.K.? WYA, Bro?" Where you at, Bro? That's what this text means: Where are you at, Bro?

By the way, a text written by a man who testified through an interpreter.

"Where are you at, Bro? I want to meet you."

This text summarizes the essence of this case. These are bros. These are guys out on the street. These are guys who are running around Koreatown, picking up girls they solicited from Craigslist, taking them to clubs, where they party with drunken men until 2:00, 3:00, 4:00 in the morning. What a wholesome, savory business.

But in this business, these bro's out on the street, they had rules.

*(The exhibit was displayed on the screen.)*

You have this exhibit in evidence, and you can look at it when you go back in the jury room. The rules that Mr. Lee and Mr. Shin and, we can assume, the other doumi drivers exerted upon the women whom they exploited ruthlessly. Those rules require, among other things, a positive attitude. Okay. That's simple enough.

You must be punctual. Okay.

Then it admonishes the girls to: "Follow your

clients when they use the restroom or an ATM to prevent nonpayment."  Because after all, it's about money.  It's all about making sure the customers pay the girls, and the girls then pay the drivers.

Number 11:  "Please don't lie to your clients and us about money."  Money, money, money.  That's what makes this little world go 'round.  "Please don't lie to your clients and us about money.  We only charge $120 plus tips for the first two hours and 60 plus tips for every one-hour extension.  If you don't know how much to collect, please let us know immediately."

This is a hustle.  They're out on the street.  And why do they have these rules?  They had these rules because every night, they're running around with these young girls whom they solicit off Craigslist in an environment that's ripe for drug abuse, illicit sex, and every other form of street crime known to man.

The rules are comical.

But look at the very last one, Number 14:  "Should you violate any of our policies above, you will be removed and banned to work in our industry."

And where have we heard that before, about somebody getting "banned from the industry"?  Oh, the prosecutors are claiming that D.K. Cho would ban drivers.  But it's the drivers' stated written policy that they'd ban

114

the doumis, these poor girls, if they didn't give them a proper cut of the night's proceeds or if they did any of the things that are prohibited by rules 1 through 13.

So these drivers formed an association to bring a modicum of order to the jungle.  Now, in this pristine, august chamber in this United States district court, the prosecutors have attempted to sanitize what's going on there and make it feel like these are like taxi drivers, taking tourists to Disneyland, or they're like Uber eats drivers, delivering pizzas at 2:00 in the morning to hungry college students.

But, no.  Don't be fooled.  They're trying to put lipstick on a pig.  The prosecutor claims that the defense is insensitive to the plight of these poor girls.  But it's these drivers, their star witnesses, who put a target on these girls' backs and exposed them to the danger of the streets in this exploitative environment in which they all thrived and profited from the work of the girls.

Remember, the drivers only got paid if they could bring the girls to clubs, the girls could party till 3:00 doing, don't tell us what, and then bring us back our cash.  That's the business model out on the streets among "the bros."

Now, the question for you -- and by the way, the beautiful thing about a trial is you've had to listen to us

for -- I counted.  These are kind of short days in the sense that we're supposed to be let go at 2:30, but we're putting in six, seven hours a day in this courtroom, and you've listened to probably 20 hours of testimony.  But in another hour or so, when I'm done and when the prosecutor -- they get the last word because they have the burden of proof.  Remember that.  I get to tell you whatever I think the defense showed and argue to you our case.  But then they get the last word.

And the reason they get the last word is they have this awesome responsibility of proving guilt beyond a reasonable doubt.  So they get the last word.

But as soon as the case is submitted to you, then you take over, and you get to decide.  It's up to you to decide the facts in this case.  So you get to decide whether D.K. Cho's collection of money -- and by the way, it's a pittance.  Don't lose sight of the fact that we're talking about 100-dollar payments, $200.  These are very minor payments.  They're budget dust.  But the question is:  Was D.K. Cho collecting money, small amounts, in exchange for running a group chat on Kakao and running off the competition and keeping the drivers fully employed without letting other drivers come in and dilute their opportunity for profit, was that a protection racket?  Or was it a voluntary, if at times slightly chafing and unwelcome,

116

association of street rats who needed to band together to achieve their common goal of exploiting hardworking, sexy young women who earned a few hundred dollars of cash every night abasing themselves for the pleasure of karaoke bar patrons?  Figuring that out will be your task.

And the government didn't exactly make it easy by providing you with slivers of the truth, half lies, and some testimony that contained lots of words but told you nothing.

One great example is the testimony of Mr. Shin. He is the alleged victim in Counts 1 and 2.

*(The media was played.)*

The videos of Mr. Shin being beaten are really not very helpful.  In the video, you can clearly see Mr. Shin being savagely pummeled with baseball bats by two men.  Is one of them D.K. Cho?  I can't tell.  You won't be able to tell.  You'll be able to have this video back in the jury room, and you can watch it a hundred times.  You will not know whether D.K. Cho is one of the two men savagely assailing Mr. Shin with baseball bats.

You will have a clue.  You'll see that one of the assailants closest to the camera is wearing shorts, which is a great opportunity to look at the man's legs.

Now, what do we know from other independent evidence the prosecutors presented about Mr. Cho's legs? They're covered with tattoos.  I don't see any tattoos on

the legs of the man assailing Mr. Shin with a baseball bat. Do you?  That'll be up to you.

But, of course, even though we have this video, we still have to take Mr. Shin's word for it.  But what good is Mr. Shin's word?

As you recall, he testified, quite dramatically, that he beaten by Mr. Cho.  He said, "I knew it was Mr. Cho immediately.  I told my partner, Mr. Lee, it was Mr. Cho. And then I told the policeman it was Mr. Cho."

And then I asked him, as you may recall, "Well, didn't you tell the police something different when you first encountered LAPD officers at about 5:00 in the morning on May 8th, when you were assailed?"

And he denied it.  "No.  I've always consistently maintained every step of the way," Mr. Shin said.  "Every step of the way, I identified my assailant as D.K. Cho."

So that's why, this morning, we brought in Los Angeles Police Department Officer Natalie Morales.  And what did Natalie Morales tell us?  She told us that when she and her partner -- I believe it was an Officer Rodriguez -- when they reported to Good Samaritan Hospital at about 5:30 the morning on May 8th, 2021, to take a report from a man who claimed he'd been beaten with baseball bats, that he told the police -- Mr. Shin told the police -- he was beaten by two Black men.  That's right.  He was beaten by two Black

men.

Now, you'll notice something kind of interesting happened.  Natalie Morales is a -- is a young officer who has only been on the force now four years.  But at the time this happened, she was a rookie.

And when she was questioned by the prosecutors, I think she realized that, "Uh-oh, I think the testimony I gave help the defense.  Me think I have displeased the state.  Now this prosecutor is mad at me."

So when we asked her about the report she was referring to, she sustained her own objection and called it hearsay.  I've never seen that before in my life.  A witness declared a question of mine to ask for hearsay, made an objection, and granted her own objection.

But the cat was out of the bag.  You can render unto Caesar only so much before you have to come clean.  She gave us the facts as they are:  That this man, Mr. Shin, when he was attacked and confronted by the police, he did something despicable.  Either he lied to the police about who assailed him for some strange reason so as not to implicate Mr. Cho, which we can't really believe, or he falsely blamed the attack on two Black men.  That's great; isn't it?  What a horrible thing to do.

But the truth of the matter is, he was probably telling the truth.  He told us in his testimony one of the

two assailants was Black.  And he told the police they were both Black.  And then he changed his tune when he came here to this courtroom during the trial.

The problem for you, then, becomes:  What do you believe?  Can you believe him?

The judge has instructed you that the weight of the evidence as to a fact does not necessarily depend on the number of witnesses testify about it.  What's important is how believable the witnesses are.

If you decide that a witness has testified -- has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  You may choose not to believe anything that witness said.

There's an old expression in Latin that goes something like, "*Uno falso falso toto*," or something like, which means -- it's an old -- it's an old maxim that's quite true.  If somebody will lie about out one thing, they'll obviously lie about another thing and anything.  And you can't believe them.

So ladies and gentlemen, I submit to you that Mr. Shin has discredited himself and he's been impeached with a prior inconsistent statement, which shows that he's a liar.

Now, either way, I want to make sure you're clear

that the beating of Mr. Shin, whether it was by D.K. Cho or someone else, is not charged in the indictment. And that's going to be a challenge for you when you go back into the jury room and deliberate.

You heard a lot of evidence about things that are not in the indictment. As Your Honor gave you an instruction -- you'll get the instructions too -- reminding you, you're not to find this man guilty of things that are not charged against him. But it gets awfully confusing. And there's a reason for that. The prosecutors know how weak their case is, and so they -- with typical flair, they kind of overdid it, and they larded it up with a lot of stuff that's not in the indictment. It's not in the indictment that D.K. Cho beat Mr. Shin.

But what's interesting is the timing of it. Mr. Shin and Mr. Lee were roaming the streets, doing their doumi driving business. And they were apparently not afraid of D.K. Cho. Because in December or January -- December 2020, as you recall, or January 2021, Mr. Cho raised the association dues from $100 to $200; a petty amount for these guys that are running around all night, getting cash from these karaoke bar patrons.

And when he raised the rates, what do they do? They blew them off. They didn't pay him.

Then in April -- that's the -- on April 21st,

121

2021, Mr. Lee sends his cheeky text: "Hello. Where ya at, D.K.? Where ya at, Bro? I want to meet you. We need to meet." Is that the language of someone who's terrified? Is there an emoji on there showing him trembling with fear, that he's seeking an audience with His Holiness, D.K. Cho? No. This is street vernacular. "Dude, we've got to talk. It's been months; I haven't paid you a penny. I probably will never pay you another penny, but let's talk." That's not the language of someone who's afraid.

So now step back for a second. And what happens next? According to the government, on May 8th -- two and a half, three weeks after this text -- Mr. Shin is beaten savagely. Okay?

You have to take his word for it as to who beat him. His word is shady and shaky. But that's all they got. What's significant about that? Well, what's significant is, after the beating, Mr. Lee and Mr. Shin, they pack up shop and they split. And they're never heard from again on the streets of Koreatown.

Yet the indictment, charges Counts 1, 2, 3, and 4, there's two counts each against Mr. Cho for extorting through force, fear, and violence against Shin and Lee, two counts against each.

Look in the indictment. All those counts occurred well before May 8th, 2021. The government's theory is --

122

it's a conundrum for them.  They haven't quite been able to circle the circle or square the square with this.

If they didn't beat him until May and they stopped working after May, how do you know they were paying D.K. Cho through force or fear or violence prior to May 8th?  Prior to May 8th is when the charges are, in the indictment.  That was during the time period when they felt entitled to say, "Where you at, Dude?  Get over here.  Hey, Bro.  Let's talk," when they were not afraid.

According to the government, the beating was to make them afraid.  But they hadn't been beaten yet when Counts 1, 2, 3, and 4 occurred.  So which is it?  If they need to be beaten to cooperate with this protection racket, then you'd think that all the payments they made would have been subject to the fear induced by the beating.  But it's just the opposite.  They don't get beaten till after a long period of paying him and treating him as if he's a bro on the streets of K-Town.

Now, the carjacking.  The carjacking is another stretch by the government that is charged in the indictment.  Count 57 alleges that D.K. Cho carjacked Mr. Shin.  And if you look at the video, which you've already been shown in the government's argument, but I'm going to show it to you here --

*(The media was played.)*

-- watch what happens here in the upper -- upper part of the screen.  See -- here's the guy.  Watch what he does.  He's peaking around the corner, up there in the top of the screen.  He's peaking around the corner.  And then what happens?  Oh, okay.  Here comes the guy who's going to steal the car now.  Mr. Shin, of course, is lying prone on the ground, behind the vehicle.

Some guy who we know is not D.K. Cho now decides to steal the car, and he does.  Watch here how there's a beating by two men who Mr. Shin described his two Black men.  Then they disappear around the corner.

And then minutes go by.  And then some dude -- we don't know who he is.  He's not charged in this indictment.  Some dude comes back around the corner and steals a car.

Carjacking requires that the force and fear and violence be used to steal a car.  But what we have here is a guy getting beaten and then a guy stealing his car.  But it's not a carjacking.  Read the definition of carjacking.

Now, there's this concept of -- the carjacking instruction itself required that Mr. Cho did the carjacking.  He stole the Honda Odyssey by means of force and violence or intimidation.

But as you can see, the beating occurred before and separate from and apart from, in time and space, the actual stealing of the car.

Now, the government is going to revert to this aiding and abetting theory.  To aid and abet means to intentionally help someone else commit carjacking.

It's not enough that Mr. Cho merely associated with the person committing the crime or unknowingly or unintentionally did things that were helpful to that person or that he was just present at the scene of the crime.

The evidence must show beyond a reasonable doubt that Mr. Cho acted with the knowledge and intention of helping that person commit carjacking.

So I ask you:  Does D.K. Cho appear to have anything to do with the theft of that Honda Odyssey?  It doesn't appear that he has anything to do with it.  Some dude chose to steal Mr. Shin's car while Mr. Shin is writhing in pain on the -- on the ground, in the parking lot.

But it's not Mr. Cho.  And you have no evidence to suggest that Mr. Cho knew of, approved of, aided, abetted, counseled, procured, advised, or conspired with the car thief to take that car.  Given that fact alone, you must find Mr. Cho not guilty of Count 57.

Then we have the testimony of the other main victim in the case, alleged victim, and that's S.S.  S.S. is another street guy here illegally.

And by the way, let me address that because the

125

prosecution, in their argument, suggested that somehow the defense is dismissive of or contemptuous of these guys because of their citizenship status.  Not in the least.

Two of them describe themselves, in their own words, as illegal aliens.  They described themselves as illegal aliens.  They're not my words.  Theirs.

But what's significant about their immigration is we didn't bring it up in order to throttle them or to shame them.  This is a country of immigrants.  My family were immigrants.  That's not what it's about.

What it's about is -- because the government wants to say, "Look over here -- look over here.  These defense lawyers are cravenly and dismissive of these poor immigrants."

But you have to look over here, which is where the government gave them U visas.  Oh, now I see why there's relevance to immigration status:  Because these guys were all here illegally.  They came over and overstayed their student visas.  And they're working the streets, and they're not contributing to the betterment or enlightenment of society in what they do.  But nevertheless, they're out there, hustling away.  And then they find themselves government witnesses.  And they're told:  "If you cooperate with the United States Government, we will give you what's called a U visa."  And the U visa -- basically, it's a

126

pathway to citizenship for somebody who otherwise would be here illegally.

But there's a hitch. You have to cooperate with the government. And they tell you that if you don't tell the truth or you commit perjury, then you can lose your U visa.

Well, let me tell you something. And these guys acknowledged it themselves in their testimony. They know what side their bread is buttered on. They were working for "Team Government," and they know who holds the power to yank their U visa. It's these guys sitting right here.

Nobody has ever been accused of perjury in the history of this republic for testifying consistently with the government's theory of a case. So these witnesses had an inducement to lie because they were getting citizenship from lying for the government to help bolster the government's case. That's what's relevant about their citizenship status, not that they're here illegally.

But the government waived a magic wand called the U visa to get them to come to court and testify consistently with the government's theory, which is D.K. Cho's a thug; D.K. Cho's an extortionist; D.K. Cho's a blight on humanity.

And they did their job quite well. I'm sure they'll get to keep their U visas for their brilliant performance.

127

Now, there's Mr. Kang.  We call him Y.K.  Y.K. claimed that he only paid Mr. Cho his association dues because he was afraid of D.K. Cho.  But he acknowledged that he sought D.K. Cho's help numerous times, including to post with the group chat about some doumi named Lucinda.

And Mr. Yang writes:  "Got caught selling drugs" -- misspelled drugs -- "at recital.  Also, have lots of payment issues.  She just stay in the room without confirming with customers and end up charging them many times."

So this is a typical exchange.  This is shoptalk, ladies and gentlemen.  This is not some terrified victims paying homage to their master on the streets who wields a baton in order to heard them together.

These are guys in this group chat called Kakao, and they're having shoptalk, and they're sharing information, and they're relying on D.K. Cho to act as traffic control for their enterprise.

And here, Mr. Yang is very happy to take advantage of his access to Kakao and his access to the association to send a warning to the other drivers.  That's what this is, ladies and gentlemen.  This is life on the street among a bunch of hustlers.

Now, you'll notice too that Mr. Kang gave us another example of that slice and dice and look at it one

128

way, but don't look at it the other way, kind of testimony for the government when he testified about witnessing a man getting punched who was sitting in a car at one of the clubs.  You saw the video.  I won't play it again.  But you see -- actually, the prosecutor played it during his closing argument.  It's just a sock in the -- by Mr. Cho into a car.  And that was the testimony of Mr. Yang, who -- Kang, Y.K.  Mr. Kang testified that he witnessed D.K. Cho, in this video, punching a driver.

So I asked him, "Well, show us where you are in this video."

"You can't see me in the video."

"Well, where are you?"

He goes, "I'm way off here, to the right."

"Tell us where."

And he shows you.  In the video, he claims to be two cars over, behind a car, at a place where -- again, you're the jury.  Don't take my word for it.  Look at the video, and you decide whether Mr. Kang could see a thing from where he says he was.

I submit to you, it is preposterous on its face that he would dare assert to you, whether he's keeping his U visa by doing so or not, he tells you he witnessed an act that only the video camera witnessed, not him.  But he's trying to jump into the fray.  Be wary.  Be wary of somebody

who's trying a little too hard to help "Team Government" prevail in their case.  And that was Mr. Kang.

He also testified -- oh.  He also -- he did testify too that he has no idea who the driver was.  We know it's not S.S.  S.S. claims separately that he got punched.  But, suspiciously, there's no video of that.  You have a video of a guy getting punched in an act that's not in the indictment.

You have tons of video of stuff that's not in the indictment.  But what's in the indictment and we'd really like to know if S.S. really got punched by D.K. Cho, you have to take his word for it.  Sorry, no video there.  You've got to take his word for it; a guy who's basically angling for his U visa.  But we have a video of somebody being punched, and you have no idea why he's being punched.

Look, I'm not going to stand here and tell you that in that video, you're seeing the best of D.K. Cho.  It's a -- it's not a pleasant sight.  He's punching some guy.  Do you know why?  I don't know why.  Did the government tell you why?  They don't know why.

They want you to think that it's just part of his effort to instill fear in the community.  But do you have any idea what that driver said to Mr. Cho to inspire Mr. Cho to punch him or what private beef may be going on between those two men?  You don't know.

And therein lies the rub, ladies and gentlemen. It's not up to you to answer every question the government leaves unanswered.  It's not up to me.  I'm just a defense attorney trying to represent my client.  I don't have access to the vast resources of this awesome government of ours. They do.  At the drop of a hat, they bring in an army of agents and can marshal an enormous amount of evidence.  But they can't tell you why D.K. Cho hit a man seated in that car or who that man is or why he got hit or what's going on there.

They're going to ask you to make a leap, an assumption, speculate.  But you don't have to do that.  This is a place of truth, of facts.  This isn't a place where we can let our fantasies fly.  So I'll submit to you, you have no idea why this man got punched.  And you should place very little stock in it.

Now, another great example of the incompleteness, of the deception in these videos is the video of the shooting.  Again -- I read the indictment again this morning because I was wondering, Am I missing something?  They keep bringing up the shooting.  Is the shooting in the indictment?  It's not in the indictment.  Mr. Cho's not accused anywhere of shooting anybody.

It's another gratuitous video aimed at smearing him and making you think the worst of him without any real

proof of anything that he did.

So, for example -- I won't play them.  But you have them in evidence.  And the most glaring issue is there's about 80 to 90 seconds missing.  There's a gap between the two videos.

The first video shows the doumis getting out of the car, and then Mr. Cho goes and leans in and has a conversation with the -- here, I'll just show it.  It's easier for me to show it than to try to -- you shouldn't have to listen to me explaining it.  You'll see it for yourself.

*(The media was played.)*

Here come the doumi.  Let's go, doumi.  Go work hard.  These drivers need to get paid.  Get in there.

Okay.  Then you see Mr. Cho coming over, and he has a conversation with somebody inside the vehicle.  We're not told who.  I don't remember any witness testifying that he or she was in the car and spoke to D.K. Cho.

But we heard from the guy who calls himself R. or I.D.K. -- and I.D.K. in a case full of texts.  I.D.K. is significant because I.D.K., of course, is text speak for "I don't know."  But I.D.K. says this is what he saw.  And this is all you see.  You see D.K. Cho outside the vehicle.  And it ends at 52 minutes and two seconds.

*(The media was played.)*

And then the next video jumps -- whoops.

The next video jumps to -- I'll get this right.

The next video jumps to 53 and, like, 8 seconds, about 80 to 85 seconds later.  And then you see a shot fired, and the car goes into the parking garage.

What happened in 80 seconds?  Well, Mr. I.D.K. testified that he provided this video to the government. And what he did is, he got the surveillance cameras from his club.  But he said that the surveillance cameras are motion activated.  I saw lots of motion.

Again, this is up to you to decide.  You don't have to take his word for it.  Is it suspicious to you that with all this motion -- guys are running around, the car's moving; there's definitely motion; there's action; there's activity -- is it plausible to you that the camera then just shut itself off during the critical 80 seconds where if it were on -- if it were on, we would be able to see what did D.K. Cho do?  Did D.K. Cho walk off to the right?  Did he walk off to the left?  Did he go inside the club?  Did he walk down into the foreground, into the parking lot?

You don't know.  You're being asked to conclude in the second of two videos, which is 80 seconds after the first one ends, that, oh, you are to assume that it's D.K. Now he's moved from in front of the car, in the first video, to way down here, at the end of the parking lot, in the

second video, you're to assume that he magically transmogrified.  He moved himself magically to a spot many, many yards away, and from whence he allegedly fired a shot at the car.

There is video of it.  They just didn't give it to us.  They didn't show it.  They relied on I.D.K. to give them what he was willing to give them.  And what he gave them was just enough to look bad for D.K. Cho but not enough for us to know if D.K. Cho did the shooting.  That's perfectly -- that's perfectly good enough for them, though, because it allows the government to argue, "Well, of course he did the shooting.  That's D.K.  That animal.  That savage.  That hunter.  The hunter, hunting is prey with all of his gnarly weapons."

That's all they wanted.  This is just a -- this is just a way for them to make that argument.  But when it comes time to asking for the proof, show us -- you know, Missouri -- the license plates out of Missouri say, "We're the Show-Me state."  I never understood what that means in the context of a state.  But let's be the "Show-Me state" in this courtroom.  Show me.  Where is that 80 seconds?

Show us D.K. Cho leaving the car and walking down to the end of the parking lot and shooting into that van. Surely, that exists.  But you're being told it doesn't exist.  Again, the most important piece of evidence that

might crack this case wide open and conclusively prove one way or another whether D.K. Cho shot at that van, that's missing.  That, you don't get.

You get a bunch of other crap from which you're supposed to draw inferences and assumptions.  Ladies and gentlemen, don't be fooled.  Don't be fooled by this incomplete meal they're serving you and telling you you should be full.

Now, the bottom line in this case is that there's insufficient evidence of the allegations against Mr. Cho. And that brings us back to the fundamental basis of this case, the instructions, which is that if you find there to be reasonable doubt, you must find Mr. Cho not guilty.

If you can't be sure whether the witnesses are compromised, equivocating, evasive and deceitful, if you can't be sure whether the witnesses told you the truth or whether they shaded their testimony to please the government to keep their you U visas, that's reasonable doubt.

If you can't be sure whether D.K. Cho ran a protection racket or a cheap, hundred-dollar-a-month association to keep out competition and let the doumi drivers coordinate, engage in shoptalk that had mutual benefit to them, if you're not sure which it is, that's reasonable doubt.

If you think that the doumi drivers weren't afraid

of D.K. Cho, they were afraid of being banned from the business, they were afraid of competition from other drivers, they were afraid of other drivers, they were afraid of not getting paid, if you think they were more afraid of that than afraid of D.K. Cho, that's reasonable doubt.  On the basis of which not only can you, but must you find the defendant not guilty.

Thank you.

THE COURT:  All right.  Government, would you like to make a rebuttal closing argument?

MS. MacCABE:  Yes.  Thank you.

THE COURT:  You may.


*REBUTTAL ARGUMENT*

BY MS. MacCABE:

Defense counsel told you that the defendant is entitled to fair justice.  He is.  So are his victims.

The defense keeps trying to minimize the payments that these victims made month after month to the defendant because they were in small amounts.

These are monthly payments that he is extorting from many victims over years.  And before that, it was cash payments.  All for the defendant doing nothing.

For the gap in the video with the shooting, I.D.K. told you that there was not missing video.  His camera just,

unfortunately, didn't capture that small gap.

But his camera captured more than the defendant wanted it to. It captured him pulling down his sleeves so he wouldn't leave fingerprints on the car. It captured him turning his face so you could see half of it's visible.

The defendant called I.D.K. and asked him if his surveillance cameras were working that night. I.D.K. told you where the defendant walked off through and where the exit was to his parking.

The defense asserts that you could not see what happened in that gap. But the defense is not asserting that the defendant did not do it.

You heard from the five victims in this case who have extortion counts attached to them as well as the carjacking count. Each victim told you the same thing: They paid the defendant because they were afraid of him, because he threatened them, because he used force against them, and because he was violent.

You don't have to just take every single victim's word in this case. But you have their words. They heard things about the defendant, and you saw those things about the defendant.

They heard that he was in the Grape Street Crips, and you heard that he was in the Grape Street Crips.

They heard about and saw him with guns, and you

heard and saw the guns that were at the defendant's house when law enforcement searched it.

You even saw the many, many text messages of the defendant saying that he beat people, laughing about it. The victims saw him beating people.  They heard about him beating people.  They were even beat themselves.  And the defendant, in his own words in the text messages you've seen, admitted to all of that.

You also saw the videos in this case of things that the victims witnessed and experienced themselves.  You saw the carjacking videos.  You saw the angles of what happened.  You heard the testimony from Y.S. about what was happening on those videos.

You also heard from Y.K. about seeing the defendant at Soopsok or Forest karaoke multiple times; once with respect to hitting those individuals that you saw on camera and again later, with a firearm.

You also heard the defendant, in his own words, threatening Y.S. on Y.S.'s car camera.

I submit to you that all of those pieces of evidence corroborate what you already heard from each of the victims, which were all consistent with one another.

Defense argues that you can only convict the defendant if his victims texted him about all these things that he did to them.  But you saw the defendant text people

138

about it.  You don't need the victims texting him directly.

And with respect to the U visa, only one of the victims told you that he needed that U visa, and that victim would have that U visa revoked if he perjured himself.  But also, he received that certification after he had already reported the defendant to law enforcement.  S.S. had undergone that entire operation, that you heard phone calls that were recorded.  You also saw the text messages of the defendant extorting S.S. that night.  And he hadn't had the U visa certification at that point.

He came to law enforcement because he told you he was afraid.  The defendant had threatened to kill him and had punched him in the face.

And all the victims openly admitted their immigration status to you.  They weren't hiding it.  They told you that they either didn't have status in this country or they were seeking status through some other avenue.

And with the lengthy conversation during this case about the victim somehow been involved in drug trafficking or sex trafficking or something else, you saw no evidence of that.

You, in fact, saw the opposite.  Defense counsel showed you the rules.  You heard from the victims that they did not want these illegal and dangerous activities going on.

They were not -- as defense counsel put it -- putting a target on these, quote/unquote, "girls' backs." The defendant was putting a target on all of his victims and, in fact, by shooting at a car with a driver and hitting someone who is in that vehicle, putting a target on her as well.

And the prohibitions or bans listed in those rules had to do with illegal conduct that was dangerous versus what the defendant is charged with here, extorting these victims, banning them, prohibiting them from not paying him, and otherwise exacting revenge on them and erupting in violence at them.

But even if the victims were involved with any criminal activity, even though some of them are not here legally, some of them were working without work visas, that doesn't give the defendant the opportunity to just run right over them, extort them, hunt them down, beat them with baseball bats, point firearms in their faces, or otherwise display them at the karaoke bars, or even shoot at them.

That's not in your jury instructions. And, in fact, as the defendant treated the victims throughout his time extorting them for years, the defense just wants you to find them not worthy of safety. But they are.

For the carjacking, the defense is trying to get you to speculate about what Y.S. might have said to some

officer that night.  But the defense did not call the officer who responded to the intersection or even the officer who wrote the report.  Instead, you heard from a trainee who had no independent memory of the events whatsoever, as she told you.  She just read the report and told you what was in it.

But that statement could be construed so many ways.  As she said, two male Blacks, it didn't sound like that's something that Y.S. was going to report to the officers.  Rather, you saw -- you heard from Y.S. that one of the individuals was Black, and the other individual was the defendant.  And he may have reported that night that -- the individual was Korean or Asian.

The defendant, as you saw in his Instagram posts that the victims discussed, was wearing a black mask and beanie.  Perhaps the victim was describing what the assailants were wearing.  But we don't know because we didn't hear from an officer with independent memory of it.

And, in fact, even if Y.S. said that at one point, it would have been when he was under double the dose of the strongest pain medication that the hospital gives, after he had been rendered unconscious by metal baseball bats.

And to the defense's point about the video not showing tattoos on the defendant's legs, you heard that those tattoo photographs were taken three years after the

141

carjacking.  But on the video, it's clear that the defendant is wearing high socks.  The victim told you that he couldn't see the tattoos because he was holding his arm up to protect his head from getting beaten in with metal baseball bats.

And Y.S. and J.L. both told you who actually carjacked Y.S., and that's the evidence that you heard.  And all of that evidence points to the defendant.  There is no evidence that the assailant, who continued to beat Y.S. while he was on the ground, was anyone other than the defendant, as Y.S. was yelling, "I will pay you," repeatedly at him, and as the defendant was yelling, "Fuck him up," to his accomplice.

"Fuck him up" is something that you yell when you're in charge, when you are controlling the other person and helping them with one of the elements of carjacking, which is committing serious bodily injury.

And in addition, you know that it was the defendant because the assailants were lying in wait.  And Y.S., as he said, was 100 percent sure that it was the defendant; so much so, that he and his partner quit the industry afterwards.

And another reason that you know the defendant was committing the carjacking is because he ran from the surveillance footage.  He ran out of view of the camera, consistent with everything he tried to do with respect to

142

karaoke bar surveillance cameras:  Calling the operators, either the managers or the owners, to ask them if the surveillance cameras had been working, to demand that they be turned off.  And all of this to conceal his violence from law enforcement.

You know that these payments were for extortion.  You know they were not for some good or service, for the defendant providing some union or something for these victims to be involved in and get some sort of benefit from him.

You heard the defendant asking multiple victims, "Did you call cops?"  He's very concerned with law enforcement catching him.

You saw a text message where he talks about someone being a "snitch."  And throughout the operation, you saw text messages and on phone calls of the defendant telling S.S. to go somewhere else because he was worried about undercovers spotting him.

That is not some sort of service that he's providing to the victims.  This is him trying to hide his extortion from police.

Defense counsel asked you, "How do you know if the victims paid the defendant out of force, violence, or fear?"  Well, you know because the victims told you so.  And they told you all about the defendant's violent reputation in

Koreatown, one that he cultivated and one that he benefited from because that's how he kept this scheme of fear going for years.

All the victims told you that he did not provide them with goods or services for these payments.

And you heard that J.L.'s text messages to the defendant the night of the dash camera footage were because the defendant had just threatened his business partner, and they wanted to have police come and observe their next interaction with him so that they could catch him and finally put a stop to this.

Unfortunately, it took a few years for that to eventually happen, when S.S. was able to have law enforcement come surveil his interaction with the defendant.

And for the group message that Y.K. sent out about drugs, that is because, as he testified, he believed that the drug dealer was dangerous.  Nowhere in that text message did you see Y.K. asking the defendant for anything.

He told you, on the witness stand, that the defendant was using the group message to provide his one-sided rules and to tell all of the people in that group what to do.  But he wanted to share that information with his fellow drivers.  That does not somehow absolve the defendant from these extortion counts.

The defendant has been planning for this,

quote/unquote, "association" defense all along.  He wanted to hide behind the term "the association."

You heard, this morning, a text message where one of the individuals texted the defendant a screenshot of a conversation that he had with someone about what bars they could go to.  And he said that it depended on D.K. saying they are good to go.

The defendant responded, "Don't say 'D.K.'  Say 'association.'"

Like he tried to hide his phone, like he tried to hide his fingerprints, and like he tried to hide from all the surveillance cameras, the defendant wanted to hide behind some facade of some association.

But he can't hide anymore.  You've seen the truth.  And you know the defendant is guilty.  As defense counsel put it:  "Don't be fooled."  That's exactly right.  Do not be fooled.  The defendant is guilty of all 57 counts.

Thank you.

THE COURT:  All right.  That concludes the closing arguments by counsel.

I'm going to ask one of the court security officers to come up to take custody of the jury and ask my courtroom deputy to swear in the court security officer.

THE CLERK:  Yes, Your Honor.

Please state your name for the record.

145

THE SECURITY OFFICER:  Donald Ernest Kozakowski.

THE CLERK:  Thank you.

Do you solemnly swear to keep this jury together in some private and convenient place, that you will not permit any person to speak or communicate with them, nor do so yourself unless by order of the Court or to ask them whether they have agreed upon a verdict, and that you will return them into the court when they have so agreed or when ordered by the Court, so help you God?

THE SECURITY OFFICER:  I do.

THE CLERK:  Thank you.

THE COURT:  All right.  Ladies and gentlemen, please be patient.  We will get you the jury instructions on the law.  And the evidence has to be gathered and provided to you.  So we'll get all of that to you as soon as possible.  But in the meantime, go ahead and begin your deliberations in accordance with my instructions.

And we'll see you soon.

THE CLERK:  All rise.

You may take your notebooks.

*(The jurors exited the courtroom.)*

THE CLERK:  You may be seated.

THE COURT:  Counsel, please make sure you go through my courtroom deputy's exhibit list to make certain that there's agreement as to all of the exhibits that are in

146

evidence.  Absent an objection, I will assume that Ms. Freeman's exhibit list is accurate.

And obviously, provide her with contact information.  And make sure you're not too terribly far away in the event of a verdict or a question.  All right?

MR. WERKSMAN:  Your Honor, will the Court want to convene to excuse the jury for the day, or will you just let them go when they've reached some --

THE COURT:  Yeah, I will just let them go. Standard hours are 8:30 to 5:00 for jury deliberations.  So you can assume they'll be here until about 5:00 p.m., and then they'll be back in the morning by 8:30.

MR. WERKSMAN:  Very well.  Thank you.

THE COURT:  All right.  Thank you.

We're in recess.

*(Recess.)*

(At 2:08 p.m. proceedings were adjourned.)

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:   February 17, 2025


                                    /S/____WIL S. WILCOX_____

                                    U.S. COURT REPORTER
                                       CSR NO. 9178.